UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:19-CV-054-SPC-UAM


DR. NELAYDA FONTE, an
individual,

          Plaintiff,

-vs-

LEE MEMORIAL HEALTH SYSTEM,

          Defendant.
_____/



DEPOSITION OF DR. NELAYDA FONTE



Thursday, January 23, 2020
10:07 a.m. - 5:36 p.m.

U. S. Legal Support, Inc.
2180 West First Street, Suite 230
Fort Myers, Florida



Stenographically Reported By:
Jane Petersen, FPR
Florida Professional Reporter

Page 2

```
 1                    APPEARANCES
 2
 3   On behalf of the Plaintiff:
         YORMAK EMPLOYMENT AND DISABILITY LAW
 4       9990 Coconut Road
         Bonita Springs, FL 34135
 5       239.985.9691
         byormak@yormaklaw.com
 6   BY: BENJAMIN H. YORMAK, ESQUIRE
 7
     On behalf of the Defendant:
 8       CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
         100 North Tampa Street
 9       Suite 3350
         Tampa, FL 33602
10       813.223.7166
         alyons@constangy.com
11       tampa@constangy.com
     BY: ANGELIQUE GROZA LYONS, ESQUIRE
12
13
                        - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2               I N D E X
 3   DR. NELAYDA FONTE                          4
     DIRECT EXAMINATION                         4
     BY MS. LYONS:
 4   CERTIFICATE OF OATH                      218
     CERTIFICATE OF REPORTER                  219
 5   WITNESS NOTIFICATION LETTER              220
     Errata Sheet (to be forwarded upon execution)  221
 6
 7
 8
 9
10              E X H I B I T S
11   Exhibit No. 1, 10/30/19 Letter           25
     Exhibit No. 2, Test message              26
12   Exhibit No. 3, Interfacility Transfer    58
     Guidelines
13   Exhibit No. 4, On Call Requirements      64
     Exhibit No. 5, Written transcript        69
14   Exhibit No. 6, Attestation of Completion 89
     Exhibit No. 7, AHCA Summary of Deficiencies  93
15   Exhibit No. 8, Power Point Presentation 101
     Printout
16   Exhibit No. 9, Employee conference document  102
     Exhibit No. 10, Text message exchange   110
17   Exhibit No. 11, Performance Improvement 112
     Planning Form
18   Exhibit No. 12, Written transcript      127
     Exhibit No. 13, Text messages           152
19   Exhibit No. 14, Text messages           154
     Exhibit No. 15, Text messages           156
20   Exhibit No. 16, Text messages           160
     Exhibit No. 17, Psychiatric Assessment  162
21   Exhibit No. 18, Psychiatric Assessment  166
     Exhibit No. 19, Text messages           191
22   Exhibit No. 20, Text messages           193
     Exhibit No. 21, Text messages           194
     Exhibit No. 22, Text messages           197
23   Exhibit No. 23, Termination letter      213
     Exhibit No. 24, Employment Agreement    214
24   Exhibit No. 25, Amendment to Employment 215
     Agreement
25
```

Page 4

```
 1           Deposition taken before Jane Petersen, Florida
 2   Professional Reporter, and Notary Public in and for the
 3   State of Florida at Large in the above cause.
 4                        *****
 5           THE COURT REPORTER:  Do you swear or affirm the
 6       testimony you are about to give will be the truth,
 7       the whole truth, and nothing but the truth?
 8       THE WITNESS:  I do.
 9   Thereupon,
10               DR. NELAYDA FONTE,
11   having been first duly sworn or affirmed, was examined and
12   testified as follows:
13               DIRECT EXAMINATION
14   BY MS. LYONS:
15       Q.   Could you state your full name for record.
16       A.   It's Nelayda Fonte.
17       Q.   Could you spell your first name, please.
18       A.   N-E-L-A-Y-D-A.
19       Q.   Have you ever gone by any other name?
20       A.   No.
21       Q.   Dr. Fonte, we're here to take your deposition
22   in the lawsuit that you filed against Lee Health.  I'm
23   the attorney representing Lee Health and I'll be asking
24   you questions today.
25           Have you ever had a deposition taken before?
```

Page 5

```
 1       A.   Yes.
 2       Q.   You probably know the rules, but I'm going to
 3   go over them real quick just so that we're on the same
 4   page before we get started.
 5           We have a court reporter who's taking down
 6   everything that's said today, so for that reason I ask
 7   that you provide verbal responses to my questions, such
 8   as a yes or a no as opposed to merely nodding your head
 9   or saying uh-huh or huh-uh, because these don't come
10   across very clear in the written word.
11           I also ask that you speak loudly.  I know that
12   you're recovering from bronchitis, so if the court
13   reporter can't hear you, she'll just let you know and ask
14   you to repeat yourself.
15           I also ask that if I ask you a question at any
16   point during the day that you don't understand for any
17   reason, let me know.  I'm happy to rephrase the question
18   or repeat it.  I want to make sure you understand my
19   question before you provide the answer.
20           So can you agree that if you don't understand
21   my question, you will let me know?
22       A.   Yes.
23       Q.   Also, I will probably be taking your deposition
24   most of the day, so if for any reason you need a break,
25   I'm happy to take a break.  Just let me know and we can
```

Page 6

1  do that.  The only caveat is if I've asked a question,
2  you'll need to answer that specific question before we
3  can begin taking the break.
4          Do you have any questions before we get
5  started?
6  A.  No.
7  Q.  What is your date of birth?
8  A.  ████████, 1964.
9  Q.  Are you married?
10  A.  Yes.
11  Q.  How many times have you been married?
12  A.  Once.
13  Q.  What year were you married?
14  A.  1995.
15  Q.  Do you have any children?
16  A.  Two girls.
17  Q.  What are their ages?
18  A.  17 and 18.
19  Q.  When is the last time you gave a deposition?
20  A.  I don't recall exactly, but it will be a little
21  over two years at least.
22  Q.  Have the depositions you've given previously
23  been related to your services as a physician?
24  A.  Correct.
25  Q.  Approximately how many times, total, have you

Page 7

1  been deposed?
2  A.  Maybe 100 times.  I really couldn't even
3  quantify.  It's probably one of the more common things we
4  do as trauma surgeons with the cases that we take care
5  of.
6  Q.  You're a medical doctor, correct?
7  A.  I'm an osteopathic physician, yes, a DO.
8  Q.  Where did you attend medical school?
9  A.  It was the University of Medicine and Dentistry
10  in New Jersey, the School of Osteopathic Medicine.  It
11  has recently changed names, I believe -- I think two
12  years ago it changed to Rowan School of Osteopathic
13  Medicine, R-O-W-A-N.
14  Q.  What does osteopathic medicine mean?
15  A.  So there are two branches of fully licensed
16  physicians in the United States.  There's the allopathic
17  or MD branch, and there's the osteopathic branch.
18  Osteopathic came into existence in the 1890s with a
19  physician, an MD named Andrew Still.  Basically, in the
20  nutshell, his wife had gotten very, very ill, and using
21  their modalities of the time, the cathartics, the
22  leaches, that sort of thing, she was getting worse
23  instead of better, and he had an intensive study of the
24  human body at the time and kind of turned away from the
25  practice of medicine as it existed at the time and,

Page 8

1  therefore, created the separate branch that he called
2  osteopathic medicine.  Its basis is on the body
3  structures, what we call the rule of the artery, blood
4  and bones using manipulation to help to relieve some of
5  the symptoms of illnesses.
6          As it progressed, I think by the 1920s when
7  antibiotics and other medications that legitimately
8  helped patients, they incorporated that into the
9  practice, and so we are fully licensed clinicians, but we
10  do have training in what we call osteopathic manipulation
11  or, basically, using the body to help to relieve some of
12  the symptoms that have resulted from the illness.
13  Q.  What year did you graduate from the University
14  of Medicine and Dentistry of New Jersey?
15  A.  I graduated medical school in 1989.
16  Q.  Did you receive any training after your
17  graduation from medical school?
18  A.  Yes.  I did a surgical -- I did a rotating
19  internship followed by a surgical residency, followed
20  business a trauma critical care fellowship.
21  Q.  Where did you do your rotating internship?
22  A.  It was at Kennedy Memorial Hospital System in
23  South Jersey.
24  Q.  What year did you complete that program?
25  A.  The internship?

Page 9

1  Q.  Yes.
2  A.  In 1990.
3  Q.  Where did you do your surgical residency?
4  A.  Same place.  And I completed that in 1994.
5  Q.  And you said you did a trauma -- what was the
6  rest of that?
7  A.  Critical care.
8  Q.  And where did you do that at?
9  A.  That was at Cooper Hospital in Camden, New
10  Jersey.
11  Q.  What year did you complete that?
12  A.  That was in '95.
13  Q.  Are you board certified?
14  A.  I am.
15  Q.  What are you board certified in?
16  A.  General surgery.
17  Q.  Is it possible to be board certified as a
18  trauma surgeon?
19  A.  No.  There's no certification.  There's a
20  certificate of specialization that's provided after that
21  fellowship.
22  Q.  Are you required, as part of your board
23  certification, to complete continuing education
24  requirements?
25  A.  Yes, ma'am.

Page 10

1    Q.   What is that requirement?
2    A.   So that's recently changed.  The requirement
3  was, I believe, 90 CMEs, or continuing medical education
4  credits every three years.  It goes on a three-year
5  cycle.  I think they decreased it to 60, very recently,
6  like this year or the end of last year.  I don't recall.
7    Q.   What year did you become board certified in
8  general surgery?
9    A.   That was in 2000.
10   Q.   Since 2000 when you became board certified in
11 general surgery have you met your required continuing
12 education requirements?
13   A.   I've always exceeded it.
14   Q.   When did you begin working for Lee Health?
15   A.   1996.
16   Q.   In 1996 when you were hired, was that the first
17 position you'd held in Florida?
18   A.   Yes.  In Florida.
19   Q.   What were you hired to do when you were hired
20 in 1996 by Lee Health?
21   A.   To provide trauma and surgical critical care
22 coverage.
23   Q.   Your employment ended in January 2019, correct?
24   A.   Correct.
25   Q.   Since then have you been employed or received

Page 11

1  compensation for performing medical services?
2    A.   Not employed, but I am helping to cover
3  critical care at Lehigh Regional Medical Center, and that
4  started in December of '19.
5    Q.   What is your arrangement with Lehigh Regional
6  to help cover critical care?
7    A.   I am contracted, actually, with a medical group
8  called Innovative Health Care and they -- I get paid
9  through them, basically.  And I do four or five days of
10 coverage for their ICU a month.
11   Q.   Are you paid hourly?
12   A.   It's a 24-hour shift, so it's paid for the
13 24 hours of coverage.
14   Q.   What is the rate for the 24-hour shift?
15   A.   $1,800.
16   Q.   Are you paid as a 1099?
17   A.   Correct.
18   Q.   Between January 2019 and December 2019 did you
19 perform any other work for which you were paid?
20   A.   No.  I gave a -- ATLS is Advanced Trauma Life
21 Support and I'm an instructor.  I believe at the end of
22 June of 2019 I taught at an ATLS class at Tampa General,
23 and there's a remuneration for teaching for the day.  I
24 don't recall exactly how -- $500 maybe.
25   Q.   And you did that one time?

Page 12

1    A.   Correct.
2    Q.   What efforts have you made since January 2019
3  to find other work?
4    A.   So I reached out to some of the closer trauma
5  centers including Sarasota and Lakeland, speaking with
6  their directors of trauma in regards to availability or
7  job potentials.  Neither one of them was actively looking
8  or had open positions.  They certainly said that if
9  something came up, they had my CVs and they would call.
10        In addition to that, I also had reached out to
11 locum tenens organizations to see if they could be of
12 help in trying to find positions through locums, and
13 then, obviously, reaching out to Innovative Health Care
14 where that did provide a position at Lehigh for covering
15 their critical care.
16   Q.   When did you reach out to the trauma center in
17 Sarasota?
18   A.   Sarasota would have been -- I think that was in
19 July.
20   Q.   Of 2019?
21   A.   Correct.
22   Q.   And when did you reach out to Lakeland?
23   A.   Lakeland was in June of 2019.
24   Q.   Who did you speak with there?
25   A.   I'd have to refer to my phone for his name.

Page 13

1  Sobowale.  It's difficult to -- I couldn't spell it for
2  you.
3    Q.   Who did you reach out to at Sarasota?
4    A.   At Sarasota, again, I'd have to refer to my
5  phone for his name, but he -- he was the director at the
6  time.  I don't know if he still is, but he was the
7  director at the time of the trauma program.
8    Q.   Could you check for his name, please?
9    A.   Yes.  So it's Brockhurst,
10 B-R-S-O-C-K-H-U-R-S-T.  And if you want the spelling on
11 Dr. --
12   Q.   Sobowale.  Yes, please.
13   A.   Yeah.  S-O-B-O-W-A-L-E.
14   Q.   Thank you.
15   A.   Uh-huh.
16   Q.   What locum tenens organization did you reach
17 out to?
18   A.   I had spoken with Fusion, Hayes Locums.
19   Q.   Is that H-A-Y-S or H-A-Y-E-S?
20   A.   H-A-Y-E-S.
21        And I had kind of preliminary discussions with
22 Weatherby.
23   Q.   Any others?
24   A.   No.
25   Q.   When did you first reach out to Fusion?

Page 14

1     A.    Fusion, I think, was sometime in March of '19.
2     Q.    Who did you speak with there?
3     A.    There's a woman named Bre, B-R-E White.
4     Q.    Did they have any locum assignments that are
5  available?
6     A.    She initially was hoping to place me at -- I'm
7  trying to remember the name of the hospital.  Sorry.  I
8  can refer to my phone and give you the exact information.
9  I don't remember the name of the hospital, but it wasn't
10 too far.  It was, like, in Punta Gorda, Port Charlotte,
11 and they were looking, but they were not getting back to
12 her and finally she just said this looks like it's a dead
13 end; they're not being very responsive, so there was
14 never a contract signed.
15          It was her -- you know, my CV was presented to
16 them.  I believe they wound up filling the position with
17 a full timer and that's why they weren't getting back to
18 her, but I can't swear to that.  I think that was like
19 the rumor on the grapevine.
20    Q.    Were there any other positions that Fusion
21 was -- had available or knowledge of?
22    A.    I know she had asked me about something in
23 Tennessee.  I don't have a license in Tennessee, so my
24 comment to her was there are positions that look like
25 they would match my expertise; I'm certainly willing to

Page 15

1  license outside of the state.  Unfortunately, Bre wound
2  up leaving Fusion and so my application -- I guess my
3  file kind of wound up falling out.
4          I actually reached out to them again in --
5  would have been, like, October, November, thereabouts,
6  because I hadn't heard from them in a little bit, because
7  initially there was a lot of phone calls, and that's
8  where I found out that she had left the company.
9     Q.    And did they have anyone else there that you
10 worked with?
11    A.    There was another woman that I was supposed to
12 kind of be given to, but I haven't heard any job
13 potentials from her.  And again, that would have been end
14 of October, November '19.
15    Q.    What specifically were you looking for as far
16 as an assignment goes?
17    A.    Trauma or surgical critical care positions.
18    Q.    Did you have any geographic restrictions?
19    A.    Again, just based on I don't have a license
20 outside of New Jersey and Florida, but I told them that I
21 was willing to get licensed if there was a position
22 that -- that fit those criteria.
23    Q.    So would that be no, you didn't have any
24 geographic restrictions?
25    A.    Correct.

Page 16

1     Q.    When did you work with Hayes Locums?
2     A.    So Hayes, we actually went through the
3  credentialing process with them, so a full application
4  was made with them, and then when they were kind of
5  finalizing the credentialing process they said that --
6  I'm going to try to remember the wording on the e-mail.
7  That I was too high risk because of this case, and that
8  they would relook at my application once this case was
9  resolved.
10    Q.    And by this case, you mean the case you have
11 filed against Lee Health?
12    A.    Correct.
13    Q.    Who told you that?
14    A.    So the agent, I guess, at Locums was a last
15 name Prefontaine.
16    Q.    Is it a man or a woman?
17    A.    It was a man.  And basically, he said that
18 that's what their legal department had advised him, and
19 that he was sorry and he was as frustrated by it as I
20 was, but that was their recommendation -- their legal
21 department's recommendation.
22    Q.    When did those conversations take place?
23    A.    I want to say -- and I might be off by a month
24 or so, but I want to say that was maybe around August.
25    Q.    When you are looking for a locums assignment,

Page 17

1  do you have to go through credentialing?
2     A.    Yes.
3     Q.    Had you gone through credentialing with Fusion?
4     A.    No.
5     Q.    When did you speak to someone at Weatherby?
6     A.    So Weatherby had been reaching out to me fairly
7  regularly almost a year even before my contract had
8  terminated.  They kind of send out e-mails, generally, to
9  physicians saying if you're interested in locums, you
10 know, we can find something for you.  So after I was
11 terminated at the beginning of January, I reached out to
12 them.  I don't know if it was mid January, end of
13 January.  Thereabouts, mid to end of January.
14    Q.    Who did you speak with there?
15    A.    Again, I'd have to refer back to my phone,
16 because there's different people from Weatherby that have
17 reached out.  I can give you her name, but I'd have to
18 refer to my phone.
19    Q.    Go ahead.
20    A.    Sorry.  I'm horrible with names.  There was a
21 Kaitlin Owen, O-W-E-N.  There was also a Veronica Simons.
22    Q.    Did Weatherby have any positions that met your
23 criteria?
24    A.    No.  They -- they called a couple of times
25 again.  There were out-of-state positions that were

Page 18

1  filling up before -- because, again, I'm not licensed out
2  of the state, so they would ask me are you interested
3  in -- I think at one point there was a potential for
4  something in Georgia, but again, by the time they got to
5  me -- these positions fill up rather quickly, and
6  usually, there's someone that has a license in the state,
7  so they're able to get those positions quicker.  So I
8  never had a formal offer of a position from them.
9      Q.   Were you ever credentialed through them?
10     A.   No.
11     Q.   Did they have any positions in the State of
12 Florida --
13     A.   I --
14     Q.   -- that they told you about?
15     A.   No.
16     Q.   How long of a period -- when did you stop
17 communicating with Weatherby?
18     A.   Probably October of '19.
19     Q.   What is the process to get licensed in another
20 state?  I realize it varies state by state, but
21 generally?
22     A.   Yeah.  So generally, there's an application
23 that has to be placed with the Board of Medicine for the
24 state, whatever the state is, and it basically goes
25 through -- similar to a credentialing process where they

Page 19

1  have to do the background check, and check your
2  credentials, medical school, your training, et cetera,
3  and then there's some variation from state to state, but
4  that's at least the common denominator for most states.
5      Q.   Since January 2019 have you placed an
6  application with the Board of Medicine of any other
7  state?
8      A.   No.
9      Q.   What is Innovative Health --
10     A.   Health Care.
11     Q.   -- Health Care?
12     A.   They're a -- a group that provides critical
13 care services.
14     Q.   Where are the -- where are they located?
15     A.   I believe they're based -- their office is in
16 Naples.
17     Q.   Do they provide these services on, like, a
18 temporary basis to fill in at hospitals or trauma centers
19 or is it a more permanent relationship?
20     A.   I believe it's a more permanent relationship
21 that the hospital would contract with them to provide
22 health care coverage at that institution.
23     Q.   Do you know if they provide health care
24 coverage at institutions outside of the State of Florida?
25     A.   I don't know that.

Page 20

1      Q.   Do you know if they have contracts with anyone
2  other than Lehigh?
3      A.   I don't know that.
4      Q.   Did they offer you the opportunity to perform
5  work anywhere other than Lehigh?
6      A.   No.
7      Q.   At one point when we were talking about -- I
8  think it was Weatherby, but one of the locum places, you
9  said, we were talking to them.  Were you working with
10 another doctor or physician to be placed as a -- like as
11 a group or as a duo?
12     A.   No.
13     Q.   During the period from January 2019 to today,
14 were there any other avenues you took to secure work of
15 any sort?
16     A.   So between --
17     Q.   January 2019 and today.
18     A.   I've talked to colleagues in trauma, again,
19 about potential openings or letting them know that I was
20 looking for a job.
21     Q.   Anything else?
22     A.   No.  I think the locums, the position in Lehigh
23 and talking to colleagues in Sarasota and Lakeland.
24     Q.   Other than your colleagues at Sarasota and
25 Lakeland, have you talked to any other colleagues?

Page 21

1      A.   Yes.  I talked to David Kaderis, who is a
2  trauma surgeon in Pensacola.
3      Q.   Could you spell his last name?
4      A.   K-A-D-E-R-I-S, I believe, Kaderis.
5      Q.   Anyone else?
6      A.   No.
7      Q.   Have you reached out to anyone else other than
8  people you've already told us about to discuss whether
9  they were aware of any openings or any way to assist you
10 in finding a position or an assignment?
11     A.   I believe I had a discussion with Dr. Goldberg,
12 Dean Goldberg.  He does trauma and general surgery in
13 Tampa.
14     Q.   Anyone else?
15     A.   To the best of my recollection, I think
16 that's -- that's it.
17     Q.   Are you currently looking for additional work
18 or are you going to continue just working the four or
19 five days of coverage a month with Lehigh Regional?
20     A.   No.  I am -- I do have ongoing efforts to find
21 positions with trauma locums and I am in the process of
22 negotiating a position with a local general surgery group
23 to help provide them with some coverage as well.
24     Q.   What ongoing efforts do you have to find locum
25 positions?

Page 22

1   A.   Well, like I said, I have an open file with
2   Fusion as well as Weatherby, so they reach out to me if
3   they think there's a position or an opportunity.
4        Q.   When is the last time you spoke to someone from
5   Fusion?
6        A.   Fusion, I think, like I said, was sometime in
7   October, November when Bre left and I had an introduction
8   to the lady that was taking over for Bre, but I haven't
9   heard from them since.
10       Q.   When is the last time you reached out to Fusion
11  or Weatherby or another similar organization?
12       A.   Again, that would have been October, November
13  of this past year.
14       Q.   Is there a reason you haven't reached out since
15  then?
16       A.   Well, I started the position with Innovative
17  Health Care and we started having discussions with this
18  local general surgery group, and I was hoping that that
19  would be enough.
20       Q.   You said, we started having discussions with
21  this local surgery group.  Who is the we?
22       A.   I guess I'm using the royal we.
23       Q.   Okay.
24       A.   I'm sorry.
25       Q.   That's okay.  I just have to check.

Page 23

1        A.   Yeah.
2        Q.   What is the local general surgery group?
3        A.   That is Healing Arts -- Surgical Healing Arts.
4   I can't remember.  I'm sorry.
5        Q.   That's okay.
6        A.   Surgical Healing Arts.  I just want to make
7   sure I had that right.
8        Q.   Where is that located?
9        A.   Here in Fort Myers.
10       Q.   When did you first begin speaking with them
11  about a position?
12       A.   That would have been probably about that same
13  time, October, November.
14       Q.   How did you come in contact with them?
15       A.   So they reached out to me.  They felt that my
16  skills as a -- an open belly surgeon in the community
17  were necessary, and they did not want to see me leave the
18  community.  Their practice is very different from
19  anything that I've done, because I'm not there -- they do
20  general and bariatric surgery, but they wanted to make
21  sure that, again, my skills were available in the
22  community to -- with open bellies.  As surgery has become
23  more minimally invasive, surgeons are becoming more
24  comfortable with the laparoscopy and the robot and not
25  too comfortable with actually open the abdomen, and

Page 24

1   that's my area of expertise, because of trauma, because
2   we only do open bellies, so we were looking at a position
3   where I could be available to them when they did have
4   open belly cases, and in exchange, they were going to try
5   to train me with some of the laparoscopy and robotics,
6   which is, at this point, not part of my surgical
7   expertise.
8        Q.   Where are you in the negotiation of a position?
9   Is there a contract been --
10       A.   Contract hasn't been signed.
11       Q.   Have they offered you a position?
12       A.   Yes.  They offered me the position.  We've gone
13  through touring, meeting all the partners, but I was
14  actually sick -- I had the flu, and then that developed
15  into bronchitis, and that has made it, part of the month,
16  difficult to get together, so we're looking at,
17  hopefully, within the next couple of weeks actually being
18  able to finalize the contract.
19       Q.   Will you be working a certain number of shifts,
20  performing a certain number of surgeries?  How is that
21  going to be structured?
22       A.   Right now I don't even know, because I haven't
23  got the contract in hand.  We're looking at it as a --
24  almost an as-needed position.  Again, my expertise is in
25  the open abdomen, with the added caveat that I'll help

Page 25

1   them with some rounds or office hours, that sort of
2   thing.  Again, I'm not a bariatric surgeon, so I don't --
3   I don't do the type of surgeries that they do at this
4   point.
5        Q.   What is the compensation that you're
6   considering?
7        A.   We really don't even know.  I had gotten an
8   e-mail from them, Moses Shieh, who's the -- basically,
9   the senior partner, owner of that group, and he kind of
10  gave me a breakdown of what their remuneration is, and at
11  this point, because of the fact that I really won't be
12  able to do their surgeries, I'm not trained to do their
13  surgeries, it would almost be as a first assist.  So the
14  numbers that they quoted were -- or the way he phrased it
15  was, at this point you'd be coming in almost like one of
16  our physician extenders, and that's about $40,000 a year
17  with the ability to, obviously, increase that after I've
18  had more training, and can do the procedures and bill for
19  those procedures as the primary surgeon.  Again, this is
20  a -- right now, kind of like a part-time as-needed
21  temporary position, because obviously, that's -- I cannot
22  pay most of my bills.
23       Q.   I'm going to hand you a document that we will
24  mark as Exhibit 1 to your deposition.
25       (Exhibit No. 1, 10/30/19 Letter was marked for

Page 26

1  identification.)
2  BY MS. LYONS:
3      Q.  If you could take a minute, look that over and
4  let me know when you're done, please.
5      A.  Okay.
6      Q.  Have you had a chance to review Exhibit 1?
7      A.  Yes, ma'am.
8      Q.  Is this a letter you received from Lehigh
9  Regional Medical Center informing you that your request
10 for an appointment to their medical staff was approved?
11     A.  That's correct.
12     Q.  The letter references that you'd have to go
13 through hospital orientation within 90 days of your
14 appointment.
15         Have you done that orientation?
16     A.  Yes, ma'am.
17     Q.  When did you do that?
18     A.  That would have been in November sometime.  I
19 don't remember the date.
20     Q.  I think you indicated you first started working
21 shifts in December; is that correct?
22     A.  That's correct.
23     Q.  I'm going to hand you a document that we are
24 going to mark as Exhibit 2 to your deposition.
25     (Exhibit No. 2, Test message was marked for

Page 27

1  identification.)
2  BY MS. LYONS:
3      Q.  If you could look that over and let me know
4  when you're done, please.
5          Have you had a chance to look over Exhibit 2?
6      A.  Yes.
7      Q.  Do you recognize this as a text message
8  exchange that you had?
9      A.  Yes.
10     Q.  Who is -- is it Ernst?
11     A.  Yes.
12     Q.  Who is Ernst?
13     A.  Ernst Vieux.
14     Q.  Could you spell the last name.
15     A.  V-I-E-U-X.
16     Q.  Vieux?
17     A.  Vieux.
18     Q.  I just want to make sure I'm saying it right.
19     A.  Dr. Vieux was one of the partners at Lee
20 Memorial trauma, as well as the past trauma director
21 prior to Dr. Diaz, who is the director currently.
22     Q.  Is he still at Lee Health?
23     A.  No.  He resigned in January of '19.
24     Q.  Did you reach out to him at some point after
25 your contract ended about finding a position?

Page 28

1      A.  Yes.
2      Q.  Did he advise you there's a huge trauma need;
3  critical care pays better?
4      A.  That's what the text says.
5      Q.  Is there a difference between trauma and
6  critical care?
7      A.  Yes.
8      Q.  When you were looking for a position, were you
9  looking for either?
10     A.  Correct.
11     Q.  Do you agree with his assessment that there's a
12 huge trauma need?
13     A.  There's a large trauma need.
14     Q.  Is that because there are few or there are
15 fewer trauma surgeons than there are positions?
16     A.  That's correct.
17     Q.  Do you know what Dr. Vieux is doing now?
18     A.  Locums.
19     Q.  Do you know where he's doing his -- do you know
20 if he's working through an organization to do his locums
21 or a company?
22     A.  I don't know that.  I think he is going through
23 a locums company, but I don't know which one.
24     Q.  Do you know where he's doing his locums at?
25     A.  I know of one position where he's covering

Page 29

1  neurocritical care and it's in the Dakotas.  I don't
2  remember if it's North or South Dakota.  There may be
3  another position as well, but I just don't recall.
4      Q.  Do you agree with his assessment that he put in
5  the text message to you that there were lots of jobs?
6      A.  So I don't agree, in part because one of the
7  issues with these trauma physicians is many of them have
8  converted to what's called an acute care service where
9  they provide trauma and acute care surgery.  Because I've
10 only been doing trauma for 25 years, I don't have the
11 current skills to provide standard of care in general
12 surgery, so that has limited my options with some of the
13 positions that have been brought up, because I cannot
14 cover the general surgery component of the requirements
15 that they're looking for.
16     Q.  So when you say that many places have converted
17 to trauma and acute care --
18     A.  Surgery.  Acute care surgery.
19     Q.  Acute care surgery.  Can you explain what acute
20 care surgery means?
21     A.  Yes.  So patients who come in through the
22 emergency room with perforated bowel, GI bleeding,
23 diverticulitis with perforation, incarcerated hernias; in
24 other words, they're not trauma patients, they would fall
25 under the general surgery umbrella, and again, I haven't

Page 30

1  done general surgery since my residency days, so
2  positions that have that combined trauma/acute care
3  surgery model would not fit my -- my skill set, and
4  that's what's kind of limited my options with finding
5  locums work.
6      Q.   So you're not capable of fixing a perforated
7  bowel?
8      A.   So I am totally capable of fixing a perforated
9  bowel, but much of the surgery is done laparoscopically
10 and I don't do laparoscopic work and haven't in over
11 25 years.
12          So when you're talking about fixing something,
13 I could fix just about anything with an open abdomen, but
14 that's not the standard of care in the community or
15 nationally.  Much of this is done laparoscopically.
16 Gallbladder surgery, appendicitis, those are being done
17 laparoscopically and are kind of the things that would
18 come in through the emergency room.  I can certainly take
19 care of it, again, with an open abdomen, but the standard
20 of care is laparoscopy and that's not something that I
21 can provide at this point.
22     Q.   The surgeries you'll be performing with
23 Surgical Healing Arts, would those be laparoscopically or
24 open belly?
25     A.   So they -- they do some open belly surgeries,

Page 31

1  which is why they were reaching out to me to help them
2  with those cases, and kind of the exchange is I'll be
3  scrubbing with them on the laparoscopic procedure so I
4  could learn it.  Basically, I'm trying to learn -- get a
5  skill set that I don't have.
6      Q.   So just to make sure I understand what you're
7  saying, you essentially agree that there's lots of jobs,
8  but many of those jobs you have to be able to do trauma
9  and acute care surgery?
10     A.   Correct.
11     Q.   Which means laparoscopic surgery?
12     A.   A large part of it.  Yeah.
13     Q.   So in the e-mail from Dr. Vieux where he said
14 there is a huge trauma need, critical care pays better,
15 what is the difference between trauma and critical care?
16     A.   So trauma surgery is the evaluating of a trauma
17 patient; taking them to the operating room, if necessary;
18 coordinating care of that patient with consultants, if
19 you need a neurosurgeon, an orthopedic surgeon,
20 et cetera.  The critical care component is actually the
21 management of that patient while they're in the intensive
22 care unit.
23     Q.   When you stated earlier that many places had
24 converted to trauma and acute care surgery, is it your
25 understanding that those places only hire physicians or

Page 32

1  contract with physicians who can do both trauma and acute
2  care surgery?
3      A.   They would have to, or come up with a backup
4  system where -- in my -- for example, with me.  If I were
5  to get contracted in a program that has the trauma/acute
6  care surgery model, they would have to provide a backup
7  surgeon so that if a case -- a general surgery case came
8  in, that's -- I could refer to them to provide the care
9  for that patient if it fell outside of the realm of my
10 expertise.  Again, if the case required opening the belly
11 and taking care of whatever was happening, I could do
12 that, but again, for example, with an appendectomy or a
13 cholecystectomy, a gallbladder surgery, the standard of
14 care is laparoscopic.  Hernias is the same, laparoscopic.
15 So I could provide the surgery, open, but that would fall
16 outside of the realm of the standard of care that's
17 provided, basically, nationally for those patients, so
18 that would not be in the patient's best interest.
19     Q.   Does Dr. Vieux do laparoscopic surgery?
20     A.   He had been in a model similar to the acute
21 care surgery program before he joined us, so he had been
22 doing general surgery and laparoscopy up until the time
23 that he joined us for trauma.
24     Q.   When was that?
25     A.   I'm going to say 11 years ago, thereabouts.

Page 33

1      Q.   So he hadn't done it for 11 years?
2      A.   Correct.
3      Q.   And is he currently now doing it?
4      A.   I don't know.
5      Q.   You never asked him?
6      A.   No.  I know he's doing the critical care
7  position in the Dakotas, but that's critical care; that's
8  not surgery.  I don't know if he's doing another job
9  somewhere else doing something different.
10     Q.   In your opinion, what is the percentage of
11 facilities that have switched to or are currently using
12 the trauma and acute care surgery model versus just the
13 trauma model?
14     A.   So I wouldn't be able to give you a percentage,
15 but more than half, for sure, have gone to the acute care
16 surgery model/trauma.  I just couldn't tell you if it's
17 60 percent, 70 percent at that point.
18          I know most of the physicians that we had
19 talked about with the locums, and the reason it was
20 harder to find positions was because I had to give the
21 disclosure of I don't do general surgery.
22     Q.   Did you and Dr. Vieux attempt to secure any
23 contracts or positions where you would both work at the
24 same facility?
25     A.   Yes.  We had talked about sharing a position as

Page 34

1  a means of trying to get a job, basically.  I do recall
2  the name of the facility that Fusion was trying to place
3  me at, and that was Blake Hospital.  I had mentioned it
4  was Punta Gorda or --
5       Q.   Yes.
6       A.   And at one point they were looking for filling.
7  I think it was, like, 14 -- 14 days a month or -- they
8  were basically looking for a full-time position.  And we
9  had talked about the possibility of sharing that
10 position, but again, they just never got back.  I think
11 they actually wound up hiring somebody for the full time
12 and they never --
13      Q.   And what was that position doing -- to do?
14      A.   That was for trauma and critical care.
15      Q.   Why would you need to share it with Dr. Vieux?
16      A.   That's a full-time position and too far to
17 travel from here.
18      Q.   Where did you say it was?  I'm sorry.
19      A.   It's either Port -- I can look it up and tell
20 you exactly where they are.  It would be an
21 hour-and-a-half to two-hour drive, I think.
22      Q.   That's good enough.  I can look it up.  Don't
23 worry about it.
24      A.   And he lives in St. Petersburg, so it would
25 kind of be the same thing.  It's too -- it's too far to

Page 35

1  do -- to commute on a regular basis.  But to do it
2  through locums where you can go for four or five days and
3  then go home, basically, then it would be doable.
4           Actually, I think it's closer to Bradenton, if
5  I recall.  But again --
6       Q.   Any other positions that you can recall having
7  discussions with either the facility directly, through a
8  locum organization, whatever, any places, about
9  performing services for them?  We've talked about Blake;
10 we've talked about a place in Georgia.
11      A.   They had -- again, I don't know the -- the
12 hospitals, because typically, when the locums agent
13 reaches out, they don't give you the name of the
14 facility; they'll just kind of give you a broad, there's
15 a position in Tennessee, for example, that's looking for
16 five nights of coverage at such and such a rate and it
17 would be for critical care, for example.  So you never
18 have, like, the name of a facility.
19      Q.   Right.  Were there any others that were
20 generally described to you?  You've described one in
21 Tennessee and one in Georgia, I think.
22      A.   Yeah.  And then -- well, obviously, Blake --
23      Q.   And Blake.
24      A.   -- was one of the ones that they had reached
25 out about.  Those are the only ones that actually

Page 36

1  generated a discussion.
2       Q.   Are there any others that they told you about
3  that didn't lead to a discussion for whatever reason?
4       A.   Yeah.  Usually it would be a, there's a
5  position, but its acute care surgery model, so I can't do
6  that one, so I couldn't pursue it, so it wouldn't
7  generate further discussion from then on.
8       Q.   How many times did they reach out to you about
9  a position that was in the acute care surgery model and
10 you had to advise you were not qualified for it?
11      A.   Maybe three or four times.
12      Q.   How many times did one of the locums agencies
13 reach out to you about a position either in trauma or
14 critical care and describe the position to you, even if
15 you don't remember the details of what they described?
16      A.   Other than the ones I already mentioned, I
17 think the Tennessee and Georgia, I think those are the
18 ones that we actually kind of had a discussion about.
19 And Blake.
20      Q.   So in a ten-month period there were only three
21 trauma critical care positions that were discussed with
22 you?
23      A.   Correct.
24      Q.   And there were only three or four acute care
25 surgery positions?

Page 37

1       A.   So I think those were automatically kind of
2  taken off, because I don't fit that criteria.  So like in
3  a discussion about Tennessee, they could have mentioned,
4  you know, there's this other position, but that involves
5  acute care.  Okay.  I don't do acute care, so fine, move
6  on.  Is there something else?
7           But so far as having conversations about actual
8  positions that I could fit, those are the three major
9  ones -- or those are the ones that come to mind, so I
10 guess those are the ones that kind of had some serious
11 follow-up.
12      Q.   You may have said this and if so, I apologize.
13 When do you expect to have the contract finalized with
14 the --
15      A.   Healing Arts.
16      Q.   -- surgical -- is it Surgical Healing Arts?
17      A.   Surgical Healing Arts.
18           We're hoping in the next couple weeks.
19      Q.   Where would you perform those surgeries?
20      A.   That would be at Lee Memorial Hospital and Gulf
21 Coast Medical Center, I believe, are the two facilities.
22 I think they do work at HealthPark as well.  So it will
23 be wherever -- wherever they need me.
24      Q.   You stated earlier that you first began working
25 for Lee Health in 1996.

Page 38

1        Was that as an employee or were you contracted
2   through a medical group?
3        A.   An employed position.
4        Q.   At some point did that change?
5        A.   No.  That's an employed position.
6        Q.   During the time that you've worked with Lee
7   Health, what facility did you work at?
8        A.   Trauma center is at the downtown facility in
9   Lee Memorial Hospital.
10       Q.   And that's a Level 2 trauma center?
11       A.   Correct.
12       Q.   What does that mean?
13       A.   So there's different levels of trauma
14   certification.  Level 1 would be a facility that is
15   associated with a medical school, has residents, does --
16   participates in research.  A Level 2 has -- does not have
17   the residents, the teaching component of academic
18   position and research, and then there's level threes,
19   level fours and level fives.  They kind of get
20   categorized with what their categories are for providing
21   trauma care.
22       Q.   Who or what certifies a facility as a trauma
23   center?
24       A.   That comes down from the state.
25       Q.   Are there state guidelines and requirements

Page 39

1   that must be met in order to reach the certification?
2        A.   Yes.  And it's an ongoing process.  I believe
3   every three years they come and do site visits for
4   recertification to make sure that you're maintaining the
5   standards.
6        Q.   Are there also federal standards as it would
7   relate to reimbursement for trauma services that must be
8   met?
9        A.   I honestly don't know.  There certainly are
10   state requirements and means of providing finances and
11   remuneration.
12       Q.   Are there any agencies that provide -- I don't
13   know what the word would be.  Where they certify that a
14   facility has met their standards to be, you know, like a
15   trauma center or anything like that?
16       A.   There is.  So -- I'm not sure I'll be able to
17   answer that accurately.  CMS reviews, the committee of
18   trauma reviews, but I'm not sure who the actual -- I
19   don't want to misspeak, so I'm going to defer on that.
20       Q.   Are there certain -- certain criteria
21   established by the state for what constitutes a trauma?
22       A.   Yes.
23       Q.   Do those apply to all trauma -- certified
24   trauma centers in the state?
25       A.   Correct.

Page 40

1        Q.   If an emergency call for EMT or medical
2   services is received and the patient has the -- meets the
3   criteria for what qualifies as a trauma, does that
4   patient then go to Lee Memorial Hospital?
5        A.   If it's in our catchment area, then yeah.
6        Q.   What is that area?
7        A.   So Lee Memorial covers Lee County, Collier
8   County, Charlotte, Glades and Hendry Counties.
9        Q.   So then just to make sure the record is clear,
10   if a emergency call comes in and it's determined by the
11   first responders that that patient meets the criteria for
12   what qualifies as trauma and is located in Lee, Collier,
13   Charlotte, Glades or Hendry County, that patient is
14   transported to Lee Memorial Hospital?
15       A.   Correct.
16       Q.   To the trauma center?
17       A.   Correct.
18       Q.   In that situation where the first responder
19   determines that the patient meets the criteria for what
20   qualifies as trauma in one of those counties, can Lee
21   Memorial Hospital refuse to accept the patient, the
22   trauma patient?
23       A.   From EMS, no.
24       Q.   Is the EMS worker the person who determines
25   whether the individual meets the criteria for what

Page 41

1   qualifies as a trauma in the field?
2        A.   Yes.  It would be the first responder would
3   determine the level of injury and therefore, whether or
4   not the patient met trauma alert criteria.
5        Q.   Does it ever happen that the first responder
6   makes the determination that the patient meets level
7   trauma alert criteria and then when the patient gets
8   there it's determined that the patient truly didn't meet
9   that criteria?
10       A.   Yes.  Often.
11       Q.   And when that happens and the patient shows up
12   at Lee Memorial Hospital being transported by the EMS,
13   does Lee Memorial Hospital still have to accept that
14   patient or could you send them off?
15       A.   No.  Once the patient arrives at our door, it's
16   our patient, so even if it didn't meet criteria, once the
17   patient's evaluated, we still provide care for that
18   patient.
19       Q.   Does a trauma center have to have a -- have to
20   have certain equipment and supplies readily available to
21   treat a trauma?
22       A.   Yes.
23       Q.   Does a trauma center have to have a trauma room
24   designated and equipped with those -- with those -- with
25   that equipment and supplies?

Page 42

1    MR. YORMAK:  Object to the form.  If you can
2  follow it.
3    MS. LYONS:  You can object to the grammar.  I'm
4  not sure the form is objectionable.  Let me try it
5  again.
6  BY MS. LYONS:
7    Q.   Does a trauma center have to have specially
8  equipped trauma rooms?
9    A.   Yes.
10   Q.   Does a trauma center also have to have a trauma
11 surgeon available 24/7 to provide care to a trauma
12 patient?
13   A.   Yes.
14   Q.   You said earlier that a trauma open -- you said
15 earlier that open belly is your area of expertise,
16 because with traumas, you only do open belly.
17   A.   Correct.
18   Q.   That may be simplified just a tad bit, but I
19 understand that to mean that if a patient comes in and is
20 a trauma patient, meeting the criteria for trauma patient
21 and you suspect that -- well, you explain it to me.
22 You'll probably do a better job than I will of what that
23 means.
24        Why does a trauma surgeon only do open belly?
25   A.   Right.  So trauma patients typically come in

Page 43

1  after a major injury.  So for example, if you step off
2  the sidewalk and twist your ankle, that's somebody who's
3  going to be seen in the emergency room, but doesn't
4  necessarily require trauma services.  Patients usually
5  have to have what we call multisystem injuries, or
6  penetrating wound to the head, neck, chest, belly, that
7  sort of thing.  With the trauma patient coming in, if we
8  see that they have, either through ultrasound or CAT
9  scan, what we call fluid in the abdomen, it's typically
10 what we refer to as hemoperitoneum or blood in the
11 abdomen.  So with the trauma patients, if they're
12 unstable or you identify a hemoperitoneum or a
13 pneumoperitoneum or air inside the abdomen, you need to
14 do a very quick and thorough evaluation of all of the
15 organs in the abdominal cavity, and that is very
16 difficult to do with a camera, because if there's blood
17 in the abdomen, you would basically get blood on your
18 camera; you wouldn't be able to see.
19        In addition to which the whole setup of
20 laparoscopy requires time, whereas the scalpel to open
21 the abdomen requires seconds, less than a minute.  So
22 with the trauma patient, when there's need to operate in
23 the abdomen, you're doing what's called an exploratory
24 laparotomy, and that is an opening of the abdomen so that
25 you can assess all of the organs at the same time.

Page 44

1    Q.   You explained it better than I did.  I'm just
2  going to admit that right now.
3    MR. YORMAK:  You're a juris doctor, I believe.
4    MS. LYONS:  It's not the same type of doctor.
5    MR. YORMAK:  It's a little different.
6    If I collapse here, I know who I'm calling.
7  BY MS. LYONS:
8    Q.   I think you said that if the patient's not
9  stable.  What does that mean, stable, as you use it?
10   A.   So hemodynamic stability for trauma alerts or
11 for trauma patients is considered a blood pressure less
12 than 90 systolic or a sustained heart rate greater than
13 120.  So a patient that looks like they have injuries
14 consistent with possible ongoing bleeding, that would
15 make them hemodynamically unstable.
16   Q.   So I'm going to try and put that in words that
17 I can understand.
18        If a trauma patient comes in and they are
19 hemodynamically unstable, meaning their systolic pressure
20 is less than 90 or they have a sustained heart rate
21 greater than 120, then that is alarming --
22   A.   Correct.
23   Q.   -- because they could be losing blood
24 somewhere?
25   A.   Correct.

Page 45

1    Q.   In that situation, a trauma surgeon such as
2  yourself would open up the abdomen and explore where the
3  blood loss is coming from?
4    A.   So that's one possibility.  There's multiple
5  reasons why a person could be losing blood.  Multiple
6  orthopedic injuries of large bones, like the femurs or
7  pelvic fractures can bleed a tremendous amount.  So to
8  put it in perspective, the body has five liters of blood.
9  You can lose two to three liters into your pelvis just
10 from broken bones.
11        So part of the job of the trauma surgeon is to
12 assess where the potential sites of blood are.  So an
13 exploratory laparotomy takes place if you have or
14 suspect -- have evidence or suspect that the bleeding is
15 intraabdominally.
16   Q.   If a patient is bleeding internally and you
17 have reason to believe that that's happening in the
18 abdominal cavity, and that's not treated, could that
19 cause the patient to die?  Could they lose so much blood
20 into their abdominal cavity that they would die?
21   A.   Patients can exsanguinate into the abdominal
22 cavity.  Yes.
23   Q.   So if a jury were ever to read this they would
24 say what's exsanguinate?
25   A.   Basically, to lose your blood volume.  To bleed

Page 46

1  out.
2      Q.   Is time of the essence when you suspect a
3  patient might -- when a patient is hemodynamically
4  unstable and you reasonably believe that the blood is in
5  the abdominal cavity?
6           Did you forget the beginning of my question?
7      A.   What was the question?
8      Q.   I know.  I'm sorry.
9           Is time of the essence if the patient is
10 hemodynamically unstable and you believe that the
11 bleeding is occurring in the abdominal cavity?
12     A.   Yes.  Absolutely.
13     Q.   Is there a period of time by which that needs
14 to be addressed, meaning is it known that in ten
15 minutes -- if you don't take care of it in ten minutes,
16 the patient will have lost too much blood volume, or does
17 that just depend on many factors, such as their size
18 and --
19     A.   Yeah.  That becomes multifactorial.  Overall,
20 we talk about the golden hour in trauma, and the golden
21 hour, basically, means from the time of the injury until
22 the time that you perform indicated interventions,
23 whatever is required for that patient's injuries.
24          The reason we talk about the golden hour is
25 there are three peaks in mortality in trauma patients.

Page 47

1  There's the patients whose injuries are so severe that
2  they basically die at the scene.  The second peak comes
3  in that -- that hour, and that would be from major
4  injuries, such as a -- a major exsanguination, a horrific
5  liver injury, for example, where if you don't intervene
6  in a timely fashion, a patient's going to die.
7           Another example for that would be a tension
8  pneumothorax where the lung's collapsed and you have
9  pressure builds up in their chest and it actually blocks
10 off blood return to the heart, and that patient can die
11 if that's not addressed in a timely fashion.
12          And then the third peak occurs later during
13 their hospital stay if they have severe head injuries or
14 multisystem organ failure, infection, et cetera.  So the
15 trauma centers focus on that golden hour where we could
16 make the -- the most difference in preventing morbidity
17 and mortality in the care of these severely injured
18 patients.
19     Q.   I want to circle back to something I had asked
20 you earlier.  You said that traumas in Lee, Collier,
21 Charlotte, Glades and Hendry County that are attended to
22 by first responders are brought to Lee Memorial Hospital.
23 I didn't ask this, so I want to make sure it's clear on
24 the record.  That means there is no other trauma center
25 in any of those counties, correct?

Page 48

1      A.   Correct.
2           MR. YORMAK:  Do you want to take a quick break,
3  Angelique?
4           MS. LYONS:  Sure.
5           MR. YORMAK:  We've been going for an hour and
6  40, so --
7           MS. LYONS:  Sure.  That's fine.
8      (Whereupon, a recess commenced at 11:40 a.m. and
9  concluded at 11:48 a.m.)
10 BY MS. LYONS:
11     Q.   When you worked at Lee Health, were you
12 credentialed --
13     A.   Yes.
14     Q.   -- to work there?
15          What were you credentialed to do?
16     A.   I was hired as a trauma and surgical critical
17 care physician.
18     Q.   So were you credentialed to do trauma and
19 critical care?
20     A.   Correct.
21     Q.   You mentioned earlier an organization called
22 ATLS or ALTS, one of the two.
23     A.   ATLS.
24     Q.   What is that organization?
25     A.   So that's not an organization; that's a course.

Page 49

1      Q.   A course?
2      A.   It's Advanced Trauma Life Support, and it
3  provides the algorithm for assessing and managing trauma
4  patients.
5      Q.   And you are an instructor in that course?
6      A.   Correct.
7      Q.   So are you certified as an instructor by them?
8      A.   Correct.
9      Q.   If an individual takes the ATLS course, are
10 they then certified by ATLS in trauma?
11     A.   No.  So the American College of Surgeons, ACS
12 is the one who sponsors this course, and so if you take
13 the course and pass the exam, there's a written and a
14 practical part to the exam, then you become ATLS
15 certified.
16     Q.   Are you ATLS certified?
17     A.   Yes, in addition to being ATLS instructor
18 certified.
19     Q.   So when I looked it up, the ATLS certified,
20 according, I guess, to the ACS, means that the individual
21 is certified for initial assessment and stabilization of
22 all injured patients -- of all injured trauma patients to
23 include special populations.  Would you agree with that?
24     A.   Yes.
25     Q.   So what is -- in that sense, what does

Page 50

1  stabilization mean?
2      A.   We talked about hemodynamic instability or
3  hemodynamic stability, and so stabilizing would be being
4  able to maintain a blood pressure greater than 90,
5  obviously, a heart rate, perhaps if the patient had
6  respiratory issues, for example, I mentioned pneumothorax
7  or the collapsed lung.  Addressing that, putting a tube
8  in to get that lung to reexpand.  So it's the
9  interventions necessary to provide hemodynamic stability
10 for that patient.
11     Q.   And that's something trauma surgeons are
12 equipped to do, to provide the interventions necessary to
13 provide hemodynamic stability to trauma patients?
14     A.   Correct.  That's one of the jobs.
15     Q.   In a regular emergency room, would the doctors
16 there be -- are they generally ATLS certified, based on
17 your experience?
18     A.   It varies by hospital and whatever their
19 requirements are, so I wouldn't be able to give you a
20 percentage of how many ERs have ATLS certified ER
21 physicians.
22          To be clear, ATLS is actually a course that is
23 meant for physicians that are not at a trauma center,
24 because again, the basis is being able to identify and
25 stabilize that the trauma injuries in the trauma patient.

Page 51

1  A trauma center would go beyond that to not just
2  identifying and stabilizing, but then provide
3  preventative care.
4      Q.   In addition to traumas coming to Lee Health
5  directly from EMS, they may also come to Lee Memorial
6  Hospital from -- as a transfer from another medical
7  facility --
8      A.   Correct.
9      Q.   -- within that county area, correct?
10     A.   Correct.
11     Q.   Generally, during the time that you worked at
12 Lee Memorial Hospital in the trauma department, did most
13 of the trauma patients come from EMS or did most come
14 from transfers from other facilities?
15     A.   EMS.
16     Q.   Are you able to assign a percentage as to how
17 many would be EMS versus how many would be transfers?
18 And don't feel like you have to.  I was just --
19          MR. YORMAK:  Object to the form.
20 BY MS. LYONS:
21     Q.   -- wondering if you can.
22     A.   Yeah.  A majority, a great majority comes from
23 EMS, but I couldn't assign a percentage.
24     Q.   When a medical facility wants to transfer a
25 patient to the Lee Memorial Hospital trauma center, the

Page 52

1  process to do so is to contact -- well, what is the
2  process to do so?
3      A.   We now have a transfer center, and so the
4  process is the outside facility would contact the
5  transfer center and then the transfer center triages the
6  call to whatever service the -- the patient in question
7  needs.
8      Q.   So if the patient in question needs trauma
9  service, then the transfer center would contact the
10 trauma department?
11     A.   Yeah.  Or the trauma surgeon on call.
12     Q.   And that transfer center is staffed by nurses;
13 is that correct?
14     A.   I don't know.  They may have nurses; they may
15 have EMS.  I don't know what the exact composition or job
16 requirement is.
17     Q.   When a patient is transferred to the trauma
18 center, what is the mode of transportation?  Do they come
19 by ambulance, by air?  That's probably the only two,
20 but --
21     A.   So typically, it depends on the distance, and
22 it's the sending facility -- the transfer centers arrange
23 that, so --
24     Q.   Is there a general rule of thumb if it's going
25 to take longer than so many minutes by road, then we send

Page 53

1  it by air?
2      A.   I'm sure there is, but I don't know what it is.
3      Q.   If a trauma is coming to Lee Memorial Health
4  from an outside facility, is it important that that
5  trauma patient arrive within that golden hour?
6      A.   If they're coming from another facility as a
7  transfer?
8      Q.   Right.
9      A.   That never happens.
10     Q.   Meaning by the time the trauma patient arrives
11 at Lee Health -- Lee Memorial Hospital when they were
12 transferred from an outside facility, it's been more than
13 an hour since the patient experienced the trauma?
14     A.   Correct.
15     Q.   Would it be preferable to get to the patient
16 within that first hour after experiencing the trauma?
17     A.   So again, we have the golden hour rule.  Any
18 patient that has been subjected to a serious traumatic
19 event, the rule of thumb is they should be going to the
20 trauma center within that hour so that we can provide
21 definitive care.  We have to find out what -- what
22 injury -- why they didn't come to the trauma center.  Was
23 it not recognized by EMS or were they -- so for instance,
24 someone who is pulseless or extremely unstable, that
25 won't make the transport, so if you're having CPR in

Page 54

1   progress, for example, that has to go to the closest
2   hospital until --
3       Q.   Even if it meets trauma criteria?
4       A.   Yeah.  You can't -- you have to be able to try
5   to have a live patient and if the patient is already
6   receiving CPR, then that, technically, is no signs of
7   life, so they would have to go to the closest facility to
8   try to resuscitate, and stabilize and then provide -- if
9   they could stabilize the patient, provide a transfer to
10  the trauma center.
11      Q.   This may seem like a silly question, but a
12  patient who is being transferred from another facility to
13  Lee Memorial Hospital's trauma center typically would
14  meet the criteria for a trauma patient when they arrive
15  at the outside facility; would that be true?  In other
16  words, they don't get to the outside facility and then
17  become a trauma patient; they were already meeting the
18  criteria and they just ended up, essentially, at the
19  wrong place for whatever reason?
20      A.   No.
21      Q.   Okay.
22      A.   So oftentimes, again, as we mentioned earlier,
23  EMS is the one who determines whether the patient meets
24  trauma alert criteria or not.
25      Q.   Right.

Page 55

1       A.   Sometimes they don't assess the patient or the
2   patient isn't showing signs of severe injury and they
3   will take that patient to whatever the closest hospital
4   is, and then once the patient is assessed, worked up
5   radiographically, et cetera, they may find injuries that
6   that facility cannot handle and then call for a transfer.
7       Q.   Right.  And in those situations, the patient
8   had those injuries; they just were not known at the time,
9   correct?
10      A.   At the time of the EMS evaluation.  Correct.
11      Q.   So it's not -- it would be atypical for someone
12  to arrive at an outside facility and suffer the trauma or
13  the injury in the hospital.  Like they came to the
14  hospital, typically, with the trauma or injury; it was a
15  either misdiagnosed or they were nonresponsive and had to
16  go to the closest facility, or maybe their neighbor
17  brought them in and didn't know it was a trauma; they
18  should have gone to Lee Health, something along those
19  lines; would that be true?
20      A.   I don't know that we can term it as
21  misdiagnosed.  So EMS does the best that they can at the
22  scene, but they obviously don't have access to x-rays,
23  ultrasound, CAT scans, so you can have a patient, for
24  example, with, let's say, a splenic injury, but they're
25  relatively young and are able to compensate for whatever

Page 56

1   bleeding is occurring internally, so their blood pressure
2   may be over 100, and even if they're a little
3   tachycardic, meaning your heart rate is a little fast,
4   maybe it's 110 because they're young, and healthy and
5   normally have a heart rate of 60.
6       Q.   Right.
7       A.   Okay?  So when EMS arrives at the scene and
8   they've got a patient who is hemodynamically stable,
9   blood pressure is okay and there's only minimal
10  tachycardia, they would take that patient to the closest
11  hospital.
12           During the workup, i.e., they do a CAT scan and
13  they identify a splenic injury and say they don't have a
14  general surgeon, they would then call for a transfer.  So
15  I wouldn't classify that as a misdiagnosis.  They're
16  making their assessment based on the patient's condition
17  at the time of their evaluation and then taking them to
18  what they think is the appropriate facility to care for
19  that patient.
20      Q.   Right.  But the underlying injury existed prior
21  to arriving at the outside facility; they were just
22  unable to assess it for whatever reason?
23      A.   Correct.
24      Q.   Now, does a general surgeon typically open up
25  patients to do the splenectomy or would they do that

Page 57

1   laparoscopically?
2       A.   Again, typically when it comes to trauma
3   patients, because of the blood factor, the -- I guess the
4   best way to explain it is if you have a camera, and
5   you're trying to take a picture and the viewer gets
6   covered with blood, or if you're outside --
7       Q.   Because that happens all the time, right?
8       A.   Or I guess maybe it's snowing, or is raining --
9       Q.   That's probably more likely to happen.
10      A.   -- so the viewer, you know, you're trying to
11  kind of wipe it off so you can get a better view.  So
12  with trauma, typically if you're going into the belly for
13  something that's bleeding, laparoscopically, you're
14  putting a camera into a space that has blood in it, so
15  it's hard to see, because you have to keep pulling it
16  out, wiping it off, putting it in.  So in those
17  situations you would open the abdomen.
18      Q.   And a general surgeon at a nontrauma center can
19  do that?
20      A.   General surgery residency provides that
21  training, yes, as part of the five-year surgical program.
22      Q.   Does a general surgeon at a nontrauma center
23  typically perform open belly surgeries after the
24  residency?
25      A.   They can.  Depends on what kind of practice

Page 58

1  they have, but there are many things where you do have to
2  open the abdomen.
3      Q.   So there are guidelines that have been
4  established that identify -- that are Interfacility
5  Transfer Guidelines For Trauma Patients, correct?
6      A.   Correct.
7      Q.   I'm going to hand you a document that we'll
8  mark as Exhibit 3 to your deposition.
9           (Exhibit No. 3, Interfacility Transfer Guidelines was
10 marked for identification.)
11 BY MS. LYONS:
12     Q.   If you could review that, let me know when
13 you're done.
14     A.   Okay.
15     Q.   Have you had a chance to review Exhibit 3?
16     A.   Yes.
17     Q.   Do you recognize this document?
18     A.   Yes.
19     Q.   What it?
20     A.   It's the Interfacility Transfer Guidelines.
21     Q.   Do you know if this is a statewide guideline or
22 if it's a Lee Memorial Hospital guideline?
23     A.   I -- I want to say state, but I'm not
24 100 percent sure.
25     Q.   At the bottom it says, all transfers must be in

Page 59

1  accordance with boost -- I'm just going to start that
2  sentence over again.
3           All transfers must be in accordance with both
4  state and federal EMTALA, which is spelled E-M-T-L-A
5  laws.  What is EMTALA?
6      A.   EMTALA laws coordinate interfacility transfers
7  of patients to make sure that patients aren't being
8  dumped from one facility to another.
9      Q.   When you were working at Lee Memorial Hospital
10 in the trauma department, was it necessary for you to
11 comply with EMTALA laws?
12     A.   Yes.
13     Q.   Were these the Interfacility Transfer
14 Guidelines that were in effect during, say, the last few
15 years that you worked at Lee Memorial Hospital in the
16 trauma department?
17     A.   I believe so.
18     Q.   As a trauma surgeon at Lee Memorial Hospital,
19 you were familiar with and abided by these guidelines?
20     A.   I was -- I knew that we had guidelines.  I had
21 not seen the updated guidelines, so I could not quote you
22 all of the exact criteria, but I had an overall view of
23 what we took and what we accepted.
24     Q.   Are the guidelines that are Exhibit 3 the
25 updated ones or the ones that you were familiar with?

Page 60

1      A.   I believe it's the updated.
2      Q.   Do you know when they were updated?
3      A.   I don't.
4      Q.   Do you know the difference between the prior
5  version and this updated version that's Exhibit 3?
6      A.   I would have to see them next to each other to
7  be accurate in that answer.
8      Q.   You understood when you were employed at Lee
9  Memorial Hospital in the trauma department that you were
10 supposed to be aware of the Interfacility Transfer
11 Guidelines; is that true?
12     A.   Rephrase -- or can you ask that again?
13     Q.   Well, was it -- was it necessary, as an
14 employee of the trauma department at Lee Memorial
15 Hospital, for you to be aware of the Interfacility
16 Transfer Guidelines?
17     A.   I don't believe that this was ever posted for
18 us to see, read, evaluate on an ongoing basis as they
19 were updated or revised.  We had practical protocols, so
20 to speak, within the department that we practiced by, and
21 those involved determining whether the transfers facility
22 had a patient that, one, had multisystem injuries that
23 would require a trauma center or injuries that were above
24 be beyond the facility's capacity to care for that
25 patient.

Page 61

1      Q.   But you knew there were Interfacility Transfer
2  Guidelines, correct?
3      A.   Correct.
4      Q.   And you knew that that was the criteria that
5  was supposed to be used in determining whether a patient
6  was transferred from an outside facility to the trauma
7  department at Lee Memorial?
8      A.   So I knew that there were criteria.  Again, it
9  was not something that we had been provided with in
10 written form or posted anywhere.  We kind of just had
11 this, I guess, practice that was fairly consistent
12 amongst the surgeons to accept or deny transfers based on
13 the patient's condition and the facility's ability to
14 treat them.
15     Q.   So what was the practice that you followed?
16     A.   Right.  So again, if the patient had
17 multisystem injuries, that would require trauma center
18 transfer.  If the patient had an injury at a facility
19 that could provide care for that, like, isolated injury,
20 then the facility had the personnel to take care of that
21 injury.  A lot of what we did was, in essence -- because
22 again, at that point, it's not a trauma alert; it's a
23 transfer from one facility to another, and -- especially
24 in season when beds are at a premium, we didn't just give
25 a trauma bed away to a patient that was at a facility

Page 62

1  where they could provide the care.
2      Q.   So if the outside facility could not provide
3  the care, then you would accept the transfer?
4      A.   Absolutely.
5      Q.   And the outside facility was the one who would
6  determine whether or not they could provide the care?
7      A.   Generally.
8      Q.   What circumstances would someone who worked at
9  Lee Memorial Hospital be better qualified to determine
10  the capabilities of an outside facility?
11      A.   I'm sorry.  Can you repeat the question?
12      Q.   Well, I said to you the outside facility would
13  be the one to determine if they were capable of providing
14  the care and you said generally.
15          So were there circumstances where someone at
16  Lee Memorial Hospital would be better equipped to
17  determine the capabilities of a transferring facility?
18      A.   So on occasion we would get a call from the
19  emergency room physician about a potential transfer, but
20  they had not reached or spoken to their own physicians,
21  their own specialists, so sometimes they would place a
22  call and we would say, well, that sounds like something
23  that could be handled at any hospital and doesn't require
24  a transfer to the trauma center.  Did you speak to your
25  general surgeon --

Page 63

1      Q.   Right.
2      A.   -- or intensivist or whatever the situation
3  was.  And so typically, we performed that type of triage
4  to make sure that the physician on hand or the
5  appropriate physician on hand was able to take care of
6  the issues that the patient was trying to be transferred
7  for.
8      Q.   And if the appropriate physician on hand, say,
9  for example, the general surgeon, determined he was -- he
10  or she was not capable of providing the care to the
11  patient, then that patient would be transferred?
12      A.   Generally, yeah.
13      Q.   Well, in what circumstances would -- well, let
14  me rephrase that.
15          In that circumstance -- no.  Let me rephrase
16  that again.
17          The appropriate doctor at the transferring
18  facility was the one who would decide whether he or she
19  had the capability to perform the care for the patient;
20  is that correct?
21      A.   Yes.
22      Q.   Had you ever seen Exhibit 3 before I showed it
23  to you, this physical document?  Not my exact piece of
24  paper, but a copy of the Interfacility Transfer
25  Guidelines.

Page 64

1      A.   Yes.  This was shown to me in -- I'll say March
2  or April of '18.
3      Q.   After it was shown to you in March or April of
4  2018, did you understand that these were the guidelines
5  that were to be followed in determining whether a patient
6  should be transferred to the trauma center from another
7  facility?
8      A.   After I read this, I saw what are considered
9  situations that should be transferred to a trauma center.
10      Q.   And you understood the guidelines applied
11  to you as the trauma surgeon at Lee Health at least as of
12  March or April 2018?
13      A.   Correct.
14      Q.   I'm going to hand you a document that we're
15  going to mark as Exhibit 4 to your deposition.
16          (Exhibit No. 4, On Call Requirements was marked for
17  identification.)
18  BY MS. LYONS:
19      Q.   If you could take a moment, look that over and
20  let me know when you're done, please.
21          Have you had a chance to review the document
22  that has been marked as Exhibit 4?
23      A.   Yes.
24      Q.   Have you ever seen that document before?
25      A.   I don't recall seeing this specific document.

Page 65

1  No.
2      Q.   Have you ever seen a document containing
3  similar content as the document that's marked as
4  Exhibit 4?
5      A.   Yes.
6      Q.   When did you first see a document containing
7  similar content to that document marked as Exhibit 4?
8      A.   I'm going to say sometime in April of '18.
9  Could have been March.
10      Q.   Did you understand the -- that the information
11  contained on Exhibit 4 summarized the basic obligations
12  leading to on-call requirements?
13      A.   Yes.
14      Q.   Did you understand that those obligations
15  applied to you as a trauma surgeon at Lee Memorial
16  Hospital?
17      A.   Yes.
18      Q.   Did you understand that as a trauma surgeon at
19  Lee Memorial Hospital, that if you failed to comply with
20  the obligations relating to on-call requirements as
21  outlined on Exhibit 4, that you'd be in violation of
22  hospital policy?
23      A.   Yes.
24      Q.   Did you understand that if you failed to comply
25  with the on-call requirements as outlined on Exhibit 4,

Page 66

1  that you could be subject to discipline?
2     A.   Yes.
3     Q.   Do you recall being on call on March 3, 2018
4  and receiving a call from the transfer center regarding a
5  patient at Lehigh Regional Medical Center who had a self
6  inflicting stab wound to the stomach?
7     A.   I do.
8     Q.   Do you recall what time of day you received
9  first notification of that patient?
10    A.   It was in the evening.  I don't remember the
11 exact time.
12    Q.   Do you recall where you were at when you
13 received first notification?
14    A.   I believe I was at the hospital.
15    Q.   Were you the trauma surgeon on call that -- at
16 the time that call came in?
17    A.   I was.
18    Q.   Now, I know we've talked about Lehigh a little
19 bit before.  Where is that physically located, the
20 hospital?
21    A.   Lehigh Acres?  On Lee Boulevard.
22    Q.   It so approximately how far is that from Lee
23 Memorial Hospital?
24    A.   35, 40 minutes drive.
25    Q.   Does that hospital have a trauma department?

Page 67

1     A.   No.
2     Q.   Does that hospital have an emergency
3  department, an emergency room?
4     A.   Yes.
5     Q.   Do you know how large the emergency room is?
6     A.   I'm going to guess at about ten beds.
7     Q.   Do you recall that you were first notified of
8  this patient when you received a call from Doug at the
9  transfer center?
10    A.   Yes.  With the caveat I didn't know the
11 gentleman's name, Doug, but it was a male from the
12 transfer center that had called.
13    Q.   And did you, thereafter, speak with Dr. Gatob
14 in the emergency department at Lehigh?
15    A.   Again, I don't remember the name, but there was
16 a male ER physician that spoke with me.
17    Q.   And then did you also speak with that male ER
18 physician plus the surgeon on call at Lehigh Regional
19 Medical Center?
20    A.   Yes.
21    Q.   Do you remember his name?
22    A.   No.
23    Q.   I'm going to tell you his name was
24 Dr. Kapadokis (phonetic)?
25    A.   Okay.

Page 68

1     Q.   We'll call him the surgeon on call.
2     A.   Okay.
3     Q.   At any time during the period from when the
4  first notification came in about the trauma to where the
5  request for transfer was denied, did you ever review any
6  of the patient's medical records or scans?
7     A.   No.  We don't have access to that.  I had
8  verbal reports from the ER physician.
9     Q.   The patient was described during the call as
10 hemoperitoneum with considerable blood.  That means that
11 there was bleeding inside the stomach in the peritoneum?
12    A.   Read the description again.  I'm sorry.
13    Q.   Hemoperitoneum with considerable blood.  Did I
14 say hemo?
15    A.   Yes.  That's what I was trying to clarify.
16    Q.   I'm going to say it one more time.
17         I meant the patient was described as
18 hemoperitoneum with considerable blood.
19         Does that mean that the patient was bleeding
20 inside the peritoneum or their stomach cavity?
21    A.   That there had been some bleeding into the
22 abdominal cavity.  Yes.
23    Q.   And it was reported that the patient had two
24 stab wounds to the stomach area.
25         If there was hemoperitoneum with considerable

Page 69

1  blood in a patient who had been stabbed in the abdomen,
2  does that mean that the stab wound pierced the
3  peritoneum?
4     A.   Yes.
5     Q.   And the peritoneum is the wall of the cavity in
6  the -- that contains the abdomen?
7     A.   It's the lining of the abdominal cavity.
8         MS. LYONS:  I want to take a break for a
9     minute, if we can.
10        (Discussion off the record.)
11 BY MS. LYONS:
12    Q.   I'm going to play for you a recording of your
13 call with Dr. Gatob and Dr. K.
14        MR. YORMAK:  Are we abbreviating that to Dr. K?
15        MS. LYONS:  I am for now.
16        MR. YORMAK:  Okay.  I just want to make sure
17     it's not a different doctor.
18        MS. LYONS:  Yes.  Yes.  Thank you.  Dr. K, the
19     general surgeon at Lehigh Medical Center.  And I had
20     it transcribed, because it's not very loud, and I
21     thought it would be easier if we could all follow
22     along with the transcript.  So --
23        MR. YORMAK:  Are you going to mark it?
24        MS. LYONS:  Yes.
25     (Exhibit No. 5, Written transcript was marked for

Page 70

1  identification.)
2  BY MS. LYONS:
3      Q.  I'm going to mark it as Exhibit 5.  And you
4  don't have to type the recording when it plays.  So
5  Exhibit 5 will be recording number
6  354-4142300-579443105657.  And there's a copy for you,
7  and there's copy for you, and Tracy has her copy?
8          MS. PYLES:  Thank you.
9      (Whereupon, the recording is played.)
10 BY MS. LYONS:
11     Q.  So we just listened to the audio recording of
12 your conversation with Doug, Dr. Gatob and Dr. Kapadokis,
13 who we're calling Dr. K; is that correct?
14     A.  Correct.
15     Q.  And you followed along with the audio recording
16 by reading the transcript that has been marked as
17 Exhibit 5, correct?
18     A.  Correct.
19     Q.  And do you agree that the transcript accurately
20 transcribes what was said during the phone conversation?
21     A.  Yes, what was audible.
22     Q.  And there were certainly large portions of it
23 that were inaudible and that were marked as such in the
24 written transcript.
25          During that telephone call that we just

Page 71

1  listened to, Dr. Kapadokis was the general surgeon on
2  call at Lehigh Regional Medical Center, correct?
3      A.  Correct.
4      Q.  And Dr. Kapadokis told you on at least one
5  occasion that he could not do the surgery -- he doesn't
6  feel he could perform the surgery, correct?
7      A.  I don't know if that was the way he phrased it,
8  but --
9      Q.  Well, essentially what he was telling you was
10 he did not feel that they had the capabilities at the --
11 at Lehigh Regional Medical Center to handle that case,
12 correct?
13     A.  I think he was insistent that this was a trauma
14 and all traumas go to Lee.  I'm trying to find --
15     Q.  Did he specifically say to you that he did not
16 have the capabilities at that facility --
17     A.  That's what I'm trying to find.
18     Q.  Well, to speed this along, look at page 15 of
19 the transcript, Exhibit 5 at line 16.  He says, I'm
20 not -- I'm not -- again, I'm not -- I don't have the --
21 the facilities to take care of a trauma at this place.  I
22 just don't.  Isn't that what he -- Dr. K told you?
23     A.  Yes.
24     Q.  And Dr. K requested that the patient be
25 transferred to Lee Memorial Hospital's trauma center?

Page 72

1      A.  Yes.
2      Q.  Would you agree with me that on more than one
3  time during your phone call that's represented in Exhibit
4  5 that Dr. K asked you to take this patient?
5      A.  He insisted that it was a trauma and it needed
6  to be transferred to Lee.
7      Q.  I'm sorry.  That wasn't my question.
8          Would you agree with me that on more than one
9  occasion Dr. K specifically asked you to accept the
10 transfer of the patient?
11     A.  Yes.
12     Q.  Would you agree with me that on at least more
13 than one -- on more than one occasion during that phone
14 call Dr. K made it clear that he did not think they had
15 the capability to handle the case?
16     A.  I don't agree with that.  He --
17     Q.  Would you look on line 18 -- or page 18,
18 please, line 24.  You say to him, you told me you're not
19 skilled at bowel work.
20          Do you recall Dr. K telling you he was not
21 skilled at bowel work?
22     A.  I think up higher I was asking him if he had
23 performed -- or if he was comfortable with the open
24 abdomen and bowel resections or repairs.
25     Q.  And he never answered that question?

Page 73

1      A.  He never answered that.  And that was the
2  question that I was trying to get answered.  Because had
3  he said that he did not feel comfortable in the
4  abdomen -- and I think I say that in the transcript.  If
5  you tell me you're not comfortable with that, then the
6  discussion needs to go no further, but if you're telling
7  me that you are comfortable in the belly; that you do
8  bowel resections, then should be a case that falls within
9  the realm of your expertise.
10     Q.  Is he the one who can determine whether he
11 feels he's capable of performing a surgery or is that
12 you, someone who's never met him?
13     A.  So when we are on trauma call, we often have to
14 do triage for the calls that we get for transfers, for
15 example.
16     Q.  That wasn't my question.
17          MR. YORMAK:  Let her finish her answer, though.
18 She was getting to it.
19          MS. LYONS:  I don't think she was.
20          MR. YORMAK:  Well, she's entitled to explain
21 herself.
22          THE WITNESS:  So sometimes we would get a call
23 for a transfer on a patient who has, for example, two
24 rib fractures.  Two rib fractures don't need to come
25 to a trauma center.  If they have pulmonary

Page 74

1   service -- sometimes they go home.  But if they have
2   a pulmonary service or an intensivist service, then
3   that is something that falls within the realm of
4   their expertise and they can take care take of it.
5       If fact, when this call was first put through,
6   the transfer center -- and I don't think you have --
7   it's not part of this transcript, but when they
8   initially contacted me, their question was, I don't
9   know why they're even calling.  They have a general
10  surgeon on call.  So even the transfer center, in
11  their triage, had determined that they had the
12  ability and the capacity to take care of this
13  patient.
14      So that kind of sets a mindset when you start
15  talking to them and it's, well, I'm told you have a
16  general surgeon.  This certainly sounds, based on CAT
17  scan, that there's no major vascular injuries;
18  there's no liver injuries; there's no major
19  intraabdominal catastrophic injuries.  It sounds like
20  a simple straightforward case that should fall under
21  the realm of the general surgeon's expertise.
22      In fact, since I'm working at Lehigh, I can
23  tell you that they do much more complicated cases
24  than this, because I'm now providing critical care
25  for their surgical patients.  So at the time, even

Page 75

1       when I asked if he was general surgery certified,
2       which he didn't answer either, but at the time I
3       think I said -- and I'm not sure I came through
4       audibly, but it was a, if you tell me you're a breast
5       surgeon and you're covering the emergency room, then
6       there's no discussion; I'll take the patient, because
7       this falls outside of your expertise, but if you're
8       telling me that you're a general surgeon and you do
9       bowel resections and bowel repairs, then there's
10      nothing about this case that falls outside of your
11      level of expertise.
12  BY MS. LYONS:
13      Q.   Did you ask him what his practice was in?
14      A.   I asked him if he -- actually, I asked him if
15  he did bowel surgery; if he was comfortable with bowel
16  resections and repairs.
17      Q.   Did he ever tell you he was comfortable with
18  those?
19      A.   He kept focusing on, it's a trauma; it needs to
20  go to you.
21      Q.   Did he ever tell you he was comfortable doing a
22  bowel resection?
23      A.   He never answered the question.
24      Q.   Did he tell you that he was not comfortable
25  doing the surgery?

Page 76

1       A.   He told me that they did not have the means to
2   do it there; however, if you also follow, he said, if she
3   was unstable, I would take her to the operating room.  So
4   it kind of contradicts itself.  Either you have the
5   ability to take care of it or you don't have the ability
6   to take care of it.
7       Q.   Didn't you tell me earlier that the person who
8   determines whether they have the ability to take care of
9   it is the surgeon on call at the transferring facility?
10      A.   That's in response to the EMTALA forms, because
11  the EMTALA forms say that it's the sending facility,
12  either ER physician or whoever that determines whether
13  the patient needs to go to a different facility.
14      Q.   Right.  So therefore, the referring physician,
15  or Dr. K in this case, is the one to determine whether
16  the referring facility has the capability to take care of
17  the patient, correct?
18      A.   By EMTALA standards, yes.
19      Q.   And you're required, when you worked at Lee
20  Health, to follow EMTALA standards, correct --
21      A.   That --
22      Q.   -- because they were the law, right?
23      A.   That is correct, although --
24      Q.   And --
25      A.   Sorry.

Page 77

1       Q.   Go ahead.
2       A.   Although as I mentioned, there are the written
3   rules and then there is what the practice was at our
4   facility, and if we felt that the sending facility had
5   the ability to take care of whatever isolated injury
6   there was, we did not accept those patients.
7       Q.   Well, if the sending facility agreed, after
8   further consult with you, that they had the ability to
9   care for the patient then that makes sense, but in a
10  situation like this where Dr. K repeatedly pleaded with
11  you on multiple occasions to take this patient and you
12  responded by saying things to him such as, a second year
13  resident could do this kind of operation.
14      A.   A second year resident should be able to do
15  that kind of operation.
16      Q.   Do you think you have -- do you think that was
17  consistent with EMTALA's directive that the person who
18  gets to determine whether the transferring facility has
19  the capability is, in fact, the transferring facility?
20      A.   That is what it says on the EMTALA form.
21      Q.   And you did not accept the transferring
22  physician's conclusion that the transferring facility did
23  not have the capabilities to handle that patient,
24  correct?
25      A.   Correct.

Page 78

1    Q.    And if we look at Exhibit 3, this patient meets
2  the definition for Interfacility Transfer Guidelines,
3  correct?  Because if you look under abdominal injuries,
4  there was a penetrating wound of the abdomen with
5  suspicion of penetration of the peritoneum, correct?
6    A.    Correct.
7    Q.    So there -- just to make sure the record's
8  clear, the patient, on March 3, 2018, that Dr. K, at
9  Lehigh Regional Medical Center, tried to transfer to Lee
10  Memorial Hospital's trauma department, that you refused,
11  did meet the definition for a trauma under the
12  Interfacility Transfer Guidelines, correct?
13    A.    The patient did match the criteria for
14  abdominal injuries, but as you can see in the first line,
15  it says, patients with any of the following
16  trauma-related diagnoses should be transferred to a
17  trauma center.  We interpreted this as it should be if
18  the facility is not capable of handling it.
19          For example, if you look under head injuries,
20  there's areas that call for brain hemorrhage.  I can tell
21  you that when they called us about a subdural or an
22  epidural hematoma from a facility such as Naples
23  Community Hospital, which has neurosurgical coverage,
24  those patients would not be accepted, because they have
25  neurosurgical coverage in an isolated injury where the

Page 79

1  facility -- the sending facility had the ability to take
2  care of that patient.  They had the appropriate
3  subspecialty.
4          At Lehigh, when I was called by the transfer
5  center, they, offhand, said I don't know why they're even
6  calling; they have general surgery coverage.  And, in
7  fact, on the day following this exchange, our practice --
8  again, because we did deny transfers on occasion -- our
9  practice was, we would then talk to Michael Marcus, who's
10  the trauma nurse coordinator and let him know about the
11  exchange.
12          And even Michael Marcus, who is the trauma
13  nurse coordinator, when I said, look, I refused this.
14  They had a general surgery patient; she had some blood in
15  the belly from a self-inflicted stab wound; they'd
16  already worked her up; the CAT scan showed there was no
17  major injuries, and she remained hemodynamically stable.
18  She's in there for hours.  And Michael's response to me
19  was, yeah, that's fine.  They should be able to handle
20  that at that facility.
21          So up until later when the complaints came
22  through I didn't think anything more of this case.
23  So because again, these criteria, you know, these are, yes,
24  they should be transferred, but not, they must be
25  transferred if that patient is in a facility that can

Page 80

1  deliver the appropriate level of care.
2    Q.    Does it say on that form, Exhibit 3, that you
3  can refuse -- you can refuse the transfer if you, as the
4  trauma surgeon, determine that the other facility is
5  capable of doing the care even though the other facility
6  has said they aren't?
7    A.    So there's nothing about the transfer
8  guidelines that talks about when a patient can be
9  refused; it just provides guidelines for patients that
10  would fall under the auspices of transferring to a trauma
11  center.
12    Q.    And are you aware of any written document,
13  either a Lee Health document, or an ATLS document or
14  otherwise that says the accepting facility's surgeon gets
15  to determine whether the transferring facility has the
16  capability to handle the patient?
17    A.    I'm sorry.  Repeat that.  Is there a written
18  document --
19    Q.    Are you aware of any written document anywhere,
20  regardless of the source of the document, that says that
21  the accepting facility's surgeon gets to determine
22  whether the transferring facility has the capability to
23  care for the patient?
24    A.    I don't recall anything in writing other than
25  our practice, which, for the 23 years that I was there,

Page 81

1  how we managed these patients.
2    Q.    In fact, the ATLS guidelines, which you are
3  certified, say that it is the transferring facility's
4  doctor who gets to decide if they're capable of handling
5  the patient, correct?
6    A.    They are the ones who decide whether their
7  facility can handle the patient.  Correct.
8    Q.    And in this case, Dr. K very clearly indicated
9  to you that he did not think the facility could handle
10  the patient, correct?  Whether you agreed with his
11  conclusion or not, that's what he told you?
12    A.    Yes.
13    Q.    And when you spoke with Michael Marcus the day
14  after this incident, did you tell him that on multiple
15  occasions the transferring physician told you he did not
16  think Lehigh Regional Medical Center could handle the
17  patient?
18    A.    I remember telling him that they wanted to
19  transfer the patient; that they didn't think they were
20  qualified.  And his answer to me was, yes, this falls
21  under what a general surgeon can do; I don't see a
22  problem with it.
23          So it wasn't until it was reported, and then
24  legal got involved and wanted us to review the case that
25  I had any idea that there was going to be a problem with

Page 82

1  this case.

2      Q.   As you sit here today, do you think you should

3  have accepted that transfer?

4      A.   Not because of the care that it required, but

5  because of the --

6      Q.   The law?

7      A.   Again, we have many patients -- I mean, if you

8  look at the transcript, their ER doc actually talks about

9  other cases that had been denied by Lee that were sent to

10  Blake, et cetera.  So this wasn't the first time that a

11  patient had been denied from Lehigh, certainly not just

12  by me, but other services, because he actually had a

13  backup plan.

14           I'm trying to find where --

15      Q.   I know where it says that.

16           But do you know why those patients were denied

17  by Lee?

18      A.   No idea.

19      Q.   Do you know if it's maybe they were at capacity

20  and didn't have availability to accept patients?

21      A.   No idea.  I don't know anything about those

22  cases other than he knows that there were cases that were

23  not accepted at Lee.

24      Q.   But you don't know that those other examples

25  that Dr. Gatob at Lehigh Regional Medical Center

Page 83

1  mentioned had anything to do with the on-call physician

2  in the trauma center at Lee Memorial Hospital deciding to

3  reject a transfer or refuse a transfer when the Lehigh

4  Regional Medical Center doctor said that he did not think

5  they were qualified or had the capabilities to perform

6  the task, do you?

7      A.   So I'm not familiar with the case, but I think

8  Dr. Gatob actually mentioned something about a patient

9  with a splenic injury that had been refused by Lee and

10  was sent elsewhere.

11           And I can tell you that the trauma center, we

12  didn't divert.  I mean, in the 23 years that we were

13  there, we would not divert a patient based on bed

14  capacity and capabilities.  So I don't know the specifics

15  of that case, but he actually mentions cases that had to

16  go to other trauma centers and he mentioned a splenic

17  injury in here somewhere.  I'd have to kind of go back

18  and try to find it.

19      Q.   Do you know of any doctor at Lee Health who

20  refused a transfer request when the transferring

21  facility's surgeon said they did not have the capability

22  to do it?

23      A.   I can't name cases, but --

24      Q.   Can you name doctors?

25      A.   That have refused cases?

Page 84

1      Q.   Where the transferring doctor -- the

2  transferring surgeon on call said, we are not capable of

3  handling this case.

4      A.   I would have to do a QI chart review.

5  Anecdotally, I can give you examples where there were

6  discussions between, for example, neurosurgeons with NCH

7  when NCH, Naples Community Hospital, wanted to transfer

8  patients with subdurals and having those physicians, you

9  know, get into verbal discussion as to the capabilities

10  and abilities of the sending neurosurgeon, and that's,

11  basically, what was happening here.  We were discussing a

12  general surgery case, which the sending surgeon, Dr. K,

13  kept focusing on, it's a trauma, it's a trauma, and I was

14  trying to focus on the injury and not the mechanism that

15  created that injury.

16      Q.   The example you gave with the neurosurgeon at

17  Naples, did the neurosurgeon at Naples and the Lee

18  Memorial Hospital surgeon reach an agreement as to what

19  was going to happen?

20      A.   Again, I said that that was discussions

21  afterwards, so I don't know the entire discussion or

22  scope of the discussion.  I know that there were patients

23  and there have been patients that have been refused, just

24  like orthopedics.  We've had fractures that try to be

25  sent in and the orthopedic surgeon will get on the phone

Page 85

1  and say, no, I want to speak to your orthopedic surgeon,

2  because I know that they do that type of surgery there

3  and they just don't want to get up at 9:00 o'clock at

4  night or 10:00 o'clock at night to take care of it.

5      Q.   And in those situations does the orthopedic

6  surgeon at the transferring facility agree to handle the

7  case, ultimately?

8      A.   I don't know.  Again, I know that there have

9  been those discussions --

10      Q.   So you don't know if it's the same situation as

11  here where the transferring facility never agreed to

12  handle the case and had to transfer it to somewhere

13  further away?

14      A.   Correct.

15      Q.   Do you think your tone of voice and manner of

16  speaking to the doctors at Lehigh Regional was

17  professional?

18      A.   I think I was insistent in trying to assess

19  what his skill level was, which he was hesitant to give

20  me that information.  So I think I was persistent in

21  trying to figure out if this was just a, I don't want to

22  get up at 9:00 o'clock at night versus, no, I truly don't

23  know how to do this.

24      Q.   Did you ask him how long it had been -- or did

25  you have any knowledge as to how long it had been since

Page 86

1  he had worked in an open belly?
2      A.   I tried to elicit that from him when I asked
3  him if he felt comfortable doing bowel resections and
4  repairs.  He never gave me an answer.
5      Q.   Would you agree that you were condescending
6  when you spoke to him?
7      A.   No.  I think I was just trying to be very
8  persistent in trying to get a straight answer from him.
9  I even gave him the option of if you're a breast surgeon
10 and don't feel comfortable in the belly, then this
11 discussion is over; send the patient.  I understand your
12 discomfort.  But if you work in the abdomen, this is
13 something that should fall within the scope of your
14 practice.
15     Q.   Was Lee Memorial Hospital close -- the closest
16 trauma center to Lehigh?
17     A.   We're the only trauma center in five counties.
18     Q.   So was it the closest trauma center to Lehigh?
19     A.   Yes.
20     Q.   Was Lee Memorial Hospital full -- let me phrase
21 that.
22          Did Lee Memorial Hospital have capacity to take
23 that patient?
24     A.   Again, we never diverted trauma cases.  I
25 couldn't tell you right now what the bed situation was in

Page 87

1  2018 that night, but that was -- that did not play a role
2  in my decision-making.
3      Q.   Do you know who reported the incident to the
4  hospital?
5      A.   I'm assuming somebody from Lehigh called to
6  complain, and that's an assumption on my part.
7      Q.   Do you know if the hospital did an internal
8  investigation?
9      A.   Yes, they did.
10     Q.   Do you know who was in charge of that
11 investigation?
12     A.   I believe it was Mary Lorah.
13     Q.   Do you know how long the investigation lasted?
14     A.   I'm going to say -- I'm going to say a month,
15 because in the process of the investigation they found
16 multiple issues systemwide with transferring patients
17 from outside of the facility, as well as intrafacility,
18 meaning within Lee Memorial Health System, and so because
19 of the multitude of issues with transferring, they
20 actually came up with a series of new protocols and
21 procedures that were to be implemented systemwide and
22 were provided to the entire system, basically, as an
23 educational process.
24     Q.   Well, they had to do that because your refusal
25 is an EMTALA violation, right?

Page 88

1      A.   That's what I'm assuming.
2      Q.   So this was reported as an EMTALA violation; is
3  what your understanding?
4      A.   It was self-reported.  Yes.
5      Q.   And it was investigated by AHCA as well?
6      A.   I believe so.
7      Q.   And the ultimate finding was it was, in fact,
8  an EMTALA violation for you to refuse to accept the
9  March 3rd patient transfer?
10     A.   So I was never given closure either in writing
11 or verbally as to the actual AHCA findings.  I was told
12 that the system -- that AHCA investigated and that the
13 system came up with new procedures and protocols to be
14 implemented systemwide based on the number of other
15 issues that they had uncovered when they did the internal
16 investigation on this case, and that that -- those
17 policies and procedures are accepted by AHCA as being
18 adequate and no further action was taken.  I believe
19 there was no fines to the system or to myself.
20     Q.   What other problems do you think were
21 discovered in the investigation other than your refusal?
22     A.   There were other -- other refusals.  Other
23 refusals from other physicians, other services, again,
24 from hospitals outside of our system, as well as within
25 the facility, because there's -- Lee Memorial Health

Page 89

1  System has five hospitals, and so they had identified
2  other issues, refusals, delays based on the practice that
3  had -- the practice that had been going on, and so the
4  new policies and procedures were created to prevent
5  situations like this from happening systemwide.
6      Q.   Let me hand you a document that we'll mark as
7  Exhibit 6 to your deposition.
8          (Exhibit No. 6, Attestation of Completion was marked
9  for identification.)
10 BY MS. LYONS:
11     Q.   Have you had a chance to look at Exhibit 6?
12     A.   Yes.
13     Q.   Do you recognize that?
14     A.   Yes.
15     Q.   Is it an Attestation of Completion signed by
16 you?
17     A.   Yes.
18     Q.   Is that your signature that appears on the line
19 employee signature?
20     A.   Yes.
21     Q.   Did you sign this on April 12, 2018?
22     A.   Yes.
23     Q.   Did you read the document before you signed it?
24     A.   Yes.
25     Q.   Was the information that you signed -- did you

Page 90

1  agree with what you were signing?
2       MR. YORMAK:  Object to the form.
3       THE WITNESS:  I'm not sure --
4  BY MS. LYONS:
5       Q.  Well, it says, I acknowledge that I attended
6  the presentation that was presented by risk management on
7  4/12/18 that addressed the following.
8           So had you, in fact, attended the presentation
9  on 4/12/18?
10      A.  Yes.
11      Q.  And did that presentation address the things
12 listed?
13      A.  Yes.
14      Q.  When you signed this, did you understand your
15 obligations under EMTALA and Florida Access to Care
16 regulations?
17      A.  Yes.
18      Q.  And when you signed this, did you agree to
19 comply with the regulations as discussed in the
20 presentation?
21      A.  Yes.
22      Q.  Did you -- when you signed this, did you
23 understand what contributed to the recent EMTALA
24 citation?
25      A.  So Mary Lorah did the presentation for my

Page 91

1  entire department, and the presentation did not focus on
2  me and this case; it focused on multiple issues within
3  the system that involved transferring patients either
4  interfacility or intrafacility, and that there were going
5  to be changes in policies and procedures for transferring
6  patients and accepting of patients.  So there was a -- I
7  forget -- 30-minute, 45-minute presentation of this --
8  you had asked me if I had seen this form on the
9  Interfacility Transfer Guidelines.  She provided this for
10 us, as well as the EMTALA laws and then explained what
11 the procedures were going to be moving forward and
12 accepting transfer patients.
13      Q.  Was there a case study of the case cited in the
14 deficiency report from AHCA at any point?
15      A.  I don't remember the specifics of the case, if
16 that was presented versus there was a transfer that was
17 denied and created an EMTALA violation.  So I think she
18 kind of did it in a -- in broad strokes, but also
19 mentioned that in the discovery or in the evaluation,
20 there were multiple cases of issues that were potential
21 EMTALA violations, whether intrafacility or
22 interfacility, so I don't remember that the details of
23 this case were discussed as more of generalized, there
24 was a transfer that was refused and this is a problem.
25      Q.  Well, you certainly knew the details of the

Page 92

1  case, right?
2       A.  Yeah.  My partners did, too.
3       Q.  And you knew it was found to be an EMTALA
4  violation, correct?
5       A.  After the fact, yes.
6       Q.  So at the time you signed this, did you
7  understand what contributed to the recent EMTALA
8  citation?
9       A.  Yes.
10      Q.  When you signed this had you had an opportunity
11 to ask questions and obtain clarification as needed?
12      A.  Yes.
13      Q.  And when you signed this had you reviewed the
14 transfer guidelines?
15      A.  Yes.  That was provided to us during that
16 presentation.
17      Q.  When you signed this had you reviewed the plan
18 of correction that was -- that will be -- that was going
19 to be submitted to AHCA?
20      A.  I'm sorry.  One more time.
21      Q.  When you signed this document had you reviewed
22 the plan of correction that was going to be submitted to
23 AHCA?
24      A.  She presented -- she, Mary Lorah presented to
25 us the new policies and procedures moving forward for

Page 93

1  accepting transfer patients.  Yes.
2       Q.  I'm going to hand you a document that we're
3  going to mark as Exhibit 7 to your deposition.
4       (Exhibit No. 7, AHCA Summary of Deficiencies was
5  marked for identification.)
6  BY MS. LYONS:
7       Q.  Have you ever seen this document before?  The
8  actual document itself, and then we'll talk about the
9  content of it.
10      A.  I don't think so.
11      Q.  Well, take your time, review it.  Let me know
12 when you're done.
13      MR. YORMAK:  While she's reading that, I'm
14 going to take a little break.
15      MS. LYONS:  Absolutely.
16      (Whereupon, a recess commenced at 2:14 p.m. and
17 concluded at 2:21 p.m.)
18 BY MS. LYONS:
19      Q.  Have you had a chance to review Exhibit 7?
20      A.  Yes.
21      Q.  I know you told me you haven't seen this actual
22 physical form of this document.
23          Have you seen the information that's contained
24 in Exhibit 7 before today?
25      A.  The second column, which provides the

Page 94

1  information from risk management that was provided to all
2  of the staff.  Yes.
3      Q.   So just to make sure the record's clear, the
4  second column or the right-hand column on Exhibit 7 is
5  the provider's plan of correction, according to its
6  heading, correct?
7      A.   Correct.
8      Q.   And the information provided under that
9  provider's plan of correction column is information that
10 you were made aware of through the risk management
11 presentation you attended on April 12, 2018?
12     A.   That's correct.
13     Q.   During that presentation on April 12, 2018 did
14 Mary Lorah clarify that the sending hospital determines
15 whether or not the individual has an emergency medical
16 condition requiring transfer?
17     A.   Yes.
18     Q.   During that presentation on April 12, 2018 did
19 Mary Lorah clarify that on-call specialists may discuss
20 cases with the sending hospitals, but may not refuse
21 transfers?
22     A.   Yes.
23     Q.   During that -- during that training on
24 April 12, 2018 did Mary Lorah clarify that if a physician
25 refuses an emergency transfer from another hospital when

Page 95

1  Lee Health has capability and capacity to accept the
2  emergency transfer, then that needs to be reported to the
3  transfer center staff up the chain of command?
4      A.   I'm not sure I understand the question.
5      Q.   During the presentation on April 12, 2018 did
6  Mary Lorah explain that there was a chain of command
7  to -- that should be engaged if there was a situation
8  where you observed or learned that a physician refused a
9  transfer?
10     A.   Yes.
11     Q.   During that presentation -- at the conclusion
12 of that presentation did you understand that the
13 transferring facility is the facility that will determine
14 whether or not they have the capabilities to care for a
15 patient or whether that patient needs to be transferred?
16     A.   Yes.
17     Q.   Following the presentation on April 12, 2018
18 did you understand that the Interfacility Transfer
19 Guidelines would apply to all future trauma interfacility
20 transfers at Lee Health?
21     A.   Yes.
22     Q.   Following the presentation on April 12, 2018
23 did you understand that the EMTALA on-call emergency
24 services obligations applied to the on-call requirements
25 for physicians at Lee Health?

Page 96

1      A.   So yes.  We were provided with the EMTALA
2  on-call emergency services obligations.  During Mary
3  Lorah's conversation with us or education of the new
4  policies and procedures, we also discussed the conundrum
5  of accepting patients when the sending facility feels
6  they can't handle it, whether or not we would be the
7  appropriate receiving facility if the services that the
8  patient required exceeded our capabilities, and I think
9  that's part of the fifth bullet point on that page that
10 says if a hospital's requesting transfer of a patient
11 with an emergent medical condition, because the hospital
12 lacks the service capability to care for the patient and
13 Lee Memorial Health System Hospital has the service
14 capability and is the geographically closest hospital,
15 the on-call physician must provide the necessary consult
16 and treatment.
17          And the reason I'm saying that is the service
18 capability.  For example, if they call with us a burn
19 patient, we're not a burn center.  We may be the closest
20 hospital; we may be a higher level of care than that
21 hospital than the sending hospital, but we would not be
22 the appropriate facility, because we're not a burn
23 center.  The burn center is up in Tampa.  So that
24 conversation also ensued within the educational part of
25 this, because the law becomes very black and white, but

Page 97

1  we're also trying to do the right thing for the patient
2  and make sure that they get to the right hospital to
3  provide definitive care.
4      Q.   So bullet five says, if a hospital is
5  requesting transfer of a patient with an emergent medical
6  condition because the hospital lacks the service
7  capability to care for the patient and the LMHS hospital
8  has the service capability and it's the geographically
9  closest hospital, the on-call physician will provide the
10 necessary consult and treatment.
11          So it was your understanding based on that,
12 that if a transfer was coming into the trauma department
13 for trauma services and you had capability to perform
14 trauma services there, then you would accept the patient,
15 correct?
16     A.   If the -- again, we're a Level 2; we're not a
17 Level 1, so if there's, for example, pediatric
18 neurosurgery.  We have no pediatric neurosurgeons.  So if
19 they're trying to transfer a trauma patient in to us that
20 we cannot provide the care for, we would refer them to
21 Tampa General, because they have the appropriate
22 subspecialists to take care of that patient.
23          As I mentioned previously, burns would be
24 another example of a case where we cannot provide -- we
25 are a trauma center.  We're a Level 2 trauma center.

Page 98

1  We're not a burn center.  We don't have the capacity to
2  take care of those patients and we, in fact, transfer
3  them out to Tampa ourselves, so we don't keep those
4  patients even if they come to us directly.
5       Q.   But if they come to you directly, you stabilize
6  them before you transfer them out, right?
7       A.   That's the initial facility's primary job is to
8  stabilize before you transfer.
9       Q.   Right.  And that's a trauma center's job is to
10  stabilize patients who come in with traumas, correct?
11      A.   It's any emergency room's job to stabilize a
12  patient.  As we mentioned earlier, some trauma patients
13  make it to nontrauma centers and it's their job to
14  stabilize the patient before transferring it to a trauma
15  center.  Correct.
16      Q.   If a burn patient -- if a burn victim came in
17  by EMS, they would be brought to Lee Health -- Lee
18  Memorial Hospital, correct --
19      A.   Yeah.
20      Q.   -- in the county area?
21      A.   Right.
22      Q.   In that situation, the trauma department would
23  work on that patient until they were stable enough to be
24  transferred to wherever the nearest burn hospital is,
25  correct?

Page 99

1       A.   Correct.  We would assess the patient, assess
2  the percentage of total body surface area involved, get
3  IV access and start fluids, because burn patients tend to
4  just lose a lot of fluids because of the burns and, I
5  mean, as soon as the patient hits the door, our social
6  worker's calling Tampa to initiate the transfer to the
7  burn center, which is Tampa General.
8       Q.   What if you can never stabilize the patient
9  enough for transfer?
10      A.   Then that patient stays with us.  You can't --
11  you cannot transfer an unstable patient.  You do not want
12  a patient to arrest in a helicopter or in an ambulance on
13  their way to another facility, so you keep the patient
14  until you can stabilize them for transfer.
15      Q.   You said that Tampa -- I'm sorry.  Lee Memorial
16  Hospital a Level 2 trauma center and you don't do
17  pediatric neurosurgery.
18      A.   Right.
19      Q.   That that would be a very limited specialty,
20  pediatric neurosurgery.
21      A.   They have that in Tampa General.
22      Q.   And neurosurgery is on the brain; is that
23  correct?
24      A.   Brain, spine.
25      Q.   But if a pediatric patient with a head injury

Page 100

1  came in by EMS, Lee Memorial Hospital would still accept
2  that patient and may transfer them to Tampa, but would
3  accept that trauma patient initially, correct?
4       A.   So all trauma alerts called in the field within
5  our catchment area come to Lee Memorial.
6       Q.   Right.
7       A.   So we don't pick and choose who comes.
8       Q.   Right.
9       A.   It's EMS determines whether a patient meets
10  trauma alert criteria and they get brought to our ER.
11      Q.   Right.  So even though Lee Memorial Hospital
12  doesn't have a pediatric neurosurgeon, if a trauma
13  patient who is a child with a head injury comes by EMS,
14  he would come to Lee Health, correct, or -- yeah, to Lee
15  Health, correct?
16      A.   All trauma alerts within the five county
17  region, regardless of age --
18      Q.   I know that.  I just want to yes or no to my
19  specific question.  I'm going to ask it again.  Just a
20  yes or no, is all I need.  I know the general rule.
21           If EMS brings a trauma patient who is a
22  pediatric patient, i.e., a child, and has suffered a head
23  injury, EMS would bring that child to Lee Memorial
24  Hospital even though you don't have a pediatric
25  neurosurgeon, correct?

Page 101

1       A.   Correct.  All trauma alerts come to Lee
2  Memorial Hospital.
3       Q.   And in that situation with the child with the
4  head injury, you would stabilize the child and determine
5  if he needed to go to Tampa general via transfer for a
6  pediatric neurosurgeon?
7       A.   So we would stabilize the child, but any child
8  with a head injury goes Tampa general, because we do not
9  have pediatric neurosurgery capabilities.  And so any
10  child -- and the age cutoff for -- in trauma terms for
11  pediatric is 16 and under.  So any child 16 and under
12  that has a head injury automatically goes to Tampa
13  general.
14      Q.   How far is Tampa general?
15      A.   By air or by ground?
16      Q.   By air.
17      A.   About 40 minutes, 45 minutes maybe.
18      Q.   From Lee Memorial Hospital?
19      A.   From Lee Memorial.  Yeah.
20      Q.   I'm going to hand you a document that we'll
21  mark as Exhibit 8 to your deposition.
22           (Exhibit No. 8, Power Point Presentation Printout was
23  marked for identification.)
24  BY MS. LYONS:
25      Q.   This is a printout of a power point

Page 102

1 presentation.  And if you could take a moment and review
2 that and let me know when you're done.
3           Have you had a chance to review Exhibit 8?
4    A.    Yes.
5    Q.    Is that part of the materials that Mary Lorah
6 shared during the April 12, 2018 presentation that you
7 attended?
8    A.    Yes.  This looks like the presentation that she
9 had.
10   Q.    Following the March 3rd refusal to accept a
11 patient transfer, you were given a final written warning
12 for that action, correct?
13   A.    That's correct.
14   Q.    I'm going to hand you what we'll mark as
15 Exhibit 9, which is the employee conference form
16 documenting that final written warning.
17           Have you seen this document before?
18   A.    Yes.
19   (Exhibit No. 9, Employee conference document was
20 marked for identification.)
21 BY MS. LYONS:
22   Q.    Is this a document you received on or about
23 April 30, 2018?
24   A.    Yes.
25   Q.    Who gave you this -- physically handed you this

Page 103

1 document?
2    A.    Dr. Prasad and Kris Fay.
3    Q.    Was anyone else present during that meeting?
4    A.    No.
5    Q.    Where did that meeting take place?
6    A.    In their office, the administration building.
7    Q.    How long did the meeting last?
8    A.    Not very long.  15, maybe -- thereabouts,
9 15 minutes.
10   Q.    Were you surprised you were written up?
11   A.    I was surprised that I was given a final
12 warning when I had never received any kind of warning in
13 the 23 years of employ.
14   Q.    Why do you think you were given a final
15 warning?
16   A.    I don't know.  You'd have to ask Dr. Prasad and
17 Kris Fay.
18   Q.    Do you think they were mad at you?
19   A.    That's not for me to say.
20   Q.    I'm asking what your belief is.
21           Do you think they were mad at you?
22   A.    I truthfully don't know.  Dr. Prasad was
23 recently hired.  He had not been with Lee very long at
24 this point.  I had met him all of one time prior to this
25 meeting, so I didn't -- I don't have any preconceived

Page 104

1 notions as to why he would pursue a final warning.
2           And actually, that's how the meeting started
3 when they said this is your final warning.  And I kind of
4 said, wait, I never had a first warning.  And their
5 answer was that it was their prerogative to choose the
6 severity of the reprimand.
7           My comment was there were certainly physicians,
8 even within my department, who had had multiple warnings
9 and kind of never got this, and so I was surprised that
10 after an essentially clean record for 23 years without
11 issue, that, you know, it would go to this after that one
12 episode.
13           I understood that after the inservice, and
14 being clarified on the law and on EMTALA, that I could
15 have handled that situation differently and should have
16 handled that situation differently, but I thought that
17 this --
18   Q.    Level?
19   A.    -- level of reprimand was in excess of my
20 record.
21   Q.    Did you think it was unfair?
22   A.    Yes.
23   Q.    Do you think there was particular reason they
24 were picking on you or being unfair to you?
25   A.    Again, I had met Dr. Prasad once prior to this,

Page 105

1 so I have no history with him at all.  Kris Fay, I had
2 known a little bit longer.
3           And actually, when I said I've never had a
4 first reprimand or even what they call a cup of coffee
5 where you sit down with someone and just kind of discuss
6 whatever the issue is, and I said in light of the history
7 of not letting physicians go for much worse behavior, I
8 thought that this was excessive.  Kris Fay's been with
9 Lee Memorial longer, so she said, I know -- I know the
10 cases you're referring to, but this was our decision.
11           And so, you know, like in my department we had
12 a physician who, for more than a decade, had multiple
13 issues of sexual harassment, and Lee Memorial has a zero
14 tolerance policy for sexual harassment and even though
15 multiple nurses had come forward, invariably, the nurses
16 were removed and that physician was maintained in place.
17 And so I kind of thought, well, you have a zero tolerance
18 policy with a physician who's had multiple issues and
19 didn't get this, and I had one incident in 23 years and
20 it was raised to this.  So did I think it was unfair?
21 Yes.  Do I know why?  You'd have to ask them.
22   Q.    Do you know of any physician who committed an
23 EMTALA violation and was -- for which the hospital was
24 cited?
25   A.    I do not.  I wouldn't be privy to that within

Page 106

1  the system.  Usually that's something that risk
2  management and legal handles.
3      Q.  Did Dr. Prasad or Kris Fay review the contents
4  of the employee conference form with you when you met on
5  April 30th?
6      A.  Did they review the contents?
7      Q.  Yes.
8      A.  To the best of my recollection, they gave me
9  the form to read and asked me to sign it.  I believe
10 Dr. Prasad's comment was, your signature just means that
11 you were provided with this and that you read it.  It
12 does not imply that you necessarily agree with it.  And
13 so I signed it and said thank you and left the room.
14     Q.  Did you, at some point, read the document and
15 everything it said?
16     A.  Oh.  Yeah.  Yeah.  Yeah.  They gave it to me to
17 read.  But there wasn't a discussion.  It was, they
18 provided it to me; I read it, and then he made the
19 comment of your signature does not imply that you agree;
20 it just implies that you read it and we provided you with
21 the form.
22     Q.  Did you understand that as a final written
23 warning, any future violations, as outlined in the form,
24 would lead to termination?
25     A.  I'm sorry.  Repeat the question.

Page 107

1      Q.  Did you understand after receiving the
2  write-up, the final written warning on April 30, 2018,
3  that any future violations of EMTALA or the transfer
4  policy at Lee Health could lead to termination?
5      A.  The way I was interpreting this paragraph
6  referred -- and again, the latter part of it talks about
7  conduct, behavior, so conduct detrimental to the image,
8  disruptive behavior, conduct which disturbs the patient.
9  So I was interpreting this as a last warning for
10 behavioral issues, since they considered my exchange with
11 Dr. K as unprofessional.
12     Q.  Do you see at the last two sentences of the
13 main paragraph where it says, based upon these behaviors
14 and the incorrect medical decision-making related to this
15 situation, Dr. Fonte is being issued a final warning.
16 Should Dr. Fonte persist in these behaviors by repeating
17 the same or similar offenses, her employment will be
18 terminated?
19     A.  Correct.  Again, I'm looking at it as -- I
20 interpreted it as behaviors, so --
21     Q.  Okay.  So did you see where it says,
22 additionally, administration reserves the right to issue
23 additional corrective action, up to and including
24 termination, if additional unknown facts are discovered
25 from the EMTALA AHCA investigation?

Page 108

1      A.  Correct.
2      Q.  So understood the write-up was for refusing to
3  accept the transfer of the patient, in part, correct?
4      A.  In part.
5      Q.  And you understood it was a final written
6  warning, correct?
7      A.  Correct.
8      Q.  And you understood a final written warning
9  means future violations will lead to termination,
10 correct?
11     A.  Correct.  And again, my interpretation of
12 future violations was behavioral, because that last
13 sentence that you read was related to the EMTALA
14 investigation of the case from March and nothing further
15 came out from that case, so there was no new findings or
16 new issues that resulted in any further action being
17 taken from administration.
18     Q.  So when you read this, did you understand that
19 you could violate EMTALA or Lee Health's transfer
20 guidelines and you wouldn't be terminated?
21     A.  So I believe that this occurred -- this meeting
22 occurred after the educational component.
23     Q.  Yes.  It did.
24     A.  And so at that point, you know, now I'd been
25 educated.  I had the EMTALA rules, and regs and transfer

Page 109

1  agreements, and so I interpreted this as it's behavioral,
2  and at that point, they were still pending final
3  discovery, I guess, although I think it had been pretty
4  much completed at that point, from AHCA and the hospital
5  internal investigation.
6      Q.  So my question to you was, after you read this
7  document and were issued a final written warning on
8  April 30, 2018, did you understand that any future
9  violation of EMTALA or Lee Health's transfer policies
10 would lead to termination, yes or no?
11     A.  I understood that any violation could lead to
12 termination, since this is a final warning, period.
13     Q.  Is there anything else that was said during
14 that meeting other than what we've already talked about?
15     A.  No.  Like I said, I think it was fairly brief.
16 They gave me the last warning.  I told them I was
17 surprised and shocked at the severity of the warning
18 considering my record, and we discussed, as I said, the
19 other physicians, even within my own department, that had
20 had even more complicated and repetitive misbehaviors
21 that had gone known by administration and no action had
22 been taken.
23          And then at that point it was, well, your
24 signature just implies that we gave you the form and that
25 you read it, and it does not imply that you agree with

Page 110

1   it.  So I signed it.  And I think we discussed my having
2   to do -- so if you look at number two, there were a
3   number of options for remediation, I guess, including
4   courses that I could take, and so we looked at that -- I
5   mean, they mentioned that, that that was part of the
6   remediation process, and I would be meeting with our
7   trauma director, I think -- I think it was monthly for
8   three months, maybe.  It could be four months.  I don't
9   remember, exactly, the length of time that might be in
10  there.  But I would be meeting with him on a regular
11  basis to make sure we didn't have any issues and that
12  there weren't any ongoing problems and we did that and
13  was basically cleared by him.
14      Q.   That was Dr. Diaz?
15      A.   Correct.
16      Q.   Let me hand you a document we'll mark as
17  Exhibit 10 to your deposition.
18          (Exhibit No. 10, Text message exchange was marked for
19  identification.)
20  BY MS. LYONS:
21      Q.   Have you had a chance to review Exhibit 10?
22      A.   Yes.
23      Q.   Is this an e-mail exchange between you and --
24  I'm sorry.
25          Is this a text message exchange between you and

Page 111

1   another individual --
2       A.   Yes.
3       Q.   -- named Scott?
4       A.   Scott Wolf.
5       Q.   Who is Scott Wolf?
6       A.   He's the chief administrative officer at Lee
7   Memorial Hospital.
8       Q.   And this e-mail exchange took place right after
9   you were issued the final written warning, correct?
10      A.   Correct.
11      Q.   He states in here, this was an unfortunate
12  circumstance.  You will learn from it an emerge a
13  stronger, better physician.
14          Did you agree that you had learned from that
15  circumstance?
16      A.   Yeah.
17      Q.   And do you think following the March incident
18  and the subsequent retraining by Mary Lorah, the
19  write-up, that you had a better understanding of EMTALA
20  and Lee Health's policies regarding accepting transfers?
21      A.   Yes.
22      Q.   You mentioned that you had some follow-up steps
23  you took with Dr. Diaz.  I'm going to hand you a document
24  that I think references those follow-up steps you took.
25  And we'll mark that document as Exhibit 11.

Page 112

1       (Exhibit No. 11, Performance Improvement Planning
2   Form was marked for identification.)
3   BY MS. LYONS:
4       Q.   Is this a Performance Improvement Planning Form
5   that you and Dr. Diaz completed?
6       A.   Correct.
7       Q.   Did this outline specific things you had to do
8   to meet the action plan required by the final written
9   warning?
10      A.   Yes.
11      Q.   Is any of this your handwriting other than the
12  signature?
13      A.   The courses and the dates that I took them on.
14      Q.   The top three ones, correct?
15      A.   Correct.
16      Q.   The fourth one is Dr. Diaz's?
17      A.   Yes.
18      Q.   What is A-S-S-E-T?
19      A.   The ASSET course is a course that reviews
20  surgical dissections for different types -- it's a
21  cadaver lab, basically, and we do dissections and
22  exposures for different parts of the body with different
23  type of injuries, so it's kind of like a practice,
24  cadaver course.
25      Q.   And the ATLS is the course that we've been

Page 113

1   talking about previously?
2       A.   Right.  The Advanced Trauma Life Support.
3       Q.   What was the General Surgery Board Review
4   course?
5       A.   It's a Board Review course.  It's four-day
6   course that basically covers everything in general
7   surgery.
8       Q.   Where was that offered, if you remember?
9       A.   I don't.  Sorry.
10      Q.   Did you meet with Dr. Diaz regarding this on --
11  this Performance Improvement Planning Form on May 16,
12  2018?
13      A.   Yes.  That's the date on the form.
14      Q.   And is that your signature above the line that
15  says employee signature?
16      A.   Yes, it is.
17      Q.   And did you and Dr. Diaz agree that these would
18  be the -- this would be your action plan and those would
19  be your completion dates?
20      A.   Yes.
21      Q.   During the discussion with Dr. Diaz, was there
22  anything else that was covered during that discussion
23  other than this Performance Improvement Planning Form?
24      A.   No.  Like I said, I'd been there for 23 years
25  with exemplary behavior.  There's no reason for that to

Page 114

1  change after that one incident, and so he basically sat
2  down with me and said, you know, there haven't been any
3  issues; we weren't expecting any and none came up, so it
4  was a fairly short sit and meet to, basically, fill out
5  the forms and provide them back to LPG, Lee Physicians
6  Group administration.
7      Q.  Do you remember a call that came through the
8  trauma center in November 2018 involving a five-year-old
9  boy who had been in a motor vehicle accident?
10     A.  Yes.
11     Q.  The transfer center.
12     A.  Transfer center.
13     Q.  Let me reask it altogether.  I'm sorry.  I know
14  it sounded wrong when I said it.
15         Do you recall a -- receiving a telephone call
16  from the transfer center in November 2018 regarding a
17  five-year-old boy who had been in a motor vehicle
18  accident?
19     A.  Yes.
20     Q.  That patient had been transferred to -- not
21  transferred.  I'm sorry.  That patient had initially been
22  taken to Lehigh Regional Medical Center by the first
23  responders, correct?
24     A.  Correct.
25     Q.  Do you know why that patient was not originally

Page 115

1  brought to Lee Memorial Hospital following the motor
2  vehicle accident?
3      A.  I believe he was a trauma arrest.
4      Q.  What does that mean?
5      A.  That he had no signs of life.  They were doing
6  CPR or compressions.
7      Q.  Were you the trauma surgeon on call?
8      A.  I was.
9      Q.  Do you remember what time of day the call came
10  in?
11     A.  Again, it was evening, but not -- not really --
12  I remember I was in the intensive care unit still, but, I
13  don't know, 8:00, 9:00, 10:00 o'clock.  Evening, but not
14  early hour evening.
15     Q.  Had that child not coded and had been brought
16  by EMS to Lee Memorial Hospital, would you have accepted
17  the patient?
18     A.  We accept all trauma alerts.
19     Q.  So is that a yes?
20     A.  Yes.
21     Q.  When you received the call from the emergency
22  room staff at Lehigh Regional Medical Center, what did
23  they explain to you was the child's condition?
24     A.  The ER physician said that he was in and out of
25  PEA, which is pulseless electrical activity, meaning he

Page 116

1  had no pulses, so they were, on and off, doing CPR to try
2  to get return of signs of life.
3      Q.  Anything else they told you about him?
4      A.  That he'd been a trauma arrest; that's why he
5  was brought to them, and they, you know, were trying to
6  transfer him out.
7      Q.  Did you accept the -- did the doctor at Lehigh
8  Regional Medical Center ask to transfer the patient to
9  Lee Memorial Hospital?
10     A.  She did.
11     Q.  Did you accept the transfer?
12     A.  Well, at the time of her call, with her telling
13  me that he was in and out of PEA, that would not be an
14  acceptable transfer, because he's unstable; that they
15  would need to stabilize him and get signs of life before
16  they transferred, and I also said that if she could
17  stabilize him enough for a transfer, that he should go to
18  Tampa General where they could provide definitive care;
19  that if he came to us, we wouldn't keep him, because we
20  could not provide definitive care, and in fact, we would
21  only be able to stabilize and ship out, and that sending
22  him directly to Tampa would get him to the facility that
23  could provide definitive care quickly.  He wouldn't waste
24  time with us as middleman, so to speak.
25     Q.  How far of a helicopter ride is it from Lehigh

Page 117

1  Regional to Lee Memorial Hospital?
2      A.  From Lehigh to -- I believe he would have come
3  by ground and that would have been about a 35-minute
4  ride.
5      Q.  How far of a helicopter ride is it?
6      A.  I don't know.
7      Q.  What makes you think he would have come by
8  ground?
9      A.  They don't usually fly them when they're in PEA
10  or unstable.  It's hard to do CPR in a helicopter, so if
11  they're that unstable, they would typically come by
12  ground.
13     Q.  Is it your under -- so the reason that you did
14  not accept the transfer patient in November 2018 is
15  because it was your understanding that he was not stable
16  enough to transfer?
17     A.  Correct.
18     Q.  Had he been stable enough to transfer, would
19  you have accepted him?
20     A.  No.  I think a child with multisystem organ
21  injuries that's that sick needed to go to the appropriate
22  facility that could provide definitive care, and that
23  would have been Tampa General.
24         Again, I think I even mentioned to her, you
25  know, if he has a bad liver injury, we don't have the

Page 118

1  right size catheters to do an embolization.  If he has a
2  neurosurgical injury, we don't have pediatric
3  neurosurgeons.  We, in fact, don't keep those patients at
4  our facility.  They stabilize and transfer out.  So my
5  comment to her was, if you can stabilize him enough for
6  transfer, then he needs to go to the correct facility
7  that could provide definitive care.
8      Q.   Did she tell you that she thought she could
9  stabilize him enough to get him to you and that he needs
10 further stabilization before he'd get all the way to
11 Tampa?
12     A.   I think she said she wasn't sure that he would
13 make it to Tampa -- or make it up to Tampa, but the
14 difference in timing from getting him to Lee to getting
15 him to Tampa is about a five-minute difference, and so
16 my -- my judgment was if we're talking about a
17 five-minute difference, then we're wasting time, because
18 you could have the helicopter there and the child up to
19 Tampa getting appropriate care from the physicians who
20 can do it.
21     For example, I can tell you that we've had
22 cases where I've had to take a child to the operating
23 room and calling in specialists that I need.  I mean,
24 case in point, I had a child whose grandfather transected
25 his trachea, so he tried to decapitate the baby.  I had

Page 119

1  to take him to the operating room.  I called around to
2  ENTs, including the ear, nose, throat doctor that was on
3  called and nobody would come in to help.  I actually
4  wound up having to call up to Tampa and have their
5  pediatric trauma surgeon talk me through the procedure,
6  because we don't have pediatric support within this
7  community.
8      So in my opinion, sending the child to the
9  appropriate facility that could -- that had the experts
10 and could provide definitive care was the best shot that
11 that child would have.  I thought sending him to me when
12 the difference in transfer times is about five minutes,
13 would be, basically, letting him die at my campus versus
14 having him die at her hospital.  And I understand her
15 urgency to get him out, but I was trying to get him out
16 to the facility that would give him the best chance of
17 survival.
18     Q.   So did you understand he was stable enough to
19 fly to Tampa?
20     A.   At the time that she spoke to me, he was -- her
21 comment was he was in and out of PEA, so at that point he
22 was not stable enough to go anywhere, and that's why my
23 conversation was, if you can stabilize him enough for
24 transfer, then you should transfer him to the appropriate
25 facility that could provide definitive care.

Page 120

1      Q.   You have -- wouldn't you agree that the trauma
2  surgeons at Lee Memorial Hospital have more experience in
3  stabilizing trauma patients than, say, the physician at
4  Lehigh Regional Medical Center?
5      A.   So ER stabilization is very different from what
6  we do.  So as a trauma surgeon -- you know, our ER docs
7  respond to the trauma alerts as well.  It's about getting
8  IV access; it's about controlling their airway, so if
9  they need to be intubated, which this child was; placing
10 a chest tube if they need it, which she said he didn't,
11 because I did go through certain things with her.  You
12 know, is he intubated, is his ET tube in good position;
13 does he have pneumothorax.  I went through some basic
14 steps that she could go through to try to stabilize the
15 child, which is what we would have done in the emergency
16 room.
17     So it's fluids, maybe blood if he needs it, the
18 airway, putting in a chest tube.  Those are all things
19 that can be done in any emergency room.  It's the next
20 steps, it's the providing definitive care that makes the
21 difference really between a trauma center and a nontrauma
22 center.
23     And so in my discussions with her, the child
24 was in and out of PEA, so not stable enough to transfer
25 at that time anyway, but I went through certain things

Page 121

1  with her to make sure that she was following, you know,
2  everything that she could do to stabilize that child, and
3  then it was, and if you can stabilize him, he needs to go
4  to the appropriate facility that can provide definitive
5  care, and that's not us.  Because if you stabilize him
6  enough to get him to me and he's stable, I'm calling for
7  the helicopter to send him up to Tampa and now we've
8  wasted and an hour of time that can make a difference
9  with this baby.
10     So that was -- that was where I was coming from
11 in trying do the best thing for the patient and trying to
12 not waste more time in having him come to us only to go
13 back up to Tampa.  The difference in timing, again,
14 transport time is about five minutes or so, and that's
15 considered very negligible in transport times when you're
16 trying to save a life.
17     Q.   Would you agree with me that that patient met
18 the criteria for a trauma -- let's go back.
19 Interfacility Transfer Guidelines for a trauma?
20     A.   He was a trauma arrest initially, and at the
21 time that she called me he was in PEA.  That is not a
22 stable patient for transfer to anywhere.
23     Q.   In looking at those Interfacility Transfer
24 Guidelines, was he hemodynamically unstable patient with
25 physical evidence of abdominal trauma?

Page 122

1    A.   I don't know if he had abdominal trauma.  I
2 didn't examine the patient and she hadn't sent him to CAT
3 scan, because he was so unstable.  He was hemodynamically
4 unstable, certainly.  What his injuries were, I don't
5 know.
6    Q.   Didn't she indicate that she thought there was
7 abdominal trauma?
8    A.   She, at one point, said his abdomen's
9 distended, but babies can have distended abdomens just
10 from being on the ventilator.  We -- children, opposed to
11 adults, have different types of endotracheal tube, so the
12 tube that goes down the throat to inflate the lungs, in
13 adults we use what's called a cuffed tube, so there's,
14 like, a balloon attached to it and it prevents air from
15 getting into the intestinal tract.  In children, because
16 of their anatomy, they use uncuffed tubes, so there's no
17 balloon, so you can get air into the abdomen.  At that
18 point I don't think she had dropped what we call an NG
19 tube or a tube into the stomach to try to suck out that
20 extra air.
21        So in fact, that conversation is when I said if
22 he has a liver injury, we won't be able to take care of
23 it here.  So I was -- I was relying on what our
24 capabilities were.  I know what their capabilities were.
25 I know they did not have the capability to handle the

Page 123

1 child, but in return, I didn't think we were the right
2 facility with the right capabilities to take care of such
3 an injured child.  Different from he arrives at my
4 doorstep and I have to do -- you know, he's there and
5 it's my job to try to do the best I can.  But to take a
6 transfer from another hospital to us to just send it to
7 the appropriate facility is a step and waste in time in a
8 very sick patient.
9    Q.   What is evidence of abdominal trauma?  Would
10 that include bruising above the abdomen?
11    A.   Bruising could be, yeah, a sign of injury, but
12 you could have bruises without intraabdominal injuries,
13 right?
14    Q.   Right.  Well, this defines a trauma as
15 hemodynamically unstable patient with physical evidence
16 of abdominal trauma.  So I'm asking you, could bruising
17 or redness be physical evidence of abdominal trauma?
18    A.   It can.  Yes.
19    Q.   Could a distended stomach be physical evidence
20 of abdominal trauma?
21    A.   It can, yes.
22    Q.   And could those two things combined be physical
23 evidence of abdominal trauma?
24    A.   Yes.  Absolutely.
25    Q.   So would you agree with me then that this child

Page 124

1 met the definition of a trauma sufficient for
2 Interfacility Transfer Guidelines?  He was
3 hemodynamically unstable and he had physical evidence of
4 abdominal trauma.
5    A.   So nobody's arguing the point that he met
6 criteria for transfer.
7    Q.   I just want a yes or no.  I --
8    A.   So yes.  The patient with hemodynamic
9 stabilization, not PEA.  You have to have a pulse in
10 order to leave your ER.  PEA means they were doing CPR.
11 So while they were doing CPR -- again, she told me --
12 our conversation started with, he's in and out of PEA, so
13 a patient in PEA cannot be transferred until they get
14 signs of life.  Once they have signs of life and they've
15 stabilized that patient, he absolutely met every criteria
16 for a transfer to an appropriate facility that could
17 provide definitive care.
18    Q.   And what is stabilize in that situation?  What
19 would make that child stable enough for transfer?
20    A.   At least a pulse.  I mean, you have to have a
21 heart --
22    Q.   Well, he was in and out of having a pulse.
23    A.   Right.
24    Q.   So what's enough to be stable?
25    A.   Well, enough to get him to the receiving

Page 125

1 facility.
2    Q.   So it would be a pulse that lasted an hour?
3    A.   Possibly.
4    Q.   How do you know that as the doctor --
5    A.   I don't.
6    Q.   -- if it's -- the pulse is good enough to last
7 an hour?
8    A.   So that comes in medical judgment.  That comes
9 in you're the physician taking care of the patient.
10 Certainly if -- so during a code, when a patient is
11 pulseless and they're doing CPR, there's a number of
12 medications that we also use to trying and jump start the
13 heart, to so to speak.  If the patient responds
14 transiently, meaning for a very short period of time --
15 for example, Epinephrine is one of the code medications.
16 So if you give a patient, whether it's a child or an
17 adult, Epinephrine and their heart kicks up and you start
18 to develop a pulse, right?  So you're like, okay, we got
19 him back, and the medication wears off five minutes later
20 and, basically, what you were seeing is what we call the
21 Epi kick, so it's the effects of the medication, not that
22 the heart is actually beating effectively to create a
23 pulse, then you know that, well, you know, that's not
24 going to transfer.  That's, basically, Epi kick.
25        But if you do that and you stabilize the

Page 126

1  patient, they got their heart rate back; they have a
2  pulse; they're maintaining a blood pressure; doesn't have
3  to be a normal blood pressure, but they're maintaining a
4  blood pressure, then -- then that's at least stable
5  enough.  Because you're never going to get them normal,
6  right?
7       Q.   Right.
8       A.   I mean, this is a multisystem injured person,
9  but you want to make sure that they've got at least some
10 kind of a blood pressure and heart rate that will
11 tolerate a transfer.  And then it's -- and then it's kind
12 of a guess.
13      Q.   In that situation when they have some kind of
14 blood pressure and a pulse, then you would put them on a
15 helicopter to Tampa?
16      A.   Yeah.
17      Q.   Or you could put them on a helicopter to Lee
18 Memorial Hospital, correct, if you were at Lehigh Acres?
19      A.   Typically, they come by ground from Lehigh.
20      Q.   But there's no rule that says they can't take a
21 helicopter from Lehigh to Lee Memorial, correct?
22      A.   Correct.
23      Q.   And had a patient been -- had some blood
24 pressure and some pulse and not real stable, but stable
25 enough for transport, it would have been a lot quicker to

Page 127

1  transport them to Lee Memorial Hospital by helicopter
2  than to transport the patient to Tampa General by
3  helicopter, correct?
4       A.   It's a shorter ride to -- in and out of a
5  facility to manage that child, but -- yes, it's a shorter
6  ride.
7       Q.   I'm going to hand you what we're going to mark
8  as Exhibit 12.
9            (Exhibit No. 12, Written transcript was marked for
10 identification.)
11 BY MS. LYONS:
12      Q.   Exhibit 12 is a transcript of one of the calls
13 regarding this patient.  The first call you didn't
14 actually speak to anyone, but a staff member in the
15 operating -- in the emergency department, because they
16 were busy intubating the child, so this is the call after
17 that.  We've marked that as Exhibit 13.
18      A.   This says 12.
19      MR. YORMAK:  I have 12.
20 BY MS. LYONS:
21      Q.   Then where did 13 go?
22      MR. YORMAK:  You put it on mine.
23      MS. LYONS:  Oh.
24      MR. YORMAK:  It's on mine.
25           (Discussion off the record.)

Page 128

1  BY MS. LYONS:
2       Q.   So I've handed you what we've marked as
3  Exhibit 12 which is transcript of the call with the
4  doctor, and I'm going to play it simultaneously, so we can
5  listen to it.  We don't need the court reporter to type
6  the call, because we do have the transcript of it that
7  we're marking as an exhibit.
8            For the record, this is designated as file
9  437075.
10      MR. YORMAK:  And just for the record, we don't
11 necessarily agree with the transcription, because
12 we're only hearing this for the first time.  We
13 would, of course, reserve the right to have the
14 actual audio transcribed by a different court
15 reporter.
16      MS. LYONS:  You're free to have a different
17 court reporter do it.  I'm not sure why one court
18 reporter you think would be better than another,
19 but --
20      MR. YORMAK:  On the previous audio recording I
21 saw some discrepancies in what I heard versus what I
22 saw on the page.  So we just reserve that right just
23 so the record is clear.
24 (Whereupon, the recording is played.)
25

Page 129

1  BY MS. LYONS:
2       Q.   Is that an accurate recording of your telephone
3  call with Dr. Hessler?
4       A.   Heisler.
5       Q.   Heisler?
6       A.   Yeah.
7       Q.   And does the transcript that is Exhibit 12
8  accurately reflect that conversation with Dr. Heisler?
9       A.   Yes.
10      Q.   At any point did you tell her he's not stable
11 enough to transfer?
12      A.   She was saying it herself; he kept on losing
13 his pulses and was in and out of PEA.
14      Q.   Did you ever tell her, I can't accept him,
15 because he's not stable enough to transfer?
16      A.   I don't see it in the transcript.
17      Q.   In fact, you told her he -- now that you've got
18 a pulse, you need to send him to Tampa, correct?
19      A.   Right.  And I think she followed up with, he
20 keeps losing his pulse.
21      Q.   Did she tell you that she didn't think he was
22 stable enough to get all the way to Tampa?
23      A.   Yes.
24      Q.   And did she tell you that she thought you could
25 better stabilize him and had -- were more capable to

Page 130

1   stabilize him than she was?
2       A.   Yes.
3       Q.   Did you refuse the transfer?
4       A.   If you read the transcript, she said, all
5   right; she was okay with the transfer to Tampa.  So this
6   was not a refusal; this was a redirection to an
7   appropriate facility.
8       Q.   That's your opinion?
9       A.   Correct.
10      Q.   Did you take the transfer?
11      A.   No.  I referred them to the appropriate
12  facility.
13      Q.   Did you ask what his vitals were at any point?
14      A.   If he's in and out of PEA, he wouldn't have
15  vitals.
16      Q.   Well, at some points he does, right?
17      A.   Again, you know, a picture in time isn't the
18  whole picture.  While -- you can get Epi and had have a
19  blood pressure of 200 over 90, and then lose it two
20  minutes later and have no blood pressure and no pulse.
21  So vitals on a patient who's in and out of PEA mean
22  nothing unless you've obtained vitals that are now
23  consistently there, and then you have, you know, this is
24  what his blood pressure is and what he's holding --
25      Q.   Did you --

Page 131

1       A.   -- but when they're in and out and you're
2   losing your vitals, your in and out; you're losing your
3   vitals.
4       Q.   Did you ask what his blood pressure was at any
5   point?
6       A.   I didn't need to.  He was in and out of PEA.
7       Q.   Yes or no, did you ask what his blood pressure
8   was at any point?
9       A.   I didn't need to.  It was --
10      Q.   I need a yes or no, ma'am.
11      A.   No.  It wouldn't -- wouldn't have mattered.
12      Q.   Did you ask how long he was keeping a pulse --
13      A.   No.
14      Q.   -- for?
15           Did you ask if he was on any Epinephrine or
16  anything that would, you know, give a false indication
17  that he was going to keep his pulse?
18      A.   I wouldn't need to ask that, because a patient
19  who's in PEA should be treated under ACLS protocol, which
20  is the Advanced Cardiac Life Support, and Epinephrine is
21  one of the cardiac support medications.
22      Q.   Do you know if they had given it to him?
23      A.   I assumed that if the child is under -- in and
24  out of PEA that they would be following protocol, and
25  protocol includes Epi as part of the resuscitation drugs.

Page 132

1       Q.   Did you ask though?
2       A.   Wouldn't need to.
3       Q.   Did you ask them if his periods of being -- of
4   having a pulse were connected to when he was given the
5   Epi?
6       A.   My interactions with Dr. Heisler were about
7   trying to get the child to the appropriate facility as
8   quickly as possible.  Spending time on the phone with her
9   was wasting time for the child.
10      Q.   You told me earlier that you did not accept him
11  as a transfer because he was not stable enough to
12  transfer, correct?
13      A.   I said he was not stable enough to transfer and
14  if he stabilized enough to transfer, he should go to the
15  appropriate facility that could provide definitive care,
16  and that was not Lee Memorial.
17      Q.   So did you make any effort to assess his
18  stability?
19      A.   He was in and out of PEA.  He was not stable by
20  her comments.  He kept losing his pulse.
21      Q.   And yet you told her, send him to Tampa.
22      A.   If you can stabilize him, you need to send him
23  to the appropriate hospital that can provide definitive
24  care.
25      Q.   You actually say, on page 7, at line 16, and I

Page 133

1   don't want to waste time if, you know, you've got him
2   back and you've got -- you know, you've got vitals, then
3   let's try and get him to the appropriate facility.
4       A.   Correct.
5       Q.   You never indicate there that he's not stable
6   enough to go to the appropriate facility, correct?  Your
7   statement is, let's send him to the appropriate facility.
8       A.   Yeah.  Don't waste time.  Send him to the
9   appropriate facility.  Absolutely.
10      Q.   So then you did think he was stable enough to
11  transfer at that time.
12      A.   That is not my call.  That is the ER physician
13  taking care of the patient.
14      Q.   I know.  I'm asking you what did you think,
15  though.
16      A.   That he needed to go to Tampa if she could
17  stabilize him for transfer.
18      Q.   Did you think -- at the time this call
19  concluded when you made these statements, did you think
20  that patient was stable enough to transfer?
21      A.   At that time when she said he's in and out of
22  PEA, I did not think he was stable enough to transfer.
23  Again, by her statements, he kept losing his pulses.  The
24  a patient that's losing their pulses and is in and out of
25  PEA is not stable for transfer.  But if she gets his

Page 134

1  pulses back, then get him to Tampa as quickly as
2  possible, so he could be treated at the appropriate
3  facility that could provide definitive care.
4       Q.  You told me earlier if you get some blood
5  pressure and some pulse, then they're stable enough
6  to transfer.  So did you know what his blood pressure was
7  and how long he was being in or out of PEA to determine
8  if he was stable enough to transfer?
9       A.  Again, that's not my determination.  I had a
10 conversation, which is a moment in time, and in that
11 moment in time her comments were, he's in and out of PEA.
12 Another time she said, he keeps losing his pulses.  And
13 so based on the information that she was providing to me,
14 the child was not stable to transfer anywhere at that
15 point.  And so --
16      Q.  Did you ever say that to her?
17      A.  That he was unstable?
18      Q.  That you were --
19      A.  She said it.
20      Q.  Did you ever say, I can't accept him, because
21 he's not stable enough to transfer?
22      A.  No.  Because --
23      Q.  Doesn't she get to decide if he's stable enough
24 to transfer or not?
25      A.  Yes.  She has to decide if he's stable enough

Page 135

1  to transfer and I --
2       Q.  And she --
3       A.  -- was directing her to send the child to the
4  pediatric trauma center if she could stabilize him enough
5  for transfer.
6       Q.  And she indicated to you that he was stable
7  enough for transfer, but probably not to make it as far
8  as Tampa, correct?
9       A.  Correct.  But the difference in transfer times
10 is about five minutes.
11      Q.  The difference in helicopter rides is not five
12 minutes, is it?
13      A.  No, but my understanding is they had an
14 ambulance there the child was going to be sent by
15 ambulance.
16      Q.  Where does it say that in the transcript?
17      A.  It doesn't.  Michael Marcus, our trauma nurse
18 coordinator is the one who let me know that.
19      Q.  So at the time you made the statement you
20 didn't know that?
21      A.  No, I didn't, but again, typically, transfers
22 from Lehigh come by ground, not by air.
23      Q.  Typically, though, transfers from Lehigh aren't
24 people who are not stable enough to go by ground, because
25 if they're not stable enough to go by ground and they

Page 136

1  need quicker transport, then they'll go by air, correct?
2       A.  The -- that would actually create even a longer
3  time, because now they -- you know, they have to wait for
4  the helicopter to get warmed up and brought in.  And at
5  the end of the game, it would have taken about a half
6  hour to get the helicopter to them regardless of whether
7  it was coming to Lee or not.
8       Q.  But it takes that long to get it even if it's
9  going to Tampa, right?
10      A.  Yeah.  But then it would have arrived at the
11 appropriate facility to provide definitive care.
12          I think the difference is, you know, there's
13 a -- a dictum that says you have to take everything, and
14 then there's the trying to do the best thing for the
15 patient, having the patient's best interest at heart and
16 trying to make sure that they're going to get the
17 appropriate care at the appropriate facility.  So when
18 you look at ATLS, the Advanced Trauma Life Support
19 course, the first thing that they teach is you don't go
20 to the closest hospital.  You go to the closest hospital
21 that could provide definitive care.  And I did not feel
22 that we could provide definitive care.
23          And in fact, we would actually be delaying care
24 in the patient if he -- if he had stabilized enough to
25 transport, then to send him to us so that we could then

Page 137

1  turn around and send him to Tampa would be a delay in his
2  care, and that would not be in his best interest.
3       Q.  Notwithstanding the fact that the transferring
4  physician requested a transfer of a patient who met the
5  trauma criteria and stated, I need your help to stabilize
6  him enough to get him to Tampa, you still refused that
7  patient, correct?
8       A.  I believe if you read the last page of the
9  transcript, Hope said, all right, and said thank you.
10 This was not an acrimonious exchange.
11      Q.  I didn't say it was.  I said you refused the
12 transfer, correct?
13      A.  I did not refuse the transfer.  I directed --
14      Q.  Did not accept the transfer, did you?
15      A.  I directed it to a level of appropriate care.
16      Q.  You did not accept the transfer, did you?
17      A.  I directed it to the level of care that would
18 provide definitive care for this child.
19      Q.  So let me just ask my question again, because
20 you're not answering the question I'm asking you.  The
21 transfer physician determined that the patient was stable
22 enough to transfer to Lee Health.  The transferring
23 physician determined the patient met the trauma criteria.
24 The transferring physician determined that the
25 transferring physician could not provide the immediate

Page 138

1   services that person needed, i.e., stabilization, and
2   asked that you take the transfer, correct?
3       A.   She wanted to get the child out of her ER.
4       Q.   She asked you to take the child as a transfer,
5   correct?
6       A.   That is correct.
7       Q.   And you did not take that child as a transfer,
8   did you?
9       A.   I directed it to the appropriate facility.
10      Q.   Did that child come in to Lee Memorial Hospital
11  that night as a transfer patient?
12      A.   No.  I directed the patient to an appropriate
13  facility that could provide definitive care.
14      Q.   And that doctor had specifically said to you, I
15  don't think the child will make it that far, correct?
16      A.   She wasn't sure he could make it.  If you look
17  at the transcript, she says, he keeps losing his pulses.
18           My comment was, I don't want to waste time
19  if -- if you get him back and you've got vitals, then
20  let's try to get him to the appropriate facility.
21      Q.   After this happened, did you report it up the
22  chain of command?
23      A.   Did I report it?
24      Q.   Yeah.
25      A.   So -- yeah.  I discussed it with, actually,

Page 139

1   Dr. Vieux the following morning.  I said, oh, my God,
2   they tried to send me this kid last night who had been a
3   trauma arrest and I told them to send him up to Tampa.
4           His comment was absolutely.  What were we going
5   to do.  I would have done the exact same thing.
6       Q.   Was he in the chain of command that we
7   discussed earlier?
8       A.   Was he --
9       Q.   Dr. Vieux.
10      A.   From the policy?
11      Q.   Yeah.
12      A.   So actually, the interesting thing is, before
13  the transfer center connected me with Dr. Heisler, they
14  had already told Lehigh to send the patient to Tampa,
15  because when he called me he said -- or she said, I can't
16  remember -- that the transfer operator had said they
17  called about this child that was a trauma arrest, and
18  we've already told them that they should sent it to
19  Tampa, but the ER physician is insisting on talking to
20  you.  So I said, okay, go ahead and put it through.  So
21  at that point, Lehigh had already been told by our
22  transfer center that the right facility would have been
23  Tampa.  When she spoke with me, this was the exchange
24  where I reiterated the patient needs to go to the
25  appropriate facility, and that's not us.

Page 140

1           When you talk about the procedures, the chain
2   of command, that is the transfer center that is supposed
3   to intervene if they think there's an inappropriate
4   refusal, as you're trying to get at, and they're the ones
5   that are supposed to then call the chief administrative
6   officer or whoever else is on that list, and then the
7   policy that had come through was, if there's an
8   inappropriate refusal, the transfer center calls the
9   administrator on call, the CAO or whoever's the next
10  person on call for that chain of command, and the patient
11  gets accepted to the emergency room and then it has to be
12  seen, because it's already in the facility.
13          But the transfer center didn't feel that the
14  patient should come to us, and therefore, they did not
15  follow their own policies and procedures that had come
16  through from legal, and gone up the chain of command, and
17  called administration and had administration call,
18  because they felt that the child needed to go to Tampa
19  even before I was put on the line.
20      Q.   The transfer center are not the trauma
21  surgeons, correct?
22      A.   Correct.  But again, it's their policy for them
23  to follow that chain of command and they didn't follow
24  the policy, because they didn't feel that we were the
25  right facility to begin with; otherwise, they would have

Page 141

1   triggered this chain of command reporting, and they
2   didn't do that.  That's not my job; that's transfer
3   center's job to do.
4       Q.   It was your job to accept the transfer --
5       A.   No.
6       Q.   -- when the transferring facility --
7       A.   Not if it's an inappropriate --
8       Q.   You can't interrupt --
9       A.   Sorry.
10      Q.   -- when I'm talking.
11      A.   I apologize.
12      Q.   It was your job to accept the transfer when the
13  transferring physician requests a transfer of a patient
14  who meets the Interfacility Transfer Guidelines, correct?
15      A.   If I --
16           MR. YORMAK:  I'm going to object to the form.
17  It's been asked and answered several times.
18           THE WITNESS:  If I can refer to the EMTALA
19  on-call emergency services obligation.  Again, at
20  bullet point five.  If a hospital is requesting
21  transfer of a patient with an emergent medical
22  condition because the hospital lacks the service
23  capability to care for the patient and the Lee
24  Memorial Hospital has -- has the service capability
25  and is geographically closest, the on-call physician

Page 142

1    must provide the necessary consult and treatment.
2         And I am standing by the fact that we did not
3    have the service capability to provide care for a
4    five-year-old when we have no pediatric services at
5    the downtown campus.
6    BY MS. LYONS:
7         Q.   Yet the downtown campus frequently stabilizes
8    five-year-old trauma patients, correct?
9         A.   And ships them when they come directly through
10   our door.  We do not --
11        Q.   My question was --
12        A.   We do not deny any trauma alert that comes
13   through the door.  We do the best that we can in the
14   patient's best interest to stabilize and ship.  My --
15        Q.   My question was, the downtown hospital, Lee
16   Health -- Lee Memorial Hospital campus frequently accepts
17   trauma patients who are children, correct?
18        A.   Are you talking about transfers or are you
19   talking about from EMS?
20        Q.   I'm talking about in general.  You accept and
21   care for trauma patients who are children, correct?
22        A.   In transfer, multisystems, we do not accept.
23   We refer them to Tampa.  We are not a pediatric trauma
24   center.
25        Q.   I don't care how they got there.  I'm saying

Page 143

1    you care for them.
2         The physicians, the trauma physicians at Lee
3    Memorial Hospital frequently care for trauma patients who
4    are children, correct?
5         A.   So on average, we operate on anywhere from
6    eight to 12 pediatric case as year, and that's a review
7    that we did -- so we did that review in about -- I think
8    it was 2017, 2018.  And so the experience of the entire
9    department of trauma surgeons revolves around eight to 12
10   surgical cases a year.  I do not consider that expertise
11   when we've got six trauma surgeons dividing up those
12   eight to 12 cases.  That means, basically, on average, we
13   may operate on one to two patients a year, pediatric
14   patients.
15        That being said, not all of those are
16   exploratory laparotomies.  We have extensive wounds that
17   need cleaning, and it's too much for a child in the
18   emergency room, so we take them up to the operating room
19   so we can sedate them and do that.
20        So our experience with pediatric exploratory
21   laparotomies is extremely limited.  Now, we do the best
22   that we can under the circumstances that we have in
23   trying to stabilize these patients when we have no
24   choice, but in most situations where there's multisystem
25   injuries and a child is very sick, we, basically,

Page 144

1    intubate them, get IVs into them, start fluids and ship
2    them up to Tampa, because we just don't have the
3    capability to take care of a multisystem organ injured
4    pediatric patient at the downtown facility.
5         Q.   Do you think the doctor at Lehigh Acres had the
6    capability of taking care of that patient?
7         A.   No.  Absolutely not.  The patient needed to be
8    at a pediatric trauma center.  I'll give you case in
9    point.  Thanksgiving week of this past year they had four
10   pediatric deaths under the age of 12.  So kudos to them.
11   Let them accept things even when it's without -- you
12   know, exceeds the scope of their abilities and
13   capabilities and have four pediatric deaths, which I can
14   tell you, in the 23 years that I was there, we had never
15   had four pediatric deaths in one week.  But now there's a
16   fear of not accepting, because it's going to become a
17   legal issue, and so you accept things that maybe you
18   can't take care of, but I guess it's better and easier to
19   legally defend that than to actually do the right thing
20   by the patient.
21        In my interaction with Dr. Heisler, I thought
22   that the patient, if he could be stabilized -- and again,
23   when she talked to me, he was in and out of PEA, so
24   that's not a patient that's even stable enough to
25   transfer.  But if he could be stabilized to transfer,

Page 145

1    then getting him the appropriate facility that could give
2    him the best chance was, in my opinion, in the child's
3    best interest.
4         This was not about refusing the child because I
5    didn't want to take care of the child.  I even said, if
6    he's 16, send him.  You know, I'm happy to take care of
7    him.  If he's ten, send him.  But when you're talking
8    about a five-year-old where you have very limited
9    instrumentation -- I mean, we have a cart in the ER that
10   has a little bit of everything, again, to basically try
11   to mediate when they arrive, but we -- you know, I had a
12   case a couple years ago where the child's bladder was
13   filling up.  I had to open his belly, and the bladder was
14   halfway up and we had no Foleys, the catheter that goes
15   in to drain the urine.  I had to send for a Foley
16   catheter from HealthPark that they sent in a cab.
17        So that's the kind of environment that we work
18   under for the pediatric patients at Lee Memorial.  Again,
19   we do the best that we can when they hit our door and
20   they're ours, but if they're not at our facility, to
21   refer the patient to the appropriate hospital -- I think
22   I even said in the audio, I would feel negligent
23   accepting a patient that I knew we could not provide
24   definitive care for.
25        Q.   If that child was bleeding out in the abdomen

Page 146

1  and had to have open belly surgery, who was better
2  qualified to do it, you or the doctor at Lehigh?
3      A.   That's not a fair question.  The doctor in
4  Lehigh is an ER physician and I'm a surgeon.
5      Q.   That's why I'm asking you the question.  Who is
6  better qualified to do it?
7      A.   Of the two, myself.  But that would not be
8  definitive care for the patient, and certainly with
9  multisystem injuries, his best shot at surviving his
10 injuries would be at a facility where there are
11 specifically trained pediatric subspecialists.
12     Q.   But that doctor specifically said to you, I
13 don't think he can make it as far as Tampa, didn't she?
14     A.   And my --
15     Q.   Didn't she, yes or no, ma'am?
16     A.   Yes.
17     Q.   And that doctor specifically said to you, this
18 child needs to come to your facility to be
19 stabilized before the child is stable enough to go to
20 Tampa, correct?
21     MR. YORMAK:  Object to the form.
22     THE WITNESS:  Again, my comment was --
23 BY MS. LYONS:
24     Q.   Yes or no, ma'am?
25     A.   That's what she said.  And my answer was, if

Page 147

1  you can stabilize him enough for transfer, let's send him
2  to the appropriate facility.
3      Q.   So you knew almost immediately that there was
4  going to be a problem, right, with your actions?
5      A.   No.
6      Q.   When did you first learn that there was going
7  to be a problem?
8      A.   I'm going to say a week, maybe a
9  week-and-a-half later.
10     Q.   Do you remember what date this transfer
11 situation arose?  I'll tell you, it was November 12,
12 2018.
13     A.   Okay.
14     Q.   How did you learn there was an issue?
15     A.   I had a call, I think, from risk management
16 that said that they wanted to review the case with me.
17     Q.   Who at risk management called you?
18     A.   I don't remember.
19     Q.   Did you review the case with someone from risk
20 management?
21     A.   I did and I --
22     Q.   Who was it?
23     A.   I've got to check my phone for a name.
24     Q.   Go ahead.
25     A.   Sorry.  I'm sorry.

Page 148

1      Q.   Was it Mary Lorah?
2      A.   No.
3      Q.   Was it Debbie Wiles?
4      A.   I don't know.
5      Q.   That's okay.  If you don't know, that's all
6  right.
7      A.   I definitely don't remember.  I mean there's
8  certain people I know very well and I know their names
9  and there's.
10     Q.   Right.  So it was a phone call you received
11 that advised you of a meeting or was it an e-mail?
12     A.   I don't remember.
13     Q.   So you went up --
14     A.   I met up with her.
15     Q.   -- to risk management?
16     A.   Yeah.  Met up with her and brought her,
17 basically, the literature, ATLS recommendations of
18 sending patients to the appropriate closest facility.
19 Not just the closest facility, but the appropriate
20 closest facility that could provide definitive care and,
21 basically, that was the rule that I was following.
22     Q.   How long was your meeting with the person from
23 risk management?
24     A.   I'll say maybe a half hour.
25     Q.   Was it just the two of you?

Page 149

1      A.   Yeah.
2      Q.   Did the person from risk management, what that
3  a female?
4      A.   Yes.
5      Q.   So I can call her a she.
6      A.   Yeah.
7      Q.   Did she give you any indication as to whether
8  there was going to be an investigation or what was going
9  to happen next?
10     A.   No.
11     Q.   What did happen next?
12     A.   So we sat -- you know, we had the discussion;
13 we reviewed the case; I provided her with the
14 literature --
15     Q.   Right.
16     A.   -- and I think later that week -- because I was
17 very confused about this.  Honestly, this was -- you
18 know, again, we get calls for burns; we refer them to
19 Tampa.  We get calls about peds; we refer them to Tampa.
20 It had never been an issue.
21          So I think later that week -- I think it was
22 later that week after I'd met with her, I had called or
23 texted Mary McGullicuddy and asked her to call me at --
24 you know, at her convenience.  So she called me on the --
25 I don't remember the date, but it was that Friday, late

Page 150

1  in the day.  And I told her.  I said, I'm really
2  confused; I don't understand.  I followed ATLS protocol.
3  I referred the child to the appropriate facility, so I'm
4  not sure what the issue is.  And Hope and I did not have
5  an acrimonious conversation.  There was no behavioral
6  issues where I was being belligerent or unprofessional.
7  I was trying to direct the child to the appropriate care.
8       And Mary had said, well, you have to take every
9  transfer.
10      And I know -- I remember saying, even if it's
11  not in the patient's best interest?  Even if it causes a
12  delay in care?
13      And she said, yes.  By EMTALA, you have to
14  accept every patient.
15      So I remember saying, okay, so if it's a burn,
16  and we're not a burn center, and they decide they want to
17  send it to us, we have to take that patient even if it
18  would cause a delay in care and a detriment to their
19  outcome?
20      And her comment was, you know, yes.  That's the
21  law and that's what we have to do.  That's easier to
22  defend.
23      So at that point I remember thinking, well,
24  this is crazy.  Now you're asking me to practice law
25  instead of medicine and not use my medical judgment in

Page 151

1  trying to do the right thing by the patient, but just
2  doing whatever is supposed to be legally more defensible.
3  And I remember at one point I said, okay, I can't argue
4  the law; you're the lawyer, but this makes absolutely no
5  sense to me.  And that was the last I heard about that
6  case.
7       Q.  So when you spoke with Mary, was it your
8  impression that Mary believed that what you had done was
9  a -- was not the right thing to have done?
10      A.  Well, when she said, you have to accept every
11  patient, that -- you know, and I said, okay, that makes
12  no sense medically, but I can't argue the law with you,
13  and so -- so yeah.  But that was our last exchange.
14      Q.  Right.  So did you believe, based upon that
15  conversation with Mary, that as of that time a decision
16  had been made or people had reached the conclusion that
17  your actions were wrong?
18      A.  Honestly, I didn't know what to think at that
19  point, because, you know, risk management investigates
20  cases all the time.  And I had provided the literature
21  from ATLS that stated very clearly that you don't
22  transfer to the closest hospital; you transfer to the
23  closest appropriate hospital.  So, you know, I thought it
24  was -- they're going to review it; they're going to see
25  the literature that supports my actions and that's going

Page 152

1  to be the loop closure.
2       Q.  And when you talked to Mary and she said, no,
3  you're supposed to take every transfer, did you believe
4  that a conclusion had been reached; that you had done
5  something wrong?
6       A.  No.  I believed that, you know, she was being a
7  lawyer and saying this is what the law says, but
8  oftentimes when they do reviews, it's, well, the law says
9  this, but your actions fall within acceptable protocols
10  and practices within your specialty, so in effect, there
11  was nothing there.  As far as I knew, there had been no
12  complaints from Lehigh or issues from Lehigh to have
13  brought this up, so I wasn't even sure why the situation
14  had arisen, but --
15      Q.  Do you know who had reported it?
16      A.  No.
17      Q.  I'm going to hand you a document that we're
18  going to mark as Exhibit 13 to your deposition?
19      (Exhibit No. 13, Text messages was marked for
20  identification.)
21  BY MS. LYONS:
22      Q.  This is a text message exchange between you and
23  Michael.
24      Do you recognize this document?
25      A.  Yes.

Page 153

1       Q.  Is this a copy of a number of texts you and
2  Michael -- is it Michael Marcus?
3       A.  Correct.
4       Q.  That you and Michael Marcus sent to each other
5  on November 15th and 16th, 2018?
6       A.  Correct.
7       Q.  And you sent to Michael Marcus on
8  November 15th, which is just three days after the
9  transfer incident, so I guess I'm meeting with legal
10  again.  Correct?
11      A.  Yes.  Risk management.  That's who I met with.
12  Correct.
13      Q.  So you knew at least three days later that you
14  were meeting with risk management?
15      A.  Right.  That's what this was about.
16      Q.  So it didn't take a week or a week-and-a-half,
17  as you said earlier, but a mere three days?
18      A.  Well, that's not when the meeting occurred.
19  You asked me when I had met with someone.  I met with
20  risk management.
21      Q.  No.  I asked when did you first hear something
22  about this.
23      A.  Okay.  In three days.
24      Q.  So within three days you had heard from risk
25  management that they wanted to meet with you?

Page 154

1    A.   Yes.  That's what the text says.
2    Q.   And did you fear at that point that your
3  employment could be in jeopardy?
4    A.   No.  I felt that I had literature to support my
5  actions.
6    Q.   Let me hand you a document that we'll mark as
7  Exhibit 14 to your deposition.
8    (Exhibit No. 14, Text messages was marked for
9  identification.)
10  BY MS. LYONS:
11    Q.   This is a copy of a text exchange between you
12  and Robert O.
13        Do you recognize this document?
14    A.   I do.
15    Q.   Is this an accurate representation of the text
16  exchange between you and Robert O. on November 15th and
17  16th, 2018?
18    A.   Yes, it is.
19    Q.   Who's Robert O.?
20    A.   Robert O'Connor?  Bobby O'Connor is one of the
21  trauma surgeons.
22    Q.   On November 15th at 8:27 p.m., did you ask him
23  about headhunters?
24    A.   Yes.
25    Q.   Were you going to start looking for another

Page 155

1  job?
2    A.   Most of the trauma surgeons were doing locums
3  work, and it's fairly lucrative, so I was asking him
4  about locums.  Headhunters are, basically, locums
5  companies.  I was probably the only trauma surgeon that
6  was not doing locums so I did reach out to him.  As I
7  said earlier, Weatherby and other locums had been just
8  calling around on a fairly regular basis, and at this
9  point I thought, you know, maybe I should start doing
10  some locums as well and see what else is going out there.
11    Q.   Bus you were worried about the stability of
12  your job?
13    A.   Having had a last warning in April, I figured,
14  you know, truthfully, so many physicians had been let go
15  in that year and there was so much turmoil within Lee
16  Memorial Health System with people being let go or having
17  just leaving or contracts being terminated, that I
18  thought it would probably be a good idea to know what
19  else is out there.
20    Q.   So you had the situation with the transfer
21  issue, three days later you hear from legal or risk
22  management that there -- they need to talk to you and in
23  a same day you're, you know, maybe my job's in jeopardy I
24  better at least look what's out there, is that an
25  accurate summary?

Page 156

1    A.   Not far from accurate.  Yeah.
2    Q.   What about it is not accurate?
3    A.   I didn't think I was going to be /TERL natured,
4  but I certainly thought that it's not a bad idea to see
5  what else is out there, because it had become such a
6  toxic environment at this point, tore many reasons, not
7  jaws for me but for many physicians and I thought it was
8  a good idea to see what else is out there and what other
9  options were available.  But again, all of the trauma
10  surgeons had their full-time jobs at Lee and did locums
11  in addition, so it wasn't a, I'm doing locums instead of
12  my job, it's, I'm doing locums in addition to my job.
13    Q.   Do you know -- you -- would you agree with me,
14  though, that you at least had a little bit of concern
15  given that you were on a final written warning?
16    A.   Once I heard on this November 15th that risk
17  management wanted to talk to me, yeah.  I'd be dumb not
18  to be concerned.
19    Q.   Right.  I'm going to hand you a document we're
20  going to mark as Exhibit 15.
21    (Exhibit No. 15, Text messages was marked for
22  identification.)
23  BY MS. LYONS:
24    Q.   This is an e-mail -- sorry -- text message
25  exchange between you and Ernst Vieux from November 16,

Page 157

1  2018, correct?
2    A.   Correct.
3    Q.   And on November 16th at 10:30 a.m. he sent you
4  a text message that says, focus on patient was never
5  stable to transfer, not where should have gone.  Correct?
6    A.   Correct.
7    Q.   What was the preceding text to this, because
8  you didn't produce that, that caused him to even bring up
9  this issue of the patient transfer?
10    A.   I think I had said something about do you
11  remember the case I told you about, and he said yeah.
12  Because he's the one who the -- was on call with me the
13  morning after, and I discussed the case with him and I
14  said, yeah, the kid should never come here, you know,
15  he'd basically come here to die.
16        So I called him up and said, oh, my God, you're
17  never going to believe this; they're calling me about
18  this case.  And he thought that was crazy, and then the
19  response was, you know, just focus on the fact that he
20  wasn't stable enough to transfer.  And I was going to
21  provide the literature from the ATLS manual that talked
22  about being send to the not the closest facility, but the
23  closest appropriate facility.  But at the time of the
24  call, the kid was in and out of PEA, so he wasn't stable
25  enough to transfer anywhere.

Page 158

```
 1      Q.   But the material you gave to Mary -- sorry --
 2 risk management was about transferring to the appropriate
 3 facility, not whether they were stable enough to
 4 transfer, right?
 5      A.   You can't transfer a patient without a pulse.
 6      Q.   I need you to answer my question.
 7      A.   I don't understand it.
 8      Q.   You didn't provide -- when you went and spoke
 9 with risk management, you provided them what you felt was
10 information supporting your position that you were not
11 the proper facility to accept the transfer of that
12 patient, correct?
13      A.   I also talked to them --
14      Q.   I need you to answer my question first, yes or
15 no?
16      A.   I provided her with the ATLS recommendations
17 for transferring patients to appropriate facilities, yes.
18      Q.   Who is Lottenberg?
19      A.   Dr. Lottenberg is a trauma surgeon who was on
20 the Florida -- FCOT, the Florida Committee on Trauma and
21 is one of the physicians involved in trauma protocols,
22 state criteria and coming up with, basically,
23 requirements for trauma centers. He's kind of
24 administrative -- he's practicing surgeon, but he's at
25 the state level administratively coming up with
```

Page 159

```
 1 protocols.
 2      Q.   So you wanted Mr. Vieux to talk to risk
 3 management or legal on your behalf?
 4      A.   I wanted to him to explain what practices and
 5 protocols were for trauma. Dr. Diaz -- so Dr. Vieux was
 6 the trauma director prior to Dr. Diaz taking over. Diaz
 7 was going to be in meetings all day, so I asked if he
 8 would be available to talk to them to provide further
 9 support of the -- you know, the ATLS, basically, policies
10 and procedures for transferring patients, trauma patients
11 to appropriate facilities.
12      Q.   So what did the text message -- do you still
13 have these text messages?
14      A.   I should. You have to bear with me. I have to
15 go back a year.
16           There's nothing -- I mean, November 15th, so
17 the day before. Hey, are you still around? I can drop
18 in to sign papers. I think my answer was your e-mail
19 bounced back, and yes, please, in lounge. On my way.
20 Thank you. How are you doing. And then focus on patient
21 was never -- so there was no --
22      Q.   Can I see it?
23      A.   Um-hum.
24      Q.   Did you delete any text messages?
25      A.   No.
```

Page 160

```
 1      Q.   So just out of the blue he sent you a text
 2 message that said -- that told you how to argue your
 3 case?
 4      A.   So we may have had a telephone conversation and
 5 he sent that text as a follow-up to the conversation. I
 6 don't recall exactly what the circumstances were, if we'd
 7 been on call and talked and then he sent that text or --
 8 so I'm not sure about what preceded it, but certainly,
 9 there was nothing texted prior to this, as I showed you.
10      Q.   I'm going to hand you a document that we're
11 going to mark as Exhibit 16 to your deposition.
12           (Exhibit No. 16, Text messages was marked for
13 identification.)
14 BY MS. LYONS:
15      Q.   Exhibit 16 is a text message exchange between
16 you and Michael Marcus on November 16, 2018 at 11:49 a.m.
17 Do you recognize this document?
18      A.   Yes.
19      Q.   So if we look back at Exhibit 15, Ernst --
20 Dr. Vieux told you, at 10:31 a.m.-ish, that he thought
21 someone like Dr. Lottenberg would be good review the
22 matter, and then about an hour later you were then
23 talking to Michael Marcus as to who he thought would be
24 good review the matter, correct?
25      A.   Correct.
```

Page 161

```
 1      Q.   So I would discern, based upon your reaching
 2 out to so many people and looking for other folks to come
 3 in and help you explain the situation, that as of
 4 November 16, 2018 you were pretty concerned about the
 5 incident and the effect on your future employment,
 6 correct?
 7      A.   I think at that point I was concerned that risk
 8 management wasn't independently well informed enough to
 9 be able to make a decision, and therefore, outside
10 corroboration or outside explanation would enlighten them
11 to ATLS protocols and transfer agreements.
12           Dr. Lottenberg, being an outside reviewer,
13 somebody who was heavily involved at the state level and
14 coming up with these agreements, and these procedures and
15 protocols would be a good person to review. He didn't
16 have a pony in the race. He wasn't a partner. And so we
17 thought that, if necessary, he could be a good person to
18 review the case and give an opinion as to whether or not
19 this was appropriate or not.
20      Q.   Right. And you were concerned, at least as of
21 November 16th, that because you were in a final written
22 warning, this could result in your termination, correct?
23      A.   I did not feel that this was a refusal of care.
24 I felt that this was a referral to an appropriate
25 facility. So I was concerned that they were even
```

Page 162

1  bringing it up.  I certainly wasn't concerned about
2  losing my job, because I didn't equate this with EMTALA;
3  I equated this with medical judgment trying to provide
4  the right care to the patient at the right facility.
5      Q.   So you had no fear whatsoever as of
6  November 16th that you would lose your job?
7      A.   You know, can I say that there was a zero
8  percent chance?  No.  But was I concerned that I'm going
9  to be fired now?  No.  Because I felt that I had made a
10 decision based on my best medical judgment, and that
11 that -- it certainly was corroborated by Dr. Vieux; it
12 was corroborated by Dr. Kasiewicz, so other partners
13 that, you know, we talked about as we were on call said,
14 oh, my God, that would have been a disaster here --
15     Q.   I'm going to hand you a document that we're
16 going to mark as Exhibit 17 to your deposition.  These
17 are medical records from Margaret Walsh's practice.
18         (Exhibit No. 17, Psychiatric Assessment was marked
19 for identification.)
20 BY MS. LYONS:
21     Q.   Do you know who that is?
22     A.   Yes.
23     Q.   And who is she?
24     A.   She's a therapist.
25     Q.   Did you see Therapist Walsh in November 2018?

Page 163

1      A.   At the end of November.  Yes.
2      Q.   So November 20th, which is just four days after
3  you were out marshaling forces to help argue your case to
4  Lee Health, you met with Therapist Walsh, correct?
5          MR. YORMAK:  Object to the characterization.
6          THE WITNESS:  Yes.
7  BY MS. LYONS:
8      Q.   I'll rephrase it.
9          Just four days after you were looking for
10 someone to assist you in addressing the transfer issue,
11 you were talking with Therapist Walsh, correct?
12     A.   So --
13     Q.   Is that a yes or no, ma'am?
14     A.   I saw Ms. Walsh at the end of November.  Yes.
15     Q.   On November 20th, according to this medical
16 record that's Exhibit 17, correct?
17     A.   Yes.  That's correct.
18     Q.   Do you have any reason to think that she wrote
19 down the wrong date?
20     A.   No.
21     Q.   So it was just four days later, correct?
22     A.   Correct.
23     Q.   Did you -- your visit with her was about three
24 hours long; is that correct?
25     A.   That's correct.

Page 164

1      Q.   Have you ever read her notes as to what she
2  said you said during the visit?
3      A.   No.
4      Q.   Do you have any reason to believe she'd make
5  stuff up?
6      A.   No.
7      Q.   In the second page of Exhibit 17, in the 7th
8  paragraph it starts, she has had three work -- you're on
9  the wrong page.
10     A.   Sorry.
11     Q.   Second page of the exhibit, not the summary.
12     A.   Sorry.
13     Q.   She has had three work incidences that appear
14 to be threaten to her continued employment.  Do you see
15 that?
16     A.   Yes.
17     Q.   Did you tell your counselor on November 20th
18 that you'd had three work incidences that could threaten
19 your continued employment?
20     A.   I don't remember if the number is correct.
21     Q.   Okay.  Did you tell her about an incident where
22 you were -- yelled at the OR staff because they put a
23 case ahead of your trauma patient?
24     A.   Yes.
25     Q.   Did you tell her, then there were two

Page 165

1  incidences where she declined to accept a transfer from
2  two different hospitals.  One is currently being
3  investigated and decision has not been made, although
4  hospital attorneys said she is in the wrong?
5      A.   Yes.  That was my phone call with Mary
6  McGillicuddy when she said that EMTALA required me to
7  accept every case.  And that's followed by the statement
8  that the next senior surgical colleague agreed with me
9  that the patient was too unstable to be transported and
10 if child stabilized, needed to go to Tampa where there's
11 a pediatric trauma center.
12     Q.   Then a little while later did you tell her that
13 you feel like your head is on the chopping block like a
14 guillotine?
15     A.   After my conversations with Mary, yes.
16     Q.   Did you tell her that now you were threatened
17 with losing your job, a job you had worked hard at and is
18 at the top of her field and loved?
19     A.   Yes.
20     Q.   On the next page in the third full paragraph
21 did you tell her that your self esteem was normally high,
22 but at the moment, when you were being threatened with
23 the loss of the job you loved, you were down on yourself?
24     A.   Yes.
25     Q.   And did you tell her, at the third to the

Page 166

1  bottom paragraph, that you are afraid something terrible
2  would happen, namely, that you would be fired?
3      A.   Yes.
4      Q.   So we can agree then, can't we, that you
5  knew -- or at least suspected that the incident involving
6  the November transfer could lead to your termination,
7  correct?  Whether you thought it was fair or not, it
8  could lead to your termination?
9      A.   Correct.
10      Q.   I'm going to hand you a document I'm going to
11  mark as Exhibit 18 to your deposition.
12      (Exhibit No. 18, Psychiatric Assessment was marked
13  for identification.)
14  BY MS. LYONS:
15      Q.   Exhibit 18 is records that were sent to us, I'm
16  assuming, pursuant to a subpoena, perhaps by you.  But
17  someone sent them to us as part of this lawsuit.  And
18  they are from John Burdzy's office?
19      A.   Correct.
20      Q.   Burdzy is B-U-R-D-Z-Y?
21      A.   Correct.
22      Q.   Do you know who that is?
23      A.   That's my primary care provider.
24      Q.   Did you visit Dr. Burdzy -- am I saying that
25  right?

Page 167

1      A.   Yes.
2      Q.   Did you visit Dr. Burdzy on or about, I guess
3  February 21, 2019?
4      A.   That's the -- that's what this medical record
5  copy is from.  Yes.
6      Q.   So it looks like you visited him twice, if you
7  look at the first page.  Encounter one occurred on
8  11/28/2018 and encounter two occurred on February 21,
9  2019.  Do you see those?
10      A.   Yes.
11      Q.   And do you recall both of those visits?
12      A.   Yes.
13      Q.   If you could turn to page 5 of Exhibit 18.  At
14  the top it says encounter number one.
15      A.   Page 5 for me has laboratories.
16      Q.   Are you counting the first page?
17      A.   No.  I'm going by the --
18      Q.   Oh, it's page 6 if you go by the page
19  numbering.  I was using the cover page as page 1.
20          So it says encounter one.  Have you ever seen
21  this medical record before?
22      A.   I have not read that.
23      Q.   Do you have any reason to believe Dr. Burdzy
24  would put stuff in here that wasn't true?
25      A.   No.

Page 168

1      Q.   Do you recall seeing him on November 28, 2018?
2      A.   Yes.
3      Q.   Under the section that says additional reasons
4  for visit.  One of the things he wrote down in that first
5  paragraph is, there are administrative problems at work.
6          And in the next paragraph he wrote down, she
7  reports she may be in danger of losing her job due to
8  friction with admin.  Do you see those two?
9          Did you tell both of those things to
10  Dr. Burdzy?
11      A.   Yes.
12      Q.   And what was the friction with the admin you
13  were referring to?
14      A.   So we had spent -- I was chief of surgery at
15  the time, and for most of 2018 -- I'm trying to get the
16  dates correct.  For most of -- end of 2017 and 2018 there
17  were contractual revisions and issues between
18  administration and the employed physicians.
19          As chief of surgery, I was brought into a lot
20  of the medical staff meetings and discussions and had had
21  to represent the medical staff on occasion to
22  administration voicing the concerns over the contractual
23  changes, so there was a lot of -- again, there was just a
24  lot of tension between the medical staff and
25  administration.

Page 169

1      Q.   And do you feel that that had a negative impact
2  on your relationship with administration?
3      A.   Oh, yeah.
4      Q.   And did you feel at least as of November 28,
5  2018 that that tension caused by the contract
6  negotiations could lead to you losing your job, or would
7  that be combined with --
8      A.   I think there was a combination of things, so
9  certainly, Lee Memorial is not enamored of the squeaky
10  wheel, and unfortunately, as a physician leader, being
11  chief of surgery, I was elected to be the voice of
12  medical staff, at least for the surgery department, so I
13  know that they were not necessarily happy with the fact
14  that I wasn't a yes man, that I had to actually voice the
15  objections of the medical staff.
16          But I'd been in physician leadership in the
17  past.  I mean, I'm a past president of the medical staff
18  and this was my third term elected as the chief of
19  surgery.  So this -- it wasn't new to me to have to voice
20  where the medical staff stood, but there had been a
21  dramatic change in the relationship after the change in
22  administration and how they were dealing with the medical
23  staff, and so there was an ongoing list, I guess, of
24  physicians who were verbal and, therefore, losing their
25  positions, so there was some tension, as I knew this was

Page 170

1   happening.  And basically, by the time the second case
2   came along, even though I felt that I was doing what was
3   in the patient's best interest, I was starting to feel
4   almost gaslighted, and that's why we thought about
5   bringing in outside review, so it couldn't be seen as --
6   or wouldn't be seen as, you know, as a partner you're
7   a covering for each other or, you know, bringing in an
8   independent outside physician to review the case and
9   provide an opinion.  So that wasn't about garnering
10  support; it was about having an objective outside
11  physician reviewing the case and rendering an opinion.
12      Q.   Did you feel that you were being targeted by
13  administration and watched more closely?
14      A.   I think towards the end, yes --
15      Q.   Do you --
16      A.   -- because --
17      Q.   -- think the reason the November transfer issue
18  became a big deal and led to your termination is because
19  you were being targeted by administration due to the --
20  you know, your speaking out about the contractual
21  revisions?
22      A.   So again, in the big picture, the meeting in
23  April occurred just weeks after I had had a conference
24  call with Dr. Prasad and Kris Fay relative to these
25  contractual changes and the physicians, you know, getting

Page 171

1   outside legal counsel and my, basically, warning them
2   that they really needed to reach out to the medical
3   staff, that I had never seen them so unified on any
4   issue, and that it was really in their best interest to
5   meet -- to not come down with dictums, but to meet with
6   the medical staff and try to understand their concerns.
7           In fact, shortly thereafter or just within days
8   of that conversation, there had been a letter sent to the
9   board, Lee Memorial Hospital's board and signed by I
10  don't know how many physicians in regards to the issues
11  with the contracting.  So when I had the first meeting
12  with them in April, and it was a last warning after never
13  having had any warnings or any issues in 23 years, I
14  thought that that was rather strict and unfair, but in
15  the back of my mind I did think that perhaps it was
16  because of my verbalizing the issues with the medical
17  staff, and again, being the squeaky wheel, bringing it to
18  their attention that there was a problem.  Nothing I
19  could do about it, that was just -- that's what it was.
20      Q.   So between April and November did you continue
21  to be the squeaky wheel --
22      A.   I had --
23      Q.   -- about those issues?
24      A.   I had a job to do.  Again, I was elected, you
25  know, to represent the surgery department.  I was the

Page 172

1   chair of surgery.
2       Q.   Had that -- had those contract revisions been
3   finalized by November 12, 2018?
4       A.   No.  So the --
5       Q.   Were they --
6       A.   So trauma -- we had actually -- our department
7   had actually gone ahead and signed the revised contracts
8   in, I think it was -- I'm going to say maybe October of
9   '17.  So from -- from my perspective and our department's
10  perspective we had already agreed to their contractual
11  changes.  It was in that ensuing year when the
12  contracted -- so it was the rest of the medical staff,
13  the contracted -- the employed medical staff that was
14  having issues.
15      Q.   Okay.  And you started to speak up on their
16  behalf, because of your job?
17      A.   I was on the medical executive committee.  I
18  was on the credentialing committee.  I was on quality
19  improvement committee.  I was on the physician hospital
20  organization.  I was -- I mean, you know, so there -- I
21  was on a multitude of committees based on my role as a
22  physician leader in the hospital --
23      Q.   And do you think --
24      A.   -- and so issues came up and I -- you know,
25  you're at a meeting and issues come and so yes, I would

Page 173

1   sit there and say, you know, this is going to be a
2   problem, you know, you need to talk to the medical staff,
3   so --
4       Q.   Do you think that role contributed to the
5   escalation of the November transfer incident?  In other
6   words, had you not been in that role, that would never
7   have become an issue?
8       A.   I think partly, yes.  I think that played a
9   role in --
10      Q.   It was a factor?
11      A.   Yeah.
12      Q.   So do you think it was a factor in the decision
13  to end your contract?
14      A.   So I believe that come April when they gave the
15  final warning, which I found out through Michael Marcus,
16  and Dr. Diaz and even through legal that LPG, Lee
17  Physicians Group had actually wanted to fire me at that
18  point, and that legal had said, no, that my actions did
19  not warrant losing my job.  So when I found that out, you
20  know, you have to sit back and go, you know, I've had a
21  23 year of no issues, no problems, you know, no cups of
22  coffees, no written or verbal warnings about anything,
23  and now all of the sudden they want to fire me after one
24  incident, and legal has to actually step in and say that,
25  no, it doesn't meet the grounds for termination, it

Page 174

1  certainly makes you think that they're trying to get rid
2  of me.
3      Q.   Right.  But my question is, do you think the
4  termination of your contract was caused, at least in
5  part, by the fact that you were the squeaky wheel on
6  addressing contractual and other issues with
7  administration?
8      A.   So I -- I'm going to assume that it was part of
9  it.  I don't know if that was the only reason, but it
10  certainly would contribute to the big picture.
11     MR. YORMAK:  Can we take a quick break?
12     MS. LYONS:  Let me just make sure there's
13  nothing else about this before we do.
14  BY MS. LYONS:
15     Q.   So when you were referring to the friction with
16  admin that you thought would -- might cause you to lose
17  your job, that was the stuff you've now described as the
18  contractual revisions and the other issues that you were
19  advocating for on behalf of the medical staff --
20     A.   Correct.
21     Q.   -- is that correct?  All right.
22     MS. LYONS:  Yeah.
23     MR. YORMAK:  Okay.  Thanks.
24     (Whereupon, a recess commenced at 4:24 p.m. and
25  concluded at 4:32 p.m.)

Page 175

1  BY MS. LYONS:
2      Q.   Did you ever talk to Dr. Diaz about this
3  situation, the November transfer issue during the month
4  of November?
5      A.   I'm sure we had an exchange.  Again --
6      Q.   Do you recall anything about it?
7      A.   Other than, you know, this is being questioned,
8  you know, risk management's reviewing it, but I don't
9  remember anything other than it's being reviewed.
10     Q.   Okay.
11     A.   So again, at the time, it's not like we had a
12  decision on anything, it was, it was being reviewed, and
13  I recommended, again, an outside review as a potential so
14  that we could have an objective --
15     Q.   At some point you took FMLA leave shortly
16  thereafter, correct?
17     A.   Yeah.
18     Q.   Do you recall what your last physical date of
19  work was?
20     A.   It would have been the Friday --
21     Q.   Our records show November 16th.  Does that
22  sound accurate to you?
23     A.   Yeah.
24     Q.   I'm not trying to trick you, so --
25          Now, while that was your actual last day of

Page 176

1  work, do you recall what date you requested FMLA leave,
2  where you actually made the request for leave?
3      A.   The date, I don't remember.  I can tell you it
4  was -- I was in the emergency room the Sunday before
5  Thanksgiving.
6      Q.   That would have been in 2018, right?
7      A.   Correct.
8      Q.   So Thanksgiving was November 22, 2018, so the
9  Sunday before was November 18th.
10     A.   Yep.
11     Q.   So you were in the emergency room --
12     A.   That evening.
13     Q.   -- on November 18th.
14          And November 16th was the last date you worked,
15  according to our records --
16     A.   Correct.
17     Q.   -- which was a Friday.
18          And then after you -- how long were you in the
19  emergency room for?  Were you admitted?
20     A.   I was admitted to the intensive care unit.
21  Yeah.
22     Q.   How long were you in the hospital for overall?
23     A.   I was discharged the following late afternoon.
24     Q.   So that would be November 19th?
25     A.   Correct.

Page 177

1      Q.   When did you first contact someone at Lee
2  Health regarding a request to take FMLA leave for
3  those -- for that incident?
4      A.   So I notified our office the morning of the
5  19th.  I think I called early enough that there was no
6  one in the office, so initially I left a message, and
7  that would have been with Shelly Fay, who is our office
8  manager, but I also texted Michael Marcus, our trauma
9  nurse coordinator to let him know that I was in the ICU.
10     Q.   Did you contact someone and request FMLA leave?
11     A.   So at that point, I did not.  At that point, I
12  was more concerned with I had call later that week, and I
13  wanted to make sure that arrangements were being made to
14  get coverage, since I wouldn't be able to work it.  And
15  then once I was discharged, I think it was -- so I was
16  discharged that -- the Monday afternoon.  I think Tuesday
17  I spoke with Shelly Fay, again, our office manager, about
18  FMLA.
19     Q.   And that would have been the 20th of
20  November
21     A.   I believe so.
22     Q.   -- if it was Tuesday.
23     A.   I may be off by a day, but it was -- I believe
24  it was the Tuesday.
25     Q.   When you spoke to Shelly, was that by phone?

Page 178

1    A.    Yeah.

2    Q.    And what was the conversation you had with

3  Shelly?

4    A.    Basically, you know, she knew at that point

5  that I'd been in the hospital, and that I had a multitude

6  of doctor visits that week, that I'd had very, very high

7  blood pressure coming into the emergency room and that,

8  you know, I had talked to Jose -- to Dr. Diaz about the

9  call schedule, and he had said to just take time off and

10  make sure that you're healthy before you come back,

11  because it's, basically, hard to -- we do 24-hour shifts.

12  It's hard last minute to try to get them filled.  And so

13  looking ahead, he kind of said, you know, don't worry

14  about it, take the rest of November off and, you know,

15  we'll talk about December and see how you're doing.

16        But at that point after visiting with the

17  doctors -- so basically, I came in to the emergency room

18  with extremely high blood pressure.  My diastolic, the

19  low one was, like, 128, so I was, like, 240/128 and they

20  had to give me three Nitros under the tongue to try to

21  get my blood pressure down.  I was having chest pressure

22  and feeling some shortness of breath.  So they put me in

23  for a cardiac workup, and that included blood work, the

24  troponins, and then on a Monday I was sent over to Cape

25  Coral to have a CTA, basically, an angio of my heart,

Page 179

1  evaluate the vessels.  So once that came back okay, that

2  I didn't have a blockage, they were going to transfer me

3  out of the ICU to the floor, and that's when I requested

4  to be discharged, because quite frankly, by then I was on

5  pills, and you can imagine, as a physician having worked

6  at that hospital for 23 years, there was no rest for the

7  weary, and I thought if I can go out of the unit and

8  manage this, then I can go see a doctor the next -- you

9  know, see the cardiologist, and see my primary and kind

10  of line everybody up that way instead of sitting in the

11  hospital and having 75 visitors an hour, so that's why I

12  was discharged right from the ICU as opposed to being

13  transferred to the floor and then discharged.

14        So it was after I was seeing the physicians --

15  you know, when I was discharged I had three different

16  blood pressure medicines.  I had never had high blood

17  pressure, so this was all kind of very new.  My blood

18  sugar had been elevated.  I was now on Metformin for my

19  blood sugar.  And there was an anxiety component to all

20  of this, which is why I initiated the process of seeing a

21  therapist, as well, and a psychiatrist, because, quite

22  frankly, at that point, I was -- I think the -- you know,

23  I deal in a very stressful world, but that's my world.

24  And there were just a number of -- it's almost the straw

25  that broke the camel's back.  So, you know, you deal with

Page 180

1  stress, and that's what you deal with and that's your

2  life, but then eventually there's just more stress than

3  you can handle.

4        And after I had spoken with Mary McGillicuddy

5  on the Friday when she said, you know, you need to take

6  everything, and my answer was, even if it's not in the

7  best interest of the patient, I think that started --

8  that created anxiety for me, because now all of the

9  sudden I thought I no longer am going to be able use

10  medical judgment.  I have to practice medical-legal

11  medicine, and, basically, play to the attorneys as

12  opposed to what's in the best interest of my patients.

13  That -- that was just -- that created a tremendous amount

14  of stress for me, because Mary was somebody -- Mary

15  McGillicuddy was somebody that I trusted, and respected

16  and liked, and so when she basically said, you know, it's

17  not about the patient, it's about the law, is how I

18  interpreted her -- what she was saying, that gave me a

19  tremendous amount of anxiety that I think just built up

20  over the weekend, and then by Sunday night I -- I mean, I

21  was -- I was huffing and puffing.  Like I said, I wound

22  up in the emergency room with a diastolic of 127, and the

23  ER doc thought he had seen some EKG changes because of

24  the blood pressure, and the tachycardia and my heart rate

25  was very fast.  And at that point he had read and

Page 181

1  interpreted my EKG as having some EKG changes.  That's

2  why I was admitted to the intensive care unit to have

3  cardiac workup.

4    Q.    So -- but when did you actually ask to take

5  FMLA?

6    A.    Again, I think it was that -- so like that

7  Tuesday -- it was right after I was discharged.  I was

8  discharged --

9    Q.    Oh, yeah.  You told me that.  I'm sorry.

10    A.    Yeah.  I had spoken with Shelly Fay about it.

11  And so she actually -- it used to be, years ago, FMLA was

12  handled through HR, but I'm not sure when -- there was a

13  transition at some point in the last few years where they

14  outsourced their FMLA, I believe, to Aetna.  And so she

15  gave me that -- that information, and I had to reach out

16  to Aetna at that point.

17    Q.    Did she say anything negative about you taking

18  FMLA when you spoke with Shelly Fay about it?

19    A.    Did she say anything negative?

20    Q.    Yes.

21    A.    No.

22    Q.    When you spoke with Dr. Diaz while you were in

23  the hospital and he said, you know, take off the rest of

24  November, did you talk to him at that time about FMLA?

25    A.    I had been talking to him.  I actually didn't

Page 182

1  talk to him while I was in the hospital. He had come to
2  visit while I was at the Cape Hospital having the CTA,
3  the angio of the heart, so I didn't see him while I was
4  in the hospital. I spoke with him the next day, and his
5  comment was just, you know, take whatever time you need;
6  don't rush to come back. I'll redo the schedule so we're
7  not, you know, changing it on a daily basis; we'll just
8  keep you off the schedule for November. And then as I
9  was having my -- like I said, that week was pretty --
10 like I got out of the hospital so I could follow up with
11 the docs. So that week was pretty much a follow-up with
12 a physician almost every other day.
13         And so it was in those follow-ups, I was
14 keeping in touch with him. At one point I said, you
15 know, I feel really bad, you know, the holidays are
16 coming; it's messing everybody's holiday schedule up.
17 And he had said -- because they were adjusting some of my
18 medications, my blood pressure medications and whatnot.
19 I don't know if you've ever been on blood pressure
20 medication. It makes you very dizzy when you first
21 started up on stuff. And I didn't feel like I could
22 safely be able to operate and do our 24-hour shifts, so
23 it was after Thanksgiving, I think, that we had texted
24 and I said, you know, I don't feel like I could safely
25 do -- you know, safely operate and be dizzy and, you

Page 183

1  know, be up for these shifts.
2         So he had said, you know, just take December
3  off, because we need you to be able to come back and do
4  the job, you know, we can't have you come back and -- and
5  not be able to do the job and then we're fixing the
6  schedule. So the side effects of the medication were
7  such that I was -- I wasn't even driving at that point,
8  because it made me so dizzy.
9     Q.  Did you ever actually talk to him about FMLA?
10 Were the words FMLA used?
11    A.  I don't know if I actually said that to him.
12 Certainly to Shelly, to our office manager.
13    Q.  Right. But I'm asking about Dr. Diaz.
14    A.  I don't remember actually saying it to him, but
15 it -- you know, once you're taking time off, and he's in
16 communication with our office manager, she's the one that
17 kind of referenced me to -- not HR, but Aetna, and what
18 to call and what not, so our trauma nurse coordinator
19 certainly knew.
20    Q.  Was Dr. Diaz supportive of your need to take
21 November and December off?
22    A.  Yeah. It was actually his suggestion. I had
23 kind of wanted to just do -- I said, you know, let's do a
24 week at a time and see what happens, and he said, no, you
25 know, just take the -- take the time. It's easier to

Page 184

1  just redo the December schedule without you in it.
2     Q.  I thought you had said you were dizzy and you
3  couldn't operate.
4     A.  Correct. That was end of November. So when I
5  came out of the hospital, I was -- I was not able to
6  operate. And so we were thinking about -- I was trying
7  to do it a week at a time. I didn't know how my symptoms
8  were going to -- you know, is it something that lasts a
9  week or two? And he said, no, you know, if you're still
10 adjusting medication, just go ahead and take all of
11 December off, get yourself healthy so you can come back
12 in January.
13    Q.  So would you describe him of supportive of your
14 need to take time off in November and December?
15    A.  Yes. Absolutely.
16    Q.  Did you ever talk to Dr. Prasad about your need
17 to take time off for FMLA?
18    A.  There's no need to. He wasn't part of that
19 chain.
20    Q.  So with just a yes or no, could you tell me
21 whether you ever talked to Dr. Prasad about taking time
22 off for your need for FMLA?
23    A.  No.
24    Q.  You had taken FMLA before during your
25 employment at Lee Health, correct?

Page 185

1     A.  Yes.
2     Q.  What years had you taken it prior?
3     A.  So I took FMLA for both of my pregnancies.
4  That was 2001, May, beginning of May for maternity leave,
5  and then I took maternity leave FMLA in 2002, October.
6  And then in 2011, February of 2011 I took an FMLA leave
7  for -- my husband had gotten very, very sick, almost
8  died, wound up being fixed-winged up to Johns Hopkins in
9  Baltimore and we were up there for a bit, so during that
10 part of his illness I was on FMLA as well.
11    Q.  Did you ever have difficulty taking leave on
12 any of those occasions?
13    A.  No.
14    Q.  Do you feel as if you were -- as if you had any
15 difficulty taking your leave in 2018 and getting it
16 approved or --
17    A.  No.
18    Q.  -- being approved for it?
19    A.  No.
20    Q.  Did anyone at Lee Health ever tell you you
21 wouldn't use FMLA in November, December 2018?
22    A.  No.
23    Q.  Did anyone try to talk you out of using FMLA?
24    A.  No.
25    Q.  Did anyone say anything negative to you about

Page 186

1    the fact that you had used FMLA leave?
2    A.   No.
3    Q.   At some point you notified the hospital that
4    you were set to return from FMLA leave on January 17,
5    2000 -- no.  January 7th --
6    A.   I was --
7    Q.   I'm going to start offer.
8         At some point you notified the hospital that
9    you were going to return from FMLA leave on January 7,
10   2019, correct?
11   A.   Correct.
12   Q.   After that you received a phone call or a text
13   message from the hospital to schedule a meeting with you
14   and Dr. Prasad; is that correct?
15   A.   Can I just check the calendar for the --
16   Q.   Yeah.
17   A.   -- for the dates?
18        So I had handed -- faxed my medical --
19   Q.   Faxed?
20   A.   Yeah.  Believe it or not, our HR still uses
21   faxes.
22   Q.   Okay.  So --
23   A.   So I had faxed my medical release to go back to
24   work on January 4th to HR.  And I'm going to say about an
25   hour after I had faxed the medical release, I had a call

Page 187

1    from Shelly Fay, our office manager saying that
2    Dr. Prasad wanted a meeting with me at 9:00 o'clock in
3    the morning on the 7th.
4    Q.   Is that the date your medical release said
5    you'd be returning, or were available to return?
6    A.   Correct.
7    Q.   What did you -- did you actually speak to
8    Shelly or did she leave you a message?
9    A.   No.  I spoke with her directly.
10   Q.   Did she tell you what the meeting was about?
11   A.   No.  And in fact, I was not available on the
12   7th.  When you're gone for an extended period of time,
13   you have to take a -- so separate from FMLA, but just
14   medical staff, you have to take leave of absence from
15   your medical staff privileges so that you're not assigned
16   call or -- you're not expected to be at meetings, that
17   sort of thing.
18        So the credentialing committee is the one
19   that's responsible for putting you on a leave of absence
20   and reinstating your medical privileges when you come
21   back.  And the credentialing committee didn't meet until
22   Monday night, so the 7th in the evening.  So I would not
23   have been able to -- so I was cleared to go back to work,
24   medically, on the 7th, but I wouldn't be able to actually
25   practice and my privileges wouldn't have been instituted

Page 188

1    until after the credentialing committee meeting on the
2    7th.  So I had not planned on coming back until the 8th,
3    because I had to wait for credentialing to approve my
4    privileges coming off of the leave of absence.
5         So initially, the phone call, like I said, was
6    about an hour after I handed in my medical release that
7    they wanted to meet on Monday at 9:00 a.m. and I was not
8    able to be there, because, again, I hadn't anticipated on
9    being back until the 8th.  So then she called me back
10   after she had told him that I was not available, and the
11   meeting was set for the 8th at noon.
12   Q.   Did you ask her what the meeting was about?
13   A.   I did and she said she didn't know.
14   Q.   Did you suspect what the meeting was about?
15   A.   Frankly, no.  I had had text exchanges with
16   Dr. Diaz at the end -- or mid November -- not November.
17   I'm sorry.  Like mid December about schedules up, I think
18   until March, and coming back to work and requesting days
19   off, that sort of thing for him to come up with a
20   schedule, and so -- and that was, like I said, mid to end
21   of December, and his comment had been, yeah, that
22   shouldn't be a problem, you know, I'll look at the
23   schedule, you know, to that effect.
24        So when they called for this meeting, again, my
25   exchanges with Dr. Diaz had -- you know, job expectancy

Page 189

1    through March, because he had said that the schedule --
2    the dates that I was requesting for March were okay and
3    shouldn't be a problem.  There was no indication that
4    there had been any ongoing issues, so I was anticipating
5    coming back to work.
6    Q.   Were you nervous at all about the meeting?
7    A.   I think you're nervous at all any time you have
8    to meet with administration.  But again, I wasn't --
9    there had been no indication during that month of
10   December that there had been a problem, an issue.  Again,
11   even my exchanges with Dr. Diaz with talking about future
12   dates, his response hadn't been, oh, I'll get back to
13   you; it had been, oh, sounds okay, shouldn't be a
14   problem.  There had not been an indication that there was
15   a problem, so I wasn't sure what the meeting was about.
16        The interesting thing is I had a release to go
17   back to work, and the only stipulation that my physician
18   made was that my calls be limited to 48 hours for, like,
19   two months, while my medications were being adjusted,
20   even though at that point, I was feeling better.  We
21   didn't think that, you know, being out for three or four
22   days in a row would be beneficial in the beginning, and
23   so -- but it was just for a -- again, I think it was for,
24   like, one or two months after I started.  And that was
25   not like an unusual request.  We sometimes broke our

Page 190

1  calls out that way, although, as I mentioned earlier, the
2  guys did a lot of locums, so they would try to do, you
3  know, five or six days in a row so they could have
4  stretches of time off so they could go off and do locums
5  elsewhere.  So it wasn't an unusual request.
6          When I was talking to HR after I'd handed in --
7  faxed the letter of release, because it had that
8  stipulation, I did ask them, is there someone I need to
9  talk to to make sure that that's going to be okay.
10 Dr. Diaz hadn't verbalized that there would be a problem,
11 and I had said -- and I've got to paraphrase, because I
12 don't remember exactly how I said it, but I said, you
13 know, because it's, like, two months, would this be
14 considered like an ADA accommodation?  It's not
15 permanent, but it's just a, how do I, you know, get back
16 to work and have my calls limited to the 48 hours.
17         And the person in HR actually gave me somebody
18 else's name that handled ADA, and -- but she was out of
19 town and was going to be not available, so I never was
20 able to talk to her.  So that's the only other caveat.
21 Again, it wasn't a permanent condition, but it was, you
22 know, a two-month condition and I wanted to make sure
23 that that was provided.
24     Q.   Who did you speak with in HR?
25     A.   In HR, I spoke with -- I want to say it was

Page 191

1  Fran Caleiro, C-A-L-I-E-R-O.
2      Q.   Why did you speak to her at all?
3      A.   Because I had to let her know that I was faxing
4  back my medical release.  She was the one who was
5  receiving.  So HR receives your medical release to go
6  back to work.
7      Q.   Who's the person that Fran told you'd have
8  to speak with?  Do you remember that person's name?
9      A.   I don't.
10     Q.   It's okay.  And you never spoke to that person,
11 correct?
12     A.   No.  They were -- I think it was, like, they
13 were on vacation or they were out of town and I had
14 called, but, basically, it was -- she wasn't going to be
15 around, so I never actually got to speak with her.
16     Q.   I'm going to hand you a document that we're
17 going to mark as Exhibit 19 to your deposition.
18     (Exhibit No. 19, Text messages was marked for
19 identification.)
20 BY MS. LYONS:
21     Q.   That is copy of a text message exchange between
22 you and Dr. Vieux.
23         Do you recognize this document?
24     A.   Yes.
25     Q.   Did you tell him on Wednesday, January 2nd

Page 192

1  that, I'm hoping to start back soon, but I guess we will
2  see how this rides out?
3      A.   Yes.
4      Q.   What were you referring to when you said, but I
5  guess we will see how this rides out?
6      A.   I was going to be limited to 48-hour shifts
7  instead of the four or five, six day stretches.  I was
8  going to see how that would be received.
9      Q.   Did anyone at Lee Health ever indicate to you
10 that that was not acceptable?
11     A.   No, because like I said, I handed in the letter
12 that gave me my medical clearance with the stipulation of
13 the -- of the two months of 48 hours.  That was Friday
14 afternoon, and I never got -- went back to work.  I was,
15 basically, called to this meeting with Dr. Prasad and
16 there was no discussion with anybody about anything.
17 Basically, it's here's my letter with the stipulations,
18 and then I was fired.
19     Q.   I'm going to hand you a document that --
20         Oh, when you were told that there was a meeting
21 with you and Dr. Prasad, were you told whether anyone
22 else would be present?
23     A.   I think I was told that Dr. Diaz might be
24 there, but he was on call, so it depended on whether or
25 not he was involved in a trauma.

Page 193

1      Q.   I'm going to hand you a document that we'll
2  mark as Exhibit 20.
3      (Exhibit No. 20, Text messages was marked for
4  identification.)
5  BY MS. LYONS:
6      Q.   It is a copy of a text message exchange between
7  you and Dr. Diaz, correct?
8      A.   Correct.
9      Q.   Does it accurately reflect the text you and
10 Dr. Diaz exchanged on January 6, 2019?
11     A.   Correct.
12     Q.   And you asked him what was on the agenda,
13 correct?
14     A.   Correct.
15     Q.   Why did you tell him I really want you there?
16     A.   Because it's a well-known fact that meeting
17 with administration without a witness is not a good
18 thing, and so it's always good to have another person in
19 the room.
20     Q.   Were you surprised when he told you,
21 unfortunately, can't discuss that until Tuesday?
22     A.   Was I surprised?  No, not necessarily.  I'm --
23     Q.   Did you take that as a bad omen?
24     A.   I didn't take it as a good omen.  But I know
25 that administratively, again, through physician

Page 194

1  leadership, even there are times when things have to be
2  kept -- I'm not going to say confidential, but they're
3  just not discussed until the time of.  So that's not an
4  unusual practice systemwide.  And that's why I actually
5  phrased it in a, am I allowed to ask what's on the
6  agenda, not, you know, hey, tell me what this is all
7  about.  I kind of know the process, and the process is
8  often a, you don't discuss it until you walk into the
9  room.
10     Q.   I'm going to hand you a document we're going to
11  mark this as Exhibit 21 to your deposition.
12     (Exhibit No. 21, Text messages was marked for
13  identification.)
14  BY MS. LYONS:
15     Q.   You can review that.  It is a text message
16  exchange between you and Dr. Vieux dated January 6, 2019.
17          Do you recognize this document?
18     A.   Yes.
19     Q.   Is it an accurate copy of the text message
20  exchange between you and Dr. Vieux?
21     A.   Yes.
22     Q.   In this document you say to Dr. Vieux on
23  January 6th at 8:00 p.m., it may be I no longer work at
24  Lee come Tuesday.
25          Why do you write that to him?

Page 195

1     A.   Well, everything was in the possibility, right?
2  So --
3     Q.   Well, that's -- you didn't write -- you didn't
4  write, it may be that I win a million dollars; you didn't
5  write it may be that I get struck by lightning.
6          I mean, why did you write that specific
7  sentence?
8     A.   Because I was called to administration.
9     Q.   So were you concerned that you might be
10  terminated?
11     A.   I was concerned, yes, that at that point --
12  it's kind of -- so if you think about it from a timing
13  standpoint, I hand in my medical clearance and within an
14  hour, I get a phone call from administration that they
15  want to meet, and I'm never allowed to actually start
16  back to work before this meeting ensues.  That doesn't
17  usually bode well.
18          And then I asked to know what's on the agenda
19  and I'm told, no, I can't discuss it.  So at that point,
20  yeah, I mean, there were plenty of physicians that were
21  being let go in 2018.  I mean, in April of 2018, 25
22  physicians were let go.  So, you know, I think within the
23  realm of reason, when you're being asked, within an hour
24  of getting medical clearance, to meet with
25  administration, that certainly isn't to have lunch.

Page 196

1     Q.   Did you think the reason you were being
2  terminated is because you had asked not to work more than
3  three shifts in a row?
4     A.   No.  48 hours.
5     Q.   Oh, sorry.  Let me ask the question over again.
6          Did you think the reason you were being
7  terminated is because you had asked not to work more than
8  48 hours in a row?
9     A.   I did think that, especially because of the
10  fact that I had mentioned, again, just as a -- trying to
11  educate myself, would this fall under kind of an ADA
12  ruling to make sure that, you know, this 48-hour limit
13  would ensue.  And then, like I said, it was an hour later
14  that I got a call from admin -- you know, that
15  administration wanted to meet.  So, yeah, when they did
16  that I thought, well, what the heck, this is a temporary
17  thing just while medication is being adjusted, but, you
18  know, are they doing, oh, my God, she's an ADA problem
19  and now, you know, she's not going to do the job?  So
20  yeah, that did cross my mind that the -- just the timing
21  of it was so, kind of --
22     Q.   So you think that could have been one of the
23  reasons why you were terminated or a factor in your
24  termination?
25     A.   Yes.

Page 197

1     Q.   Let me hand you a document that we're going to
2  mark as Exhibit 22.
3     (Exhibit No. 22, Text messages was marked for
4  identification.)
5  BY MS. LYONS:
6     Q.   It's a text message exchange between you and
7  Michael Marcus.  It doesn't have the date on it.  I'm
8  going to go into the document you produced in the lawsuit
9  and see if that has a date on it.  Just give me one
10  second.
11          While we're waiting for the date, I'm going to
12  assume it's sometime after January 4th, because it says,
13  you know I have a meeting with Prasad on Tuesday.  So we
14  can assume it's between January 4th and January 8th, but
15  I was just wanting to know the exact date so we can have
16  the record clear.
17          But is this an accurate representation of your
18  text exchange with Michael Marcus --
19     A.   Yes.
20     Q.   -- around that time period?
21          And when you state to him, you know I have a
22  meeting with Prasad on Tuesday; that may be my swan song,
23  are you referring to the fact that you may be terminated
24  during that meeting?
25     A.   I did have that impression because of the

Page 198

1  timing of the request for a meeting coming on the heels
2  of my medical clearance.
3        What gave me kind of the opposite, you know, I
4  guess, feeling was that our trauma nurse coordinator
5  didn't know anything about it, so his response when I
6  said that may be my swan song, his answer is, first I've
7  heard.  So he had not been privy to any meetings,
8  discussions about my being terminated or my not being
9  able to do the job, and that's highly unusual.
10       I mean, in the past we've had physicians that
11 were let go from the trauma department and there had
12 always been departmental meetings, group meetings,
13 including the trauma nurse coordinator, the physicians,
14 so that decisions could be made about keeping that
15 physician in the group or not.  This appeared to be a
16 very limited discussion between administration and
17 Dr. Diaz.  None of my partners were aware of this going
18 on or there being an issue, and as Michael said, it's the
19 first he'd heard.  He had not been privy to any
20 discussions about my employ prior to that.
21       So actually, when I -- when I read that, it
22 kind of made me feel a little bit better, because I
23 assumed if there was going to be a big change like that
24 with a senior partner, that he certainly would have been
25 part of that discussion.

Page 199

1  Q.  By use of the phrase swan song, you were
2  referencing termination of employment?
3  A.  Yes.
4  Q.  Just so the record is clear.
5        Did Michael Marcus ever say anything negative
6  about you taking FMLA leave?
7  A.  No.  If anything, he encouraged me to take the
8  time to get healthy and come back.
9  Q.  So was he supportive of your need for leave?
10 A.  Yes.  Very much so.
11 Q.  Did Dr. Prasad ever say anything negative about
12 you taking FMLA leave?
13 A.  I had not seen, spoken to or communicated in
14 any way with Dr. Prasad, I think, since that meeting in
15 April.
16 Q.  So no, he never said anything negative about
17 taking FMLA leave to you?
18 A.  I had no exchanges, interactions with him at
19 all.
20 Q.  But I need a yes or no.
21       Did Dr. Prasad ever say anything negative to
22 you about you taking FMLA leave?
23 A.  No.
24 Q.  Did he ever discuss the FMLA with you in any
25 form?

Page 200

1  A.  Like I said, I had noted spoken with or --
2  Q.  Yes or no, ma'am?
3  A.  No.  -- since April of that year.
4  Q.  It looks like, based on the documents produced,
5  that the text with Michael Marcus was January 4th at
6  5:53 p.m.  I just wanted to make the record clear.
7        Did you appear for the meeting with Dr. Prasad?
8  A.  Yes, ma'am.
9  Q.  Where did that take place at?
10 A.  In the administrative building.
11 Q.  Was anyone else there?
12 A.  Dr. Diaz.
13 Q.  How long did the meeting last?
14 A.  Five minutes.
15 Q.  What was said?
16 A.  Dr. Prasad thanked me for the decades of
17 service to the hospital, the trauma district, the county,
18 thousands of lives that I'd saved, but that I was being
19 let go without cause, that he felt we were no longer a
20 good fit.
21 Q.  Is that language he used, good fit?
22 A.  Yes.
23 Q.  What did you say?
24 A.  He handed me the letter of termination.  I
25 asked him if that was my copy.  He said yes, and he said

Page 201

1  that my insurance coverage would end on Friday and --
2  which was incorrect, because it covers for a two-week
3  period.  I actually had insurance for another two weeks
4  and was able to get COBRA, and then he said that I should
5  coordinate with Shelly Fay to clear my office.  Shelly
6  Fay being the office manager.  And I folded up the paper,
7  put it in my purse, said thank you and walked out.
8  Q.  Did Dr. Diaz say anything?
9  A.  No.  He kind of sat there looking at his feet
10 most of the time.
11 Q.  Is there anything else that was said during
12 that meeting?
13 A.  After -- after he'd given me the paper as I was
14 getting ready to leave, Dr. Prasad said that -- and
15 again, I'm paraphrasing, but something along the lines of
16 your partners -- oh, by the way, your partners didn't
17 think you could do the job anymore, or something to that
18 effect.  Jose didn't -- Dr. Diaz didn't say anything.
19       And then, like I said, when I was -- went back
20 to clear out my office and talk to my partners -- they had
21 no clue.  They had not been part of any discussion.  The
22 office manager had not been part of any discussion.  I,
23 frankly, asked them.  I said was there something that
24 made you guys feel I couldn't do the job?  Was there an
25 issue with my performance?  I said, sometimes you're too

Page 202

1  close to something and you don't see it, you know, was
2  there a problem?
3          And the unanimous answer was, no.  They'd never
4  had a discussion.  They had no problems with the patient
5  care that I was providing; that this was all done,
6  basically, secrecy.
7          Dr. Kasiewicz, in particular, was near tears
8  and said, I hate the way this happened.  Why did this
9  happen this way?  I don't understand.
10     Q.   Did you ever think to yourself, maybe it's
11 because you were in a final written warning stemming from
12 a patient transfer issue and you had a second patient
13 transfer issue?
14     A.   I did not believe that the second transfer
15 issue was a problem.  I felt strongly that once --
16     Q.   You were already told that --
17     A.   -- I had an outside review -- I felt very
18 strongly that once I'd had an outside independent review,
19 that I would be vindicated.
20     Q.   Was there ever an outside independent review?
21     A.   I can't tell you.  I -- I got sick.  I went on
22 FMLA.  I had no further communications from the hospital,
23 from my partners, from the trauma --
24     Q.   I just wanted a yes-or-no answer.
25     A.   Okay.  Well, I'm just trying to be clear.

Page 203

1      Q.   Did -- but you already told us that after you
2  spoke with Mary McGillicuddy you felt to yourself, well,
3  maybe there's an problem here given what Mary had told
4  you.
5          So in light of that, come January and your --
6  your employment contract ended, did you ever say to
7  yourself, wow, I had been on a final written warning;
8  Mary told me she thought I had made a mistake, that I
9  should have accepted that transfer, maybe that's why I
10 was terminated?
11     A.   So I had a lot of mixed messages --
12     Q.   Just yes or no, did that --
13     A.   No --
14     Q.   -- thought run in your mind?
15     A.   -- because there were so many mixed messages
16 that they would have canceled each other out.  So --
17     Q.   Okay.
18     A.   -- after I talked to Mary --
19     Q.   I didn't ask you all of that.
20          Only -- I mean, you -- you're free, if you
21 think there's something I really need to know.  It's
22 5:17.  Your answers are very long now to my questions
23 when I'm just looking for a yes-or-no answer, so if it's
24 something you really think I need to know about, please
25 tell me, but if you're just going to repeat stuff you've

Page 204

1  already said, then a yes or no is really what I was
2  looking for.
3      A.   It's hard to do yes and no when you're getting
4  mixed messages.  So I had Mary's phone call, which made
5  me very anxious, because she was asking me to be --
6  practice medical-legal medicine instead of medicine
7  that's in the best interest of my patients, but then I
8  had communication from Dr. Diaz planning a schedule out
9  to March, and I had the exchange that we just saw with
10 Michael Marcus, the trauma nurse coordinator saying he
11 had had no participation or had no knowledge of anything
12 about terminating my job.
13     Q.   Okay.
14     A.   And so, you know, there was a -- did they
15 review it and find that everything was okay?
16     Q.   Right.  So you had had mixed messages.
17     A.   Yeah.
18     Q.   So come your termination, did you say, well,
19 I've had some mixed messages, some of them indicating
20 that maybe the reason I'm terminated is because I was on
21 a final written warning and I was involved in this --
22 another issue involving a transfer?
23     A.   No, because --
24     Q.   Okay.  I didn't --
25     A.   -- the last message from Mary was that

Page 205

1  communication in November.  But I had spoken through
2  December and into January with members of the trauma
3  department, Dr. Diaz, Michael Marcus --
4      Q.   Do you think --
5      A.   -- that did not indicate that there was a
6  problem.
7      Q.   Do you think it would have been appropriate for
8  either Dr. Diaz or Michael Marcus to advise you that your
9  employment was being terminated over a text message when
10 you asked about scheduling?
11     A.   So Michael and I --
12     Q.   Yes or no?
13     A.   -- often talked on the phone.
14     Q.   But --
15     A.   I'm just letting you know that we had
16 conversations on the phone.  It wasn't limited to text
17 messages.
18     Q.   Would Michael Marcus be the person to tell you
19 if your employment was being terminated or would that be
20 Dr. Prasad?
21     A.   Michael Marcus certainly was in a position to
22 tell me that there were ongoing issues with the transfer,
23 which is typically what happens, and that had not come
24 out that --
25     Q.   Had you asked him?

Page 206

1     A.   -- there had been --
2          Well, we had multiple conversations and I know
3   I asked --
4     Q.   Had you asked him?
5     A.   Yes.  I asked him had there been a complaint;
6   had there been an EMTALA issue?  And the answer was no.
7   There's been no complaint.  There's not been any
8   reporting of an EMTALA issue.  And that was part of our
9   discussions, because, again, when I left, it was up in
10  the air, so during our discussions in December and into
11  January, you know, it felt like, well, that had been put
12  to rest, because there's nothing else ongoing.  There's
13  no further issues, and when I talked to our program
14  director, Dr. Diaz, about scheduling through into March,
15  he -- again, this was mid December, he did not verbalize
16  any issues with a schedule into March other than saying,
17  no, that should be fine; I'll look into it, shouldn't be
18  a problem.  So I did not feel that that was an issue.
19         It was certainly something -- HR -- or not HR.
20  Risk management certainly reviews a lot of charts, and
21  sometimes they review there's a problem, and sometimes at
22  the end of the review it's like, okay, no, this is
23  acceptable or this --
24    Q.   Okay.
25    A.   -- follows the practice and --

Page 207

1     Q.   Do you know when risk management's
2   investigation ended?
3     A.   No.  I have no clue.  Like I said, I was not
4   allowed to come back to work --
5     Q.   Do you know --
6     A.   -- to get that information.
7     Q.   -- who made the decision to terminate your
8   employment?
9     A.   No.
10    Q.   Did anyone ever tell you that you were being
11  terminated because you'd used FMLA leave?
12    A.   I was terminated without --
13    Q.   I'm asking you --
14    A.   -- cause for not --
15    Q.   -- a question.
16    A.   -- being a good fit.
17    Q.   I just want a yes-or-no answer.
18         Did anyone ever tell you that you were being
19  terminated in retaliation for using FMLA leave?
20    A.   No.
21    Q.   At the time of your termination did anyone
22  mention the fact that you'd been on FMLA leave?
23    A.   No.
24    Q.   Do you know what the basis of your lawsuit is,
25  what you're suing for, under what law?

Page 208

1     A.   Well, I was on FMLA.
2     Q.   Okay.  So you --
3     A.   I had inquired about accommodations and I was
4   fired before I was allowed to come back to work.
5     Q.   So do you think you were fired because you'd
6   been on FMLA leave?
7     A.   I think I was fired because they were concerned
8   about potential ADA issues.
9     Q.   Is there any other reason you think you were
10  fired?
11    A.   I think that's the main reason.
12    Q.   Is there any other reason?  I know you've told
13  us you think your issues with administration because you
14  were believing the contract negotiations and the issues
15  that the staff -- medical staff was having with
16  administration was a factor.
17         Other than those two things, the fact that you
18  had asked for a limited number of shifts per week --
19    A.   48 hours.
20    Q.   Right.  Let me rephrase that then.
21         Other than the fact that you were vocal in
22  the -- in addressing issues with management regarding
23  medical staff concerns and that you had requested an
24  accommodation of the schedule because of your condition,
25  are there any other, other than those two things that you

Page 209

1   believe caused your termination?
2     A.   I believe that the -- biggest one was the
3   FMLA.  Because let's face it, I had been a physician
4   advocate for years --
5     Q.   Let me clarify something first.
6          The FMLA meaning what?  Meaning when you came
7   and said, I need to not work more than 48 hours in a row
8   upon my return?
9     A.   I think they were concerned that that was going
10  to be a -- maybe an ongoing issue.
11    Q.   Right.  And that would be --
12    A.   And that it would be --
13    Q.   -- hard to schedule around?
14    A.   Yeah.
15    Q.   Yeah, that's you're thought?
16    A.   Yeah.
17    Q.   So when you say, I -- the biggest thing was the
18  FMLA issue, it's not that they were mad you took FMLA
19  leave, because Dr. Diaz was very supportive of that,
20  correct?
21    A.   Correct.
22    Q.   It was that when you were coming back from FMLA
23  leave you needed an accommodation of your schedule for
24  your medical condition?
25    A.   Correct.

Page 210

1    Q.   Any other reason at all I think that you were,
2    you know, targeted for termination or that you were
3    terminated?
4         A.   Like I said, my partners felt that my care was
5    fine.  They didn't think that there had been any
6    issues --
7         Q.   Right.  I'm not asking why you shouldn't have
8    been terminated.
9         A.   I'm trying to --
10        Q.   I'm asking --
11        A.   -- brain storm.
12        Q.   Right.  No.  Brain storm inside your head.
13        A.   Okay.
14        Q.   I think we've covered everything.  I just need
15   you to tell me we have, because if there's something else
16   I need to ask you about, I want to do it before the
17   depo's over, but I think we've covered everything.
18        A.   I think they were concerned about the
19   accommodations and what issues --
20        Q.   That would present?
21        A.   -- that would present to the department.
22        Q.   Okay.  I may have asked you this.  Do you know
23   who made the decision to terminate you?
24        A.   You asked, but I don't know.
25        Q.   Okay.

Page 211

1         A.   Again, I think it was -- I know it was not a
2    departmental decision, because my partners, and the
3    trauma nurse coordinator and office manager had no idea,
4    so I'm assuming it was a decision between Dr. Diaz and
5    Dr. Prasad.  That's an assumption, because --
6         Q.   Right.
7         A.   -- that's who signed the letter.
8         Q.   Do you know any other physicians who were on a
9    final written warning and then committed a similar
10   violation and were not terminated?
11        A.   Similar violation, EMTALA?
12        Q.   No.  Similar to what they had been placed on a
13   warning for.
14             Let's start with, do you know any other
15   physicians who were on a final written warning?  That
16   will make it easier.
17        A.   No.  It doesn't make it easier, because that's
18   considered protected information between the physician --
19        Q.   Right.
20        A.   -- and administration and --
21        Q.   Do you know --
22        A.   -- whatnot, so I would not be privy to who's on
23   a final warning.
24        Q.   So then my question is, do you know of any
25   physician who's on a final written warning and your

Page 212

1    answer is no; is that correct?
2         A.   That's correct.
3         Q.   So therefore, you don't know of any physician
4    who was on a final written warning and committed a
5    similar violation as that which had placed them on the
6    final written warning and yet who was not terminated,
7    correct?  Because if you don't --
8         A.   So the closest I can come to that is we had a
9    trauma surgeon, I think I mentioned earlier, who had been
10   accused of sexual harassment, inappropriate behavior
11   multiple times.  Lee Memorial has a zero tolerance policy
12   for that.
13        Q.   When was this?
14        A.   This would have been in 2000 -- I want to say
15   '15.  '14, '15.
16        Q.   At some point was he terminated?
17        A.   But not for the sexual harassment --
18        Q.   Right.
19        A.   -- issues.
20        Q.   Just at some point was he terminated --
21        A.   Yes.
22        Q.   -- yes or no?
23        A.   Yes.
24        Q.   Do you know what year he was terminated?
25        A.   Again, I think the -- the year of termination

Page 213

1    would have been, I think, '15.
2         Q.   Oh, sorry.
3         A.   Yeah.
4         Q.   Was he ever placed on a final written warning?
5         A.   Again, I don't know about what -- what they
6    termed his final warning, because technically, there's a
7    zero tolerance policy, so the first warning would have
8    been the last warning, and he continued to work for years
9    after these accusations came through.  They had sent him
10   to --
11        Q.   Ma'am, I don't want the details.
12        A.   Okay.
13        Q.   I don't care, honestly, because it's not the
14   same, so --
15        A.   Okay.
16        Q.   -- I don't want all the details.
17             I think I handed you a document that I marked
18   as Exhibit 23 and then I didn't ask you any questions
19   about it.
20             (Exhibit No. 23, Termination letter was marked for
21   identification.)
22   BY MS. LYONS:
23        Q.   So the document which I have marked as
24   Exhibit 23, is that the letter that was given to you by
25   Dr. Prasad advising you that you were going to be paid

Page 214

1  out 13 weeks of severance under the contract and that
2  your employment at Lee Health had ended?
3      A.   Yes.
4          MS. LYONS:  I just want to take a quick two
5      minutes and look through my notes.  I think we might
6      be done.
7          (Discussion off the record.)
8  BY MS. LYONS:
9      Q.   I just want to mark a few documents and have
10  you agree that these are your Employment Agreement.
11          I'm going to hand you a document that we're
12  going to mark as Exhibit 24 to your deposition.
13      (Exhibit No. 24, Employment Agreement was marked for
14  identification.)
15  BY MS. LYONS:
16      Q.   This is an Employment Agreement that was signed
17  by you in 2005.  If you could please just glance at it
18  and let me know when you're done.
19          You're free to read the whole thing.  I'm not
20  going to ask you questions other than to authenticate
21  your signature.
22          So if you could turn to the signature page
23  which appears at page 7 of the document.  Is that your
24  signature that appears on the -- as the physician?
25      A.   Yes, it is.

Page 215

1      Q.   Was this the -- now, you told us you first
2  started working for Lee Health in 1990 --
3      A.   Six.
4      Q.   -- six.
5          And this agreement, which is an Employment
6  Agreement for a trauma surgeon, is dated April 2005.
7      A.   Correct.
8      Q.   Is this the last full contract that you signed
9  with Lee Health?
10      A.   No.  We had -- I think I mentioned earlier that
11  there was a -- there was a change to the contract.  I
12  think it was September or October of '17.  So it would
13  have been like an addendum.
14      Q.   So addendums are different than a full contract
15  like this though.
16          Is this the last full contract you recall
17  signing?
18      A.   Correct.
19      Q.   I'm going to hand you what is the addendum that
20  I think you signed in 2017, and we'll mark that as
21  Exhibit 25.
22      (Exhibit No. 25, Amendment to Employment Agreement
23  was marked for identification.)
24  BY MS. LYONS:
25      Q.   If you could just let me know if that is your

Page 216

1  signature that appears on the signature page of that
2  document.
3      A.   Yes.
4      Q.   So in the second page where it says physician,
5  that is your signature?
6      A.   Correct.
7      Q.   So as an addendum, this would mean -- your
8  understanding is the Employment Agreement that is
9  Exhibit 24 is still in effect and the addendum, which is
10  Exhibit 25, replaces some portions, namely
11  compensation --
12      A.   Correct.
13      Q.   -- correct?
14          And at the time of your termination, these --
15  this was the most recent contract and addendum in effect,
16  correct?
17      A.   Correct.
18          MS. LYONS:  I don't have any other questions
19      for you.  I don't know if Ben does or not.
20          MR. YORMAK:  I do not.  There's no cross, but
21      she will read.
22          MS. LYONS:  We'll order it.
23          THE COURT REPORTER:  Would you like to order a
24      copy?
25          MR. YORMAK:  I'll let you know.

Page 217

1          (Reading and signing of the deposition was not
2      waived by the witness and all parties.)

Page 218

```
 1              CERTIFICATE OF OATH
 2
 3
 4    THE STATE OF FLORIDA,
 5    COUNTY OF LEE.
 6
 7
 8
 9         I, Jane Petersen, Florida Professional
10    Reporter, Notary Public, State of Florida, certify that
11    DR. NELAYDA FONTE personally appeared before me on the
12    23rd of January, 2020 and was duly sworn.
13
14         Signed this February 6, 2020.
15
16
17
18
19         _____
20         Jane Petersen, FPR
           Notary Public, State of Florida
           Commission No.:  GG931553
21         Commission Expires:  December 18, 2023
22
23
24
25
```

Page 219

```
 1            CERTIFICATE OF REPORTER
 2
 3    THE STATE OF FLORIDA,
 4    COUNTY OF LEE.
 5
 6         I, Jane Petersen, Florida Professional
 7    Reporter, certify that I was authorized to and did
 8    stenographically report the deposition of DR. NELAYDA
 9    FONTE; pages 1 through 221; that a review of the
10    transcript was requested; and that the transcript is a
11    true record of my stenographic notes.
12         I further certify that I am not a relative,
13    employee, attorney, or counsel of any of the parties, nor
14    am I a relative or employee of any of the parties'
15    attorneys or counsel connected with the action, nor am I
16    financially interested in the action.
17
18         Dated this February 6, 2020.
19
20         _____
           Jane Petersen, FPR
21         Florida Professional Reporter
22
23
24
25
```

Page 220

```
 1            WITNESS NOTIFICATION LETTER
 2
      February 6, 2020
 3
 4    DR. NELAYDA FONTE
      C/O  YORMAK EMPLOYMENT AND DISABILITY LAW
 5        9990 Coconut Road
          Bonita Springs, FL 34135
 6        byormak@yormaklaw.com
          BY: BENJAMIN H. YORMAK, ESQUIRE
 7
 8    IN RE:  DR. NELAYDA FONTE VS. LEE MEMORIAL
             Deposition, taken on January 23, 2020
 9           U.S. Legal Support Job No. 2057806
10
11    The transcript of the above proceeding is now available
      for your review.
12
13    Please call to schedule an appointment between the hours
      of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a
14    U.S. Legal Support office located nearest you.
15
      Please complete review of your transcript within 30 days,
16    and return the errata sheet to our office.
17
      Sincerely,
18
19    _____
      U.S. Legal Support, Inc.
20    2180 West First Street
      Fort Myers, Florida  33901
21    239.561.3526
22    CC via transcript:
      BENJAMIN H. YORMAK, ESQUIRE
23    ANGELIQUE GROZA LYONS, ESQUIRE
24
25
```

Page 221

```
 1                   ERRATA SHEET
 2    DO NOT WRITE ON THE TRANSCRIPT-ENTER CHANGES ON THIS PAGE
 3       IN RE:  DR. NELAYDA FONTE vs. LEE MEMORIAL
                      DR. NELAYDA FONTE
 4                       01/23/2020
                       JOB#  2057806
 5
      Page No.   Line No.   Change            Reason
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    Under penalties of perjury, I declare that I have read the
      foregoing document and that the facts stated in it are
23    true.
24    _____        _____
      Date              DR. NELAYDA FONTE
25
```



# Lehigh Regional Medical Center

October 30, 2019

Nelayda Fonte, DO
12620 Treeline Court
North Fort Myers, Fl. 33903

Dear Dr. Fonte:

On behalf of the subcommittee of the Board of Trustees, and based on the recommendation from the Medical Executive Committee, I wish to inform you that your request for appointment to Lehigh Regional Medical Staff was approved on October 22, 2019 as follows:

Specialty:      Critical Care
Status:         Active
Department:     Medicine
From/To:        November 1, 2019 through October 31, 2021

A period of focused professional Practice Evaluation (FPPE) is implemented at Lehigh Regional Medical Centers for all initially requested privileges, which includes monitoring of the physician's clinical activities.

Physician's Orientation to the hospital is an essential and required component of the initial appointment process, please contact Charlene J. Fisher RN, LHRM, Director of Medical Staff Services at 239.368.4563 to schedule your Hospital Orientation within 90-days of your appointment. For training on EPIC, which is our Electronic Medical Record System, please contact the Medical Records Department at 239.368.4570.

We are pleased to welcome you to Lehigh Regional Medical Center, and look forward to your participation in our organization. I think you will find that our care partners are dedicated to providing high-quality patient care and customer service. Always feel free to bring matters that you deem important to the attention of our management staff or myself as our goal is to work together as a team for the benefit of our patients. If you have any question's please do not hesitate to contact me at 239.368.4503.

Sincerely,

Gary C. Bell, LFACHE
Chief Executive Officer

EXHIBIT
1
Fonte
1/23/20 P
PENGAD 800-631-6989

1500 Lee Boulevard • Lehigh Acres, FL 33936 • Phone (239) 369.2101 • Fax: (239) 368.4510
www.LehighRegional.com



Ernst ›

Your certainly a cute tack. It will be fine. There is a huge trauma need critical care pays better. And 12 hr shifts. Draw a map with 3, 4 ,5 hrs flight range ( including layover). Lots of jobs. Do some and see if you like it. You can commit to a little or a lot. It will be fine.



 one for Loo

 get some rest

 

EXHIBIT

FONTE  2

1/23/20

      

## INTERFACILITY TRANSFER GUIDELINES

**Patients with any of the following trauma related diagnoses should be transferred to a trauma center.**

| HEAD INJURIES | ABDOMINAL INJURIES |
|---|---|
| ◆ GCS less than 12 or a decrease of 2 or more points from the time of injury<br>◆ Open or depressed skull fracture<br>◆ Brain hemorrhage<br>◆ Meningeal hemorrhage<br>◆ Presentation of new neurological deficits<br>◆ Lateralized extremity weakness | Conditions requiring celiotomy:<br>◆ Hemodynamically unstable patient with physical evidence of abdominal trauma<br>◆ Evidence of peritoneal hemorrhage via ultrasound, DPL, or CT<br>◆ Penetrating wound of abdomen with suspicion of penetration of the peritoneum<br>◆ Ruptured hollow viscous |
| **THORACIC INJURIES** | **BURN INJURIES** |
| ◆ Tension pneumothorax with respiratory failure<br>◆ Open pneumothorax with respiratory failure<br>◆ Hemothorax with respiratory failure<br>◆ Flail chest with respiratory failure<br>◆ Pulmonary contusion with respiratory failure<br>◆ Cardiac tamponade<br>◆ Aortic disruption<br>◆ Diaphragmatic rupture<br>◆ Tracheobronchial tree injuries<br>◆ Esophageal trauma<br><br>*"With respiratory failure" means requiring ventilator support* | ◆ Second or third-degree thermal or chemical burns involving more than *10% of the total body surface area in patient under **15 years or over 55 years of age<br>◆ Second or third-degree thermal or chemical burns involving the face, eyes, ears, hands, feet, genitalia, perineum, and major joints<br>◆ Third-degree burns greater than 5% of the body surface area in any age group<br>◆ Electrical burns, including lightning injury<br>◆ Burns associated with other significant major injury or pre-existing disease<br>◆ Burn injury with inhalation injury<br><br>*\* Taken from the Adult Trauma Triage Criteria Methodology (Criteria for burns are $\geq$15% for adults)*<br>*\*\*Taken from the Pediatric Trauma Triage Criteria Methodology*<br>**Burn injuries are to be transferred to a burn center** |
| **EXTREMITY INJURIES** | **SPINE & SPINAL CORD INJURIES** |
| ◆ Amputation of extremity proximal to wrist or ankle<br>◆ Pelvic fractures with hemodynamic instability<br>◆ Two or more long bone fracture sites<br>◆ Major vascular injuries documented by arteriogram or loss of distal pulses<br><br>*Long bone sites are defined as the (1) shaft of the humerus, (2) radius and ulna, (3) shaft of the femur, (4) tibia and fibula* | ◆ Fractures, unstable or potentially unstable<br>◆ Subluxations<br>◆ Neurogenic shock<br>◆ Open spinal wounds<br>◆ Paralysis or any loss of sensory or motor function |
| **HEMODYNAMIC INSTABILITY** | |
| ◆ For an adult, a blood pressure consistently less than 90 systolic after 2 liters of normal saline and/or 2 units of blood after 2 readings, 5 minutes apart<br>◆ For a child, a blood pressure consistently less than 90 systolic after 20cc per kilogram of resuscitation fluid after 2 readings, 5 minutes apart | |

Notes:

**All transfers should be initiated with a physician-to-physician phone call to the SATC or SAPTRC**
**All transfers must be in accordance with both state and federal EMTALA laws**



PENGAD 800-631-6989

EXHIBIT
3

Fonte
1/23/20



LEE HEALTH

MEDICAL STAFF SERVICES

## EMTALA On-Call / Emergency Services Obligations

The following bullet points summarize the basic obligations relating to on-call requirements.

- If an emergency medical condition exists, Florida law requires the hospital to provide care, treatment, or surgery to relieve or eliminate the condition, *within the services capability of the facility*.
- Hospitals providing emergency services are legally required to ensure the provision of services within the service capability of the hospital, 24 hours per day, 7 days per week either directly or indirectly through arrangements with other hospitals and/or physicians.
- Hospitals must maintain an on-call list of physicians who are on the hospital's medical staff or who have privileges at the hospital, to provide treatment necessary after the initial examination to stabilize individuals with emergency medical conditions who are receiving services required in accordance with resources available to the hospital.
- The determination as to whether the on-call physician must respond in order to further assess the patient is the sole decision of the Emergency physician requesting the consultation.
- If a hospital is requesting transfer of a patient with an emergent medical condition because the hospital lacks the service capability to care for the patient and the LMHS hospital has the service capability and is the geographically closest hospital the on- call Physician must provide the necessary consult and treatment.
- A basic responsibility of members of the Medical Staff is to recognize the hospital's obligations relating to access to emergency services and to share in the responsibility for providing physician coverage on an emergency basis.  (Medical Staff Bylaws Part I, subsection 2.7.15)
- Members of the Medical Staff must meet their Emergency Department call responsibilities in accordance with facility specific rules and regulations, unless exempted from Emergency Department call responsibilities as defined by their Section or Department and approved by the FMEC.  (Medical Staff Bylaws Part I, subsection 4.1.3.5 & 4.2.3)
- If a physician who is on the on-call list to provide emergency services refuses to either appear or respond within a reasonable period of time, the physician may be subject to significant fines, penalties and liability under state and federal law and may be the subject of corrective action under the Medical Staff Bylaws. Apparent violations are required to be reported to the state and federal government for investigation.

I acknowledge that I have read the information listed above and I understand my on call obligations as defined in state and federal law and as a member of the Medical staff.

Physician Name: (Please Print)_____

Physician Signature: _____ Date:_____

05/2017


EXHIBIT 4
FoNtE
1/23/20
PENGAD 800-631-6989

1

2                   Audio Transcription:

3

4               Dr. Fonte vs. Lee Health

5

6     File:   4- recording-354-4142300-579443105657.pcm

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 5
FONTE
1/23/20 P
PENGAD 800-631-6989

Page 2

```
1          AMY: Yeah, this is Amy.
2          DOUG MCKENNA: Amy, sorry; I dropped Dr. Gatab's
3    (phonetic) call.
4          Would you be nice enough to reconnect me with him,
5    please.
6          AMY: Absolutely.
7          DOUG MCKENNA: Thank you.
8          AMY: Uh-huh.
9          (Phone rings.)
10         ER DOCTOR: Hello?
11         DOUG MCKENNA: Sorry, Dr. Gatab.  I -- I --
12   that's my -- my bad.
13         ER DOCTOR: Okay.
14         DOUG MCKENNA: Hold on a second.  I'm going to
15   first -- I'm going to first connect you with your doctor
16   first.  Hold on.
17         ER DOCTOR: Okay.  And tell him we're holding for
18   their -- their surgeon.
19         (Silence.)
20         (Phone rings.)
21         DOUG MCKENNA: Are you still with me, Dr. Gatab?
22         ER DOCTOR: Yeah.
23         DOUG MCKENNA: Hold on one second.
24         DR. KOPIDAKIS: Hello?
25         DOUG MCKENNA: Dr. Kopidakis; hey, this is Doug
```

Page 3

```
1    McKenna that works as a nurse in the Transfer Center for --
2    for Lee Memorial.  (Phonetic).  I have your doctor,
3    Dr. Gatab, your emergency room physician; we're going to
4    connect momentarily with the trauma surgeon here,
5    Dr. Fonte.  Hold on, please.
6          (Phone rings.)
7          MALE SPEAKER: Trauma Department; is this a
8    trauma alert or a transfer?
9          DOUG MCKENNA: Trauma transfer.  It's Doug again
10   in the Transfer Center, (inaudible) if you can be nice
11   enough to connect me with Dr. Fonte again, please.
12         MALE SPEAKER: Just a moment.
13         DOUG MCKENNA: Hold, please.
14         MALE SPEAKER: Calling for the transfer?
15         DOUG MCKENNA: Yeah.
16         MALE SPEAKER: All right.  One moment; I'll try
17   and put you through.
18         DOUG MCKENNA: Thanks.
19         (Music.)
20         DOUG MCKENNA: Dr. Kopidakis and Dr. Gatab; hold
21   on, please, we're going to connect momentarily.
22         MALE SPEAKER: You're connected, Doug.
23         DOUG MCKENNA: Dr. Fonte?
24         DR. FONTE: Yeah.  (Inaudible) --
25         DOUG MCKENNA: Hey, this is Doug again.  I can
```

Page 4

```
1    barely hear you; but I have Dr. Gatab, the emergency room
2    physician that you just spoke to, and his surgeon Doctor --
3    I apologize, I can't pronounce that --
4          DR. KOPIDAKIS: Kopidakis.
5          DOUG MCKENNA: Kopidakis.  Go ahead.
6          ER DOCTOR: Hey, like I said, we don't usually do
7    trauma surgery here, and our staff is kind of limited; so
8    that's what I conferred with the surgeon, who's on the
9    phone, Dr. Kopidakis, and he's still wanting to consider
10   transferring her.  And I figured the best way to get us
11   all talking together and figure out what's best for this
12   patient.
13         DR. FONTE: Okay.
14         ER DOCTOR: Dr. Kopidakis --
15         (Talking simultaneously.)
16         DR. FONTE: -- is (inaudible) there?
17   (Inaudible).  Yeah.  Hello?
18         DR. KOPIDAKIS: Hello?
19         ER DOCTOR: Hey, Doug --
20         DR. KOPIDAKIS: Yeah, I -- I'm not -- I'm not
21   part of -- this is a trauma for the emergency room.  All
22   trauma goes to Lee.  I mean, they did that at (inaudible)
23   Park and Cape Coral --
24         DR. FONTE: Um --
25         DR. KOPIDAKIS: I don't -- I don't understand
```

Page 5

```
1    why it's an issue --
2          (Talking simultaneously.)
3          DR. FONTE: No.  No, we don't.  And I -- I --
4    it's not an issue, and we don't do it out of Cape Coral and
5    (inaudible) Park.  I've been here for 22 years.  On an
6    isolated stab wound to the abdomen with no complicated
7    internal abdominal injuries (inaudible) to transfer her to
8    a trauma center.
9          So based on your CAT scans, this isn't an
10   (inaudible) -- it's stuff that your ER doctor -- to read
11   the CAT scan findings to me and there was no evidence of an
12   (inaudible) --
13         (Talking simultaneously.)
14         DR. KOPIDAKIS: Hey -- hey, I'm going to make
15   this really simple for you --
16         DR. FONTE: -- (inaudible) --
17         DR. KOPIDAKIS: -- right now.  I --
18         DR. FONTE: Yeah.
19         DR. KOPIDAKIS: -- this is -- you can deal with
20   me tomorrow or the next day; I -- this is a -- this a stab
21   wound to the abdomen with a hemoperitoneum.  This is a
22   trauma.
23         DR. FONTE: Right.
24         DR. KOPIDAKIS: And this is something (inaudible)
25   --
```

Page 6

1        DR. FONTE:  This is a general surgery case; so --
2  okay.  So -- so you're telling me that you don't know --
3        (Talking simultaneously.)
4        DR. KOPIDAKIS:  I would like -- like I'm going to
5  make this really simple for you --
6        DR. FONTE:  -- how to (inaudible) --
7        (Talking simultaneously.)
8        DR. KOPIDAKIS:  I'm not going to
9  argue (inaudible) --
10       DR. FONTE:  -- bleeders, and you don't know how
11 to repair --
12       DOUG MCKENNA:  -- I'm not going to argue with
13 you --
14       DR. FONTE: -- a small bowel!  Well, neither am I.
15 I'm not (inaudible) --
16       DR. KOPIDAKIS:  I'm not going to argue with you.
17 You can tell it to me tomorrow or Monday, or whatever you
18 want to do (inaudible) --
19       DR. FONTE:  Okay.  But the patient is --
20       DR. KOPIDAKIS:  I have never --
21       DR. FONTE:  -- in your emergency room; you're
22 going to have to take care of it.  All right.
23       You've got a stable patient with a CT reading that
24 says that she's probably got mesenteric bleed in the right
25 lower quadrant --

Page 7

1        (Talking simultaneously.)
2        DR. KOPIDAKIS:  But I didn't say mesenteric --
3        DR. FONTE:  -- (inaudible) small bowel.
4  Obviously --
5        DR. KOPIDAKIS:  I don't --
6        (Talking simultaneously.)
7        ER DOCTOR:  I said it has a hemoperitoneum.  I
8  don't know where the source of the hem- -- where the
9  (inaudible) is coming from --
10       (Talking simultaneously.)
11       DR. KOPIDAKIS:  -- but could be bowel.
12       DR. KOPIDAKIS:  That is -- it could be --
13       DR. FONTE:  Right.  Until (inaudible) --
14       DR. KOPIDAKIS:  -- it's established.
15       DR. FONTE:  -- and so you -- you don't know how
16 to fix a small bowel injury?
17       DR. KOPIDAKIS:  It's a trauma patient.  It's like
18 a gunshot wound, you don't (inaudible) --
19       DR. FONTE:  You don't know how to fix --
20       (Talking simultaneously.)
21       DR. KOPIDAKIS:  -- (inaudible) same thing
22 (inaudible) --
23       DR. FONTE:  No.  No.  No.  No.  Way different.
24 (Inaudible) --
25       DR. KOPIDAKIS:  If the patient was unable --

Page 8

1        (Talking simultaneously.)
2        DR. FONTE:  (Inaudible) --
3        DR. KOPIDAKIS:  -- of course I would take care of
4  it --
5        DR. FONTE:  (Inaudible).  Okay.  Well, I -- I
6  think that this is a general surgical case; any general
7  surgeon should be able to do an exploratory laparotomy, and
8  repair her bowel and ligate (inaudible) --
9        (Talking simultaneously.)
10       DR. KOPIDAKIS:  I'm not --
11       DR. FONTE:  -- (inaudible) that is
12 not (inaudible) --
13       DR. KOPIDAKIS:  This is a trauma patient.  It's
14 --
15       DR. FONTE:  -- (inaudible) it is trauma
16 (inaudible).  I'm not accepting your case.  This is not a
17 complex surgery.  This is a simple isolated mechanism that
18 any general surgeon is perfectly capable of handling.
19       DR. KOPIDAKIS:  Doctor -- Dr. Gatab --
20       DR. FONTE:  (Inaudible) --
21       (Talking simultaneously.)
22       ER DOCTOR:  Yeah.
23       DR. KOPIDAKIS:  Dr. Gatab --
24       ER DOCTOR:  Right.
25       DR. KOPIDAKIS:  -- in your experience there, how

Page 9

1  many times if -- did (inaudible) patients stay, how many
2  times did they go to trauma?
3        ER DOCTOR:  100 percent for the last (inaudible)
4  years --
5        (Talking simultaneously.)
6        DR. KOPIDAKIS:  I'm sorry.  Was that 100 percent?
7        ER DOCTOR:  Yeah.  I've never done a trauma here.
8  I mean, not us.  I -- as far as I can --
9        (Talking simultaneously.)
10       DR. FONTE:  An isolated stab wound with general
11 surgery coverage -- an isolated stab wound, with general
12 surgery -- we're not talking a multi-trauma patient, we're
13 talking about a stable (inaudible) --
14       DR. KOPIDAKIS:  It -- it doesn't matter.  This
15 isn't (inaudible) --
16       (Talking simultaneously.)
17       DR. FONTE:  -- (inaudible) --
18       DR. KOPIDAKIS:  -- this is considered -- this is
19 considered a trauma.
20       DR. FONTE:  This is a general surgery (inaudible)
21 --
22       DR. KOPIDAKIS:  Look --
23       DR. FONTE:  This is a general surgery
24 (inaudible.)
25       DR. KOPIDAKIS:  (Inaudible).  No, I'm -- I'm not

Page 10

1  -- well, I'm not doing it. I mean, I -- it's -- you got --
2        DR. FONTE: That's your problem with it. I'm not
3  accepting the transfer. Okay?
4        DR. KOPIDAKIS: Dr. Gatab, can she do that?
5        ER DOCTOR: I mean -- I mean, I can find
6  somewhere else to take her. I mean, I can -- I can send
7  her to Blake. I can send her to Miami. I can try Naples.
8        I mean -- and then you guys can deal with it, but
9  -- I mean, I -- I can't give her legal advice. But I can
10  find somebody to take her, even if we have to fly her to
11  Miami (inaudible) --
12        (Talking simultaneously.)
13        DR. FONTE: You guys (inaudible) do not have
14  general surgical coverage -- so if you guys do not have
15  general surgical coverage, and the patient needed an
16  exploratory laparotomy, there is absolutely no doubt
17  (inaudible) she would (inaudible) she would (inaudible) .
18        You guys don't have (inaudible) to call, you have
19  to (inaudible) practice. (Inaudible.) You have
20  (inaudible) you don't have (inaudible) coverage, they come
21  up here. If you have multi-trauma, they come over here.
22        ER DOCTOR: I mean, I might mention (inaudible)
23  --
24        (Talking simultaneously.)
25        DR. FONTE: (Inaudible) --

Page 11

1        ER DOCTOR: (Inaudible) I might mention one thing
2  --
3        DR. FONTE: (Inaudible) --
4        (Talking simultaneously.)
5        ER DOCTOR: I -- I might mention she does have
6  three-plus blood in her urine, and -- but there's no CT
7  evidence of urological injury. We don't have a urologist.
8  So I'm going to throw that out there, too.
9        But -- but -- but the rest of the CT is just like
10  I read it.
11        DR. KOPIDAKIS: We're -- we're limited by what
12  we can (inaudible) --
13        DR. FONTE: (Inaudible) .
14        (Talking simultaneously.)
15        DR. KOPIDAKIS: -- what we can do. I just -- I
16  just don't -- look -- look, just do me a favor --
17        DR. FONTE: I'm not understanding --
18        DR. KOPIDAKIS: -- take --
19        DR. FONTE: -- why you don't know how -- you
20  can't do an exploratory laparotomy. I'm just -- I just --
21  I'm -- I'm trying -- again, if this was a (inaudible) --
22        DR. KOPIDAKIS: (Inaudible) this --
23        (Talking simultaneously.)
24        DR. FONTE: -- (inaudible) I mean, I would say:
25  You know what -- and I have (inaudible) any evidence to

Page 12

1  have injuries to the liver; you said, no, there's no
2  evidence of injury to the liver.
3        DR. KOPIDAKIS: Right. But -- but you don't know
4  (inaudible) --
5        DR. FONTE: And (inaudible) --
6        (Talking simultaneously.)
7        DR. KOPIDAKIS: Again, I understand that --
8        DR. FONTE: (Inaudible) a problem --
9        DR. KOPIDAKIS: -- but you don't --
10        DR. FONTE: (Inaudible) --
11        DR. KOPIDAKIS: -- but you don't know -- you
12  don't know that until you go in. I don't have -- I mean, I
13  -- I get it, and --
14        ER DOCTOR: If it's a vascular, then we
15  definitely don't have vascular either.
16        DR. KOPIDAKIS: We don't have vascular surgery
17  here. We don't have angio. We don't have --
18        DR. FONTE: Okay. But you did tell me you did a
19  CT --
20        (Talking simultaneously.)
21        DR. KOPIDAKIS: (Inaudible) --
22        DR. FONTE: -- of the belly; did they comment on
23  a (inaudible) injury or an (inaudible) injury or
24  (inaudible) injury --
25        (Talking simultaneously.)

Page 13

1        ER DOCTOR: No, I --
2        DR. KOPIDAKIS: (Inaudible) --
3        DR. FONTE: (Inaudible) concerned about.
4        DR. KOPIDAKIS: I -- but I'm telling you as -- as
5  -- we don't have anybody if -- if I do find any of that, I
6  don't have anybody to help me. I mean, that's -- you're --
7  you're in a trauma center.
8        DR. FONTE: I'm not understanding --
9        DR. KOPIDAKIS: I mean, this --
10        DR. FONTE: -- why a hemodynamically stable
11  patient with a stab wound to the belly, who has (inaudible)
12  --
13        DR. KOPIDAKIS: Because by -- by definition --
14        (Talking simultaneously.)
15        ER DOCTOR: Okay.
16        DR. KOPIDAKIS: By -- by definition it -- by
17  definition, it is a trauma. I mean, that's -- I mean,
18  that's all I can --
19        DR. FONTE: An isolated injury (inaudible) --
20        (Talking simultaneously.)
21        DR. KOPIDAKIS: I mean, what else can I tell
22  (inaudible) --
23        DR. FONTE: -- it's an isolated injury -- it's
24  an isolated -- that's a general surgery case. I do not
25  take every case from Health Park. (Phonetic). I do not

Page 14

1  take every case from (inaudible).  I know that they have
2  general surgery.  I know that they can handle these cases.
3       Not everything gets transferred out just because
4  the general surgeon doesn't want to do an exploratory
5  laparotomy.
6       Complex surgeries?  Absolutely.  Gunshot wounds,
7  absolutely.
8       DR. KOPIDAKIS:  But if it become —
9       DR. FONTE:  — (inaudible) —
10      (Talking simultaneously.)
11      DR. KOPIDAKIS:  But — but —
12      DR. FONTE:  — (inaudible) transfers, there's
13  a — that's a whole different mechanism of injury.  So it's
14  isolated, general stab wound to the belly with — you know,
15  injury down to the bowel.  Now, that's something any
16  general surgeon can handle.  Truth— — truthfully, I mean,
17  it — you know, if you're telling me you don't know how to
18  do bowel resection or a bowel repair or you don't know how
19  to (inaudible), that's a different (inaudible).
20      So, you know, if you tell me I'm a (inaudible) and
21  I don't work in the belly at all, and I'm just doing
22  general surgery coverage, then I get it.
23      If you're a general surgeon and you know your way
24  around a belly, you certainly know how to do a bowel repair
25  and you certainly know how to (inaudible).  You know,

Page 15

1  unless you're telling me you don't.
2       DR. KOPIDAKIS:  I'm sorry?
3       DR. FONTE:  I said any general surgeon should be
4  able to do that, unless you're telling me that — that you
5  don't, that you don't know how to do that.
6       DR. KOPIDAKIS:  Right, but it — it's — it's
7  still a trauma, it's still can be — it can be other
8  things.
9       If you want to — I'll — I — I don't understand
10  why we're even arguing about this at this point.
11      DR. FONTE:  I don't either.  Like I said, to me
12  this is a simple general surgery case.
13      DR. KOPIDAKIS:  I'm — I — again, I'm not — I
14  mean, this is a trauma case to me; and if you want to
15  report me, you can report me for that.
16      I'm not — I'm not — again, I'm not — I don't
17  have the — the facilities to take care of a trauma at that
18  place.  I just don't.
19      DR. FONTE:  You don't have the facilities to do
20  an exploratory laparotomy with (inaudible) —
21      DR. KOPIDAKIS:  No, it's — it's more than that.
22      DR. FONTE:  So what (inaudible) —
23      (Talking simultaneously.)
24      DR. KOPIDAKIS:  — (inaudible) —
25      DR. FONTE:  — (inaudible) —

Page 16

1       DR. KOPIDAKIS:  Look — look, I — I don't.  I
2  mean, I — I don't know what to tell you.  I mean, I —
3  I've — I haven't done trauma in years.
4       DR. FONTE:  You haven't done a bowel resection in
5  years?  You haven't done a bowel repair in years?
6  You don't —
7       DR. KOPIDAKIS:  I'm not going to —
8       DR. FONTE:  — do bowel resection?  You don't —
9  I guess I'm not (inaudible) — I'm not understanding your
10  hesitancy to take a — a (inaudible) —
11      DR. KOPIDAKIS:  The —
12      DR. FONTE:  — (inaudible) —
13      (Talking simultaneously.)
14      DR. KOPIDAKIS:  The — the trauma (inaudible) —
15  but that's the — that's the reason we transfer them; if
16  there (inaudible) on the table, I would take everything it
17  takes to stabilize them and transfer the trauma.
18      I mean, that's what I would do.  I mean, I'm —
19  but I'm — you know, I mean, like I — like Dr. Gatab told
20  you, 100 percent of the time this goes to Lee.  100 percent
21  of the time.
22      DR. FONTE:  Well, I (inaudible) beg to differ.
23  Because like I said, I've been here for 22 years and I can
24  tell you on an isolated stab wound with general surgery
25  coverage, I don't expect them to transfer.  That is not a

Page 17

1  multi-trauma patient.  That is not something — again,
2  unless you're telling me that (inaudible) — if they — you
3  know, it's a liver, it's (inaudible) the pancreas, it's —
4  you know, you got (inaudible) —
5       DR. KOPIDAKIS:  But — but I won't know —
6       DR. FONTE:  (Inaudible) —
7       (Talking simultaneously.)
8       DR. KOPIDAKIS:  But again — again, the CAT
9  scan — the CAT scan can be (inaudible) — CAT scans can be
10  90 percent accurate, and there's a 10 percent it's not.
11  And in that — it's — it's better for the patient —
12      DR. FONTE:  (Inaudible) —
13      DR. KOPIDAKIS:  — to be in a trauma
14  (inaudible) —
15      DR. FONTE:  (Inaudible) I mean, but that's — you
16  know, that — that's — yeah; but you and I both know that,
17  you know, most of the injuries — again, just by what your
18  testing is reading, the (inaudible) in the right lower
19  quadrant possibly from bowels.  That's the way they're
20  reading it.  And that's — that's going to be specifically
21  mesenteric bleed.
22      DR. KOPIDAKIS:  But that — again, you know, like
23  you said, it's possibly that.
24      DR. FONTE:  And then —
25      DR. KOPIDAKIS:  It's still a trauma.  It's still

Page 18

1 a stab wound. And -- and --
2     DR. FONTE: I'll tell you what --
3     DR. KOPIDAKIS: -- that --
4     DR. FONTE: -- (inaudible) and if you find
5 anything else, you leave her open and call me and I will
6 transfer her to (inaudible) --
7     DR. KOPIDAKIS: I'm -- I'm not -- no, I'm not --
8 I'm not doing it. That's not what -- you know, when I --
9 no.
10     DR. FONTE: It's (inaudible) -- like I said --
11     (Talking simultaneously.)
12     DR. KOPIDAKIS: No.
13     DR. FONTE: -- I think you're totally capable of
14 handling this. If you -- are you -- are you
15 board-certified?
16     DR. KOPIDAKIS: You don't have to get personal
17 now. I'm -- I'm telling you --
18     DR. FONTE: No, I am not --
19     DR. KOPIDAKIS: you can do whatever you want
20 to me, but I -- just -- just --
21     (Talking simultaneously.)
22     DR. FONTE: (Inaudible) --
23     DR. KOPIDAKIS: -- deal with it --
24     DR. FONTE: You told me you're not skilled --
25     DR. KOPIDAKIS: -- just --

Page 19

1     (Talking simultaneously.)
2     DR. FONTE: -- at bowel work --
3     DR. KOPIDAKIS: Just take care of it and then --
4     DR. FONTE: -- and -- and I'm good with that.
5     DR. KOPIDAKIS: -- and then -- then we can talk
6 about this in front of anybody else --
7     DR. FONTE: I'm not accepting the transfer. I'm
8 not accepting the transfer.
9     ER DOCTOR: Well, I can try someplace else.
10     DR. FONTE: (Inaudible) in the emergency room,
11 that needs to be taken care of, and you are the general
12 surgeon on call. I think you need to take care of your
13 patient.
14     ER DOCTOR: I've had patients that go to Blake
15 (phonetic) after Lee refused them; so I can try that --
16     DR. KOPIDAKIS: Well, I don't understand. This
17 is a -- this is a -- like you said, 100 percent of these
18 go.
19     ER DOCTOR: I mean, I --
20     DR. FONTE: I would like to differ.
21     ER DOCTOR: And I've flown them to Miami. So I
22 can get this squared away.
23     So if you guys are -- are pretty much concluded,
24 I'll -- I'll get it squared away. So -- that's fine.
25     DR. KOPIDAKIS: Well --

Page 20

1     ER DOCTOR: It's -- it's -- it's fine, because
2 I -- I've done it before.
3     I mean, we've sent burns to Miami. We've sent
4 splenic injuries that they didn't want to do over at Lee.
5 We've done some things; so it's no problem. I --
6     DR. FONTE: Well, so 100 percent of the time the
7 patients aren't coming to Lee, right? Because you've had
8 to send them elsewhere. So --
9     ER DOCTOR: Yeah, I -- yeah, 100 percent of the
10 time --
11     (Talking simultaneously.)
12     DR. FONTE: They'll get (inaudible) --
13     ER DOCTOR: I mean, the splenic injuries --
14     (Talking simultaneously.)
15     DR. FONTE: Well, now you're telling me 100
16 percent of the time, you (inaudible) sending some to Blake
17 because (inaudible) so I'm just trying to put things in
18 perspective (inaudible), we take a lot of (inaudible) Lee
19 High (phonetic) and we know that you guys do not have the
20 services there to provide the care for the patient. When
21 you've got a simple general surgical exploratory laparotomy
22 with a possible bowel injury, maybe a mesenteric ligation,
23 that's something that any general surgeon -- that's a
24 second-year surgical resident case.
25     And so you got (inaudible) --

Page 21

1     DR. KOPIDAKIS: All right. Now, you're just --
2     (Talking simultaneously.)
3     DR. FONTE: -- you don't have a liver injury --
4     (Talking simultaneously.)
5     DR. KOPIDAKIS: All right. Look, I
6 (inaudible) -- that's just --
7     DR. FONTE: -- (inaudible), you don't have any
8 evidence of vascular injuries; that is something that you
9 should be able to handle there locally without having to
10 transfer the patient out.
11     ER DOCTOR: (Inaudible) --
12     DR. FONTE: Now, we've spent a lot of time on the
13 phone, but basically -- you know, you could have been done
14 with the case by now.
15     ER DOCTOR: Hey, Doug, I got to sign-off and
16 start working on some other entrants; so I'll let you guys
17 go.
18     DOUG MCKENNA: Thanks, Doctor (inaudible).
19     (Beeping.)
20     DOUG MCKENNA: (Inaudible) Dr. Fonte, thank you
21 very much.
22     Dr. Kopidakis, (inaudible), thank -- thank you
23 very much, sir.
24     DR. KOPIDAKIS: I'll let Dr. Gatab work on this.
25 Thank you.

Page 22

1   (End of the recording.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 23

1               C E R T I F I C A T E
2
3       I, JACKIE MENTECKY, do hereby certify that I was
4   authorized to transcribe the foregoing recorded proceeding, and
5   that the transcript is a true and accurate transcription of my
6   shorthand notes to the best of my ability taken while listening
7   to the provided recording.
8
9   Dated this 23rd day of December, 2019.
10
11
12
13
14   _____
15            JACKIE MENTECKY
16
17
18
19
20
21
22
23
24
25

## **Attestation of Completion**

I acknowledge that I attended the presentation that was presented by Risk Management on 4/12/18 that addressed the following:

Review of recent EMTALA citation and implications of that citation.

Case study of the case cited in the deficiency report from AHCA.

EMTALA/Florida Access to Care
- What is it and what is required by statute
- Duties of on call specialists
- Requirements to accept transfers from other hospitals when they lack the service capability
- Clarification that sending hospital determines whether or not the individual has an emergency medical condition requiring transfer

Review of plan of correction that will be submitted to AHCA.

Review of transfer guidelines.

I understand my obligations under EMTALA/Florida Access to care regulations and I will comply with the regulations as discussed in this presentation. I understand what contributed to the recent EMTALA citation..I have had an opportunity to ask questions and obtain clarification as needed.

Print Name: _____ Nelaydc Fonte DO

Employee #: _____ 22153

Employee Signature: _____ Nelaydc Fonte DO

Date: _____ 4/12/18

EXHIBIT
6
Fonte
1/23/20
PENGAD 800-631-6989
Mar-18

From:AHCA HEALTH QUALITY ASSURANCE    239 338 2372    04/05/2018 15:20    #279 P.005/008

PRINTED: 04/05/2018
FORM APPROVED

Agency for Health Care Administration

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | HL100012 | A. BUILDING: _____ B. WING _____ | 03/29/2018 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| LEE MEMORIAL HOSPITAL | 2776 CLEVELAND AVE FORT MYERS, FL 33801 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| H 000 | INITIAL COMMENTS<br><br>An unannounced complaint survey CCR# 2018004127 was conducted on 3/26/18 through 3/29/18 at Lee Memorial Hospital, a licensed hospital (license# 4186) in Fort Myers, Florida.<br><br>The following is a description of the deficiency. | H 000 | By submitting this Plan of Correction, the hospital does not admit that it violated any rules, regulations or statutes or agree that the citations are correct.  The hospital also reserves the right to contest the deficiencies, findings, conclusions and actions of the Agency/CMS.  The hospital reserves all rights afforded under the law. | |
| H 035 | 59A-3.255(2)(c) FAC; 395.1041(3)(e) FS EMERGENCY CARE - Txfr Proc Closest Hospital<br><br>59A-3.255(2) TRANSFER PROCEDURES. Each hospital providing emergency services and care shall establish policies and procedures which incorporate the requirements of Chapter 395, F.S., relating to emergency services. The policies and procedures shall incorporate:<br><br>(c) A provision providing that all medically necessary transfers shall be made to the geographically closest hospital with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity as stated in Section 395.1041(3) (e), F.S.<br><br>395.1041(3)<br>(e) Except as otherwise provided by law, all medically necessary transfers shall be made to the geographically closest hospital with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity. When the condition of a medically necessary transferred patient improves so that the service capability of the receiving hospital is no longer required, the receiving hospital may transfer the patient back to the transferring hospital and the transferring hospital shall receive the patient within its service capability. | H 035 | Initial Action and Investigation: Risk Manager II immediately reported the allegation of an EMTALA violation to Trauma Program Manager, investigated the case; and self-reported the allegations and findings to the Agency for Health Care Administration. The Risk Manager then met with Trauma Program Manager to discuss immediate corrective actions to be undertaken. | 3/5/18 |

AHCA Form 3020-0001

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|
| | ACMO | 4/16/18 |

STATE FORM            6899        05J11        If continuation sheet 1 of 4

EXHIBIT 7
FONTE
1/23/20
PENGAD 800-531-6989

PRINTED: 04/05/2018
FORM APPROVED

Agency for Health Care Administration

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | HL100012 | A. BUILDING: _____ B. WING _____ | | 03/29/2018 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| LEE MEMORIAL HOSPITAL | 2776 CLEVELAND AVE FORT MYERS, FL 33901 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| H 035 | Continued From page 1 | H 035 | In addition the Risk Manager II also met with the Acute Care Medical Officer, VP of Patient Care Services, and Director of the Transfer Center to more fully develop, implement, and oversee the plan of correction. | 3/29/18 |
| | This Statute or Rule is not met as evidenced by: Based on staff interview and clinical record review, the geographically closest facility refused to accept 1 (Patient #20) of 1 patient referred for transfer to a hospital with specialized trauma services. | | | |
| | The findings included: | | Action Plan: | |
| | Patient #20 arrived at Hospital #1 on 3/1/18 at 10:51 p.m., with two stab wounds to the abdomen. Hospital #1's Emergency Department (ED) Physician obtained a CT (computerized tomography) scan of the abdomen and pelvis. The CT results noted "Hemoperitoneum [blood accumulated in the space between the inner lining of the abdominal wall and the internal organs] with considerable blood noted along the liver and extending in the right lower quadrant. Suspicious linear area of abnormal enhancement most likely representing active bleeding." | H035 | Counseling: Trauma Program Manager met with the on-call Trauma Surgeon involved in the case cited in person and counseled the surgeon concerning refusal of transfer under EMTALA, and re-enforced EMTALA transfer guidelines. Trauma Program Manager also re-enforced the EMTALA transfer guidelines with all other Trauma Surgeons via email. | 3/5/18 |
| | Patient #20's clinical record showed the patient was referred to Lee Memorial Hospital which is a Level 2 Trauma Hospital. The Florida Department of Transportation city-to-city distance is 15 miles. | | Education: The Risk Manager II provided in-service training to all trauma surgeons to reinforce EMTALA and Florida law, including the following: - Duties of on-call specialists to come to the ED when requested by the ED physician; | |
| | Review of Patient #20's clinical "course" showed on 3/2/18, Hospital #1's ED Physician documented the following: "0051: Dr. [Trauma Surgeon] Lee Trauma Declines transfer without OUR General Surgeon 'coming in and examining the patient and calling her himself'. Will discuss with surgeon. 0058: Surgeon here says we is [sic] willing to talk to trauma surgeon himself. 0114 Surgeon at Lee Refuses transfer. Will | | | |

AHCA Form 3020-0001
STATE FORM                    6960        05JI11                    If continuation sheet 2 of 4

From:AHCA HEALTH QUALITY ASSURANCE    239 338 2372         04/05/2018 15:22      #279 P.007/008

PRINTED: 04/05/2018
FORM APPROVED

Agency for Health Care Administration

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | HL100012 | A. BUILDING: _____ B. WING _____ | | 03/29/2018 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| LEE MEMORIAL HOSPITAL | 2776 CLEVELAND AVE FORT MYERS, FL 33901 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| H 035 | Continued From page 2 | H 035 | -Requirements to accept transfers of unstabilized emergency patients from other hospitals when hospital has capability and capacity; | |

discuss with [Hospital #3] medical center. 0124 Patient accepted [Hospital #3] medical center."

The registered nurse (RN) documented in ED Notes of 3/2/18 at 2:11 a.m., "Patient refused by [name] trauma surgeon. Patient accepted by [Hospital #3] trauma center. To be transported by [ambulance service] critical care (all services unable to fly due to weather)."

Review of the Lee Memorial ED log showed that on 3/2/18 at 12:39 a.m., Hospital #1's ED Physician called the Transfer Center. Hospital #1's ED Physician requested to transfer Patient #20 to Lee Memorial for surgical trauma treatment. The Transfer Center nurse contacted Lee Memorial's Trauma Surgeon. A 3-way call was set up with Hospital #1's ED Physician, Hospital #1's General Surgeon, and Lee Memorial's Trauma Surgeon.

On 3/27/18 at approximately 3:20 p.m., the audio recording of the transfer phone request was reviewed. Hospital #1's ED Physician reported that the patient was stabbed in the belly, stable with air and blood in the stomach, CT scan says considerable blood and he was told that the physician interpreting the CT scan thought it was from the bowel. Lee Memorial's Trauma Surgeon responded that the on-call surgeon from the referring hospital should be able to handle it. She stated "I'm not accepting the patient."

Review of Lee Health Policy & Procedures (Chapter M14, Tab 01, #089), Emergency Department Call Services (reviewed 4/17) revealed the Purpose including: Expectations of Performance for Physicians Providing ED Call Services, items "8. Comply with

- Florida law requiring transfer to closest hospital with capability and capacity to provide emergency care needed by patient.
-EMTALA Guidelines for transfers of Trauma patients;
-Review of case cited in deficiency report as case study;
-Review of deficiency statement and plan of correction;
-Clarification that sending hospital determines whether or not the individual has an emergency medical condition requiring transfer; and
-Clarification that on-call specialists may discuss cases with sending hospitals but may not refuse transfers on behalf of the hospital.
All trauma surgeons and mid-level providers signed an attestation indicating that they attended the in-service and understand their obligations. The attestations are maintained by Risk Manager II.

4/12/18

AHCA Form 3020-0001
STATE FORM                                              6899              05JI11                          If continuation sheet 3 of 4

PRINTED: 04/05/2018
FORM APPROVED

Agency for Health Care Administration

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | HL100012 | A. BUILDING: _____ B. WING _____ | | 03/29/2018 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| LEE MEMORIAL HOSPITAL | 2776 CLEVELAND AVE FORT MYERS, FL 33901 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| H 035 | Continued From page 3 | H 035 | Education: The Risk Manager II will provide training to reinforce EMTALA and relevant Florida Law requirements, to all Emergency Department Staff (including housekeeping, security and registration staff that work in the Emergency Department) and Physicians that will include a discussion of the case cited. | 4/29/18 |
| | the requirements of the Emergency Medical Treatment and Active Labor Act (EMTALA) and the Florida Access to Emergency Services and Care law, including accepting transfers as required under both laws; and 9. Provide care to the patient that falls within the scope of the physicians privileges." | | | |
| | During an interview on 3/27/18 at 9:35 a.m. Hospital #1's General Surgeon said, "The patient had to travel 2 hours to the east coast.  She had 2 stab wounds in abdomen.  Miami did another CT did not find much; she did fine.  I have taken care of trauma in the past, it was better if you start from scratch rather than find something after you open the patient up.  If trauma comes to us there should not be a question about a hospital with a trauma team taking a trauma patient.  I made sure they did another blood count before she left to make sure she was stable for transfer." | | Education: The Risk Manager II is providing in-person training to all Transfer Center staff on how to handle situations if an on-call physician refuses an emergency transfer from another hospital when the hospital has capability and capacity to accept an emergency transfer.  Specifically, the Risk Manager outlined the process available to the Transfer Center staff to activate the chain of command and engage the assistance of the VP of Patient Care Services and the Acute Care Medical Officer if necessary. | |
| | The Lee Memorial Hospital had the capacity to treat Patient #20. The patient had been stabilized and was appropriate for transfer. The transfer was refused and the patient was sent, by ambulance to another trauma hospital in the Miami area for treatment.  The Florida Department of Transportation city-to-city distance is 133 miles. | | | 4/16/18 |

AHCA Form 3020-0001
STATE FORM                                      6899          05JI11                       If continuation sheet 4 of 4

H035
Continue from page 4 of 4

Monitoring to assure compliance: The Risk
Manager II conducts a weekly audit,
beginning April 16, 2018 that will continue for
a period of 3 consecutive months of
substantial compliance is achieved of all
requests for transfer from other hospital
emergency departments that did not result in
a transfer to verify that all requests for
transfer are being handled in accordance with
the EMTALA regulations. The Risk Manager II
is responsible for reporting aggregated data
from the audit results to the monthly facility
quality meeting for the audit period. If issues
of concern are noted for trauma cases, the
case is immediately escalated to the Trauma
Medical Director and the Trauma Program
Manager for follow up action. If issues of
concern are noted for non-trauma cases, the
case is immediately reviewed with the
Emergency Department Medical Director. Any
ongoing trends of concern regarding a specific
physician are referred to the Acute Care
Medical Officer of the hospital for a corrective
action plan. The Acute Care Medical Officer
reports any further variances or non-
compliance to the medical executive
committee and to the Board, along with
summary data.                    4/16/18



April 16, 2018

Jon Seehawer, RN
Field Officer Manager
Agency for Health Care Administration
2295 Victoria Avenue, Room 340
Ft. Myers, FL 33901
Fax (239) 338-2372

      RE:    CCR# 2018-4127
              Survey date: 3/26/2018 – 3/29/2018

Dear Mr. Seehawer,

Attached please find the Plan of Corrections regarding the above referenced complaint survey.

Please do not hesitate to contact us, if you have any questions.

Sincerely,

Kim Groeneveld
Paralegal

Enclosure



**EMTALA**

Mary Lorah

4/12/2018

LEE HEALTH

---

## What is it?

- Patient antidumping law

- Emergency Medical Treatment and Active Labor Act. Federal law enacted in 1986 intended to ensure that all people have equal access to emergency treatment regardless of their ability to pay.

- Unfunded Mandate to Provide Medical Care



LEE HEALTH

---

## What is it?

- Federal version of Florida's Access to Emergency Services and Care

- Difficult to Understand

- Easy to Violate

- Carries Severe Penalties



LEE HEALTH

---

**EXHIBIT** 8

PENGAD 800-631-6989

FORTE
1/23/20

1/21/2020

## Requirements

- To provide an appropriate medical screening exam to any individual who comes to the dedicated emergency department regardless of their ability to pay.

- Provide necessary stabilizing treatment to an individual with an emergency medical condition or an individual in labor.

- Hospitals have the ultimate responsibility for ensuring adequate on call coverage. Hospitals participating in the Medicare Program must maintain a list of physicians on call for duty after the initial examination to provide treatment necessary to stabilize an individual with an EMC. Hospitals have an EMTALA obligation to provide on call coverage for patients in need of specialized treatment if the hospital has the capacity to treat the individual.

 LEE HEALTH

## Requirements

- If a staff physician is on call to provide emergency services or to consult with an emergency room physician in the area of his or her expertise, that physician would be considered to be available at the hospital. A determination as to whether the on call physician must physically assess the patient in the emergency department is the decision of the treating emergency physician.

- Provide for an appropriate transfer of an individual if either the individual requests the transfer or the hospital does not have the capability or capacity to provide the treatment necessary to stabilize the emergency medical condition.

 LEE HEALTH

## Requirements

- Not delay examination and /or treatment in order to inquire about the individual's insurance or payment status.

- Accept appropriate transfers of individuals with emergency medical conditions if the hospital has specialized capabilities not available at the transferring hospital and has the capacity to treat those individuals.

- Obtain or attempt to obtain written and informed refusal of examination, treatment or an appropriate transfer in the case of an individual who refuses examination, treatment or transfer.

 LEE HEALTH

### How could we avoid this type of violation in the future?

#### Duty to Accept

If a hospital has specialized capabilities or facilities (including, but not limited to services such as burn units, shock trauma units, neonatal intensive care units) they may not refuse to accept from a referring hospital within the boundaries of the United States an appropriate transfer of an individual who requires such specialized capabilities or facilities if the receiving hospital has the capacity to treat the individual.

 LEE HEALTH

---

### Transfer Location

Under Florida access to care, all medically necessary transfers shall be made to the geographically closest hospital with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity.

 LEE HEALTH

---

### How could we avoid this type of violation in the future?

The Emergency Department physician from the transferring hospital has the sole decision in determining if the patient needs to be transferred to a facility with specialized capabilities.

 LEE HEALTH

## How could we avoid this type of violation in the future?

Even if there is a question as to whether the patient needs specialized capabilities it is always better to take the patient in transfer and address the issue of an inappropriate transfer later.

LEE HEALTH

---

## Thank You

LEE HEALTH

# *Employee Conference*

**LEE MEMORIAL HEALTH SYSTEM**

| NAME: Nelayda Fonte | EMPLOYEE NUMBER: 22153 | |
|---|---|---|
| JOB TITLE: Trauma Surgeon | DEPT: Trauma | DATE: 04/25/2018 |

**1** DESCRIBE THE BEHAVIOR/PERFORMANCE NEEDING IMPROVEMENT OR LIST INCIDENTS (Day, Month and Year) OF ABSENTEEISM AND TARDINESS DURING THE 12 MONTHS PRECEDING THE LATEST INCIDENT (or reason for termination): Information to Include: Who was involved. When did the behavior/performance occur (specific date or dates of a pattern). Whom/What has been impacted/affected. Describe the severity. List any policies (by name and number), protocols or practices that have been violated/breached. If considered Gross Misconduct, list as such and include the letter and description from the Corrective Action Process policy S09 06 140, page 6. Document that the involved parties have been provided with copies of applicable policies/protocols.

On March 3, 2018 Dr. Fonte was contacted by an outside facility for a patient transfer to trauma services. Patient had an injury pattern consistent with need for trauma services and Dr. Fonte failed to accept the transfer. This issue resulted in a delay of care, transfer to another trauma facility for appropriate intervention, and breach of EMTALA / Florida AHCA duties to accept for level of care. Additionally Dr. Fonte's interaction in the physician to physician report was inappropriate, unprofessional, condescending, argumentative, and failed to uphold LH/LPG physician compact for expected professional conduct and behavior. These behaviors are noncompliant with the LPG Physician Compact and also represent violations of the LH Corrective Action Process policy S09 06 140 and are considered Gross Misconduct in the form of letters q. Conduct detrimental to LH image and s. Disruptive behavior, conduct which disturbs a patient, visitor, physician, coworker, or others conducting business or performing services for Lee Health. Based upon these behaviors and the incorrect medical decision making related to this situation Dr. Fonte is being issued a Final Warning. Should Dr. Fonte persist in these behaviors by repeating the same or similar offenses her employment will be terminated.

Additionally, administration reserves the right to issue additional corrective action up to and including termination if additional unknown facts are discovered from the EMTALA / AHCA investigation.

**2** DESCRIBE EXPECTED PERFORMANCE: Refer to any policies identified in Section 1 that must be adhered to as well as any related Code of Conduct, section of the job description or performance evaluation (e.g. Teamwork) and timeframes for adherence/completion (e.g. Immediately, Ongoing, At all times, etc.)

Effective immediately and on going, Dr. Fonte's behavior, conduct and communication must demonstrate the utmost professionalism to peer physicians, administration, management and staff and to all affiliated with LH at all times. Demonstrate dramatic and sustained improvement in Dr. Fonte's cooperation, interpersonal interactions, approachability and responsiveness to the above named parties.

At all times adhere to and:

- Abide by: ATLS, Florida Trauma Triage Criteria, EMTALA /AHCA and LH/LPG physician compact and codes of conduct. Seek additional education through America College of Surgeons courses (ATOM/ ATLS/ASSET).

- The Lee Health Physicians Staff Compact. (Attached).

- Schedule 9.c.viii Conduct and Behavior (Attached).

- Lee Health Corrective Action Process Policy and Procedure S09 06 140 (Attached).

**3** ACTION PLAN (How to achieve the expected performance, including specific goals, action steps, dates for follow-up, completion, etc.) – Employee to develop with follow-up by Supervisor: (may utilize Performance Improvement Planning (PIP) Form #0784) Include any EAP recommendations or referral.

Dr. Fonte will develop an action plan inclusive of meaningful and measureable action steps designed to ensure decision making and communications that are in alignment with the all items listed in Box # 2 above for approval and acceptance by administration by XXX date.   *5/30/18 VF*

Dr. Fonte will seek additional education through America College of Surgeons courses (ATOM/ ATLS/ASSET) and provide proof of completion of same to administration by XXX date.   *per action plan VF*   *4/30/18*

**4** **CORRECTIVE ACTION PROCESS:** (Check one):

| a. | STEP ONE | STEP TWO | STEP THREE | |
|---|---|---|---|---|
| | Behavior/Performance Only ↓ (Remains active for 9 months and tuition reimbursement affected) | (Remains active for 12 months and employee may not transfer while active) | (Remains active for 18 months and employee not eligible for merit per policy) | |
| | ☐ 1ST WRITTEN REMINDER | ☐ 2ND WRITTEN REMINDER | ☐ DECISION MAKING LEAVE | ☐ TERMINATION |
| b. | STEP ONE | STEP TWO | STEP THREE | |
| | Absenteeism or Tardiness ↓ (12 months preceding last incident) | (12 months preceding last incident and employee may not transfer while active) | Initial introductory period employees only requires Step 3 | |
| | ☐ 1ST WRITTEN REMINDER | ☐ 2ND WRITTEN REMINDER | ☐ 3RD WRITTEN REMINDER | ☐ TERMINATION |

Original to Human Resources        Retain Copy in Department        Give Copy to Employee

**EXHIBIT**
**9**
Fonte
1/23/20
PENGAD 800-631-6989

## *Employee Conference*

**LEE MEMORIAL HEALTH SYSTEM**

| c. | x FINAL WARNING (action in and of itself - active indefinitely and employee not eligible for merit per policy) |
|---|---|
| **5** | CONSEQUENCES OF CONTINUED PROBLEM PERFORMANCE, ABSENTEEISM, AND/OR TARDINESS: |
| | ☐ In reference to 4a and 4b, further behavior/performance and/or excessive absenteeism and/or tardiness may result in further corrective action up to and including termination. |
| | x In reference to 4c, a repeat of the same or similar offense is grounds for termination. |
| **6** | EMPLOYEE'S REMARKS: |

| *SUPERVISOR'S SIGNATURE: | DATE: 4·30·18 | EMPLOYEE'S SIGNATURE: | DATE: 4/30/18 |
|---|---|---|---|
| Witness signature certifies that the named employee was counseled. **WITNESS SIGNATURE:** | DATE: | NOTE: The employee's signature does not indicate agreement, but simply that he/she has read this report. | |

Linked to Policies: S09 06 140, S09 06 009, S09 06 145, S09 06 867

**\*SUPERVISORS:**
CORRECTIVE ACTION SHOULD BE ENTERED ONLINE IN THE AUTOMATED PAR SYSTEM BEFORE YOU PLACE THIS DOCUMENT IN THE EMPLOYEE FILE.





Scott ›

Apr 30, 2018, 4:51 PM

My apologies for being distracted as I left- I'm sure u understand

No apologies necessary. I know this is difficult   You are an excellent surgeon. Well respected. This was an unfortunate circumstance you will learn from it and emerge a stronger better physician.

I wish administration felt the same way....

LPG

  iMessage 

EXHIBIT
10
FONTE
1/23/20
PENGAD 800-631-6989



     

●●III T-Mobile 📶   9:04 PM   ⫸ 100% 🔋⚡

 

SW

Scott ›

I wish administration felt the same way....

LPG

I understand. I will help in anyway. Let me know if you want to speak in person. Happy to do so

Thank you

May 1, 2018, 7:00 AM

Are you in the house

Will b in by 7:40?

Just wanted to see if you
want to grab a quick

  iMessage 

      

 LEE HEALTH

**Performance Improvement Planning Form**

**Employee Information:**

| Employee Name: | Nelayda Fonte, DO | Employee #: | 22153 |
| Department Name: | Trauma | Dept & Loc #: | 386.9 |
| Supervisor Name: | Jose A. Diaz, MD | Review Date: | 5/16/18 |

Use this form to document action plans when improvement is required for specific essential job standards or competencies. Attach additional documentation as needed. *The Due Date should generally be no more than 30 days from the time this form is completed. Use additional forms if more than five action plans are required.

| Action Plan | Due Date | Successfully Completed?* |
| --- | --- | --- |
| General Surgery Board Review Course  April 25-28, 2018 | | ☑ Yes ☐ No* 4/25/18 Completed |
| ASSET  Aug. 10, 2018 | | ☑ Yes ☐ No* 8-10-18 completed |
| ATLS  Nov 10, 2018 | | ☑ Yes ☐ No* exp. 10/2020 |
| | | ☐ Yes ☐ No* |
| MEET EVERY 8 weeks to check in, Monitor for issues, Discuss concerns. | | ☐ Yes ☐ No* |

**Comments:**

Jose A. Diaz, MD   5/16/18
_____      _____      _____      _____
Supervisor Signature           Date          Employee Signature            Date

*If not successfully completed, please begin and/or continue the Corrective Action process as appropriate.
Please retain this form in the departmental personnel files. **It is not necessary to send this form to Human Resources.**

Linked to Policy <u>S09 06 434</u>, <u>S09 02 135</u>



EXHIBIT
PENGAD 800-831-6989
FONTE
11
1/23/20

FM# 0784  04/12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AUDIO TRANSCRIPTION

FILE:  437075

EXHIBIT

Fonte  12

1/23/20

Page 2

1    SPEAKER: Can you open up the (inaudible) --
2    TRISH: Transfer Center; this is Trish.
3    SPEAKER: Okay. Hold on.
4    DR. HEISLER: Hello?
5    TRISH: Hi, Dr. Heisler.
6    DR. HEISLER: Hey.
7    TRISH: All right. So let me get Dr. Fonte with
8    trauma --
9    DR. HEISLER: Thanks.
10   TRISH: -- on the line. Okay?
11   DR. HEISLER: Thank you.
12   TANYA: SIC, (phonetic) this is Tanya; can I help
13   you?
14   TRISH: Hi. I was looking for Dr. Fonte, please.
15   TANYA: Okay. Hold on.
16   SPEAKER: Is it for me?
17   SPEAKER: (Inaudible).
18   DR. FONTE: Hello. Dr. Fonte?
19   TRISH: Dr. Fonte, it's Trish at the Transfer
20   Center; I've got Dr. Heisler on the phone --
21   DR. FONTE: Okay.
22   TRISH: -- from Lee High. Hold on.
23   Dr. Heisler, I've got Dr. Fonte from trauma.
24   DR. HEISLER: Hey.
25   DR. FONTE: Hey; how are you?

Page 3

1    DR. HEISLER: Hey. So we're getting a -- like an
2    intermittent pulse on this child. He goes in -- in and out
3    of PEA and we did a chest x-ray; I don't see any pneumos.
4    We did get him intubated. We're repeating his chest x-ray.
5    It did look like he probably had some pulmonary contusion.
6    His abdomen's got bruising on that, as well as his
7    chest. And his abdomen does seem to be expanding.
8    I just -- I don't think he is stable enough to --
9    to go up to Tampa. I think that, you know, he would
10   require to go to you and then be transferred up there.
11   DR. FONTE: The problem, Hope, is -- is I don't
12   have pediatric services here, and he's five. So -- you
13   know, when we get five-year-olds and stabilize them enough
14   to transfer anywhere, we send them to Tampa.
15   So it would be --
16   DR. HEISLER: Right.
17   DR. FONTE: -- you know, it would be negligent of
18   me to accept a patient to a -- you know, to -- to us, as
19   opposed to trying to get him to the appropriate facility,
20   which would be the pediatric trauma center.
21   DR. HEISLER: Right. Even if he's not really
22   stabilized enough to -- to go up there?
23   I mean, I feel like he needs another step of
24   stabilization prior to going there; and I know, you know,
25   we've done that in the past.

Page 4

1    DR. FONTE: Right. I guess my --
2    DR. HEISLER: Right.
3    DR. FONTE: -- my concern is, is if I -- if I
4    can't do anything for him, then -- then we've delayed his
5    transfer to the appropriate facility instead of trying to
6    get him there.
7    You know, you've got -- so you said you've got
8    no -- no pneumothoraxes, right? So it's not like --
9    DR. HEISLER: Right.
10   DR. FONTE: -- it's a --
11   DR. HEISLER: But it looks like pulmonary --
12   bilateral pulmonary contusions --
13   DR. FONTE: Right.
14   DR. HEISLER: -- and he keeps going into PEA.
15   We've got, you know, a couple of lines going in with a -- a
16   -- you know, fluids going --
17   DR. FONTE: Right. Right.
18   DR. HEISLER: -- you know, and everything that we
19   can do here; but his abdomen is, you know, starting to
20   distend and -- you know, I just -- the time it's going to
21   take to transfer him to Tampa, I just feel like, you know,
22   he needs to go to the closest trauma facility.
23   DR. FONTE: But he needs to go to the closest
24   appropriate trauma facility, I guess is my point.
25   I -- you know, I -- I just --

Page 5

1    (Talking simultaneously.)
2    DR. HEISLER: Yeah. I mean --
3    DR. FONTE: -- I don't want to --
4    DR. HEISLER: -- they would have diverted to you
5    though if he had a pulse; which he did --
6    DR. FONTE: Right. Right.
7    DR. HEISLER: -- initially on scene --
8    DR. FONTE: Right. Right. Right.
9    DR. HEISLER: Now that he has a pulse, he would
10   have -- you know, normally come to you anyway; and then he
11   would have gone up there (inaudible) --
12   DR. FONTE: No. No. So -- so the -- so the way
13   it goes, it's like -- it's like a burn, right?
14   DR. HEISLER: Yeah.
15   DR. FONTE: You don't send us burns. Burns go up
16   to Tampa. And so -- you know, when you've got a five-- -- I
17   mean, if you said: Look, he's 16-years-old, but he's adult
18   sized --
19   DR. HEISLER: Right.
20   DR. FONTE: -- that's different. You know what I
21   mean?
22   DR. HEISLER: Right.
23   DR. FONTE: But when you're talking about a
24   five-year-old --
25   DR. HEISLER: Right.

## Page 6

1  DR. FONTE: -- you know, we don't have a
2 pediatric facility at my campus. Right?
3  DR. HEISLER: Right.
4  DR. FONTE: So we deal -- if it comes in, and
5 it's an emergency, and I need to do what I need to do, we
6 do it.
7  DR. HEISLER: Yeah. Right.
8  DR. FONTE: But at this point, I'm taking a
9 transfer, and it just --
10  DR. HEISLER: Right.
11  DR. FONTE: -- you know, we're not the
12 appropriate facility for that --
13  DR. HEISLER: Right.
14  DR. FONTE: -- just like I wouldn't take a burn;
15 it doesn't make sense for us to --
16  DR. HEISLER: Right.
17  DR. FONTE: -- take him and -- and
18 (inaudible) --
19  (Talking simultaneously.)
20  DR. HEISLER: So -- I mean, you would --
21  DR. FONTE: Yeah. Yeah. I have a (inaudible) --
22  (Talking simultaneously.)
23  DR. HEISLER: -- (inaudible) bleeding into his
24 belly?
25  Huh? Okay. Yeah. It was diminished on the left;

## Page 7

1 tell him to pull back.
2  Okay.
3  DR. FONTE: Yeah. I would say try to -- try to
4 get him up there as quickly as possible so that they can
5 do -- I mean, they've got the pediatric surgeons; they've
6 -- you know, they've got the pediatric interventionalist,
7 so like if --
8  DR. HEISLER: Uh-huh.
9  DR. FONTE: -- it's the liver, they can embolize
10 it. I don't have pediatric embolization catheters --
11  DR. HEISLER: (Inaudible) --
12  (Talking simultaneously.)
13  DR. FONTE: -- you know what I mean? So that
14 sort of thing.
15  DR. HEISLER: All right.
16  DR. FONTE: And I don't want to waste time if --
17 you know, you've got him back and you've got -- you know,
18 you've got vitals, then let's try to get him to the
19 appropriate facility --
20  DR. HEISLER: Yeah.
21  DR. FONTE: -- where they have all the --
22  (Talking simultaneously.)
23  DR. HEISLER: They're back, but they keep coming
24 and going; that's what I'm saying --
25  DR. FONTE: Yeah. Yeah. Yeah.

## Page 8

1  DR. HEISLER: He's not really stable-stable.
2 He's in and out; so that's the reason why I wanted to go to
3 you guys.
4  But if you, you know, don't want to accept him,
5 I'll have to call Tampa.
6  DR. FONTE: I just think he needs to go to the
7 appropriate facility --
8  DR. HEISLER: All right. --
9  DR. FONTE: -- from the get-go. Okay?
10  DR. HEISLER: All right.
11  DR. FONTE: All right.
12  DR. HEISLER: Thanks.
13  DR. FONTE: Uh-huh.
14  (End of the recording.)
15
16
17
18
19
20
21
22
23
24
25

## Page 9

1  C E R T I F I C A T E
2
3  I, JACKIE MENTECKY, do hereby certify that I was
4 authorized to transcribe the foregoing recorded proceeding, and
5 that the transcript is a true and accurate transcription of my
6 shorthand notes to the best of my ability taken while listening
7 to the provided recording.
8
9 Dated this 8th day of January, 2020.
10
11
12
13
14  _____
15  JACKIE MENTECKY
16
17
18
19
20
21
22
23
24
25

 T-Mobile 📶   6:35 PM   54% 🔋⚡



Michael ›

Thu, Nov 15, 3:27 PM

Plz call me

Hi. Will do – tied up for about 35 min.

So I guess I'm meeting with legal again?

Give me a few. I'll call I

U

Fri, Nov 16, 10:27 AM

Hi!  If that was you call u in 5-7. In mtg.



iMessage

   iMessage  

      





Robert >

Thu, Nov 15, 8:27 PM

Hey quick ? What head
hunter companies do u
recommend? Weatherby?
Figured u have most
experience

Fri, Nov 16, 12:42 PM

**Simon Parsons**  SP  >

My number one go to guy
at CompHealth. He's
great!!

Thank u!!!

So does the CMO have to




iMessage





EXHIBIT
14
Fonte
1/23/20











.ıll T-Mobile 📶                5:51 PM                ↗ 12% 🔋

**‹**

EV

Ernst ›

Fri, Nov 16, 10:31 AM

Focus on pt was never
stable to transfer. Not
where should have gone.

Ty- would u b willing to
talk to our legal people
about this? Jose in
meetings all day. Just for
ur perspective on our
practice

That is stepping in his
wheel house. I rather see if
I can get someone like
lottenberg
As an outside reviewer.

Ok





EXHIBIT

15

Fonte
1/23/20



Michael >



Done

Fri, Nov 16, 11:49 AM

Dr. Lottenberg is a good choice for outside review if they are willing. He basically built most of the system in Florida

Do u have his contact info?

Ernst & i thought the same thing yesterday

  iMessage 

    

EXHIBIT
16
Conte
1/23/20
PENGAD 800-631-6989



**T-Mobile** 3:47 PM 40%



Ernst >

I Head back to SD tomorrow.
10F 😷
Be well
Ernst.

Wed, Jan 2, 3:45 PM

I Hope u had a wonderful birthday and I wish u an even better New Year. I missed you too 😘. Im hoping to start back soon but I guess we will see how this rides out. I'm certainly feeling better and have climbed out of the bottomless pit I was in before.

iMessage



EXHIBIT
19
Ernst
1/23/20

 T-Mobile 📶     8:13 PM     🖅 52% 🔋



Jose >

Sun, Jan 6, 5:12 PM

So am I allowed to ask what's on the agenda for meeting?

Hola. Unfortunate can't discuss that until Tuesday. Try not to think about that right know. I am working Tuesday but should be there on time for the meeting unless something happens.

I really want u there

Delivered

  iMessage 

EXHIBIT
20
PENGAD 800-631-6989
Fonte
1/23/20

     



**Ernst** ›

Sun, Jan 6, 8:08 PM

Hope u r having fun. Give me a call later this week after u r back. It may b I no longer work at Lee come Tuesday. It has truly been a pleasure working with you my friend. Just wanted you to know before the craziness starts

Mon, Jan 7, 11:51 AM

Got it late from hosp last night. Disappointed to hear that. Met a woman, trauma surgeon, who gave it up 2 years ago and only

EXHIBIT
21
FONTÉ
1/23/20



‹



Ernst ›

does Locums ICU on wkend. Here for last two years. She loves it.

Tue, Jan 8, 3:04 PM

At your convenience can u give me a call sometime? I just need a friend but I won't dump on u I promise.

I'll call you in a bit. And you can dump if need be.

Im getting gas. Take ur time

  iMessage 

      



**Michael** >

makes us type A folks feel all too human!! I'll try and give you a call on the eay afternoon if you are going to be around. I'd like to chat and see how things are going.

U know I have meeting with prasad on Tuesday

That may b my swan song

First I've heard... Please don't let anything throw you off track to feeling better – just not worth it. Let's chat tomorrow.





EXHIBIT
22
PONTE
1/23/20



January 8, 2019

**Via Hand Delivery**
Nelayda Fonte, D.O.

Re:     **Employment with Lee Health**

Dear Dr. Fonte,

We appreciate the multiple decades of service you have provided here at Lee Health and the Lee County Trauma Services District.

However, this letter is to provide thirteen (13) weeks no cause notice of termination of your January 1, 2005 Employment Agreement ("Employment Agreement") with Lee County Trauma Services District in accordance with paragraph 11(a) of that agreement. This letter shall serve as notice terminating all contractual relationships you have with Lee County Trauma Services District and Lee Health.

Also pursuant to paragraph 11(a), Lee Health is asking you to cease work immediately and will pay you a lump sum payment in the amount of $133,790.80, less applicable taxes, which is the salary you would have earned during the 13 week notice period.

If covered by Lee Health's Health Plan, it will cease on the last day of this pay period. If you have additional questions about benefits, I recommend you contact Nicole Davison, Senior Benefits Analyst – Human Resources, at Nicole.Davison@leehealth.org or 239-424-3265.

Please contact Shelley Fay to arrange for collection of your personal items and to return any other Lee Health property in your possession and not returned during our meeting. We appreciate your cooperation in ending our employment relationship on a positive and amicable note, and wish you the best of luck in the future.

Sincerely,

Venkat Prasad, M.D.
Chief Medical Officer
Lee Physician Group

EXHIBIT
23
Fonte
1/23/20

PENGAD 800-631-6989

**Administration**

Med Plaza One, Suite 200
9800 S. Healthpark Drive
Fort Myers, FL 33908
239-343-6525 · fax 239-343-6143

## EMPLOYMENT AGREEMENT

## TRAUMA DISTRICT SURGEON

LEE COUNTY TRAUMA SERVICES DISTRICT ("LCTSD"), a special purpose unit of

local government created by the Florida Legislature, located at 2776 Cleveland Avenue; Fort Myers,

Florida, employs Nelayda Fonte, D.O. ("Physician"), a clinical practitioner of surgery under the

following conditions and provisions:

1.      Recitals.  The Florida Legislature declared the operation and maintenance of Lee

County Trauma Services District to be a public purpose.  The availability of trauma surgeons to

provide surgical services to patients of Lee Memorial Health System's trauma center is necessary in

order to carry out the district's public purpose.  In order to fulfill its duties to provide access to

trauma services to residents and nonresidents of Lee County seeking trauma services, LCTSD has

determined it is necessary to employ physicians qualified to provide such services under the terms

and conditions and provisions set forth herein.

2.      Basis of Employment.  Physician is hired on a full-time basis to primarily perform

professional services as a trauma surgeon and surgical critical care specialist, as well as other

professional services within the scope of Physician's training as determined by the Medical Director

of Trauma Services.  Physician certifies that she is fully licensed in the State of Florida as a physician,

and has met all the requirements of the Lee Memorial Health System's (LMHS) medical staff for

membership and privileges as a general surgeon in LMHS' hospitals.

3.      Compliance with Rules.  Physician is an employee of LCTSD and shall comply with,

and be subject to, all the applicable policies, rules and regulations of LCTSD.  Physician shall report

to the Medical Director of Trauma Services.  Said Medical Director shall have administrative

oversight to ensure the Physician performs the obligations under this Agreement, including but not

limited to, the Physician's obligation to maintain a work schedule and assignments as directed by the

EXHIBIT

Fonte 24

1/23/20

Medical Director. In addition to the professional standards of practice established by LCTSD, Physician shall adhere to professional standards of practice established by LMHS' medical staff, and in matters of professional practice shall be subject to the bylaws and rules and regulations of the LMHS medical staff and the rules of the department of the medical staff to which assigned.

4. <u>Professional Practice</u>. The professional services to be provided by Physician shall be performed in accordance with, and encompass those usual and customary activities generally accepted by practitioners of trauma surgery and surgical critical care specialists, which shall include, but not be limited to:

a. Seeing, examining, and treating patients in the office setting,

b. Seeing, examining, and treating patients in the LMHS' Emergency Rooms,

c. Acting as a specialist consultant to members of LMHS' medical staff on request,

d. Performing surgery and invasive procedures within the scope of Physician's specialty,

e. Preparing appropriate notes, orders, opinions, reports, and other documents in accordance with LMHS medical staff policy,

f. Performing examinations of patients in conjunction with providing expert testimony within the scope of Physician's specialty, in judicial and administrative proceedings and providing such testimony as a treating physician,

g. Providing on-call coverage, and

h. Participating in peer review activities in accordance with LMHS and medical staff policy.

5. <u>Other Responsibilities</u>. In addition to the professional services to be provided by Physician, Physician shall also:

2

a.    Participate in committee and other organizational activities of the LMHS medical staff and LCTSD as requested,

b.    Assist and advise the LCTSD Board and administration in program development and improvement in areas of Physician's specialty or special knowledge,

c.    Supervise other LCTSD personnel pursuant to requirements of LCTSD's management, and

d.    Other duties relating to Physician's specialty as assigned by the Medical Director of Trauma Services.

6.    <u>Compensation</u>.

a.    Physician shall be paid an annual base salary of $375,000.00. In addition to the base salary, Physician shall be eligible for additional compensation as set forth in Exhibit A for back-up call coverage, excess primary call coverage, and productivity-based pay. Further, as set forth in Exhibit A, Physician shall be eligible for an annual bonus for achieving performance goals in the areas of quality of care initiatives and the ability to work with others, as defined and established by the Chief Medical Officer-Clinical and Quality Services in conjunction with the Medical Director for Trauma Services. Such bonus shall be in lieu of annual merit evaluation increases.

b.    Compensation paid pursuant to this Agreement shall be consistent with fair market value and shall not be determined in any manner that takes into account (directly or indirectly) the volume or value of any referrals. Compensation will be reviewed annually to ensure compliance with applicable state and federal laws and regulations governing physician compensation.

c.      Staff physicians are classified as professional, exempt employees. An exempt employee is not eligible for overtime pay, nor is Physician eligible for shift differential pay. Physician will be paid every two weeks on LMHS' normal payday.

7.      Benefits. Physician shall receive those benefits in accordance with LCTSD's policies, as modified for staff physicians, a summary of which is attached as Exhibit B, and as modified by this Agreement. In addition to those benefits listed in Exhibit B, LCTSD will provide Physician with annual Continuing Medical Education opportunities not to exceed a cost of $3000.00, subject to LCTSD policies and approval of the Medical Director. Physician understands and agrees that LCTSD may, from time to time, amend such policies and manuals unilaterally, and that this Agreement will be governed by such policies and manuals as they may be amended.

8.      Public Employment.

a.      Physician is a public employee under this Agreement, and is subject to the Florida Public Employees Code of Ethics, which among other things, prohibits engaging in activities that might create a financial conflict of interest with LCTSD. In addition, Physician agrees that she shall conduct herself in an ethical and professional manner and adhere to such standards of conduct as may be adopted by LCTDS.

b.      Physician is protected by the provisions of the Florida Waiver of Sovereign Immunity Act, and LCTSD agrees to bear the expense of defense and to pay any settlement or judgment in any claim, action, or suit brought against Physician arising out of employment by LCTSD, to the fullest extent permitted by law.

9.      Employment Exclusive. Physician agrees that employment by LCTSD precludes all other professional practice, including professional writing, teaching and research, not associated with

4

employment by LCTSD, unless the Chief Medical Officer-Clinical and Quality Services, shall give express written consent to the same.

10.    Prior Employment Agreement.  This Agreement amends that prior Employment Agreement between Lee Memorial Health System and Physician dated January 1, 2003 and assigned to LCTSD effective January 1, 2005, and supercedes the same.  However, this Agreement shall have no effect upon Physician's date of service or seniority, and shall not constitute or cause a break in service or employment.

11.    Term.

a.    Employment pursuant to this Agreement shall begin January 1, 2005, and continue until terminated by either party in accordance with the terms of this Agreement.  Physician or LCTSD may terminate this Agreement by giving the other party thirteen (13) weeks advance written notice.  LCTSD may elect to require Physician to cease working before the end of the applicable notice period and "pay out" Physician's base salary for the entire or remainder of the notice period applicable to Physician's voluntary or involuntary termination under section 11.a.  In the event LCTSD terminates this Agreement after December 31, 2006 due to the loss of Trauma Center designation, LCTSD may give immediate notice of termination of this Agreement and pay Physician an amount equal to six (6) months base compensation within thirty (30) days of termination.

b.    LCTSD agrees that from the effective date of this Agreement until December 31, 2006, LCTSD shall terminate Physician's employment only for cause, with cause being defined as termination under subsection 11 c. of this Agreement.  Should LCTSD terminate Physician's employment without cause, Physician shall be entitled to her base salary from the date of termination

5

through December 31, 2006, such remaining base salary to be paid a lump sum within fourteen (14) days of termination.

    c.    In addition to the termination provision set forth section 11.a., LCTSD may immediately terminate Physician's employment for disciplinary reasons pursuant to Personnel Policy 09 06 007, as the same may be in effect at the time of discipline. (A copy of current Personnel Policy 09 06 007 is attached hereto for convenience only.) Should Physician have her license to practice medicine revoked, suspended, or not renewed; or should the LMHS medical staff or Board suspend Physician's medical staff membership or privileges, employment hereunder shall terminate immediately.

    d.    Should Physician voluntarily terminate her employment with LCTSD, Physician agrees that she will not accept employment or affiliation with any entity in competition with LCTSD in Lee County for one (1) year from the date of voluntary termination. This shall not be construed as prohibiting Physician from engaging in the private practice of medicine including group practice, so long as said group practice is not affiliated with any entity in competition with LCTSD. "Affiliation" shall not be construed to prohibit Physician from holding medical privileges at any hospital.

    e.    The parties agree that pursuant to §456.057, Fla. Stat., LMHS is the "records owner" of medical records generated by Physician and that upon termination of employment, Physician shall fully cooperate with the transfer of such records to a physician designated by LMHS.

    12.    Amendments. This Agreement and other referenced and incorporated documents constitute the entire agreement between the parties, and with the exception of LCTSD's reservation of its right to unilaterally amend its policies and procedures, may be amended only by mutual written agreement of the parties. Waiver of, or failure to demand performance of, any term or condition of

this Agreement shall not constitute waiver of any other term or condition, or of the Agreement as a whole.

13.     Governing Law. This Agreement shall be governed by the laws of Florida and venue for any action hereunder shall be in Lee County, Florida.

SIGNED BY the parties this _20_ day of _April_, 2005.

For: **Physician**

Nelayda Fonte, D.O.

For:  **Lee County Trauma Services District**

Chuck Krivenko, M.D.
**Chief Medical Officer**
**Clinical and Quality Services**


**ATTACHMENTS**
  Exhibit A  Additional Compensation and Bonus Pay
  Exhibit B  Benefits Overview
  Policy & Procedure 09 06 007

7

# 2005 Trauma Surgeons Additional Compensation and Bonus Pay

## TEAM BASED RVU PRODUCTIVITY PAY:

In addition to the base compensation, team based RVU productivity pay is available on the basis of WRVU production that exceeds a threshold that is determined annually.

For calendar year 2005, the annual team threshold is calculated by multiplying 4500 WRVU's by the number of trauma surgeons or their FTE equivalent employed at the beginning of the calendar year. The quarterly team threshold is calculated by dividing the annual team threshold by four. All WRVU's exceeding the threshold will be multiplied by a conversion factor of $43.50 and placed in a pool. RVU-based productivity will be calculated and paid out quarterly by dividing the amount in the pool between each of the eligible Trauma Surgeons employed on the last day of the quarter based on their FTE status.

The quarterly team threshold will be recalculated, effective the next quarter, based on additions or subtractions of Trauma Surgeons.

In the event any quarterly team threshold is not achieved, reconciliation shall occur to ensure the annual team threshold is achieved and the 4th quarter (or subsequent successful quarter if the 4th quarter threshold is not met) shall be reduced if necessary to achieve such reconciliation.

Trauma Surgeons whose employment with LCTSD has ended for any reason, including but not limited to, resignation, termination for conduct and/or performance, or retirement, will immediately lose their participation in this Plan and will not be eligible for any payments under the Plan.

## BACK UP CALL PAY and Excess Primary Call Pay:

Backup call pay will be paid per pay period, at $500 per weekday, $1000 per weekend day, and $1000 per designated holiday (Christmas, New Years Day, Thanksgiving, Labor Day, Memorial Day and July 4th) based on assigned duties as required by the call schedule.

Compensation for six (6) primary calls per month is included in the base compensation for trauma surgeons. Primary call in excess of six (6) primary calls per month shall be paid at $2000 per excess call during the pay period in which the excess primary call occurred. It is expected that the call schedule shall be managed in order to significantly minimize the use of excess primary call.

## BONUS for QUALITY/PERFORMANCE GOALS:

At the beginning of each calendar year, the Trauma Center Medical Director and the Chief Medical Officer–Clinical and Quality Services shall develop performance goals in the area of quality of care initiatives. Annually, in lieu of a merit increase, a Quality/Performance evaluation shall be conducted by the Trauma Center's Medical Director to determine whether the Trauma Surgeon has achieved those goals. Such evaluation shall include an assessment of the physician's ability to work with others. Each Trauma Surgeon will be eligible for up to a maximum of $20,000.00 dollars. The allocated amount, based on the quality/evaluation score, will be paid in the form of a lump sum. Only Trauma Surgeons employed at the time of the annual evaluation will be eligible for a bonus payment. All bonus payments will be prorated based on length of service during the calendar year. Since the bonus program is in lieu of a merit increase, the base pay will not increase. Trauma Surgeons will not be eligible for participation in the Leadership Pay Plan. These payments will be in a separate check, which will be taxed at the participant's normal rate according to the W4 on file.

Annually, LCTSD will engage a firm specializing in physician compensation arrangements in order to evaluate the compensation and recommend revisions, including the base salary, thresholds and conversation rates, consistent with applicable state and federal laws and regulations governing physician compensation.

EXHIBIT B

## BENEFITS SUMMARY FOR LEE MEMORIAL HEALTH SYSTEM
### Trauma Surgeon

| FLEXLEE BENEFITS | WHO PAYS | ELIGIBILITY TIME AND FLEX LEE DOLLARS | WHAT YOU RECEIVE |
|---|---|---|---|
| Medical | LMHS | FlexLee Dollars after 3 months of employment | Comprehensive health coverage for employee, spouse and dependents |
| Dental | Employee | Benefit available after 3 months of employment / No FlexLee dollars | Basic and major dental coverage for employee, spouse and dependents |
| Life Insurance | LMHS/Employee | FlexLee dollars after 3 months of employment | 1 ½ times annual salary |
| LTD | LMHS | Benefit available after 3 months, FlexLee dollars after 3 months of employment | Financial protection against long term disability |
| STD | LMHS/Employee | Benefit available after 3 months, No FlexLee dollars | Financial protection against short term disability |
| Vision | Employee | Benefit available after 3 months, No FlexLee dollars | Basic eye coverage for employee, spouse and dependents |
| Flexible Spending (Medical) | Employee | Benefit available after 3 months, No FlexLee dollars | Employees may make pre-tax contributions for medical, dental and vision expenses not covered by insurance |
| Flexible Spending (Dependent) | Employee | Benefit available after 3 months, No FlexLee dollars | Employees may make pre-tax contributions for dependent care expenses |
| **OTHER BENEFITS** | | | |
| Retirement Plan Tax Sheltered 403(b) | LMHS/Employee | On employment | Tax deferred benefit for retirement. Employee may begin personal contributions upon employment. After one year of continuous full time employment, if the employee is contributing a minimum of 5%, LMHS will make a contribution equal to 5% of the employee's regular base wages (max subject to current IRS rules): 4% - 5% LMHS will match 80% of the employee contribution: 3% - 4% LMHS will match 60% of the employee contribution: 2% - 3% LMHS will match 40% of the employee contribution: 1% - 2% LMHS will match 20% of the employee contribution. Vesting occurs on 3rd anniversary of full time service. |
| College Bound Fund (529) College Savings Plan | Employee | On employment | Offered through Alliance Capital. Opportunity to save for college expenses with fund earnings tax deferred. Minimum contribution of $25.00 per pay. |
| 457(b) Retirement Savings Plan | Employee | On employment | Tax deferred benefit for retirement. Employee may begin personal contributions upon employment. |
| Deferred Compensation Plan | | | Opportunity to defer compensation for tax purposes for executives over $100,000.00 |
| Tuition reimbursement | LMHS | After one year of employment | For approved courses and programs |
| Continuing Medical Education | LMHS | After one year of employment | For programs approved by LCTD Medical Director: Up to $3000 per year. |
| PTO | LMHS | After 3 months of employment | 0-5years       = 36 days = 11.08 hours per pay<br>6 thru 9 years = 38 days = 11.70 hours per pay<br>10 thru 14 yr. = 43 days = 13.24 hours per pay<br>15 thru 19 yr. = 48 days = 14.77 hours per pay<br>20 years plus = 53 days = 16.31 hours per pay |

**Effective: January 2005**

This information is a summary only. Actual contracts, plan document and policies take precedence over this information.
Information may be subject to change.

## LEE MEMORIAL HEALTH SYSTEM
# INTEGRATED SERVICES MANUAL

| ■ POLICY ■ PROCEDURE □ PROTOCOL | CORRECTIVE ACTION PROCESS | SECTION LOCATOR | |
|---|---|---|---|
| **POLICY TYPE:** ■ System-wide    □ Service Line Specific    □ Departmental | | **TAB:** | **P09** |
| **Date Originated: 4/79** **Date Reviewed:** **Date Revised: 4/83, 8/88, 5/90, 9/91, 3/95, 8/97, 12/98, 5/00, 1/03, 6/03** | | **SUB TAB:** | **06** |
| | | **POLICY #:** | **007** |

| **Author(s):  Employee Relations** |
|---|

| **Approvals:** | | |
|---|---|---|
| **FPO** | **Jon Cecil** | **6/30/03** |
| | | Date |
| **SLC Member** | Jon Cecil | 6/30/03 |
| | | Date |

**PURPOSE:** To establish a Corrective Action Process that helps employees meet defined standards of conduct, work performance and attendance.  If corrective action becomes necessary, the purpose is to notify employees of problems and give them an opportunity to correct them.

**POLICY:**

A.   The policy is designed to ensure that there is equitable treatment for all employees.

B.   This policy applies to non-exempt, exempt, management-level employees, and employed physicians.  Management level employees and employed physicians may be counseled outside the scope of this policy at the discretion of Senior Leadership.

C.   It is the responsibility of every employee to be aware of and adhere to LMHS policies and procedures and to use good judgment in the performance of their duties.  Employees are encouraged to take advantage of all available learning opportunities and request additional instruction when needed.

D.   This policy recommends that Coaching first be used to express to an employee the importance of meeting job expectations.  Coaching is not a step in the Corrective Action Process, but rather an opportunity to help employees achieve the desired expectations. The Employee Performance Record (Form # 2092) or the Personal Management Interview (Form # 5338) can be used to document coaching sessions.

E.   It is leadership's responsibility to initiate appropriate coaching and/or corrective action upon learning of an individual employee's unacceptable behavior or performance. LMHS will not tolerate behavior that violates LMHS policies, behavioral expectations and/or performance standards. LMHS refers to this as "zero tolerance".

F.   This policy is subject to the general policy of LMHS that employment is "at will". This means the employment relationship may be terminated at any time either by the employee or LMHS for any reason not expressly prohibited by law.

G.   **DEFINITIONS:**

1.   **Performance:** The acts of performing one's job duties in accordance with established standards and conducting oneself in a business-like manner. Examples of poor performance include but are not limited to, patient or customer complaints, endangering patients or co-workers, failing to follow established policies and procedures and/or meeting defined standards of conduct.

2.   **Attendance:** Refer to Excessive Absenteeism and Tardiness Policy P09 06 018.

## PROCEDURE:

A.   **Formal Steps in the Corrective Action Process:**

All steps of Corrective Action must be documented on the Employee Conference (Form # 1100).

1.   **Oral Reminder** - first step of Corrective Action (active for 9 months). The focus here is on advising the employee that it is his/her responsibility to meet all job expectations. The goal is to seek agreement and develop an action plan with the employee thereby giving them the opportunity to improve. No more than two oral reminders in different categories may be issued. A third incident requires a written reminder.

2.   **Written Reminder** -second step of Corrective Action (active for 12 months). The focus here is the same as outlined in the oral reminder. However, the manager should advise the employee that they are now at the second step in the Corrective Action Process and improvement is necessary. No more than two active written reminders in different categories may be issued. The third incident requires a decision-making leave.

3.   **Decision-making Leave Day (DML)**- third step of Corrective Action (active for 18 months). This is scheduled time off for the employee to think about his/her action plan, make a final decision to correct the problem and remain employed with LMHS or resign. The employee will receive four (4) hours of regular pay while on a DML and accrued PTO may be used to complete the hours remaining in the regular shift. Provide employee with Decision Making Leave Form (FM #2065). The Employee Relation Specialist(s) should be consulted before placing an employee on a DML. No more than one active DML may be issued. A second incident in any category, performance/conduct and/or absenteeism or tardiness that would normally require Corrective Action at the written level or above will result in termination.

Under normal circumstances, managers are expected to follow the above steps in sequence. However, there may be situations in which the seriousness of the offense justifies skipping one or more of the steps in the process. Likewise, there may be times when a manager may decide to repeat a disciplinary step. Cases involving gross misconduct may result in immediate termination. Employee Relations Specialist should be consulted when skipping a step or termination is being considered.

**B.   CORRECTIVE ACTION GUIDELINES:**

These guidelines should be followed in order to handle Corrective Action appropriately, effectively and consistently.

**The Immediate Supervisor:**

1.   Approach Corrective Action in an objective manner by gathering the facts and identifying the deficiency.

2.   Provide the employee an opportunity to give their side of the story prior to determining the appropriate level of corrective action.  Consider if Coaching is more appropriate.

3.   Ensure that there is equitable treatment for all employees.

4.   Corrective Action should be constructive and not destructive or punitive.

5.   Corrective Action should be considered training with reason and common sense.

6.   Document all relevant communications with the employee, ensure consistency and provide a record for future reference.

7.   Make sure the employee knows and understands what is expected.  Assist the employee develop an action plan.  The plan needs to be the employee's, but guidance on how to develop a plan is important.

8.   Provide the employee incentive and opportunity to achieve expectations.

9.   Plan and conduct follow-up meetings and document the employee's progress.

The remedial steps of corrective action (oral, written reminder and decision-making leave) are essential components to achieving open honest dialogue, which is critical to the success of the employee. For this reason, employees will not be permitted to bring to a Corrective Action meeting an attorney or anyone else to act in the role of advocate or spokesperson. Another Supervisor should attend as a Witness.  Employees and supervisors may have a person from the Human Resources department attend as an observer and/or to serve as a resource to both employee and supervisor regarding policies and procedures. Finally, current government regulations require that employers must allow an employee, if he/she so requests, to bring a co-worker into an investigative interview that could lead to disciplinary action towards the employee.  The co-worker may attend in a witness capacity only, not as a participant in the process.  However, this option does not apply to a meeting where the manager is merely informing the employee that a disciplinary decision has already been made.  Refusal by the employee to comply with the requirements of this paragraph will be

considered insubordination and gross misconduct. Following termination, employees will be entitled to legal counsel in any meeting with management. If the employee elects to have legal counsel present, LMHS will exercise the same right.

## C.   GROSS MISCONDUCT:

Employment is subject to termination when an employee's conduct, performance, or attendance has not improved after adequate counseling or when the employee commits an offense of gross misconduct which is so serious that progression through the formal levels of Corrective Action is not required. Gross misconduct includes but is not limited to the reasons listed below:

1)  Breech of patient confidentiality and/or accessing records for personal gain or harm

2)  Revealing confidential information

3)  Theft

4)  Acts of violence or threats of violence toward anyone on or off company premises or when representing LMHS

5)  Willful unauthorized destruction of LMHS property or property of others

6)  Insubordination or refusal to carry out reasonable instructions pertaining to your work

7)  Refusal to float, work another assignment or work at another LMHS facility

8)  Clocking another employee in or out or allowing another employee to clock you in or out

9)  Falsification of reason for absence

10. Being convicted of a crime, adjudication withheld or guilty plea to a criminal offense (felony or misdemeanor)

11. Illegal discrimination and/or harassment

12. Smoking in hazardous and/or unauthorized areas

13)  Being under the influence of, or using, alcohol, drugs, or narcotics while on the job, or possession of any illegal substances, including prescription drugs without a valid prescription

14)  Falsification of personnel data, records, reports, or information

15)  Gross negligence or reckless disregard for the safety of persons or property in the course of employment

16)  Carrying concealed weapons

17)  Soliciting and/or receiving tips or gratuities

18)  Sleeping on the job

19.  Job Abandonment (no call/no show to work for three consecutive shifts) or walking off the job

20)  Conduct detrimental to LMHS' image

21)  Mistreatment of patients

22)  Disruptive behavior (conduct which disturbs a patient, visitor, physician, coworker, or others conducting business or performing services for LMHS

23)  Inappropriate or unauthorized use of LMHS' equipment

Before any termination, management will discuss with the appropriate Employee Relations Specialist the reason(s) for termination and will review the Termination of Employment #P09 06 071 and Grievance P09 06 026 policies. Upon termination, the employee's supervisor will provide the employee with a copy of the Grievance Policy. Resignations may be accepted during any formal step in the Corrective Action Process.

### D.   FINAL WARNING:

There are limited situations where the nature of an employee's offense may warrant a one time, final warning instead of termination. If at any time during the course of employment the employee repeats the same or similar offense he/she will be terminated. The final warning is not a step in the Corrective Action Process, but rather an action in and of itself. Management will consult with the Employee Relation Specialist(s) to determine the fair and appropriate application of final warning. The final warning is also documented on the Employee Conference Form (#1100).

### E.   CRISIS LEAVE:

Certain types of employee behavior or performance issues are so severe that in order to manage the situation, the employee should be removed from the workplace as necessary until an investigation can be completed. Crisis leave is not a step in the Corrective Action Process, but rather an action in and of itself. The manager or supervisor should consult with the appropriate Employee Relation Specialist(s) for guidance on situations that may require a crisis leave. Examples of some of the types of situations in which it may be necessary to place an employee on a crisis leave are as follows:

1.   Reporting to work impaired and/or unable to perform the requirements of the job. In cases where it appears an employee may be intoxicated or impaired, drug testing is required (refer to the Drug Free Workplace Policy P09 06 012).

2.   Acts or threats of violence toward anyone on or off LMHS' premises. Fighting or provoking a fight or any other incident that might cause injury or damage to persons or property.

3.   An allegation of sexual harassment.

4.   An allegation of theft

In such cases, the supervisor will conduct an immediate investigation of the incident, document the events leading to the crisis leave, notify the next level of department leadership as well as the Employee Relations Specialist(s) in the Human Resources Department. Upon completion of the investigation, the appropriate level of Corrective Action will be determined (if applicable).

Employees who are terminated will not be paid for any time after being placed on crisis leave. Employees who remain employed after a crisis leave will be paid for any regular hours he/she was scheduled to work during the investigative process. An exception to this policy is when an employee is placed on crisis leave for reasonable suspicion drug testing and returns to

## SECOND AMENDMENT TO EMPLOYMENT AGREEMENT

This Second Amendment to Employment Agreement (the "**Second Amendment**") is effective September 17, 2017 ("**Effective Date**"), by and between the Lee County Trauma Services District ("**LCTSD**") and Neylada Fonte, D.O. ("**Physician**").

## R E C I T A L S:

A.    Effective January 1, 2005, LCTSD and Physician entered into that certain Employment Agreement Trauma District Surgeon (the "**Agreement**") as amended by that certain First Amendment to Employment Agreement Trauma District Surgeon dated July 25, 2011 (the "**First Amendment**") for the provision of professional surgical services to patients of Lee Memorial Health System's Level II Trauma Center.  The Agreement and the First Amendment shall sometimes be collectively referred to as the "**Employment Agreement**";

B.    The physician compensation plan attached as Exhibit A to the Employment Agreement has been updated pursuant to a review to meet market standards and to remain consistent with fair market value; and

C.    LCTSD and Physician each desire to amend the compensation terms of the Employment Agreement and to replace Exhibit A with a new Exhibit A, as set forth below.

The parties agree as follows:

1.    Recitals. The Recitals above are true and correct and are incorporated herein by reference as if fully set forth below.

2.    Section 6 "Compensation". Section 6.a. of the Employment Agreement shall be deleted in its entirety and replaced with the following new Section 6.a.:

"**6.    Compensation.**

**a.    Physician shall be paid pursuant to the compensation plan attached hereto as Exhibit A, and incorporated herein by reference, as such plan may be amended or superseded from time to time by LCTSD upon notice to Physician. The compensation plan may not be changed or modified during the course of this Agreement in any manner that reflects the volume or value of referrals by Physician.**"

3.    Exhibit A. Exhibit A to the Employment Agreement is hereby deleted in its entirety and replaced with a new **Exhibit A**, attached hereto and incorporated herein by this reference.

4.    Underlying Employment Agreement. Unless specifically addressed herein, the terms of the Employment Agreement will apply and govern this Second Amendment. In the event of any conflict between the terms of this Second Amendment and the terms of the Employment Agreement, the terms of this Second Amendment shall govern and control.


EXHIBIT
25
Fonte
1/23/20

5.     Counterparts; Facsimile and Electronic (i.e., PDF) Signatures.   This Second Amendment may be executed in one (1) or more counterparts each of which shall be deemed an original but all of which when taken together shall constitute one (1) and the same agreement. Facsimile and electronic (i.e., PDF) signatures to this Second Amendment shall be as effective as original signatures.

6.     Superseding Effect.   The Employment Agreement and this Second Amendment supersede all prior or contemporaneous negotiations, commitments, agreements and writings between LCTSD and Physician with respect to the subject matter.

7.     Entire Agreement.   The Employment Agreement and this Second Amendment and any and all exhibits referenced therein and herein constitute the entire agreement between the parties hereto with respect to its subject matter and there are no other representations, understandings or agreements, whether written or oral, between the parties relating to such subject matter.

SIGNED BY the parties as of the dates set forth below.

**PHYSICIAN:**                                                    **LCTSD:**

By: _____

Neylada Fonte, D.O.                                        Jose A. Díaz, M.D., Medical Director

Date: _____9/7/17_____                     Date: _____9/14/2017_____

Attachments:
Exhibit A – Physician Compensation Plan Trauma Surgery Effective September 17, 2017

Exhibit A

## PHYSICIAN COMPENSATION PLAN

### Trauma Surgery

#### Effective September 17, 2017

| Guaranteed Base Salary | |
|---|---|
| Experienced with greater than 1 year service at LCTSD | $535,171 |
| Experienced with less than 1 year service at LCTSD | $459,452 |
| Inexperienced with less than 2 years of service at LCTSD | $459,452 |

| Extra Shift Call Rates | |
|---|---|
| Extra Shift Call Rate – Primary | $1,350 |
| Extra Shift Call Rate – Backup | $750 |

I.  **Purpose.** This Physician Compensation Plan ("**Plan**") describes the model used to calculate compensation paid by Lee County Trauma Services District (LCTSD) to its employed Physician in the specialty listed above. This Plan was designed to ensure that compensation paid by LCTSD is consistent with fair market value, is commercially reasonable, and is not determined in a manner that takes into account the volume or value of Physician's referrals.

II.  **Salary Guarantee Model.** Physician will be paid a Guaranteed Base Salary in accordance with their experience and service level as detailed in Guaranteed Base Salary table above. For experienced physicians, the Physician's compensation will be based on the weighted average seventy-fifth (75th) percentile derived from national salary data for the specialty identified above, as reported in the most recent national market surveys. For experienced physicians with less than one (1) year of service at LCTSD, the Physician's compensation will be based on the weighted average median (50th) percentile derived from national salary data for the specialty identified above, as reported in the most recent national market surveys. For inexperienced physicians with less than two (2) years of service at LCTSD, the Physician's compensation will be based on the weighted average median (50th) percentile derived from national salary data for the specialty identified above, as reported in the most recent national market surveys.

LMHS may update the Guaranteed Base Salary on an annual basis to ensure compensation remains consistent with the most recent market survey data.

III.  **Extra Shift Call Compensation.** The LCTSD is considered fully staffed with six full time Trauma Surgeons. In the event the LCTSD is staffed with less than six full time Trauma Surgeons, the Physician will be eligible to receive extra shift call pay for any shifts provided above the standard 5 primary shifts and 5 backup shifts per month. The compensation for Primary Call will be based on the seventy-fifth (75th) percentile of the MGMA Surgical Specialist Daily On-Call Compensation Rate. The compensation for Backup Call will be based on the median (50th) percentile of the MGMA Surgical Specialist Daily On-Call Compensation Rate.

IV.   **Quality Enhancement Program.**  LCTSD may develop a Quality Enhancement Program ("QEP Plan") to be used as a component of the physician's compensation. Physician will not be paid any additional compensation under the QEP Plan, and a portion of the Guaranteed Base Salary will be allocated to be paid under the QEP Plan.

V.   **Plan Administration.**

A. **Compensation Adjustments and Payment.**   All compensation is subject to proration and/or adjustment by LCTSD to reflect a less than full-time schedule, changes in full-time status, actual work hours, related changes in schedule or availability to work, or other factors necessitating a similar adjustment to compensation.

B. **Fair Market Value.**  LCTSD is prohibited by law from paying total compensation that is not commercially reasonable, that exceeds fair market value for services rendered or that takes into account the volume or value of Physician's referrals. Physician's compensation may be reviewed periodically to ensure compliance with applicable state and federal laws and regulations governing physician compensation.