Page 1

1            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                FORT MYERS DIVISION
3                        CASE NO:  2:19-cv-054-SPC-UAM
4
5      DR. NELAYDA FONTE, an
       individual,
6
7                Plaintiff,
8      vs.
9      LEE MEMORIAL HEALTH SYSTEM,
10            Defendant.
       _____/
11
12     VTC DEPOSITION OF:   LAWRENCE LOTTENBERG, MD
13     DATE TAKEN:          Monday, April 13th, 2020
14     TIME:                1:30 p.m. to 3:25 p.m.
15     PLACE:               159 Darby Island Place
                            Jupiter, Florida 33458
16
       TAKEN BY:            The Defendant
17
       REPORTED BY:         BRIGITTE ROTHSTEIN
18                          Court Reporter and Notary
                            Public, State of Florida
19
20
21
22
23
24
25

Page 2

```
1   A P P E A R A N C E S :
2   BENJAMIN H. YORMAK, ESQUIRE
       OF:  Yormak Employment and Disability Law
3        9990 Coconut Road
         Suite 206
4        Bonita Springs, Florida 34135
         byormak@yormaklaw.com
5        (239) 985-9691
6        APPEARING BY VTC ON BEHALF OF THE PLAINTIFF
7
8
9   ANGELIQUE GROZA LYONS, ESQUIRE
       OF:  Constangy, Brooks, Smith & Prophete, LLP
10       100 North Tampa Street
         Suite 3350
11       Tampa, Florida 33601
         alyons@constangy.com
12       (813) 223-7166
13       APPEARING BY VTC ON BEHALF OF THE DEFENDANT
14
15
16  ALSO PRESENT VIA VTC:
17     TRACY PYLES, ESQUIRE
       MARY LORAH, REPRESENTATIVE OF LEE MEMORIAL
18       HEALTH SYSTEM
       MARCIA DEAN, REPRESENTATIVE OF LEE MEMORIAL
19       HEALTH SYSTEM
       LAUREN HARRIS, REPRESENTATIVE OF LEE MEMORIAL
20       HEALTH SYSTEM
21
22
23
24
25
```

Page 3

```
1            I N D E X
2   VTC TESTIMONY OF LAWRENCE LOTTENBERG, ESQUIRE
3      Direct Examination by Ms. Lyons.........5
4      Cross-Examination by Mr. Yormak........66
5      Redirect Examination by Ms. Lyons......70
6   CERTIFICATE OF OATH......................74
7   CERTIFICATE OF REPORTER...................75
8
9            E X H I B I T S
10  DEFENDANT'S EXHIBIT NUMBER 1................9
       (Report)
11
    DEFENDANT'S EXHIBIT NUMBER 2................14
12     (Invoice)
13
14
15         S T I P U L A T I O N S
```
```
16      It is hereby stipulated and agreed by and
17  between counsel present for the respective parties,
18  and the deponent, that the reading and signing of
19  the deposition are hereby waived.
20
21
22
23
24
25
```

Page 4

```
1          P R O C E E D I N G S
2              * * * * * * * * * *
3        THE COURT REPORTER:  The attorneys
4   participating in this deposition acknowledge
5   that I, the Court Reporter, am not present
6   with the Witness, and that I will be reporting
7   the proceedings and administering the oath
8   remotely.  This arrangement is pursuant to the
9   Florida Supreme Court Administrative Order No.
10  AOSC-20-16 (and extended by AOSC-20-17).  The
11  parties and their Counsel consent to this
12  arrangement and waive any objections to this
13  manner of reporting.
14        Please indicate your agreement by
15  stating your name and your agreement on the
16  record.  Counsel, please.
17        MR. YORMAK:  Benjamin Yormak for the
18  Plaintiff, agreed.
19        MS. LYONS:  Angelique Lyons for the
20  Defendant, agree.
21        THE COURT REPORTER:  Doctor, can you
22  raise your right hand.
23        Do you swear or affirm that the
24  testimony you're about to give is the truth,
25  the whole truth, and nothing but the truth?
```

Page 5

```
1        THE WITNESS:  I do.
2   WHEREUPON:
3         LAWRENCE LOTTENBERG, MD
4   having been first duly sworn, testified under
5   oath as follows:
6            DIRECT EXAMINATION
7 BY MS. LYONS:
8     Q    Could you please state your full name for
9   the record.
10    A    Lawrence Lottenberg.
11    Q    Dr. Lottenberg, my name's Angelique Lyons.
12  I'm the attorney representing Lee Memorial Health
13  System in the lawsuit that has been filed by
14  Dr. Fonte.  My understanding is you have been hired
15  by Dr. Fonte's attorney to render an expert opinion
16  in this case.  Is that correct?
17    A    Yes.
18    Q    I'm sure you're familiar with the rules of
19  deposition, but I'm going to go through them just
20  briefly to make sure we're all on the same page.
21  First of all, because we're doing this deposition
22  remotely by teleconference, it's very important that
23  you speak loudly and clearly towards your
24  microphone, so that the Court Reporter will be able
25  to transcribe everything that you say.
```

2 (Pages 2 - 5)

Page 6

1    It's also very important that we not talk
2 over each other.  The Court Reporter won't be able
3 to hear both of us speaking at the same time because
4 the technology will block out one of our voices if
5 we both try to talk at the same time.  So I will try
6 very hard to make it clear when I'm done with the
7 question, so that you will know when to begin
8 providing your answer.  And then conversely, I'll
9 try to make sure you're done providing your answer
10 before I begin asking the next question just so that
11 we make certain that the Court Reporter can
12 transcribe everything that's said here today.
13    We're going to use two exhibits here
14 today.  The first is going to be a copy of your
15 report and the second will be the invoice in this
16 case.  Do you have copies of those documents?
17   A    Yes.
18   Q    Okay.  When it's time for those, I'll ask
19 you to pull those out as we go through those.
20    If at any point I ask you a question that
21 you don't understand or that does not make sense,
22 please let me know.  I want to make sure you
23 understand the question I'm asking before you begin
24 providing your answer.  Can you agree to let me know
25 if you don't understand a question?

Page 7

1   A    Yes.
2   Q    If you need to take a break at any time,
3 we are happy to do that.  I don't anticipate this
4 deposition will take more than two hours, but if you
5 do need a break, just let us know.
6    Do you have any questions before we get
7 started?
8   A    No.
9    (Ms. Harris leaves the VTC.)
10 BY MS. LYONS:
11   Q    Can you please provide a brief description
12 of your educational background and training.
13   A    I grew up in Miami.  I went to high school
14 in Miami.  I went to college at the University of
15 Florida in Gainesville from 1968 to 1971.
16    I went to medical school at the University
17 of Miami from 1971 to 1975.  I did a general
18 surgical residency from 1975 to 1980 and completed
19 my general surgery residency and went on to pass
20 Boards of the American Board Surgery.
21   Q    And what year was that?
22   A    1980.
23   Q    And can you please describe for us briefly
24 your work history since 1980.
25   A    When I finished my surgical residency, I

Page 8

1 relocated to Hollywood, Florida where I was on staff
2 at seven or eight different hospitals, including
3 Memorial Regional Hospital in Hollywood, Florida.  I
4 practiced in general vascular and trauma surgery for
5 eleven years in private practice.  And in 1991, I
6 was employed by Memorial Regional Healthcare System
7 to start the Level II trauma center in Broward
8 County at that hospital.  In 2001, we became a Level
9 I Trauma Center.
10    And in 2003, I was recruited to the
11 University of Florida in Gainesville to start the
12 Level I Trauma Center at the University of Florida
13 Shands Health Hospital.  I remained there for eleven
14 or twelve years until I retired from that position
15 and relocated to South Florida again at St. Mary's
16 Medical Center in West Palm Beach, Florida, which is
17 a Level I Trauma Center.
18    I currently hold a faculty appointment at
19 Florida Atlantic University where I'm a clinical
20 professor of surgery, and I'm the Director of a
21 simulation lab as part of surgery.  I'm also an
22 Associate Dean at the Florida Atlantic University
23 based out of St. Mary's Medical Center.
24   Q    How many times have you served as an
25 expert witness prior to this case?

Page 9

1   A    Probably twenty-five to thirty times.
2   Q    How many of those cases have you served as
3 an expert for the plaintiff?
4   A    Zero.
5   Q    How many of those cases have you served as
6 an expert for the defendant?
7   A    Twenty-five to thirty.
8   Q    And generally speaking, did those cases
9 involve claims of issues relating to medical care
10 provided?
11   A    Yes.
12   Q    This is an employment case.  Have you ever
13 served as an expert in an employment case?
14   A    No.
15    (Whereupon, a document is marked as
16    Defendant's Exhibit No. 1 for
17    identification, after which the following
18    was had:)
19 BY MS. LYONS:
20   Q    We've marked as Exhibit 1 a copy of your
21 report that was submitted by the attorney for
22 Dr. Fonte in this case.  Included in that report is
23 a fee schedule.  Is the fee schedule that's included
24 in that report your current fee schedule?
25   A    Yes.

Page 10

1    Q    And could you just briefly explain for us
2  the rates you charge for different functions that
3  you perform as an expert witness.
4    A    For phone conferences, I charge seven
5  fifty per hour.  For case review and chart review,
6  seven fifty per hour.  For narratives, seven fifty
7  per hour.  For depositions, I charge nine fifty an
8  hour.  And for court appearances, I charge -- I'm
9  not so sure of that because what I'm looking at here
10 is the exhibit that was sent to me, which is the
11 invoice, so I don't have a fee schedule.
12   Q    If you look at the last page, I believe,
13 of the expert report that was marked as Exhibit 1,
14 there is a fee schedule that indicates for courtroom
15 testimony, you charge one thousand, two hundred
16 dollars per hour.
17   A    Yes, that's correct.
18   Q    How much of your annual income in 2019 was
19 derived from fees you received as an expert witness?
20   A    Probably five percent.
21   Q    What percentage of your income in 2018 was
22 derived from fees you received for serving as an
23 expert witness?
24   A    Less than five percent.
25   Q    As part of the expert report, there was

Page 11

1  included in it a list of prior expert testimony in
2  the previous four years, and there are two cases
3  listed; Anthony Wilbur versus Orlando Health and
4  Lisette Rey versus Kendall Regional Medical Center.
5         Have you served as an expert, whether or
6  not providing testimony, in any other matters within
7  the previous four years?
8    A    I don't recall.
9    Q    On average, how many cases do you serve as
10 an expert in on an annual basis?
11   A    One to two.
12   Q    The first matter that was listed on the
13 list of prior expert testimony in the previous four
14 years is Anthony Wilbur versus Orlando Health.  Did
15 you provide testimony in a deposition in that case?
16   A    Yes.
17   Q    Did you provide testimony at trial in that
18 case?
19   A    No.
20   Q    Do you know what year that case was that
21 you provided testimony in?
22   A    I don't recall.
23   Q    Do you know what court the case was in?
24   A    I don't recall.
25   Q    Do you have records of that information

Page 12

1  that you could access?
2    A    I imagine so.
3    Q    What was the nature of the case?
4    A    Medical malpractice.
5    Q    And what were you being called to render
6  an opinion about?
7    A    The care of the patient.
8    Q    The second case listed is Lisette Rey
9  versus Kendall Regional Medical.  Do you recall what
10 year that was?
11   A    I believe it was 2019.
12   Q    Do you know what court that case was filed
13 in?
14   A    I don't recall.
15   Q    Did you provide testimony in a deposition?
16   A    Yes.
17   Q    Did you provide testimony at trial?
18   A    No.
19   Q    What was the nature of the case?
20   A    Medical malpractice.
21   Q    And what was the subject upon which you
22 were asked to provide an expert opinion?
23   A    Care of the patient.
24   Q    Have you ever provided testimony at a
25 trial as an expert witness?

Page 13

1    A    Once.
2    Q    Do you recall the name of the case?
3    A    It was in 1989 or '90.  I do not.
4    Q    Do you recall what court it was in?
5    A    Broward County.
6    Q    Do you recall either of the parties'
7  names?
8    A    I do not.
9    Q    What was the nature of the case?
10   A    Medical malpractice.
11   Q    And what was the subject upon which you
12 were asked to render an opinion?
13   A    Medical care.
14   Q    To the best of your knowledge, have you
15 ever been found by a court to not be qualified to
16 serve as an expert in a case?
17   A    No.
18   Q    To the best of your knowledge, has the
19 scope of your expert opinion ever been limited by a
20 court order?
21   A    No.
22   Q    Have you ever rendered an opinion on the
23 issue of transferring patients to a trauma center?
24   A    In a court or a deposition?
25   Q    Either.

4 (Pages 10 - 13)

Page 14

1    A    No.
2    Q    Have you rendered just a written opinion
3  on that subject in a lawsuit?
4    A    No.
5    Q    Do you have copies of any of the
6  deposition transcripts for cases in which you have
7  been deposed?
8    A    Maybe. I don't -- I -- I don't know. I
9  do not know.
10        (Whereupon, a document was marked as
11        Defendant's Exhibit No. 2 for
12        identification, after which the following
13        was had:)
14  BY MS. LYONS:
15    Q    The second document that we are marking as
16  an exhibit in this deposition is Exhibit 2, which is
17  the invoice that was provided us by Dr. Fonte's
18  attorney. Do you have a copy of that invoice in
19  front of you?
20    A    Yes.
21    Q    That document is Exhibit 2 to your
22  deposition.
23        Does this accurately account for all of
24  the fees you have charged thus far in this case?
25    A    Yes.

Page 15

1    Q    The invoice indicates that you had three
2  hours worth of phone or office conferences. Was
3  that one three-hour conference or several
4  conferences that totaled three hours?
5    A    Several conferences that totaled three
6  hours.
7    Q    Do you recall how many conferences in
8  total it was?
9    A    No.
10    Q    Were these all by telephone?
11    A    Yes.
12    Q    Who were the individuals you spoke with in
13  these conferences?
14    A    The attorney.
15    Q    Anyone else, other than the attorney, that
16  you spoke with in these conferences?
17    A    I believe Dr. Fonte was on one or two of
18  the calls.
19    Q    You're not certain?
20    A    At least one.
21        (Mr. Yormak was disconnected from the
22        VTC.)
23        (Whereupon, at 1:47 p.m., a short recess
24        was taken, after which the following was
25        had:)

Page 16

1  BY MS. LYONS:
2    Q    The second entry on the invoice, which is
3  Exhibit 2, is titled, Case Chart Review and Response
4  Prep. The third entry says, Narrative, one hours.
5  What is the difference between the narrative and the
6  response prep?
7    A    The response prep was discussion about how
8  I would respond to the situation. The narrative was
9  the creation of the narrative, including my
10  signature.
11    Q    The discussions you had about how you
12  would respond that are reflected in the second entry
13  on the invoice, who were these discussions held
14  with?
15    A    The attorney.
16    Q    Was anyone else present when you had the
17  discussions regarding how you would respond?
18    A    No.
19    Q    How many discussions did you have with
20  Mr. Yormak, the Plaintiff's attorney, regarding how
21  you would respond?
22    A    Three or four.
23    Q    In total, how much time did you speak with
24  Mr. Yormak regarding how you would respond in this
25  case?

Page 17

1    A    Whatever it reflects on the invoice in
2  hours.
3    Q    The invoice says three hours for both
4  chart review and response prep.
5    A    Correct.
6    Q    So were those three hours spent all in
7  response prep?
8    A    No. I would say probably half and half.
9    Q    What documents did Mr. Yormak provide you
10  in order for you to render your opinion in this
11  case?
12    A    A transcript of the phone call from Lehigh
13  to Lee Health.
14    Q    And just so we're clear, that's the phone
15  call from November 2018?
16    A    Correct.
17    Q    Any other documents that you were provided
18  either by Mr. Yormak or others in order to render
19  your opinion in this case?
20    A    No.
21    Q    The transcript of the phone call that you
22  were provided, was that just one of the phone calls
23  from that day, or was it more than one?
24    A    I think it was the -- the entire
25  transcript of the recorded phone calls from the

5 (Pages 14 - 17)

Page 18

1 outside hospital to Lee Health.
2     Q     There was more than one phone from the
3 outside hospital to Lee Health that day.  The
4 transcript that you reviewed, was that from just one
5 phone call, or was it more than one phone call?
6     A     I believe it was more than one -- it was
7 the entire transcript of phone calls.
8     Q     Is it the document that you attached to
9 your report?
10     A     I believe so.
11     Q     Could you look at it and tell me.
12     A     It says, Audio transcript, file 437075.
13     Q     And how many pages is that document that
14 you're looking at?
15     A     Well, on this exhibit that was sent to me,
16 it was three pages.
17     Q     And each page has four panels of
18 transcript, correct?
19     A     Correct.
20     Q     And is this the only transcript you
21 reviewed from that day?
22     A     Yes.
23     Q     Did you listen to any of the audio calls
24 from Lehigh to Lee Memorial on that day in
25 November 2018?

Page 19

1     A     No.
2     Q     Did you listen to the audio recordings or
3 review any transcripts from the transfer incident
4 that involves Dr. Fonte from March 2018?
5     A     No.
6     Q     Did you review any of Lee Health's
7 policies or procedures?
8     A     No.
9     Q     Did you review the final written warning
10 that had been issued to Dr. Fonte in April 2018 when
11 she denied a patient transfer that resulted in an
12 EMTALA violation?
13     A     No.
14     Q     Did you review any of the training that
15 Lee Health provided to Dr. Fonte following the
16 March 2018 EMTALA violation?
17     A     No.
18     Q     Did you review the AHCA Statement of
19 Deficiencies and Plan of Correction that was
20 implemented following Dr. Fonte's March 2018
21 violation?
22     A     No.
23     Q     Did you review Dr. Fonte's deposition
24 transcript in this case?
25     A     I do not believe so.

Page 20

1     Q     Have you ever met Dr. Fonte prior to
2 this -- to being asked to serve as an expert witness
3 in this case?
4     A     Yes.
5     Q     When did you first meet Dr. Fonte?
6     A     When I was invited to Lee Memorial
7 Hospital to give a trauma grant rounds lecture.
8     Q     When was that?
9     A     Several years ago.
10     Q     Do you know what year?
11     A     No.
12     Q     Other than that time when you met
13 Dr. Fonte when you were invited to Lee Health to
14 give a lecture, had you ever met her in person on
15 any other occasion?
16     A     No.
17     Q     Have you ever communicated with her by
18 telephone prior to being asked to serve as an expert
19 in this case?
20     A     I don't recall.
21     Q     Had you ever communicated with her by text
22 or Email prior to being asked to serve as an expert
23 in this case?
24     A     I don't recall.
25     Q     When were you first contacted by anyone

Page 21

1 asking you if you could serve as an expert in this
2 case?
3     A     I believe it was prior to the attorney
4 calling me.  Dr. Fonte texted me if I could help her
5 look at a case, and I agreed to help her look at a
6 case.
7     Q     Dr. Fonte sent you a text?
8     A     Initially.
9     Q     And what did that text say?
10     A     I don't recall.
11     Q     Do you still have a copy of it?
12     A     I don't believe so, but -- no, I don't
13 have -- I don't have it.
14     Q     Do you know how Dr. Fonte had your cell
15 phone number?
16     A     I always include it on my title slide, my
17 Email and phone number, for people who would like to
18 use my expertise in a myriad of subjects to contact
19 me.
20     Q     Do you remember when you received that
21 text from Dr. Fonte?
22     A     I don't recall.
23     Q     When did you first receive contact from
24 Mr. Yormak, Dr. Fonte's attorney?
25     A     I don't recall the exact day.  I believe

6 (Pages 18 - 21)

Page 22

1 it was sometime in February. I'm sure Mr. Yormak
2 will have that information for you.
3      Q      Did you receive this contact by telephone
4 or by Email?
5      A      Initially, by Email.
6      Q      After you received the text message from
7 Dr. Fonte, did you speak to her on the telephone
8 about the matter prior to being contacted by
9 Mr. Yormak?
10     A      Yes.
11     Q      And when did you speak with her?
12     A      I don't recall the date.
13     Q      How long was your phone conversation with
14 her?
15     A      Ten to fifteen minutes.
16     Q      And what did you talk about?
17     A      The particular incident that I have
18 written my expert testimony on.
19     Q      Did you take notes of this conversation?
20     A      No.
21     Q      You didn't take any notes?
22     A      No.
23     Q      Did she tell you in her words what she
24 believed had happened?
25     A      I believe so.

Page 23

1      Q      And what do you recall her saying?
2      A      That there was a child that she was called
3 about who was in PEA cardiac arrest, unstable,
4 dying, that she was asked to accept the transfer,
5 and she decided that based on the information she
6 had and the expertise she had that this was not an
7 appropriate child for transfer.
8      Q      Did she tell you why she thought it was
9 not appropriate for transfer?
10     A      Because the child was literally dying in
11 the outside hospital emergency park.
12     Q      Did Dr. Fonte provide you any other
13 information regarding this matter?
14     A      No. Such as?
15     Q      Of any sort.
16     A      No.
17     Q      Other than Mr. Yormak and Dr. Fonte, have
18 you spoken to anyone else about the factual incident
19 that took place in November 2018 or about your
20 opinion in this case?
21     A      No.
22     Q      And the only document that you reviewed in
23 formulating your opinion in this case was the one
24 transcript of the call between Dr. Fonte and
25 Dr. Heisler at Lehigh, which took place on

Page 24

1 November 12th, 2018; is that correct?
2      A      That is correct.
3      Q      In rendering your opinions in this case,
4 did you review or consult with any texts or journals
5 or other professional papers?
6      A      No.
7      Q      Did you review any statutory guidelines in
8 rendering your opinion?
9      A      Well, I used my expertise and knowledge of
10 the statutory guidelines in the state of Florida to
11 render my opinion.
12     Q      But did you review any in rendering your
13 opinion in this case?
14     A      I don't believe so.
15     Q      Did you review any professional materials
16 in rendering your opinion?
17     A      No.
18     Q      What statutory guidelines from the state
19 of Florida did you rely on?
20     A      The guidelines for the transferring of
21 injured patients.
22     Q      And where are those located?
23     A      In the Florida Department of Health.
24     Q      Any other guidelines you relied on?
25     A      The guidelines that I have personally

Page 25

1 created as being a medical director at two separate
2 Level I Trauma Centers related to the transfer of
3 injured patients.
4      Q      Did you review or rely upon Lee Health's
5 policies and procedures related to transferring or
6 accepting transfers of patients?
7      A      No.
8      Q      How is a patient determined to be a trauma
9 patient?
10     A      They fall under the category of injury as
11 related and defined by the state of Florida.
12     Q      How does a medical professional determine
13 whether or not the patient falls under the category
14 of injury needed to constitute a trauma?
15     A      It's based on three different things;
16 physiologic perimeters, mechanism of injury
17 perimeters, and paramedic judgment.
18     Q      Who makes a determination as to whether or
19 not a patient falls under the category of injury to
20 classify as a trauma?
21     A      Local authorities.
22     Q      And more specifically who makes that
23 determination?
24     A      They're usually pre-hospital guidelines
25 per county.

7 (Pages 22 - 25)

1   Q    Can a paramedic make that decision in the
2   field?
3   A    Absolutely.
4   Q    Can a doctor make that decision after
5   examining a patient?
6   A    Yes.
7   Q    If a paramedic makes a decision in the
8   field that a patient meets the category of injury
9   necessary to classify as a trauma, does that
10   paramedic then make the determination whether a
11   patient should be sent to a trauma center?
12   A    Well, I think you need to define what you
13   mean by trauma.  Are you talking about a trauma
14   alert, or are you talking about any patient with
15   trauma?
16   Q    Well, what is the difference between the
17   two?
18   A    If the patient is a trauma alert and meets
19   trauma alert criteria based on physiologic mechanism
20   of injury or paramedic judgment, the pre-hospital
21   provider must take that patient to the nearest
22   trauma center.  If the patient does not fall into
23   the criteria of a trauma alert, that trauma patient
24   can go to any hospital in the state of Florida.
25   Q    If a patient arrives at a hospital that is

1   not a trauma hospital and that patient falls under
2   the category of injury designating a trauma alert
3   based on the physiological mechanism of injury, can
4   the doctor examining that patient transfer that
5   patient to a trauma center?
6   A    With the agreement of the accepting trauma
7   surgeon.
8   Q    In that situation where the patient is at
9   a hospital already, the person to determine whether
10   the patient meets the category of injury for a
11   trauma alert is the doctor at the transferring or
12   sending hospital, correct?
13   A    Incorrect.  Most emergency room physicians
14   do not have in front of them the criteria for trauma
15   alert, nor do they actually know it.  Those criteria
16   are usually in front of the accepting trauma surgeon
17   at the trauma center.
18   Q    What is EMTALA?
19   A    It's the law by which hospital transfers
20   are ruled by the state of Florida.
21   Q    Is it a federal law?
22   A    I don't know the answer to that, but I
23   believe so.
24        Might I ask a question?
25   Q    I'm sorry?

1   A    May I ask a question?
2   Q    Okay.
3   A    Was this case an EMTALA violation?
4   Q    I'm an attorney.  I am not able to answer
5   your question.
6   A    I know the answer.  The answer is, no, it
7   was not.
8   Q    Okay.  That is your opinion, that it was
9   not an EMTALA violation, and that's fine.
10   A    That's not my opinion.
11   Q    That's not what I'm asking you, though,
12   right now.
13   A    Well, you're asking what EMTALA was.  I'm
14   just telling you that the facts are that this case
15   was not an EMTALA violation.
16   Q    Okay.  That is your opinion.  What I'm
17   asking you right now, though, is if you know
18   where -- if EMTALA is a state or federal law, and
19   you said you were not certain, correct?
20   A    I'm pretty it's a federal law.
21   Q    You're pretty sure, but you're not
22   certain, correct?
23   A    Correct.
24   Q    Under EMTALA, does the sending physician
25   have the discretion to determine whether or not the

1   patient has an emergency medical condition requiring
2   transfer?
3   A    This was not an EMTALA violation;
4   therefore, I will have no opinion on that.
5   Q    That's not my question, sir.  My question
6   is --
7   A    I do not know.
8   Q    You don't know?
9   A    No, I don't know.  When I rendered my
10   opinion for this case, I was not asked to delve into
11   EMTALA laws.
12   Q    Under the Florida guidelines on
13   transferring an injured patient, isn't it true that
14   the sending physician has the discretion to
15   determine whether or not the patient has an
16   emergency medical condition requiring transfer?
17   A    That is correct; however, the accepting
18   trauma surgeon has to agree to accept the patient
19   based on the trauma surgeon's particular situation
20   at the trauma center at that moment and based on the
21   trauma surgeon's expertise.
22   Q    All right.  Well, you're jumping ahead.  I
23   just want to talk about the first step of the
24   analysis.  In that first step of the analysis, the
25   sending physician has the sole discretion to

Page 30

1 determine whether or not the patient has an
2 emergency medical condition requiring transfer,
3 correct?
4    A    Unless the patient is about to die and the
5 discretion of the sending physician is inaccurate.
6 If the patient is unstable for transfer and the
7 sending physician still feels there's a transfer,
8 that falls on the sending physician's inaccurate
9 assessment.  No patient who is in pulseless
10 electrical activity, in and out of pulseless
11 electrical activity, is safe for transfer anywhere.
12    Q    That wasn't my question, sir.
13    A    Well, that's my answer.
14    Q    My question solely was:  Under the state
15 of Florida guidelines for transfer of an injured
16 patient, the sending physician has the sole
17 discretion to determine whether or not the patient
18 has an emergency medical condition requiring
19 transfer, correct?
20    A    Correct.
21    Q    If a patient is sufficiently stable, then
22 the patient can be transferred, correct?
23    A    Correct.
24    Q    The decision as to whether or not a
25 patient is sufficiently stable is within the

Page 31

1 discretion of the sending physician, as well,
2 correct?
3    A    And the agreement of the accepting trauma
4 surgeon.
5    Q    But the person who's examining the patient
6 and knows the details as to the patient's vitals and
7 other condition is the one who determines whether
8 the patient is sufficiently stable, correct?
9    A    The accepting physician has to accept the
10 patient.
11    Q    I'm not asking about accepting the
12 patient.  I'm asking about who gets to make the
13 medical determination as to whether the patient is
14 sufficiently stable for transfer?  That --
15    A    I'll have to say --
16    Q    That decision is made by the transferring
17 physician, correct?
18    A    Both physicians need to be involved.
19    Q    How is a physician who's never seen the
20 patient and does not have information regarding the
21 patient's vitals supposed to make a decision as to
22 whether the patient is sufficiently stable?
23    A    If the sending physician tells the
24 accepting physician that the patient is in and out
25 of pulseless electrical activity, any physician

Page 32

1 licensed to practice medicine would tell any other
2 physician, this patient is not stable for transfer
3 sight unseen.
4    Q    But what if the patient had been in -- had
5 been having a pulse and activity for twenty minutes,
6 what about in that situation?  Would the sending
7 physician have the sole discretion to determine
8 whether or not the patient was sufficiently stable
9 for transfer?
10    A    I think you're posing a hypothetical,
11 aren't you?
12    Q    Okay.  But you can answer my question,
13 please.
14    A    If the patient has sustained pulseless
15 electrical activity twenty minutes prior to the ask
16 for transfer and the patient was hemodynamically
17 stable, the patient could be transferred.
18    Q    How much time has to pass?  Does it need
19 to be twenty minutes?  Can it be fifteen minutes?
20    A    That's a judgment call, and that's why we
21 have MDs after our names.
22    Q    Could it be ten minutes?
23    A    We use our own judgment.
24    Q    Could it be ten minutes?
25    A    It could not be in and out of PEA.

Page 33

1    Q    My question is:  Could it be ten minutes?
2    A    That would depend on what the patient was
3 doing and what the injuries were and what the
4 situation was to the patient.  That's a judgment
5 call, ma'am.
6    Q    And that's a judgment call made by the
7 person who is treating the patient, correct?
8    A    Incorrect.  Both physicians.
9    Q    So if the physician on the receiving end
10 does not ask any questions to clarify the status of
11 the patient, then the judgment of the person on the
12 transferring end is the one who would determine
13 whether the patient is sufficiently stable, correct?
14        MR. YORMAK:  Object to the form.
15 BY MS. LYONS:
16    Q    You can answer.
17    A    I have no idea what you're talking about.
18 You're talking about hypotheticals.  I'm talking
19 about this case.
20    Q    Well, sir, you get to answer my questions
21 regarding they're hypotheticals or not.  So my
22 question to you was:  If there's a situation where a
23 transferring doctor has determined that they need to
24 transfer a patient and the doctor on the other end
25 of the call, say the receiving doctor, does not ask

9 (Pages 30 - 33)

Page 34

1  any questions about the patient's current status or
2  any of their condition, then the person on the
3  receiving end is not qualified to make a judgment
4  call as to whether or not the patient is
5  sufficiently stable for transfer, wouldn't you
6  agree?
7       MR. YORMAK:  Object to the form.
8       THE WITNESS:  I do not know.
9  BY MS. LYONS:
10      Q    If a doctor does not ask any questions
11  about a patient's condition, would you agree with me
12  that that doctor is not qualified to make a judgment
13  call, a medical judgment call?
14      A    I do not know.
15      Q    Pediatric trauma refers to the subset of
16  trauma victims under the age of fifteen years,
17  correct?
18      A    Correct.
19      Q    Is there a difference between pediatric
20  and infant?
21      A    No, not by the trauma criteria.
22      Q    What does the term -- what age range does
23  the term "infant" cover?
24      A    Usually two and younger.
25      Q    Trauma departments, as designated by the

Page 35

1  state of Florida, have special skills and
2  capabilities to treat and stabilize victims of
3  trauma, correct?
4       A    Correct.
5       Q    With a pediatric patient in the ideal
6  situation, a pediatric patient suffering a trauma
7  would be transferred to a pediatric trauma center,
8  correct?
9       A    Correct.
10      Q    On page five of your report you state that
11  if a pediatric trauma center is not available
12  because the distance is too far for the patient to
13  travel given their current medical condition, then
14  the next best practice is to transfer the pediatric
15  patient to a Level II trauma center to receive
16  further stabilization until the patient is able to
17  be transferred to a pediatric trauma center; is that
18  correct?  Do you agree with that statement in your
19  report?
20      A    No.  The next best place is to transfer to
21  a Level II trauma center with pediatric
22  capabilities.
23      Q    Your report says, and I'll quote it
24  exactly on page five, "If sufficiently stable, the
25  pediatric trauma patient should be transferred to a

Page 36

1  pediatric trauma center, which would be the center
2  that would provide the patient with the best
3  possible chance of survival.  If sufficiently
4  stable, but where a pediatric trauma center is
5  unavailable, such as due to excessive distance or
6  poor weather for a medi flight, the pediatric trauma
7  patient should be transferred to the nearest trauma
8  center for a higher level of care where the patient
9  can be further stabilized before another transfer to
10  a pediatric trauma center."
11      Do you agree with those statements you put
12  in your report?
13      A    Yes.
14      Q    So just to summarize then, the best option
15  for a pediatric trauma patient is a pediatric trauma
16  center first.  If, however, that is not possible for
17  whatever reason, then the next best option is to
18  send the pediatric trauma patient to a Level II
19  trauma center for further stabilization before
20  another transfer to a pediatric trauma center,
21  correct?
22      A    Correct.
23      Q    It's acceptable, therefore, for a Level II
24  trauma center to accept a pediatric trauma patient
25  under those circumstances, correct?

Page 37

1       A    Unless the accepting trauma surgeon does
2  not believe or does not feel, based on that trauma
3  surgeon's years of experience and training, that
4  that trauma surgeon is capable of managing such a
5  patient.
6       Q    What are you basing that on?
7       A    Not every adult trauma surgeon does
8  pediatric surgeries and is capable of managing
9  pediatric trauma.
10      Q    What part of the Florida or federal law
11  are you basing your assertion on that unless a
12  specific trauma surgeon doesn't feel that he or she
13  is capable of handling such a patient?
14      A    No statute.  That's good sound medicine.
15      Q    Right.
16      And, in fact, a statute says that they are
17  to accept the patient if the hospital has the
18  capability to provide care, correct?
19      A    And I am not aware that Lee Memorial has
20  the capability to handle a pediatric trauma patient.
21      Q    Well, let's just -- I'm asking about the
22  statute right now, not Lee Memorial.  Wouldn't you
23  agree with me that the statute in Florida regarding
24  transferring says that the Level II trauma center
25  should accept a pediatric -- should accept a patient

10 (Pages 34 - 37)

Page 38

1  provided that the trauma center has the capability
2  to provide care?
3     A    Correct.
4     Q    So it's not whether that individual
5  surgeon working that day has the capability to
6  provide care; it's whether or not the medical
7  facility, the trauma center itself has that
8  capability, correct?
9     A    It's also whether or not there are
10  multiple other patients there, whether that trauma
11  surgeon is busy with other patients, whether that
12  trauma surgeon has the capability of getting a
13  backup trauma surgeon in in a timely fashion.  It's
14  also part of what is the status of the patient at
15  the outside hospital.  It's also the status of time
16  and distance to a pediatric trauma center versus a
17  Level II trauma center.
18     Q    But you'll agree with me, won't you, sir,
19  that the decision about where and how to transfer is
20  made by the sending center or sending doctor?  The
21  decision that is made by the accepting center or
22  doctor is whether or not the medical facility has
23  the capability and capacity to provide care,
24  correct?
25        MR. YORMAK:  Object to form.

Page 39

1        MS. LYONS:  What's the basis of the
2     objection?
3        MR. YORMAK:  I believe we've been over
4     this about six different times.  You've asked
5     the same question, just putting it six
6     different ways.
7  BY MS. LYONS:
8     Q    Okay.  You can answer please.
9     A    As long as the accepting trauma surgeon
10  feels the transfer is appropriate.
11     Q    Feels the transfer is appropriate.  Does
12  the statute say that?
13     A    No, it doesn't.
14     Q    Right.
15        My question was, the statute, the Florida
16  guidelines --
17     A    Life and death has very little to do with
18  statutes, ma'am.  This is an experienced trauma
19  surgeon making the determination that the patient is
20  too unstable to be transferred.
21     Q    The Florida statute regarding transfers
22  provides that the receiving facility gets to make
23  the decision as to whether they have the capability
24  and the capacity to accept the transfer, correct?
25     A    And the receiving facility means the

Page 40

1  accepting trauma surgeon.
2     Q    Sir, could you just answer my question.
3  The statute says the receiving facility has the
4  responsibility to make the decision whether the
5  facility has the capability and the capacity to
6  accept a transfer, correct?
7     A    That's what the statute says.
8     Q    The statute says that the transferring
9  facility, the transferring physician, has the
10  responsibility for determining whether a transfer is
11  appropriate and whether the patient is sufficiently
12  stable, correct?
13     A    Correct.
14     Q    The statute also provides that if a
15  patient is not sufficiently stable for transfer,
16  that a patient can still be transferred if the
17  physician certifies the medical benefits expected
18  from the transfer outweigh the risk, correct?
19     A    Correct.
20     Q    As you state in your report at page six,
21  "In addition, the transfer of unstable patients must
22  be appropriate under the law, such that the
23  transferring hospital must provide ongoing care
24  within its capability until transfer to minimize
25  transfer risk, must provide copies of medical

Page 41

1  records, and must confirm that the receiving
2  facility has the capability and the capacity to
3  treat the patient, and that the transfer will be
4  made with qualified personnel and appropriate
5  medical equipment."
6        Is that what the statute provides?
7     A    Yes.
8     Q    So even if the patient is not stable, the
9  treating physician or the sending physician can
10  still determine that a transfer is necessary
11  provided those four conditions are met, correct?
12     A    The statute may say that, but from a
13  medical point of view, that's a totally dangerous
14  incorrect statement.
15     Q    So are you saying you disagree with the
16  statement that you put in your report?
17     A    I disagree with the statute because it
18  does not allow for good sound judgment.
19     Q    Well, I just want to talk about the
20  statute, and you told us at the beginning and
21  throughout your CV that is attached to this document
22  that you have a lot of experience and knowledge of
23  that statute.  So just to make certain I understand,
24  the statute says that a patient who is medically
25  unstable can still be transferred provided those

11 (Pages 38 - 41)

Page 42

1  four conditions are met, correct?
2      A    That is correct.
3      Q    And the decision as to whether the medical
4  benefits expected from the transfer outweigh the
5  risks, that decision is made by the physician who is
6  sending the patient for transfer, correct?
7           MR. YORMAK:  Object to the form.
8           THE WITNESS:  Correct.
9  BY MS. LYONS:
10     Q    Lee Health is a Level II trauma center,
11 correct?
12     A    Correct.
13     Q    Which means that Lee Health has
14 specialized capabilities to handle trauma patients
15 and to stabilize victims of trauma, correct?
16     A    Correct.
17     Q    As a Level II trauma center, is Lee Health
18 required to follow the state guidelines and statutes
19 that we were just talking about?
20     A    Yes.  And when you use the term
21 "guidelines", they are guidelines.  They are not
22 written in stone.  They are not by law.  They are
23 guidelines.  They are not protocols.  They are
24 guidelines.  Guidelines are simply a group of
25 statements that guide one in caring for patients.

Page 43

1      Q    And Lee Health is required to follow those
2  guidelines by AHCA, correct?
3      A    Correct.
4      Q    And Lee Health is also required, as a
5  Level II trauma center, to follow EMTALA?
6      A    Correct.
7      Q    The November 12th, 2018 incident about
8  which you've been asked to render an opinion, that
9  involved a five-year-old patient, correct?
10     A    Correct.
11     Q    So he would've been considered a pediatric
12 patient; is that correct?
13     A    Correct.
14     Q    Do you know how many trauma patients Lee
15 Health has accepted over the past five years?
16     A    No, I don't.
17     Q    Do you know how many pediatric trauma
18 patients Lee Health has accepted over the past five
19 years?
20     A    No.
21     Q    Do you know how many pediatric trauma
22 patients Lee Health has refused to accept over the
23 past five years?
24     A    No.
25     Q    Do you know whether or not Lee Health has

Page 44

1  the capability to render stabilizing care to a
2  pediatric trauma patient?
3      A    Say that again.
4      Q    Do you know whether Lee Health has the
5  capability to render services to stabilize a
6  pediatric trauma patient?
7      A    No.
8      Q    Do you know whether Lee Health had the
9  capacity to render services to a pediatric trauma
10 patient on November 12th, 2018?
11     A    No.
12     Q    Now, the situation involving that patient
13 on November 12th, 2018, the best option would've
14 been to transfer that patient to Tampa because that
15 was a pediatric trauma center at Tampa General,
16 correct?
17     A    Correct.
18     Q    In the recording, which you read the
19 transcript of, the doctor treating the patient,
20 Dr. Heisler, said that the patient was not stable
21 enough to transfer all the way to Tampa, correct?
22     A    Correct.
23     Q    The doctor treating the patient said she
24 wanted to send the patient to Lee Health for further
25 stabilization and then the patient could be sent to

Page 45

1  Tampa, correct?
2      A    Correct.
3      Q    As you previously stated, if a pediatric
4  patient could not be transferred to a pediatric
5  trauma center, then the patient should be
6  transferred to the closest Level II trauma center,
7  correct?
8      A    What is the definition of closest?
9      Q    Well, we'll get to that.  That's my next
10 question, but just answer the first question.  I'll
11 rephrase it, if you'd like.
12          As you previously stated, if a pediatric
13 patient could not be transferred to a pediatric
14 trauma center, then the patient should be
15 transferred to the closest Level II trauma center
16 based on time it takes to get there?
17     A    Correct.
18     Q    In your report, you put that the flight
19 time from Lehigh Regional to Tampa General was
20 around thirty-five minutes; is that correct?
21     A    Correct.
22     Q    Dr. Fonte testified it was about
23 forty-five minutes.  Neither here, nor there.  We'll
24 say somewhere -- can we agree to say it's between
25 thirty-five and forty-five minutes?

12 (Pages 42 - 45)

Page 46

```
1        A    I was under the impression it was
2   thirty-five minutes.
3        Q    Okay.  We'll go with that.
4             Do you know how long the flight time is
5   from Lehigh Regional to Lee Health?
6        A    No.
7        Q    Do you know if the doctor at Lehigh
8   Regional asked for an air transfer when the first
9   call was placed to the transfer center?
10       A    I don't know that.
11       Q    Would you agree that a -- assuming the
12  flight time from Lehigh Regional to Lee Health was,
13  approximately, ten minutes, would you agree that it
14  would have taken less time to transfer the patient
15  by air from Lehigh Regional to Lee Health than it
16  would have taken to transfer the patient by air from
17  Lehigh Regional to Tampa?
18       A    I would agree with that.  I am unaware of
19  the fact that asked for air transport to Lee Health
20  was made.  Is that a fact?
21       Q    Yes.
22       A    Where is that?
23       Q    Well, I don't have to provide you that
24  information, but that is in the first call that
25  Lehigh Regional made to Lee Health.  When they
```

Page 47

```
1   called the transfer center, they asked for air
2   transport.
3             So assuming that's true, assuming that
4   Lehigh was going to transfer the patient by air to
5   Lee Health, would you agree with me that the travel
6   time would've been significantly shorter to transfer
7   the patient to Lee Health than it was to transfer
8   the patient to Tampa?
9        A    Yes.
10       Q    And would you agree that if the patient
11  was not able to be transferred to Tampa because the
12  flight time was too long, the transfer to Lee Health
13  by air would've been appropriate?
14            MR. YORMAK:  Object to the form.
15            You can answer.
16            THE WITNESS:  If the patient was stable
17       for transfer.
18  BY MS. LYONS:
19       Q    Or if the sending physician determined
20  that, although not stable, the medical benefits
21  expected from the transfer outweighed the risks,
22  correct?
23       A    I disagree with that.
24       Q    Why do you disagree with that?  That's
25  what --
```

Page 48

```
1        A    Because I'm a physician of sound judgment.
2        Q    Okay.
3        A    And I do not think that the transferring
4   physician was using sound judgment.  I think the
5   transferring physician was using panic, because they
6   had a patient there that was in the process of
7   actively dying in front of their eyes.
8        Q    Would you agree with me, though, that
9   under the regulations and the statutes, that if the
10  patient was not able to be transferred to Tampa
11  because the flight was too long, then the transfer
12  to Lee Health by air would've been appropriate
13  assuming that the transferring physician determined
14  the medical benefits expected from the transfer
15  outweigh the risk?
16       A    According to the statutes, yes.
17       Q    And Dr. Heisler had stated in the call
18  that she didn't believe the patient was sufficiently
19  stable for the long transfer to Tampa, correct?
20       A    Correct.
21       Q    And Dr. Heisler stated that the patient
22  needed additional stabilization that Lehigh Regional
23  could not provide, correct?
24       A    That's what the doctor stated.  Whether
25  the doctor was correct, I do not know.
```

Page 49

```
1        Q    I am so sorry.  I forgot put my phone on
2   mute.  Just one second.
3             All right.  Sorry.  I fixed it.
4             Do you recall in the transcript of the
5   call that Dr. Fonte acknowledged that Lee Health has
6   provided additional stabilization to pediatric
7   patients in the past?
8        A    Yes.
9        Q    Does the call transcript indicate how long
10  the patient's pulse had been established --
11  reestablished?
12       A    No.
13       Q    Dr. Fonte did not ask that question during
14  that call, did she?
15       A    Only because the term that was used by the
16  doctor at the outside hospital was, "in and out of
17  PEA arrest".
18       Q    And Dr. Fonte did not ask what that meant,
19  did she?
20       A    It's because she knew what it meant.
21       Q    I'm asking you a question, sir.  You don't
22  know what Dr. Fonte knew or didn't know.  But --
23       A    More than likely, she knew what it meant.
24       Q    You do know from reading the transcript,
25  Dr. Fonte did not ask Dr. Heisler to explain what
```

13 (Pages 46 - 49)

Page 50

1 she meant when she used the phrase "in and out of
2 PEA", correct?
3    A   I wouldn't ask.
4    Q   That wasn't my question, sir. You
5 reviewed the transcript. In the transcript of the
6 call, did Dr. Fonte ask Dr. Heisler what she meant
7 when she used the phrase "in and out of PEA"?
8    A   No, she didn't ask.
9    Q   Did Dr. Fonte ask Dr. Heisler how long it
10 had been since she had reestablished pulse activity?
11    A   No.
12    Q   On page nine of your report, you state,
13 "Indeed, Dr. Fonte indicated to Dr. Heisler that if
14 she was able to resuscitation the pediatric patient,
15 the best chance for survival was an air transfer to
16 the pediatric trauma center in Tampa. In my
17 experience, the travel time by air from southwest
18 Florida to Tampa would be about thirty-five minutes.
19 The travel time by ambulance from Lehigh Regional
20 Medical Center to Lee Health is about thirty
21 minutes. This difference is minute and without
22 question a pediatric trauma patient like this should
23 have been transferred to Tampa by air if a pulse
24 could have been regained, which it had not because
25 the patient was in and out of PEA. A transfer to a

Page 51

1 Level II adult trauma center would've been improper
2 and would've been a deviation from the appropriate
3 standard of care owed to the patient."
4        That's the opinion you included in your
5 report, correct?
6    A   Correct.
7    Q   That opinion was based in part upon your
8 understanding that the transfer from Lehigh Regional
9 Medical Center to Lee Health, were it to have
10 happened, would've been by ambulance, correct?
11    A   Correct.
12    Q   If, however, the transfer from Lehigh
13 Regional Medical Center to Lee Health would have
14 been by air, then the difference would not have been
15 minute, would it?
16    A   No.
17    Q   If in that situation, then the transfer to
18 Lee Health would have been appropriate assuming the
19 patient was either stable or the physician had
20 certified that the medical benefits expected from
21 the transfer outweighed the risks, correct?
22    A   Correct.
23    Q   Would you agree with me that Lee Health's
24 trauma center could've provided a higher level of
25 care than Lehigh Regional?

Page 52

1    A   There's one unknown variable in this case,
2 what was the cause of death?
3    Q   Well, at the time these decisions were
4 made there wasn't one because the patient was still
5 alive, but in general, would you agree with me that
6 Lee Health could've provided a higher level of care
7 to a trauma patient than Lehigh Regional could?
8    A   Not if the patient had already
9 exsanguinated all of the blood volume in the abdomen
10 or chest, or disassociated the brain from the base
11 of the brain and had lethal injuries.
12    Q   You don't know if either of those two
13 things had happened, correct?
14    A   No. I don't know if there was a
15 postmortem on this case. Maybe you do.
16    Q   Right. But you don't know whether or not
17 either of those two things had had happened. So
18 absent either of those two things, would you agree
19 with me that Lee Health could've provided a higher
20 level of care to a trauma patient than Lehigh
21 Regional?
22    A   I don't know much about Lehigh hospital.
23 I don't know if there was a general surgeon
24 available to see the patient. I don't know if there
25 was a neurologist or a neurosurgeon available to see

Page 53

1 the patient. There's a lot of unknowns in this case
2 for me to make that statement the way you want the
3 statement made.
4    Q   According to the regulations and the
5 statute, Dr. Fonte could not have disagreed with
6 Dr. Heisler's determination that the medical
7 benefits expected from the transfer outweighed the
8 risks, correct?
9        MR. YORMAK: Object to the form.
10        THE WITNESS: According to the statutes,
11 no.
12 BY MS. LYONS:
13    Q   Let me reask that, because I asked correct
14 at the end, and then the way you answered it.
15        So is it true that, according to the
16 regulations and statutes, Dr. Fonte could not have
17 disagreed with the transferring physician,
18 Dr. Heisler's determination that the medical
19 benefits expected from the transfer outweighed the
20 risk?
21        MR. YORMAK: Object to the form.
22 BY MS. LYONS:
23    Q   Do you agree with that statement?
24    A   I agree.
25    Q   Having read the transcript of the

14 (Pages 50 - 53)

Page 54

1 telephone call on November 12th, 2018, would you
2 agree that it appears from the things that she said,
3 that Dr. Heisler had made the determination that the
4 medical benefits expected from the transfer to Lee
5 Health outweighed the risks to the patient?
6     A    I can't put words in her mouth.
7     Q    Okay.  Well, can you form an opinion
8 having read the transcript?
9     A    No, I will not.
10    Q    Do you know after this call whether or not
11 that patient was transferred to Tampa?
12    A    I was told the patient expired at Lehigh.
13    Q    Who told you that?
14    A    I think Mr. Yormak told me that.  I don't
15 know.  I was under the impression that the patient
16 expired at Lehigh.  Was the patient transferred to
17 Tampa General?
18    Q    That's my understanding.
19        Let's assume that the patient was
20 transferred to Tampa General, would you agree based
21 on that fact, assuming it's true, that Dr. Heisler
22 must've determined either that the patient was
23 stable enough for transfer, or although not stable
24 enough, the medical benefits expected from the
25 transfer outweigh the risks?

Page 55

1        MR. YORMAK:  Object to the form.
2        THE WITNESS:  I would agree.
3 BY MS. LYONS:
4     Q    In the transcript of the telephone call
5 that you reviewed, did Dr. Fonte ever tell
6 Dr. Heisler that she could not accept the patient
7 because Dr. Fonte did not think the patient was
8 stable enough to transfer?
9     A    I have to look.
10        What was your question again?
11    Q    I'm not sure I remember, but hold on.  Let
12 me see.
13        Oh, in the transcript of the telephone
14 call that you reviewed, did Dr. Fonte ever tell
15 Dr. Heisler that Dr. Fonte could not accept the
16 patient because Dr. Fonte did not think the patient
17 was stable enough to transfer?
18    A    I don't see that.
19    Q    In fact, it would've been inappropriate
20 for Dr. Fonte to say that because, according to the
21 guidelines and the statute, Dr. Heisler was the one
22 who got to make that decision, correct?
23    A    Correct.
24    Q    Does the fact that the patient was placed
25 on the helicopter for transfer to Tampa General,

Page 56

1 does that change any of your opinions in this case?
2     A    I would have to have more information.
3 Were they doing the CPR when they put the patient on
4 the helicopter?  Were the flight medics doing ACLS
5 PALS?  What drugs were they given?  What,
6 ultimately, happened to the patient?  What was the
7 postmortem on the patient?  Unfortunately, there's
8 some things here, which I don't have the information
9 on.
10    Q    Would you agree that you don't have all of
11 the information necessary to make a determination as
12 to whether or not that patient was stable enough for
13 transfer?
14    A    Based on this transcript of the phone
15 call, in my expert opinion, this patient was not
16 stable enough for transfer at the moment the phone
17 call was made.
18    Q    Do you have an opinion as to whether or
19 not the medical benefits expected from the transfer
20 by air to Lee Health outweighed the risks to the
21 patient?
22    A    The biggest unknown here is, what did this
23 patient expire from?  What were the injuries?
24    Q    So you don't have enough information to
25 render an opinion as to whether or not the medical

Page 57

1 benefits expected from the transfer by air to Lee
2 Health outweighed the risks to that patient?
3     A    Correct.
4     Q    Do you know what instructions Dr. Fonte
5 had been provided by Lee Health as to what to do
6 when she received transfer calls?
7     A    No.
8     Q    Do you know whether Dr. Fonte was
9 instructed that before denying a transfer request,
10 that she needed to discuss it with designated
11 individuals at Lee Health?
12    A    No.
13    Q    Do you know whether Dr. Fonte was
14 instructed that before denying a transfer call based
15 on capability of the facility, she needed to discuss
16 that issue first with designated individuals at Lee
17 Health?
18    A    No.
19    Q    Do you know whether Dr. Fonte did that on
20 November 12th, 2018, whether she discussed anything
21 with designated individuals at Lee Health?
22    A    No.
23    Q    Do you know whether Dr. Fonte's actions on
24 November 12th, 2018 violated any of Lee Health's
25 policies?

15 (Pages 54 - 57)

Page 58

1    A    No.
2    Q    You've never reviewed Lee Health's
3  transfer policy, correct?
4    A    I don't believe I did, no.
5    Q    Do you know if Lee Health's transfer
6  policy was consistent with federal and state law?
7    A    If they're a designated, state designated
8  Level II trauma center, more than likely it will be
9  consistent with state law.
10   Q    Do you know if Dr. Fonte violated Lee
11  Health's transfer policy?
12   A    I hope not.
13   Q    I may have asked you that twice, and I'm
14  sorry.
15        Did you review the written warning that
16  was provided to Dr. Fonte by Lee Health in
17  April 2018?
18   A    No.
19   Q    Do you know if Dr. Fonte violated that
20  final written warning that was given to her in
21  April 2018 when she refused the transfer request on
22  November 12th, 2018?
23   A    No.
24   Q    On November 12th, 2018, you don't know how
25  many other patients were at Lee Health's -- at the

Page 59

1  hospital, correct?
2    A    Correct.
3    Q    And you don't know how many other medical
4  providers were available to render assistance to any
5  trauma patients who came in, correct?
6    A    Correct.
7    Q    And you have no knowledge regarding the
8  ability to have other healthcare providers come in
9  or obtain pediatric implements and equipment from
10  Lee Health's pediatric hospital, correct?
11   A    Correct.
12        Might I just ask, that last statement you
13  made, did you imply that in order for them to
14  appropriately take care of pediatric trauma, they
15  have to obtain equipment from an off-site pediatric
16  hospital?
17   Q    No.
18   A    I thought that's what you were implying.
19   Q    No.
20   A    Okay.
21   Q    Did Dr. Fonte ever tell you that she
22  believed she's incapable of treating a trauma
23  patient who's a pediatric patient?
24   A    No.  She did mention to me that taking
25  care of pediatric trauma at Lee Health is difficult,

Page 60

1  because the pediatric hospital is off-site.
2    Q    Did she tell you she has, in fact, taken
3  care of pediatric trauma patients at Lee Health?
4    A    I don't recall.
5    Q    If she told you it was difficult, would
6  that indicate that she had done it before?
7    A    Perhaps.
8    Q    In your report on page seven, there's a
9  heading.  In the heading it says, "Dr. Fonte did not
10  violate the prevailing standards of care by refusing
11  a transfer of an infant."
12        Would you agree with me that a
13  five-year-old is not an infant?
14   A    I would.
15   Q    So should that instead read, of a
16  pediatric patient?
17   A    How about child?
18   Q    I'm good with child, too.
19        Do you still agree that Dr. Fonte did not
20  violate the prevailing standard of care by refusing
21  a transfer of the child in this situation when the
22  child could have taken a ten-minute air flight to
23  Lee Health?
24   A    In this situation when the child was in
25  and out of PEA, I agree.

Page 61

1    Q    Even though the doctor who was making the
2  transfer determined that the medical benefits
3  expected from the transfer outweighed the risks?
4        MR. YORMAK:  Object to the form.
5        THE WITNESS:  I agree.  I agree that
6    Dr. Fonte was correct in not accepting a
7    patient who was in and out of PEA.
8  BY MS. LYONS:
9    Q    So in that situation when the transferring
10  physician determines that the medical benefits
11  expected from the transfer outweigh the risk, you
12  agree that it's okay for the receiving hospital to
13  just say, nope, we're not going to take the patient?
14   A    I wouldn't use the word "nope".
15   Q    Okay.  Then I'll rephrase it.
16        So your opinion is that regardless of the
17  statute and the regulations and the guidelines by
18  the Florida Department of Health and AHCA, that even
19  if a transferring physician determines that the
20  medical benefits expected from the transfer outweigh
21  the risks, it is okay for a receiving hospital to
22  impose their own judgment and decline to accept that
23  transfer?
24   A    I think it's okay for a Board certified
25  fellowship trained trauma surgeon to make a

Page 62

1    determination that it is futile to transfer a
2    patient in and out of PEA. That I think is okay.
3        Q    Do you think looking back now that
4    Dr. Fonte had enough information as to whether or
5    not the medical benefits expected from the transfer
6    would outweigh the risks?
7        A    I don't know.
8        Q    So you said that a doctor could make a
9    decision to not accept a transfer even though the
10   transferring physician determined that the medical
11   benefits expected from the transfer outweighed the
12   risks if the receiving doctor thinks it to be
13   futile, is that your opinion?
14       A    I think if a discussion is had between the
15   two physicians on medical level about the status of
16   the patient, that's okay.
17       Q    Where in the guidelines, statutes, or
18   regulations does it say that a receiving physician
19   can refuse to accept a transfer because they think
20   it's futile?
21       A    It doesn't say that, but at some point
22   solid medical judgment has to factor into the care
23   of an injured patient.
24       Q    And the person providing the care and the
25   person in the best position to make that solid

Page 63

1    medical judgment is the person who, in fact, is
2    caring for the patient, the sending physician,
3    correct?
4        A    There's a huge difference between an
5    emergency medicine physician and a Board certified
6    fellowship trained trauma surgeon. A huge, huge
7    difference.
8        Q    There's also a huge difference between the
9    person on the ground who actually is witnessing the
10   patient and knows the details of the patient's
11   condition versus someone on the phone who's not had
12   the benefit of that information, wouldn't you agree?
13       A    Not necessarily.
14       Q    Do you think a doctor should make
15   decisions without having all the information?
16       A    I think that Dr. Fonte had the information
17   she needed to make the determination.
18       Q    And was the determination she made
19   supported by or authorized in any of the guidance,
20   statutes, or regulations?
21       A    You are trying to melt guidance,
22   guidelines, statutes with medical care. You can't
23   do that.
24       Q    But answer my question, sir. Was the
25   decision she made to not accept this transfer

Page 64

1    patient, even though the transferring physician
2    either determined the patient was stable enough or
3    that the medical benefits of the transfer outweighed
4    the risks, what guideline, statute, or regulation
5    gave Dr. Fonte the authority to deny that?
6        A    Medical care has nothing do with authority
7    and guidelines and statutes.
8        Q    So then is it your position --
9        A    That and the fact that there was no EMTALA
10   violation filed in this case only substantiates my
11   opinion, my expert opinion, that some medical
12   judgment was exercised in this case by Dr. Fonte.
13       Q    Regardless of whether you believe her
14   judgment -- she exercised beyond a medical judgment,
15   would you agree with me that the guidelines,
16   regulations, and statutes did not give her the
17   authority to refuse to accept that patient transfer?
18       A    Sometimes we use sound medical judgment
19   above guidelines and authority.
20       Q    I understand that, sir, but I'd like you
21   to answer my question. Would you agree with me that
22   regardless of Dr. Fonte's medical judgment, the
23   guidelines, statutes, and regulations governing
24   transfers in this situation did not give Dr. Fonte
25   the authority to refuse to accept that transfer?

Page 65

1        A    It doesn't compute with me, ma'am. It
2    just doesn't. I cannot equate guidelines, statutes,
3    and authority with medical judgment. I can't. I've
4    been doing this for forty years, and I have never
5    looked at it that way.
6             To the best of my ability, I have followed
7    guidelines, statutes, and authority; however, as
8    even noticed at this very moment in the United
9    States of America, we are not particularly following
10   every single guidelines, statute, and authority in
11   the care of deathly ill patients.
12       Q    I don't think we can equate this situation
13   with this patient on November 12th, 2018 with a
14   national pandemic. But regardless, my question to
15   you is: Is Lee Health responsible for following
16   guidelines, statutes, and regulations?
17       A    Yes.
18       Q    Is Dr. Fonte, as an employee -- was
19   Dr. Fonte, as an employee of Lee Health, also
20   responsible for following guidelines, statutes, and
21   regulations?
22       A    Yes, but she went above that and used
23   sound medical judgment in her opinion.
24       Q    And did something that the guidelines,
25   regulations, and statutes did not permit, correct?

17 (Pages 62 - 65)

1    A    Again, there's too much unknown about this
2  case.
3    Q    There's too much unknown for you to render
4  an opinion on that?
5    A    On that issue, yes. On that particular
6  issue, yes. I would want to know the exact cause of
7  death. I would want to know if, in fact, that
8  patient was transferred and what care that patient
9  received and what procedures were done on that
10  patient upon arrival at a pediatric trauma center.
11  I do not have that information.
12    MS. LYONS: I don't have any further
13    questions at this time.
14    MR. YORMAK: I have just a couple.
15    CROSS-EXAMINATION
16  BY MR. YORMAK:
17    Q    Dr. Lottenberg, thank you for your time
18  this afternoon.
19    If you look at page six of your expert
20  report -- can you get that in front of you, sir.
21    A    Got it.
22    Q    Okay.
23    The first full paragraph, and I'll read
24  you and I'll stop after the first Roman numeral,
25  "Where the patient is unstable, a hospital may not

1  transfer the patient unless, one, the physician
2  certifies the medical benefits expected from the
3  transfer outweigh the risks."
4    In the transcript that you reviewed, did
5  you see anywhere where Dr. Heisler said that the
6  medical benefits outweigh the risks?
7    A    No.
8    Q    And, obviously, there was no patient
9  transfer request in writing that you're aware of,
10  correct?
11    A    Correct.
12    Q    Okay.
13    Now, in that same paragraph you outline
14  four different criteria for the transfer of unstable
15  patients in order to make the transfer appropriate.
16  And I wanted to focus in on the fourth one. It
17  says, "The transfer must be made with qualified
18  personnel and appropriate medical equipment."
19    Can you outline for us when a patient is
20  and out of PEA, what procedures must be done to try
21  to treat that patient?
22    A    You would follow pediatric advanced life
23  support. You would provide CPR, compressions of the
24  chest, appropriate ventilations, appropriate drugs,
25  according to the patient's body weight, drips of

1  appropriate drugs.
2    Q    What kind of drugs are you referring to?
3    A    Pressure drugs, such as epinephrine, other
4  drugs, sedatives.
5    Q    All right. And when a patient is in and
6  out PEA, can they treated in an ambulance up to the
7  appropriate level that they are in an emergency
8  room?
9    A    No. It's a different level of treatment.
10    Q    Is it a lower level of treatment?
11    A    Yes.
12    Q    Is the patient's best chance for survival
13  remaining where they are until they are sufficiently
14  stable to be transferred?
15    MS. LYONS: Object to the form of the
16    question.
17  BY MR. YORMAK:
18    Q    You can answer.
19    A    Yes.
20    Q    And in your professional opinion, is it
21  ever appropriate to transfer a patient who is in and
22  out of PEA?
23    A    No.
24    MS. LYONS: Object to the form of the
25    question.

1  BY MR. YORMAK:
2    Q    Based on your review of the transcript,
3  was there anything that would indicate to you
4  Dr. Heisler believed that the patient was
5  sufficiently stable that they could be transferred
6  to Tampa?
7    A    No.
8    Q    Was there anything that indicated at all
9  that the patient was sufficiently stable for
10  transfer anywhere?
11    MS. LYONS: Object to the form of the
12    question.
13    THE WITNESS: No.
14  BY MR. YORMAK:
15    Q    Do you believe that a receiving trauma
16  surgeon has an obligation to accept any patient that
17  a transferring facility deems appropriate?
18    A    That's a difficult question to answer.
19    Q    Okay.
20    So if there is a situation where the
21  patient in question is actively dying, would it be
22  appropriate to put that person in an ambulance?
23    MS. LYONS: Object to the form of the
24    question.
25    THE WITNESS: No.

18 (Pages 66 - 69)

Page 70

1  BY MR. YORMAK:
2      Q    Is the physician's goal, in particularly a
3  trauma physician's goal, to take all measures
4  necessary to prolong or sustain life?
5      A    Yes.
6      Q    Okay.
7          And do you believe Dr. Fonte's decision to
8  not have this patient put in an ambulance would've
9  given this patient the best chance of survival?
10         MS. LYONS:  Object to the form of the
11     question.
12         THE WITNESS:  Yes.
13  BY MR. YORMAK:
14     Q    Do you believe that Dr. Fonte did anything
15  wrong in her medical judgment?
16     A    No.
17         MS. LYONS:  Object to the form of the
18     question.
19         MR. YORMAK:  I don't have any further
20     questions at this time.
21         MS. LYONS:  I have a follow-up.
22           REDIRECT EXAMINATION
23  BY MS. LYONS:
24     Q    When Mr. Yormak asked you if you agreed
25  that a hospital had -- a trauma center had an

Page 71

1  obligation to accept any patient as a transfer, you
2  said that's a difficult question to answer.  Why is
3  that difficult to answer?
4      A    Because I've been on the receiving end and
5  pronounced patients dead as they arrived at the
6  hospital.
7      Q    Okay.
8          But that doesn't negate whether or not
9  there's an obligation to accept any patient as a
10  transfer, correct?
11     A    Again, we discussed this.  Some medical
12  judgment says to me that this patient should not
13  have been transferred at the time that that phone
14  call was made.
15     Q    But do you agree that a hospital has a
16  legal obligation to accept any patient as a
17  transfer?
18         MR. YORMAK:  Object to the form.
19         THE WITNESS:  I cannot -- I cannot --
20     I'm not a legal person.  I'm a trauma surgeon.
21  BY MS. LYONS:
22     Q    You stated at the beginning that you're
23  very familiar with the regulations, and the
24  statutes -- the Florida statutes and the regulations
25  and guidelines.  So given your extensive knowledge

Page 72

1  of the Florida statutes, regulations, and the
2  guidelines, would you agree that a trauma center has
3  a legal obligation to accept any patient as a
4  transfer?
5      A    All of the legalities and the legal
6  obligations are defensible and arguable.  That's
7  what we've been doing here for two hours.  We've
8  been arguing the legal obligations, but we have not
9  been focusing on the patient.
10     Q    Right.  Sir, I have a very specific
11  question that I want you to answer, and I'll ask it
12  again.
13         Given your extensive knowledge of the
14  state of Florida statutes, regulations, and
15  guidelines, would you agree with me that a trauma
16  center has an obligation to accept any patient as a
17  transfer?
18     A    I would agree with you.
19         MS. LYONS:  Okay.  Thank you.  No
20     further questions.
21         You have the right to read or waive.
22         THE WITNESS:  I'll waive.
23         MS. LYONS:  You want to waive?
24     He wants to waive.
25         THE COURT REPORTER:  Did you need to

Page 73

1  order this?
2      MS. LYONS:  I would like to order it,
3  please.
4      THE COURT REPORTER:  Mr. Yormak, did you
5  need a copy?
6      MR. YORMAK:  Yes, we'll take a copy.
7      (Whereupon, at 3:25 p.m., the proceeding
8     was concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

19 (Pages 70 - 73)

Page 74

1          CERTIFICATE OF OATH
2
3
   STATE OF FLORIDA
4  COUNTY OF BROWARD
5
6        I, BRIGITTE ROTHSTEIN, Court Reporter and
7  Notary Public, State of Florida, certify that
8  LAWRENCE LOTTENBERG, MD personally appeared before
9  me via VTC and was duly SWORN/AFFIRMED and produced
10 a Florida driver's license as identification.
11       WITNESS my hand and official seal this
12 13th day of April, 2020.
13
14
15
16
17

18     BRIGITTE ROTHSTEIN
       Court Reporter and Notary Public,
19     State of Florida
       My Commission:  GG 966580
20     Expires: March 17th, 2024
21
22
23
24
25

Page 75

1          CERTIFICATE OF REPORTER
2
   STATE OF FLORIDA
3
   COUNTY OF BROWARD
4
5        I, BRIGITTE ROTHSTEIN, Stenographic Court
6  Reporter, CERTIFY I was authorized to and did
7  stenographically report the VTC deposition of
8  LAWRENCE LOTTENBERG, MD; that a review of the
9  transcript WAS NOT requested; and the foregoing
10 transcript, page 5 through page 73, is a true and
11 accurate record of my stenographic notes.
12       I further certify that I am not a
13 relative, employee, attorney, or counsel of any of
14 the parties, nor am I a relative or employee of any
15 of the parties' attorney or counsel connected with
16 the action, nor am I financially interested in the
17 action.
18       Dated this 15th day of April, 2020.
19
20
21
22
23     BRIGITTE ROTHSTEIN
       COURT REPORTER
24
25

20 (Pages 74 - 75)

**[& - answer]**

| & |
|---|
| **&**   2:9 |

| **0** |
|---|
| **054**   1:3 |

| **1** |
|---|
| **1**   3:10 9:16,20 10:13 |
| **100**   2:10 |
| **12th**   24:1 43:7 44:10,13 54:1 57:20,24 58:22,24 65:13 |
| **13th**   1:13 74:12 |
| **14**   3:11 |
| **159**   1:15 |
| **15th**   75:18 |
| **17th**   74:20 |
| **1968**   7:15 |
| **1971**   7:15,17 |
| **1975**   7:17,18 |
| **1980**   7:18,22,24 |
| **1989**   13:3 |
| **1991**   8:5 |
| **1:30**   1:14 |
| **1:47**   15:23 |

| **2** |
|---|
| **2**   3:11 14:11,16,21 16:3 |
| **20-16**   4:10 |
| **20-17**   4:10 |
| **2001**   8:8 |
| **2003**   8:10 |
| **2018**   10:21 17:15 18:25 19:4,10,16 19:20 23:19 24:1 43:7 44:10,13 54:1 57:20,24 58:17,21 58:22,24 65:13 |
| **2019**   10:18 12:11 |

| **2020**   1:13 74:12 75:18 |
|---|
| **2024**   74:20 |
| **206**   2:3 |
| **223-7166**   2:12 |
| **22908**   74:17 75:22 |
| **239**   2:5 |
| **2:19**   1:3 |

| **3** |
|---|
| **33458**   1:15 |
| **3350**   2:10 |
| **33601**   2:11 |
| **34135**   2:4 |
| **3:25**   1:14 73:7 |

| **4** |
|---|
| **437075**   18:12 |

| **5** |
|---|
| **5**   3:3 75:10 |

| **6** |
|---|
| **66**   3:4 |

| **7** |
|---|
| **70**   3:5 |
| **73**   75:10 |
| **74**   3:6 |
| **75**   3:7 |

| **8** |
|---|
| **813**   2:12 |

| **9** |
|---|
| **9**   3:10 |
| **90**   13:3 |
| **966580**   74:19 |
| **985-9691**   2:5 |
| **9990**   2:3 |

| **a** |
|---|
| **abdomen**   52:9 |
| **ability**   59:8 65:6 |
| **able**   5:24 6:2 28:4 35:16 47:11 48:10 |

50:14
**absent**   52:18
**absolutely**   26:3
**accept**   23:4 29:18 31:9 36:24 37:17 37:25,25 39:24 40:6 43:22 55:6,15 61:22 62:9,19 63:25 64:17,25 69:16 71:1,9,16 72:3,16
**acceptable**   36:23
**accepted**   43:15,18
**accepting**   25:6 27:6 27:16 29:17 31:3,9 31:11,24 37:1 38:21 39:9 40:1 61:6
**access**   12:1
**account**   14:23
**accurate**   75:11
**accurately**   14:23
**acknowledge**   4:4
**acknowledged**   49:5
**acls**   56:4
**action**   75:16,17
**actions**   57:23
**actively**   48:7 69:21
**activity**   30:10,11 31:25 32:5,15 50:10
**addition**   40:21
**additional**   48:22 49:6
**administering**   4:7
**administrative**   4:9
**adult**   37:7 51:1
**advanced**   67:22
**affirm**   4:23
**affirmed**   74:9

**afternoon**   66:18
**age**   34:16,22
**ago**   20:9
**agree**   4:20 6:24 29:18 34:6,11 35:18 36:11 37:23 38:18 45:24 46:11 46:13,18 47:5,10 48:8 51:23 52:5,18 53:23,24 54:2,20 55:2 56:10 60:12 60:19,25 61:5,5,12 63:12 64:15,21 71:15 72:2,15,18
**agreed**   3:16 4:18 21:5 70:24
**agreement**   4:14,15 27:6 31:3
**ahca**   19:18 43:2 61:18
**ahead**   29:22
**air**   46:8,15,16,19 47:1,4,13 48:12 50:15,17,23 51:14 56:20 57:1 60:22
**alert**   26:14,18,19 26:23 27:2,11,15
**alive**   52:5
**allow**   41:18
**alyons**   2:11
**ambulance**   50:19 51:10 68:6 69:22 70:8
**america**   65:9
**american**   7:20
**analysis**   29:24,24
**angelique**   2:9 4:19 5:11
**annual**   10:18 11:10
**answer**   6:8,9,24 27:22 28:4,6,6

**[answer - care]**                                                                 Page 77

30:13 32:12 33:16
33:20 39:8 40:2
45:10 47:15 63:24
64:21 68:18 69:18
71:2,3 72:11
**answered**  53:14
**anthony**  11:3,14
**anticipate**  7:3
**aosc**  4:10,10
**appearances**  10:8
**appeared**  74:8
**appearing**  2:6,13
**appears**  54:2
**appointment**  8:18
**appropriate**  23:7,9
39:10,11 40:11,22
41:4 47:13 48:12
51:2,18 67:15,18
67:24,24 68:1,7,21
69:17,22
**appropriately**
59:14
**approximately**
46:13
**april**  1:13 19:10
58:17,21 74:12
75:18
**arguable**  72:6
**arguing**  72:8
**arrangement**  4:8
4:12
**arrest**  23:3 49:17
**arrival**  66:10
**arrived**  71:5
**arrives**  26:25
**asked**  12:22 13:12
20:2,18,22 23:4
29:10 39:4 43:8
46:8,19 47:1 53:13
58:13 70:24

**asking**  6:10,23 21:1
28:11,13,17 31:11
31:12 37:21 49:21
**assertion**  37:11
**assessment**  30:9
**assistance**  59:4
**associate**  8:22
**assume**  54:19
**assuming**  46:11
47:3,3 48:13 51:18
54:21
**atlantic**  8:19,22
**attached**  18:8
41:21
**attorney**  5:12,15
9:21 14:18 15:14
15:15 16:15,20
21:3,24 28:4 75:13
75:15
**attorneys**  4:3
**audio**  18:12,23
19:2
**authorities**  25:21
**authority**  64:5,6,17
64:19,25 65:3,7,10
**authorized**  63:19
75:6
**available**  35:11
52:24,25 59:4
**average**  11:9
**aware**  37:19 67:9

**b**

**b**  3:9
**back**  62:3
**background**  7:12
**backup**  38:13
**base**  52:10
**based**  8:23 23:5
25:15 26:19 27:3
29:19,20 37:2
45:16 51:7 54:20

56:14 57:14 69:2
**basing**  37:6,11
**basis**  11:10 39:1
**beach**  8:16
**beginning**  41:20
71:22
**behalf**  2:6,13
**believe**  10:12 12:11
15:17 18:6,10
19:25 21:3,12,25
22:25 24:14 27:23
37:2 39:3 48:18
58:4 64:13 69:15
70:7,14
**believed**  22:24
59:22 69:4
**benefit**  63:12
**benefits**  40:17 42:4
47:20 48:14 51:20
53:7,19 54:4,24
56:19 57:1 61:2,10
61:20 62:5,11 64:3
67:2,6
**benjamin**  2:2 4:17
**best**  13:14,18 35:14
35:20 36:2,14,17
44:13 50:15 62:25
65:6 68:12 70:9
**beyond**  64:14
**biggest**  56:22
**block**  6:4
**blood**  52:9
**board**  7:20 61:24
63:5
**boards**  7:20
**body**  67:25
**bonita**  2:4
**brain**  52:10,11
**break**  7:2,5
**brief**  7:11

**briefly**  5:20 7:23
10:1
**brigitte**  1:17 74:6
74:18 75:5,23
**brooks**  2:9
**broward**  8:7 13:5
74:4 75:3
**busy**  38:11
**byormak**  2:4

**c**

**c**  2:1 4:1
**call**  17:12,15,21
18:5,5 23:24 32:20
33:5,6,25 34:4,13
34:13 46:9,24
48:17 49:5,9,14
50:6 54:1,10 55:4
55:14 56:15,17
57:14 71:14
**called**  12:5 23:2
47:1
**calling**  21:4
**calls**  15:18 17:22
17:25 18:7,23 57:6
**capabilities**  35:2,22
42:14
**capability**  37:18,20
38:1,5,8,12,23
39:23 40:5,24 41:2
44:1,5 57:15
**capable**  37:4,8,13
**capacity**  38:23
39:24 40:5 41:2
44:9
**cardiac**  23:3
**care**  9:9 12:7,23
13:13 36:8 37:18
38:2,6,23 40:23
44:1 51:3,25 52:6
52:20 59:14,25
60:3,10,20 62:22

62:24 63:22 64:6
65:11 66:8
**caring** 42:25 63:2
**case** 1:3 5:16 6:16
8:25 9:12,13,22
10:5 11:15,18,20
11:23 12:3,8,12,19
13:2,9,16 14:24
16:3,25 17:11,19
19:24 20:3,19,23
21:2,5,6 23:20,23
24:3,13 28:3,14
29:10 33:19 52:1
52:15 53:1 56:1
64:10,12 66:2
**cases** 9:2,5,8 11:2,9
14:6
**category** 25:10,13
25:19 26:8 27:2,10
**cause** 52:2 66:6
**cell** 21:14
**center** 8:7,9,12,16
8:17,23 11:4 13:23
26:11,22 27:5,17
29:20 35:7,11,15
35:17,21 36:1,1,4,8
36:10,16,19,20,24
37:24 38:1,7,16,17
38:20,21 42:10,17
43:5 44:15 45:5,6
45:14,15 46:9 47:1
50:16,20 51:1,9,13
51:24 58:8 66:10
70:25 72:2,16
**centers** 25:2
**certain** 6:11 15:19
28:19,22 41:23
**certificate** 3:6,7
74:1 75:1
**certified** 51:20
61:24 63:5

**certifies** 40:17 67:2
**certify** 74:7 75:6,12
**chance** 36:3 50:15
68:12 70:9
**change** 56:1
**charge** 10:2,4,7,8
10:15
**charged** 14:24
**chart** 10:5 16:3
17:4
**chest** 52:10 67:24
**child** 23:2,7,10
60:17,18,21,22,24
**circumstances**
36:25
**claims** 9:9
**clarify** 33:10
**classify** 25:20 26:9
**clear** 6:6 17:14
**clearly** 5:23
**clinical** 8:19
**closest** 45:6,8,15
**coconut** 2:3
**college** 7:14
**come** 59:8
**commission** 74:19
**communicated**
20:17,21
**completed** 7:18
**compressions**
67:23
**compute** 65:1
**concluded** 73:8
**condition** 29:1,16
30:2,18 31:7 34:2
34:11 35:13 63:11
**conditions** 41:11
42:1
**conference** 15:3
**conferences** 10:4
15:2,4,5,7,13,16

**confirm** 41:1
**connected** 75:15
**consent** 4:11
**considered** 43:11
**consistent** 58:6,9
**constangy** 2:9
**constangy.com**
2:11
**constitute** 25:14
**consult** 24:4
**contact** 21:18,23
22:3
**contacted** 20:25
22:8
**conversation** 22:13
22:19
**conversely** 6:8
**copies** 6:16 14:5
40:25
**copy** 6:14 9:20
14:18 21:11 73:5,6
**correct** 5:16 10:17
17:5,16 18:18,19
24:1,2 27:12 28:19
28:22,23 29:17
30:3,19,20,22,23
31:2,8,17 33:7,13
34:17,18 35:3,4,8,9
35:18 36:21,22,25
37:18 38:3,8,24
39:24 40:6,12,13
40:18,19 41:11
42:1,2,6,8,11,12,15
42:16 43:2,3,6,9,10
43:12,13 44:16,17
44:21,22 45:1,2,7
45:17,20,21 47:22
48:19,20,23,25
50:2 51:5,6,10,11
51:21,22 52:13
53:8,13 55:22,23

57:3 58:3 59:1,2,5
59:6,10,11 61:6
63:3 65:25 67:10
67:11 71:10
**correction** 19:19
**could've** 51:24 52:6
52:19
**counsel** 3:17 4:11
4:16 75:13,15
**county** 8:8 13:5
25:25 74:4 75:3
**couple** 66:14
**court** 1:1,18 4:3,5,9
4:21 5:24 6:2,11
10:8 11:23 12:12
13:4,15,20,24
72:25 73:4 74:6,18
75:5,23
**courtroom** 10:14
**cover** 34:23
**cpr** 56:3 67:23
**created** 25:1
**creation** 16:9
**criteria** 26:19,23
27:14,15 34:21
67:14
**cross** 3:4 66:15
**current** 9:24 34:1
35:13
**currently** 8:18
**cv** 1:3 41:21

**d**

**d** 3:1 4:1
**dangerous** 41:13
**darby** 1:15
**date** 1:13 22:12
**dated** 75:18
**day** 17:23 18:3,21
18:24 21:25 38:5
74:12 75:18

**dead** 71:5
**dean** 2:18 8:22
**death** 39:17 52:2
  66:7
**deathly** 65:11
**decided** 23:5
**decision** 26:1,4,7
  30:24 31:16,21
  38:19,21 39:23
  40:4 42:3,5 55:22
  62:9 63:25 70:7
**decisions** 52:3
  63:15
**decline** 61:22
**deems** 69:17
**defendant** 1:10,16
  2:13 4:20 9:6
**defendant's** 3:10
  3:11 9:16 14:11
**defensible** 72:6
**deficiencies** 19:19
**define** 26:12
**defined** 25:11
**definition** 45:8
**delve** 29:10
**denied** 19:11
**deny** 64:5
**denying** 57:9,14
**department** 24:23
  61:18
**departments** 34:25
**depend** 33:2
**deponent** 3:18
**deposed** 14:7
**deposition** 1:12
  3:19 4:4 5:19,21
  7:4 11:15 12:15
  13:24 14:6,16,22
  19:23 75:7
**depositions** 10:7

**derived** 10:19,22
**describe** 7:23
**description** 7:11
**designated** 34:25
  57:10,16,21 58:7,7
**designating** 27:2
**details** 31:6 63:10
**determination**
  25:18,23 26:2
  31:13 39:19 53:6
  53:18 54:3 56:11
  62:1 63:17,18
**determine** 25:12
  27:9 28:25 29:15
  30:1,17 32:7 33:12
  41:10
**determined** 25:8
  33:23 47:19 48:13
  54:22 61:2 62:10
  64:2
**determines** 31:7
  61:10,19
**determining** 40:10
**deviation** 51:2
**die** 30:4
**difference** 16:5
  26:16 34:19 50:21
  51:14 63:4,7,8
**different** 8:2 10:2
  25:15 39:4,6 67:14
  68:9
**difficult** 59:25 60:5
  69:18 71:2,3
**direct** 3:3 5:6
**director** 8:20 25:1
**disability** 2:2
**disagree** 41:15,17
  47:23,24
**disagreed** 53:5,17
**disassociated** 52:10

**disconnected** 15:21
**discretion** 28:25
  29:14,25 30:5,17
  31:1 32:7
**discuss** 57:10,15
**discussed** 57:20
  71:11
**discussion** 16:7
  62:14
**discussions** 16:11
  16:13,17,19
**distance** 35:12 36:5
  38:16
**district** 1:1,1
**division** 1:2
**doctor** 4:21 26:4
  27:4,11 33:23,24
  33:25 34:10,12
  38:20,22 44:19,23
  46:7 48:24,25
  49:16 61:1 62:8,12
  63:14
**document** 9:15
  14:10,15,21 18:8
  18:13 23:22 41:21
**documents** 6:16
  17:9,17
**doing** 5:21 33:3
  56:3,4 65:4 72:7
**dollars** 10:16
**dr** 1:5 5:11,14,15
  9:22 14:17 15:17
  19:4,10,15,20,23
  20:1,5,13 21:4,7,14
  21:21,24 22:7
  23:12,17,24,25
  44:20 45:22 48:17
  48:21 49:5,13,18
  49:22,25,25 50:6,6
  50:9,9,13,13 53:5,6
  53:16,18 54:3,21

  55:5,6,7,14,15,15
  55:16,20,21 57:4,8
  57:13,19,23 58:10
  58:16,19 59:21
  60:9,19 61:6 62:4
  63:16 64:5,12,22
  64:24 65:18,19
  66:17 67:5 69:4
  70:7,14
**drips** 67:25
**driver's** 74:10
**drugs** 56:5 67:24
  68:1,2,3,4
**due** 36:5
**duly** 5:4 74:9
**dying** 23:4,10 48:7
  69:21

| e |
|---|

**e** 2:1,1 3:1,9 4:1,1
**educational** 7:12
**eight** 8:2
**either** 13:6,25
  17:18 51:19 52:12
  52:17,18 54:22
  64:2
**electrical** 30:10,11
  31:25 32:15
**eleven** 8:5,13
**email** 20:22 21:17
  22:4,5
**emergency** 23:11
  27:13 29:1,16 30:2
  30:18 63:5 68:7
**employed** 8:6
**employee** 65:18,19
  75:13,14
**employment** 2:2
  9:12,13
**emtala** 19:12,16
  27:18 28:3,9,13,15
  28:18,24 29:3,11

43:5 64:9
**entire** 17:24 18:7
**entry** 16:2,4,12
**epinephrine** 68:3
**equate** 65:2,12
**equipment** 41:5
59:9,15 67:18
**esquire** 2:2,9,17
3:2
**established** 49:10
**exact** 21:25 66:6
**exactly** 35:24
**examination** 3:3,4
3:5 5:6 66:15 70:22
**examining** 26:5
27:4 31:5
**excessive** 36:5
**exercised** 64:12,14
**exhibit** 3:10,11
9:16,20 10:10,13
14:11,16,16,21
16:3 18:15
**exhibits** 6:13
**expected** 40:17
42:4 47:21 48:14
51:20 53:7,19 54:4
54:24 56:19 57:1
61:3,11,20 62:5,11
67:2
**experience** 37:3
41:22 50:17
**experienced** 39:18
**expert** 5:15 8:25
9:3,6,13 10:3,13,19
10:23,25 11:1,5,10
11:13 12:22,25
13:16,19 20:2,18
20:22 21:1 22:18
56:15 64:11 66:19
**expertise** 21:18
23:6 24:9 29:21

**expire** 56:23
**expired** 54:12,16
**expires** 74:20
**explain** 10:1 49:25
**exsanguinated** 52:9
**extended** 4:10
**extensive** 71:25
72:13
**eyes** 48:7

### f

**facility** 38:7,22
39:22,25 40:3,5,9
41:2 57:15 69:17
**fact** 37:16 46:19,20
54:21 55:19,24
60:2 63:1 64:9 66:7
**factor** 62:22
**facts** 28:14
**factual** 23:18
**faculty** 8:18
**fall** 25:10 26:22
**falls** 25:13,19 27:1
30:8
**familiar** 5:18 71:23
**far** 14:24 35:12
**fashion** 38:13
**february** 22:1
**federal** 27:21 28:18
28:20 37:10 58:6
**fee** 9:23,23,24
10:11,14
**feel** 37:2,12
**feels** 30:7 39:10,11
**fees** 10:19,22 14:24
**fellowship** 61:25
63:6
**field** 26:2,8
**fifteen** 22:15 32:19
34:16
**fifty** 10:5,6,6,7

**file** 18:12
**filed** 5:13 12:12
64:10
**final** 19:9 58:20
**financially** 75:16
**fine** 28:9
**finished** 7:25
**first** 5:4,21 6:14
11:12 20:5,25
21:23 29:23,24
36:16 45:10 46:8
46:24 57:16 66:23
66:24
**five** 9:1,7 10:20,24
35:10,24 43:9,15
43:18,23 45:20,23
45:25,25 46:2
50:18 60:13
**fixed** 49:3
**flight** 36:6 45:18
46:4,12 47:12
48:11 56:4 60:22
**florida** 1:1,15,18
2:4,11 4:9 7:15 8:1
8:3,11,12,15,16,19
8:22 24:10,19,23
25:11 26:24 27:20
29:12 30:15 35:1
37:10,23 39:15,21
50:18 61:18 71:24
72:1,14 74:3,7,10
74:19 75:2
**focus** 67:16
**focusing** 72:9
**follow** 42:18 43:1,5
67:22 70:21
**followed** 65:6
**following** 9:17
14:12 15:24 19:15
19:20 65:9,15,20

**follows** 5:5
**fonte** 1:5 5:14 9:22
15:17 19:4,10,15
20:1,5,13 21:4,7,14
21:21 22:7 23:12
23:17,24 45:22
49:5,13,18,22,25
50:6,9,13 53:5,16
55:5,7,14,15,16,20
57:4,8,13,19 58:10
58:16,19 59:21
60:9,19 61:6 62:4
63:16 64:5,12,24
65:18,19 70:14
**fonte's** 5:15 14:17
19:20,23 21:24
57:23 64:22 70:7
**foregoing** 75:9
**forgot** 49:1
**form** 33:14 34:7
38:25 42:7 47:14
53:9,21 54:7 55:1
61:4 68:15,24
69:11,23 70:10,17
71:18
**formulating** 23:23
**fort** 1:2
**forty** 45:23,25 65:4
**found** 13:15
**four** 11:2,7,13
16:22 18:17 41:11
42:1 67:14
**fourth** 67:16
**front** 14:19 27:14
27:16 48:7 66:20
**full** 5:8 66:23
**functions** 10:2
**further** 35:16 36:9
36:19 44:24 66:12
70:19 72:20 75:12

**futile**   62:1,13,20

**g**

**g**   4:1
**gainesville**   7:15
  8:11
**general**   7:17,19 8:4
  44:15 45:19 52:5
  52:23 54:17,20
  55:25
**generally**   9:8
**getting**   38:12
**gg**   74:19
**give**   4:24 20:7,14
  64:16,24
**given**   35:13 56:5
  58:20 70:9 71:25
  72:13
**go**   5:19 6:19 26:24
  46:3
**goal**   70:2,3
**going**   5:19 6:13,14
  47:4 61:13
**good**   37:14 41:18
  60:18
**governing**   64:23
**grant**   20:7
**grew**   7:13
**ground**   63:9
**group**   42:24
**groza**   2:9
**guidance**   63:19,21
**guide**   42:25
**guideline**   64:4
**guidelines**   24:7,10
  24:18,20,24,25
  25:24 29:12 30:15
  39:16 42:18,21,21
  42:23,24,24 43:2
  55:21 61:17 62:17
  63:22 64:7,15,19
  64:23 65:2,7,10,16

65:20,24 71:25
  72:2,15

**h**

**h**   2:2 3:9
**half**   17:8,8
**hand**   4:22 74:11
**handle**   37:20 42:14
**handling**   37:13
**happened**   22:24
  51:10 52:13,17
  56:6
**happy**   7:3
**hard**   6:6
**harris**   2:19 7:9
**heading**   60:9,9
**health**   1:9 2:18,19
  2:20 5:12 8:13 11:3
  11:14 17:13 18:1,3
  19:15 20:13 24:23
  42:10,13,17 43:1,4
  43:15,18,22,25
  44:4,8,24 46:5,12
  46:15,19,25 47:5,7
  47:12 48:12 49:5
  50:20 51:9,13,18
  52:6,19 54:5 56:20
  57:2,5,11,17,21
  58:16 59:25 60:3
  60:23 61:18 65:15
  65:19
**health's**   19:6 25:4
  51:23 57:24 58:2,5
  58:11,25 59:10
**healthcare**   8:6 59:8
**hear**   6:3
**heisler**   23:25 44:20
  48:17,21 49:25
  50:6,9,13 54:3,21
  55:6,15,21 67:5
  69:4

**heisler's**   53:6,18
**held**   16:13
**helicopter**   55:25
  56:4
**help**   21:4,5
**hemodynamically**
  32:16
**high**   7:13
**higher**   36:8 51:24
  52:6,19
**hired**   5:14
**history**   7:24
**hold**   8:18 55:11
**hollywood**   8:1,3
**hope**   58:12
**hospital**   8:3,8,13
  18:1,3 20:7 23:11
  25:24 26:20,24,25
  27:1,9,12,19 37:17
  38:15 40:23 49:16
  52:22 59:1,10,16
  60:1 61:12,21
  66:25 70:25 71:6
  71:15
**hospitals**   8:2
**hour**   10:5,6,7,8,16
  15:3
**hours**   7:4 15:2,4,6
  16:4 17:2,3,6 72:7
**huge**   63:4,6,6,8
**hundred**   10:15
**hypothetical**   32:10
**hypotheticals**
  33:18,21

**i**

**idea**   33:17
**ideal**   35:5
**identification**   9:17
  14:12 74:10
**ii**   8:7 35:15,21
  36:18,23 37:24

38:17 42:10,17
  43:5 45:6,15 51:1
  58:8
**imagine**   12:2
**implemented**   19:20
**implements**   59:9
**imply**   59:13
**implying**   59:18
**important**   5:22 6:1
**impose**   61:22
**impression**   46:1
  54:15
**improper**   51:1
**inaccurate**   30:5,8
**inappropriate**
  55:19
**incapable**   59:22
**incident**   19:3 22:17
  23:18 43:7
**include**   21:16
**included**   9:22,23
  11:1 51:4
**including**   8:2 16:9
**income**   10:18,21
**incorrect**   27:13
  33:8 41:14
**indicate**   4:14 49:9
  60:6 69:3
**indicated**   50:13
  69:8
**indicates**   10:14
  15:1
**individual**   1:5 38:4
**individuals**   15:12
  57:11,16,21
**infant**   34:20,23
  60:11,13
**information**   11:25
  22:2 23:5,13 31:20
  46:24 56:2,8,11,24
  62:4 63:12,15,16

66:11

**initially** 21:8 22:5
**injured** 24:21 25:3
  29:13 30:15 62:23
**injuries** 33:3 52:11
  56:23
**injury** 25:10,14,16
  25:19 26:8,20 27:2
  27:3,10
**instructed** 57:9,14
**instructions** 57:4
**interested** 75:16
**invited** 20:6,13
**invoice** 3:12 6:15
  10:11 14:17,18
  15:1 16:2,13 17:1,3
**involve** 9:9
**involved** 31:18
  43:9
**involves** 19:4
**involving** 44:12
**island** 1:15
**issue** 13:23 57:16
  66:5,6
**issued** 19:10
**issues** 9:9

**j**

**journals** 24:4
**judgment** 25:17
  26:20 32:20,23
  33:4,6,11 34:3,12
  34:13 41:18 48:1,4
  61:22 62:22 63:1
  64:12,14,14,18,22
  65:3,23 70:15
  71:12
**jumping** 29:22
**jupiter** 1:15

**k**

**kendall** 11:4 12:9
**kind** 68:2
**knew** 49:20,22,23
**know** 6:7,22,24 7:5
  11:20,23 12:12
  14:8,9 20:10 21:14
  27:15,22 28:6,17
  29:7,8,9 34:8,14
  43:14,17,21,25
  44:4,8 46:4,7,10
  48:25 49:22,22,24
  52:12,14,16,22,23
  52:24 54:10,15
  57:4,8,13,19,23
  58:5,10,19,24 59:3
  62:7 66:6,7
**knowledge** 13:14
  13:18 24:9 41:22
  59:7 71:25 72:13
**knows** 31:6 63:10

**l**

**l** 3:15
**lab** 8:21
**lauren** 2:19
**law** 2:2 27:19,21
  28:18,20 37:10
  40:22 42:22 58:6,9
**lawrence** 1:12 3:2
  5:3,10 74:8 75:8
**laws** 29:11
**lawsuit** 5:13 14:3
**leaves** 7:9
**lecture** 20:7,14
**lee** 1:9 2:17,18,19
  5:12 17:13 18:1,3
  18:24 19:6,15 20:6
  20:13 25:4 37:19
  37:22 42:10,13,17
  43:1,4,14,18,22,25

44:4,8,24 46:5,12
  46:15,19,25 47:5,7
  47:12 48:12 49:5
  50:20 51:9,13,18
  51:23 52:6,19 54:4
  56:20 57:1,5,11,16
  57:21,24 58:2,5,10
  58:16,25 59:10,25
  60:3,23 65:15,19
**legal** 71:16,20 72:3
  72:5,8
**legalities** 72:5
**lehigh** 17:12 18:24
  23:25 45:19 46:5,7
  46:12,15,17,25
  47:4 48:22 50:19
  51:8,12,25 52:7,20
  52:22 54:12,16
**lethal** 52:11
**level** 8:7,8,12,17
  25:2 35:15,21 36:8
  36:18,23 37:24
  38:17 42:10,17
  43:5 45:6,15 51:1
  51:24 52:6,20 58:8
  62:15 68:7,9,10
**license** 74:10
**licensed** 32:1
**life** 39:17 67:22
  70:4
**limited** 13:19
**lisette** 11:4 12:8
**list** 11:1,13
**listed** 11:3,12 12:8
**listen** 18:23 19:2
**literally** 23:10
**little** 39:17
**llp** 2:9
**local** 25:21
**located** 24:22

**long** 22:13 39:9
  46:4 47:12 48:11
  48:19 49:9 50:9
**look** 10:12 18:11
  21:5,5 55:9 66:19
**looked** 65:5
**looking** 10:9 18:14
  62:3
**lorah** 2:17
**lot** 41:22 53:1
**lottenberg** 1:12 3:2
  5:3,10,11 66:17
  74:8 75:8
**loudly** 5:23
**lower** 68:10
**lyons** 2:9 3:3,5 4:19
  4:19 5:7,11 7:10
  9:19 14:14 16:1
  33:15 34:9 39:1,7
  42:9 47:18 53:12
  53:22 55:3 61:8
  66:12 68:15,24
  69:11,23 70:10,17
  70:21,23 71:21
  72:19,23 73:2

**m**

**ma'am** 33:5 39:18
  65:1
**making** 39:19 61:1
**malpractice** 12:4
  12:20 13:10
**managing** 37:4,8
**manner** 4:13
**march** 19:4,16,20
  74:20
**marcia** 2:18
**marked** 9:15,20
  10:13 14:10
**marking** 14:15
**mary** 2:17

mary's  8:15,23
materials  24:15
matter  11:12 22:8
  23:13
matters  11:6
md  1:12 5:3 74:8
  75:8
mds  32:21
mean  26:13
means  39:25 42:13
meant  49:18,20,23
  50:1,6
measures  70:3
mechanism  25:16
  26:19 27:3
medi  36:6
medical  7:16 8:16
  8:23 9:9 11:4 12:4
  12:9,20 13:10,13
  25:1,12 29:1,16
  30:2,18 31:13
  34:13 35:13 38:6
  38:22 40:17,25
  41:5,13 42:3 47:20
  48:14 50:20 51:9
  51:13,20 53:6,18
  54:4,24 56:19,25
  59:3 61:2,10,20
  62:5,10,15,22 63:1
  63:22 64:3,6,11,14
  64:18,22 65:3,23
  67:2,6,18 70:15
  71:11
medically  41:24
medicine  32:1
  37:14 63:5
medics  56:4
meet  20:5
meets  26:8,18
  27:10

melt  63:21
memorial  1:9 2:17
  2:18,19 5:12 8:3,6
  18:24 20:6 37:19
  37:22
mention  59:24
message  22:6
met  20:1,12,14
  41:11 42:1
miami  7:13,14,17
microphone  5:24
middle  1:1
minimize  40:24
minute  50:21 51:15
  60:22
minutes  22:15 32:5
  32:15,19,19,22,24
  33:1 45:20,23,25
  46:2,13 50:18,21
moment  29:20
  56:16 65:8
monday  1:13
mouth  54:6
multiple  38:10
must've  54:22
mute  49:2
myers  1:2
myriad  21:18

**n**

n  2:1 3:1,15 4:1
name  4:15 5:8 13:2
name's  5:11
names  13:7 32:21
narrative  16:4,5,8
  16:9
narratives  10:6
national  65:14
nature  12:3,19 13:9
nearest  26:21 36:7
necessarily  63:13

necessary  26:9
  41:10 56:11 70:4
need  7:2,5 26:12
  31:18 32:18 33:23
  72:25 73:5
needed  25:14 48:22
  57:10,15 63:17
negate  71:8
neither  45:23
nelayda  1:5
neurologist  52:25
neurosurgeon
  52:25
never  31:19 58:2
  65:4
nine  10:7 50:12
nope  61:13,14
north  2:10
notary  1:18 74:7,18
notes  22:19,21
  75:11
noticed  65:8
november  17:15
  18:25 23:19 24:1
  43:7 44:10,13 54:1
  57:20,24 58:22,24
  65:13
number  3:10,11
  21:15,17
numeral  66:24

**o**

o  3:15 4:1
oath  3:6 4:7 5:5
  74:1
object  33:14 34:7
  38:25 42:7 47:14
  53:9,21 55:1 61:4
  68:15,24 69:11,23
  70:10,17 71:18
objection  39:2

objections  4:12
obligation  69:16
  71:1,9,16 72:3,16
obligations  72:6,8
obtain  59:9,15
obviously  67:8
occasion  20:15
office  15:2
official  74:11
oh  55:13
okay  6:18 28:2,8,16
  32:12 39:8 46:3
  48:2 54:7 59:20
  61:12,15,21,24
  62:2,16 66:22
  67:12 69:19 70:6
  71:7 72:19
old  43:9 60:13
once  13:1
ongoing  40:23
opinion  5:15 12:6
  12:22 13:12,19,22
  14:2 17:10,19
  23:20,23 24:8,11
  24:13,16 28:8,10
  28:16 29:4,10 43:8
  51:4,7 54:7 56:15
  56:18,25 61:16
  62:13 64:11,11
  65:23 66:4 68:20
opinions  24:3 56:1
option  36:14,17
  44:13
order  4:9 13:20
  17:10,18 59:13
  67:15 73:1,2
orlando  11:3,14
outline  67:13,19
outside  18:1,3
  23:11 38:15 49:16

**outweigh**  40:18
  42:4 48:15 54:25
  61:11,20 62:6 67:3
  67:6
**outweighed**  47:21
  51:21 53:7,19 54:5
  56:20 57:2 61:3
  62:11 64:3
**owed**  51:3

**p**

**p**  2:1,1 3:15 4:1
**p.m.**  1:14,14 15:23
  73:7
**page**  5:20 10:12
  18:17 35:10,24
  40:20 50:12 60:8
  66:19 75:10,10
**pages**  18:13,16
**palm**  8:16
**pals**  56:5
**pandemic**  65:14
**panels**  18:17
**panic**  48:5
**papers**  24:5
**paragraph**  66:23
  67:13
**paramedic**  25:17
  26:1,7,10,20
**park**  23:11
**part**  8:21 10:25
  37:10 38:14 51:7
**participating**  4:4
**particular**  22:17
  29:19 66:5
**particularly**  65:9
  70:2
**parties**  3:17 4:11
  13:6 75:14,15
**pass**  7:19 32:18
**patient**  12:7,23
  19:11 25:8,9,13,19

26:5,8,11,14,18,21
26:22,23,25 27:1,4
27:5,8,10 29:1,13
29:15,18 30:1,4,6,9
30:16,17,21,22,25
31:5,8,10,12,13,20
31:22,24 32:2,4,8
32:14,16,17 33:2,4
33:7,11,13,24 34:4
35:5,6,12,15,16,25
36:2,7,8,15,18,24
37:5,13,17,20,25
38:14 39:19 40:11
40:15,16 41:3,8,24
42:6 43:9,12 44:2,6
44:10,12,14,19,20
44:23,24,25 45:4,5
45:13,14 46:14,16
47:4,7,8,10,16 48:6
48:10,18,21 50:14
50:22,25 51:3,19
52:4,7,8,20,24 53:1
54:5,11,12,15,16
54:19,22 55:6,7,16
55:16,24 56:3,6,7
56:12,15,21,23
57:2 59:23,23
60:16 61:7,13 62:2
62:16,23 63:2,10
64:1,2,17 65:13
66:8,8,10,25 67:1,8
67:19,21 68:5,21
69:4,9,16,21 70:8,9
71:1,9,12,16 72:3,9
72:16
**patient's**  31:6,21
  34:1,11 49:10
  63:10 67:25 68:12
**patients**  13:23
  24:21 25:3,6 38:10
  38:11 40:21 42:14

42:25 43:14,18,22
49:7 58:25 59:5
60:3 65:11 67:15
71:5
**pea**  23:3 32:25
  49:17 50:2,7,25
  60:25 61:7 62:2
  67:20 68:6,22
**pediatric**  34:15,19
  35:5,6,7,11,14,17
  35:21,25 36:1,4,6
  36:10,15,15,18,20
  36:24 37:8,9,20,25
  38:16 43:11,17,21
  44:2,6,9,15 45:3,4
  45:12,13 49:6
  50:14,16,22 59:9
  59:10,14,15,23,25
  60:1,3,16 66:10
  67:22
**people**  21:17
**percent**  10:20,24
**percentage**  10:21
**perform**  10:3
**perimeters**  25:16
  25:17
**permit**  65:25
**person**  20:14 27:9
  31:5 33:7,11 34:2
  62:24,25 63:1,9
  69:22 71:20
**personally**  24:25
  74:8
**personnel**  41:4
  67:18
**phone**  10:4 15:2
  17:12,14,21,22,25
  18:2,5,5,7 21:15,17
  22:13 49:1 56:14
  56:16 63:11 71:13

**phrase**  50:1,7
**physician**  28:24
  29:14,25 30:5,7,16
  31:1,9,17,19,23,24
  31:25 32:2,7 33:9
  40:9,17 41:9,9 42:5
  47:19 48:1,4,5,13
  51:19 53:17 61:10
  61:19 62:10,18
  63:2,5 64:1 67:1
**physician's**  30:8
  70:2,3
**physicians**  27:13
  31:18 33:8 62:15
**physiologic**  25:16
  26:19
**physiological**  27:3
**place**  1:15,15 23:19
  23:25 35:20
**placed**  46:9 55:24
**plaintiff**  1:7 2:6
  4:18 9:3
**plaintiff's**  16:20
**plan**  19:19
**please**  4:14,16 5:8
  6:22 7:11,23 32:13
  39:8 73:3
**point**  6:20 41:13
  62:21
**policies**  19:7 25:5
  57:25
**policy**  58:3,6,11
**poor**  36:6
**posing**  32:10
**position**  8:14 62:25
  64:8
**possible**  36:3,16
**postmortem**  52:15
  56:7
**practice**  8:5 32:1
  35:14

**practiced** 8:4
**pre** 25:24 26:20
**prep** 16:4,6,7 17:4
  17:7
**present** 2:16 3:17
  4:5 16:16
**pressure** 68:3
**pretty** 28:20,21
**prevailing** 60:10,20
**previous** 11:2,7,13
**previously** 45:3,12
**prior** 8:25 11:1,13
  20:1,18,22 21:3
  22:8 32:15
**private** 8:5
**probably** 9:1 10:20
  17:8
**procedures** 19:7
  25:5 66:9 67:20
**proceeding** 73:7
**proceedings** 4:7
**process** 48:6
**produced** 74:9
**professional** 24:5
  24:15 25:12 68:20
**professor** 8:20
**prolong** 70:4
**pronounced** 71:5
**prophete** 2:9
**protocols** 42:23
**provide** 7:11 11:15
  11:17 12:15,17,22
  17:9 23:12 36:2
  37:18 38:2,6,23
  40:23,25 46:23
  48:23 67:23
**provided** 9:10
  11:21 12:24 14:17
  17:17,22 19:15
  38:1 41:11,25 49:6
  51:24 52:6,19 57:5

**58:16
provider** 26:21
**providers** 59:4,8
**provides** 39:22
  40:14 41:6
**providing** 6:8,9,24
  11:6 62:24
**public** 1:18 74:7,18
**pull** 6:19
**pulse** 32:5 49:10
  50:10,23
**pulseless** 30:9,10
  31:25 32:14
**pursuant** 4:8
**put** 36:11 41:16
  45:18 49:1 54:6
  56:3 69:22 70:8
**putting** 39:5
**pyles** 2:17

---

**q**

**qualified** 13:15
  34:3,12 41:4 67:17
**question** 6:7,10,20
  6:23,25 27:24 28:1
  28:5 29:5,5 30:12
  30:14 32:12 33:1
  33:22 39:5,15 40:2
  45:10,10 49:13,21
  50:4,22 55:10
  63:24 64:21 65:14
  68:16,25 69:12,18
  69:21,24 70:11,18
  71:2 72:11
**questions** 7:6 33:10
  33:20 34:1,10
  66:13 70:20 72:20
**quote** 35:23

---

**r**

**r** 2:1 4:1

**raise** 4:22
**range** 34:22
**rates** 10:2
**read** 44:18 53:25
  54:8 60:15 66:23
  72:21
**reading** 3:18 49:24
**reask** 53:13
**reason** 36:17
**recall** 11:8,22,24
  12:9,14 13:2,4,6
  15:7 20:20,24
  21:10,22,25 22:12
  23:1 49:4 60:4
**receive** 21:23 22:3
  35:15
**received** 10:19,22
  21:20 22:6 57:6
  66:9
**receiving** 33:9,25
  34:3 39:22,25 40:3
  41:1 61:12,21
  62:12,18 69:15
  71:4
**recess** 15:23
**record** 4:16 5:9
  75:11
**recorded** 17:25
**recording** 44:18
**recordings** 19:2
**records** 11:25 41:1
**recruited** 8:10
**redirect** 3:5 70:22
**reestablished** 49:11
  50:10
**referring** 68:2
**refers** 34:15
**reflected** 16:12
**reflects** 17:1
**refuse** 62:19 64:17
  64:25

**refused** 43:22
  58:21
**refusing** 60:10,20
**regained** 50:24
**regarding** 16:17,20
  16:24 23:13 31:20
  33:21 37:23 39:21
  59:7
**regardless** 61:16
  64:13,22 65:14
**regional** 8:3,6 11:4
  12:9 45:19 46:5,8
  46:12,15,17,25
  48:22 50:19 51:8
  51:13,25 52:7,21
**regulation** 64:4
**regulations** 48:9
  53:4,16 61:17
  62:18 63:20 64:16
  64:23 65:16,21,25
  71:23,24 72:1,14
**related** 25:2,5,11
**relating** 9:9
**relative** 75:13,14
**relied** 24:24
**relocated** 8:1,15
**rely** 24:19 25:4
**remained** 8:13
**remaining** 68:13
**remember** 21:20
  55:11
**remotely** 4:8 5:22
**render** 5:15 12:5
  13:12 17:10,18
  24:11 43:8 44:1,5,9
  56:25 59:4 66:3
**rendered** 13:22
  14:2 29:9
**rendering** 24:3,8
  24:12,16

**rephrase**  45:11
    61:15
**report**  3:10 6:15
    9:21,22,24 10:13
    10:25 18:9 35:10
    35:19,23 36:12
    40:20 41:16 45:18
    50:12 51:5 60:8
    66:20 75:7
**reported**  1:17
**reporter**  1:18 3:7
    4:3,5,21 5:24 6:2
    6:11 72:25 73:4
    74:6,18 75:1,6,23
**reporting**  4:6,13
**representative**  2:17
    2:18,19
**representing**  5:12
**request**  57:9 58:21
    67:9
**requested**  75:9
**required**  42:18
    43:1,4
**requiring**  29:1,16
    30:2,18
**residency**  7:18,19
    7:25
**respective**  3:17
**respond**  16:8,12,17
    16:21,24
**response**  16:3,6,7
    17:4,7
**responsibility**  40:4
    40:10
**responsible**  65:15
    65:20
**resulted**  19:11
**resuscitation**  50:14
**retired**  8:14
**review**  10:5,5 16:3
    17:4 19:3,6,9,14,18

19:23 24:4,7,12,15
    25:4 58:15 69:2
    75:8
**reviewed**  18:4,21
    23:22 50:5 55:5,14
    58:2 67:4
**rey**  11:4 12:8
**right**  4:22 28:12,17
    29:22 37:15,22
    39:14 49:3 52:16
    68:5 72:10,21
**risk**  40:18,25 48:15
    53:20 61:11
**risks**  42:5 47:21
    51:21 53:8 54:5,25
    56:20 57:2 61:3,21
    62:6,12 64:4 67:3,6
**road**  2:3
**roman**  66:24
**room**  27:13 68:8
**rothstein**  1:17 74:6
    74:18 75:5,23
**rounds**  20:7
**ruled**  27:20
**rules**  5:18

**s**

**s**  2:1 3:9,15,15 4:1
**safe**  30:11
**saying**  23:1 41:15
**says**  16:4 17:3
    18:12 35:23 37:16
    37:24 40:3,7,8
    41:24 60:9 67:17
    71:12
**schedule**  9:23,23
    9:24 10:11,14
**school**  7:13,16
**scope**  13:19
**seal**  74:11
**second**  6:15 12:8
    14:15 16:2,12 49:2

**sedatives**  68:4
**see**  52:24,25 55:12
    55:18 67:5
**seen**  31:19
**send**  36:18 44:24
**sending**  27:12
    28:24 29:14,25
    30:5,7,8,16 31:1,23
    32:6 38:20,20 41:9
    42:6 47:19 63:2
**sense**  6:21
**sent**  10:10 18:15
    21:7 26:11 44:25
**separate**  25:1
**serve**  11:9 13:16
    20:2,18,22 21:1
**served**  8:24 9:2,5
    9:13 11:5
**services**  44:5,9
**serving**  10:22
**seven**  8:2 10:4,6,6
    60:8
**shands**  8:13
**short**  15:23
**shorter**  47:6
**sight**  32:3
**signature**  16:10
    74:17 75:22
**significantly**  47:6
**signing**  3:18
**simply**  42:24
**simulation**  8:21
**single**  65:10
**sir**  29:5 30:12
    33:20 38:18 40:2
    49:21 50:4 63:24
    64:20 66:20 72:10
**site**  59:15 60:1
**situation**  16:8 27:8
    29:19 32:6 33:4,22
    35:6 44:12 51:17

60:21,24 61:9
    64:24 65:12 69:20
**six**  39:4,5 40:20
    66:19
**skills**  35:1
**slide**  21:16
**smith**  2:9
**sole**  29:25 30:16
    32:7
**solely**  30:14
**solid**  62:22,25
**sorry**  27:25 49:1,3
    58:14
**sort**  23:15
**sound**  37:14 41:18
    48:1,4 64:18 65:23
**south**  8:15
**southwest**  50:17
**spc**  1:3
**speak**  5:23 16:23
    22:7,11
**speaking**  6:3 9:8
**special**  35:1
**specialized**  42:14
**specific**  37:12
    72:10
**specifically**  25:22
**spent**  17:6
**spoke**  15:12,16
**spoken**  23:18
**springs**  2:4
**st**  8:15,23
**stabilization**  35:16
    36:19 44:25 48:22
    49:6
**stabilize**  35:2 42:15
    44:5
**stabilized**  36:9
**stabilizing**  44:1
**stable**  30:21,25
    31:8,14,22 32:2,8

32:17 33:13 34:5
35:24 36:4 40:12
40:15 41:8 44:20
47:16,20 48:19
51:19 54:23,23
55:8,17 56:12,16
64:2 68:14 69:5,9
**staff** 8:1
**standard** 51:3
60:20
**standards** 60:10
**start** 8:7,11
**started** 7:7
**state** 1:18 5:8 24:10
24:18 25:11 26:24
27:20 28:18 30:14
35:1,10 40:20
42:18 50:12 58:6,7
58:9 72:14 74:3,7
74:19 75:2
**stated** 45:3,12
48:17,21,24 71:22
**statement** 19:18
35:18 41:14,16
53:2,3,23 59:12
**statements** 36:11
42:25
**states** 1:1 65:9
**stating** 4:15
**status** 33:10 34:1
38:14,15 62:15
**statute** 37:14,16,22
37:23 39:12,15,21
40:3,7,8,14 41:6,12
41:17,20,23,24
53:5 55:21 61:17
64:4 65:10
**statutes** 39:18
42:18 48:9,16
53:10,16 62:17
63:20,22 64:7,16

64:23 65:2,7,16,20
65:25 71:24,24
72:1,14
**statutory** 24:7,10
24:18
**stenographic** 75:5
75:11
**stenographically**
75:7
**step** 29:23,24
**stipulated** 3:16
**stone** 42:22
**stop** 66:24
**street** 2:10
**subject** 12:21 13:11
14:3
**subjects** 21:18
**submitted** 9:21
**subset** 34:15
**substantiates** 64:10
**suffering** 35:6
**sufficiently** 30:21
30:25 31:8,14,22
32:8 33:13 34:5
35:24 36:3 40:11
40:15 48:18 68:13
69:5,9
**suite** 2:3,10
**summarize** 36:14
**support** 67:23
**supported** 63:19
**supposed** 31:21
**supreme** 4:9
**sure** 5:18,20 6:9,22
10:9 22:1 28:21
55:11
**surgeon** 27:7,16
29:18 31:4 37:1,4,7
37:12 38:5,11,12
38:13 39:9,19 40:1
52:23 61:25 63:6

69:16 71:20
**surgeon's** 29:19,21
37:3
**surgeries** 37:8
**surgery** 7:19,20 8:4
8:20,21
**surgical** 7:18,25
**survival** 36:3 50:15
68:12 70:9
**sustain** 70:4
**sustained** 32:14
**swear** 4:23
**sworn** 5:4 74:9
**system** 1:9 2:18,19
2:20 5:13 8:6

**t**

**t** 3:9,15,15
**take** 7:2,4 22:19,21
26:21 59:14 61:13
70:3 73:6
**taken** 1:13,16
15:24 46:14,16
60:2,22
**takes** 45:16
**talk** 6:1,5 22:16
29:23 41:19
**talking** 26:13,14
33:17,18,18 42:19
**tampa** 2:10,11
44:14,15,21 45:1
45:19 46:17 47:8
47:11 48:10,19
50:16,18,23 54:11
54:17,20 55:25
69:6
**technology** 6:4
**teleconference** 5:22
**telephone** 15:10
20:18 22:3,7 54:1
55:4,13

**tell** 18:11 22:23
23:8 32:1 55:5,14
59:21 60:2
**telling** 28:14
**tells** 31:23
**ten** 22:15 32:22,24
33:1 46:13 60:22
**term** 34:22,23
42:20 49:15
**testified** 5:4 45:22
**testimony** 3:2 4:24
10:15 11:1,6,13,15
11:17,21 12:15,17
12:24 22:18
**text** 20:21 21:7,9
21:21 22:6
**texted** 21:4
**texts** 24:4
**thank** 66:17 72:19
**things** 25:15 52:13
52:17,18 54:2 56:8
**think** 17:24 26:12
32:10 48:3,4 54:14
55:7,16 61:24 62:2
62:3,14,19 63:14
63:16 65:12
**thinks** 62:12
**third** 16:4
**thirty** 9:1,7 45:20
45:25 46:2 50:18
50:20
**thought** 23:8 59:18
**thousand** 10:15
**three** 15:1,3,4,5
16:22 17:3,6 18:16
25:15
**time** 1:14 6:3,5,18
7:2 16:23 20:12
32:18 38:15 45:16
45:19 46:4,12,14
47:6,12 50:17,19

[time - violated]

52:3 66:13,17
70:20 71:13
**timely** 38:13
**times** 8:24 9:1 39:4
**title** 21:16
**titled** 16:3
**today** 6:12,14
**told** 41:20 54:12,13
54:14 60:5
**total** 15:8 16:23
**totaled** 15:4,5
**totally** 41:13
**tracy** 2:17
**trained** 61:25 63:6
**training** 7:12 19:14
37:3
**transcribe** 5:25
6:12
**transcript** 17:12,21
17:25 18:4,7,12,18
18:20 19:24 23:24
44:19 49:4,9,24
50:5,5 53:25 54:8
55:4,13 56:14 67:4
69:2 75:9,10
**transcripts** 14:6
19:3
**transfer** 19:3,11
23:4,7,9 25:2 27:4
29:2,16 30:2,6,7,11
30:15,19 31:14
32:2,9,16 33:24
34:5 35:14,20 36:9
36:20 38:19 39:10
39:11,24 40:6,10
40:15,18,21,24,25
41:3,10 42:4,6
44:14,21 46:8,9,14
46:16 47:1,4,6,7,12
47:17,21 48:11,14
48:19 50:15,25

51:8,12,17,21 53:7
53:19 54:4,23,25
55:8,17,25 56:13
56:16,19 57:1,6,9
57:14 58:3,5,11,21
60:11,21 61:2,3,11
61:20,23 62:1,5,9
62:11,19 63:25
64:3,17,25 67:1,3,9
67:14,15,17 68:21
69:10 71:1,10,17
72:4,17
**transferred** 30:22
32:17 35:7,17,25
36:7 39:20 40:16
41:25 45:4,6,13,15
47:11 48:10 50:23
54:11,16,20 66:8
68:14 69:5 71:13
**transferring** 13:23
24:20 25:5 27:11
29:13 31:16 33:12
33:23 37:24 40:8,9
40:23 48:3,5,13
53:17 61:9,19
62:10 64:1 69:17
**transfers** 25:6
27:19 39:21 64:24
**transport** 46:19
47:2
**trauma** 8:4,7,9,12
8:17 13:23 20:7
25:2,8,14,20 26:9
26:11,13,13,15,18
26:19,22,23,23
27:1,2,5,6,11,14,16
27:17 29:18,19,20
29:21 31:3 34:15
34:16,21,25 35:3,6
35:7,11,15,17,21
35:25 36:1,4,6,7,10

36:15,15,18,19,20
36:24,24 37:1,2,4,7
37:9,12,20,24 38:1
38:7,10,12,13,16
38:17 39:9,18 40:1
42:10,14,15,17
43:5,14,17,21 44:2
44:6,9,15 45:5,6,14
45:15 50:16,22
51:1,24 52:7,20
58:8 59:5,14,22,25
60:3 61:25 63:6
66:10 69:15 70:3
70:25 71:20 72:2
72:15
**travel** 35:13 47:5
50:17,19
**treat** 35:2 41:3
67:21
**treated** 68:6
**treating** 33:7 41:9
44:19,23 59:22
**treatment** 68:9,10
**trial** 11:17 12:17,25
**true** 29:13 47:3
53:15 54:21 75:10
**truth** 4:24,25,25
**try** 6:5,5,9 67:20
**trying** 63:21
**twelve** 8:14
**twenty** 9:1,7 32:5
32:15,19
**twice** 58:13
**two** 6:13 7:4 10:15
11:2,11 15:17 25:1
26:17 34:24 52:12
52:17,18 62:15
72:7

**u**

**u** 3:15
**uam** 1:3
**ultimately** 56:6
**unavailable** 36:5
**unaware** 46:18
**understand** 6:21
6:23,25 41:23
64:20
**understanding**
5:14 51:8 54:18
**unfortunately** 56:7
**united** 1:1 65:8
**university** 7:14,16
8:11,12,19,22
**unknown** 52:1
56:22 66:1,3
**unknowns** 53:1
**unseen** 32:3
**unstable** 23:3 30:6
39:20 40:21 41:25
66:25 67:14
**use** 6:13 21:18
32:23 42:20 61:14
64:18
**usually** 25:24 27:16
34:24

**v**

**variable** 52:1
**vascular** 8:4
**ventilations** 67:24
**versus** 11:3,4,14
12:9 38:16 63:11
**victims** 34:16 35:2
42:15
**view** 41:13
**violate** 60:10,20
**violated** 57:24
58:10,19

**[violation - zero]**

**violation**  19:12,16
  19:21 28:3,9,15
  29:3 64:10
**vitals**  31:6,21
**voices**  6:4
**volume**  52:9
**vs**  1:8
**vtc**  1:12 2:6,13,16
  3:2 7:9 15:22 74:9
  75:7

| w |
|---|

**waive**  4:12 72:21
  72:22,23,24
**waived**  3:19
**want**  6:22 29:23
  41:19 53:2 66:6,7
  72:11,23
**wanted**  44:24
  67:16
**wants**  72:24
**warning**  19:9 58:15
  58:20
**way**  44:21 53:2,14
  65:5
**ways**  39:6
**we've**  9:20 39:3
  72:7,7
**weather**  36:6
**weight**  67:25
**went**  7:13,14,16,19
  65:22
**west**  8:16
**wilbur**  11:3,14
**witness**  4:6 5:1
  8:25 10:3,19,23
  12:25 20:2 34:8
  42:8 47:16 53:10
  55:2 61:5 69:13,25
  70:12 71:19 72:22
  74:11

**witnessing**  63:9
**word**  61:14
**words**  22:23 54:6
**work**  7:24
**working**  38:5
**worth**  15:2
**would've**  43:11
  44:13 47:6,13
  48:12 51:1,2,10
  55:19 70:8
**writing**  67:9
**written**  14:2 19:9
  22:18 42:22 58:15
  58:20
**wrong**  70:15

| x |
|---|

**x**  3:1,9

| y |
|---|

**year**  7:21 11:20
  12:10 20:10 43:9
  60:13
**years**  8:5,14 11:2,7
  11:14 20:9 34:16
  37:3 43:15,19,23
  65:4
**yormak**  2:2,2 3:4
  4:17,17 15:21
  16:20,24 17:9,18
  21:24 22:1,9 23:17
  33:14 34:7 38:25
  39:3 42:7 47:14
  53:9,21 54:14 55:1
  61:4 66:14,16
  68:17 69:1,14 70:1
  70:13,19,24 71:18
  73:4,6
**yormaklaw.com**
  2:4
**younger**  34:24

| z |
|---|

**zero**  9:4

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| **DR. NELAYDA FONTE**, an individual, | **CIVIL ACTION** |
| Plaintiff, | |
| | **Case No. 2:19-cv-054** |
| v. | |
| | **Judge: Sheri Polster Chappell** |
| **LEE MEMORIAL HEALTH SYSTEM**, and **DR. VENKAT PRASAD**, | **Mag. Judge: Nicholas P. Mizell** |
| Defendants. | |

## EXPERT REPORT OF DR. LAWRENCE LOTTENBERG, MD FACS

**I.    Qualifications.**

I am the former Trauma Medical Director (2004 to 2010) of the Acute Care Surgery Service at a major academic medical center and Level I Trauma Center and Pediatric Trauma Referral Center in North Central Florida at the University of Florida College of Medicine Shands/UF Medical Center, where I was an Associate Professor of Surgery and Anesthesiology. In that capacity, I was responsible for oversight of coordinating all aspects of care for trauma patients across the continuum including clinical, educational, research, pre-hospital and for monitoring all patient outcomes.

I am currently a Professor of Surgery at the Charles E. Schmidt College of Medicine at Florida Atlantic University and the Director of Simulation and Surgical Technology as well as a trauma and acute care surgeon at the Level I Adult/Pediatric Trauma Center at St. Mary's Medical Center in West Palm Beach , FL where I serve as the Director of Trauma Research and Education. I am a practicing trauma, surgical critical care physician and perform emergency surgery on a daily basis. My duties include daily walk rounds, bi-weekly multidisciplinary sit down rounds, and caring for an average daily census of 30 to 50 patients, including approximately 450 operative cases per year

in the operating room and over 500 bedside surgical procedures in the intensive care unit. I also perform complex surgical procedures including entero-cutaneous fistula repair and complex ventral hernia repair. I am an expert in abdominal wall reconstruction after open abdomen.

I was also responsible for co-authoring the State of Florida Application for a Level I Adult and Pediatric Trauma Center at Shands/UF, the establishment of all policies and procedures related to trauma care at Shands/University of Florida and I direct quality improvement initiatives in the care of trauma patients. My daily teaching responsibilities included mentoring surgical residents, medical students, physician extender students, and formal didactic lectures and laboratory training sessions.

Presently, I am responsible for the training and mentorship of fifteen actively practicing Trauma Surgeons in the United States. Attached is my *curriculum vitae*, which includes additional details of my professional qualifications and experience. My fee schedule is also attached.

### II.    Assignment & Documents Reviewed.

I have been retained by Dr. Nelayda Fonte to provide my expert opinion as to whether she improperly refused to accept a pediatric trauma transfer in November 2018. I am aware that Dr. Fonte alleges she was wrongly terminated from her employment by Lee Health and that Lee Health has taken the position that she was terminated because she refused to accept a transfer in November 2018.

I have reviewed a transcript of the phone call on November 12, 2018 between Dr. Heisler of Lehigh Regional Medical Center and Dr. Fonte of Lee Health. This transcript provided me with the exact information that Dr. Fonte received from Dr. Heisler during that call. From my independent review of this transcript, I am of the opinion that Dr. Fonte did not act improperly and she was in accordance with all standards of care governing patient transfers.[1]

---

[1]    I have not been requested to, nor have I performed analysis beyond that which was required to formulate my opinions as rendered herein, nor will I be rendering opinions relating to issues of liability. The information, analysis,

### III.      Relevant Prevailing Standards of Care for Trauma Transfers.

When a child suffers a serious injury, timely access to the appropriate level of care, both in the pre-hospital and hospital setting, is essential for an optimal outcome. Nevertheless, over 17 million children across the U.S.-- 23% of the pediatric population -- are more than 60 minutes by either ground or air transport to the nearest pediatric trauma center, and only 23% of children in areas with the lowest population density have access within 60 minutes.[2] The Institute of Medicine has recognized the disparity in trauma care access and has strongly recommended coordination, regionalization and accountability in its goals for pediatric emergency and trauma care.[3] The American College of Surgeons Committee on Trauma (ACS COT) states that injured children have special needs that "may be optimally provided in the environment of a children's hospital with a demonstrated commitment to trauma care."[4] The standards for the State of Florida mimic the standards for the American College of Surgeons. Previously, I have been responsible for writing these standards. For example, children with severe traumatic brain injury have improved survival when treated centers that follow national treatment guidelines.[5] However, only a small proportion of acute care hospitals have the resources to be called a trauma center (TC), a designation by the individual states or by ACS verification, and even fewer are pediatric trauma centers (PTC).

---

and opinions contained in this Declaration are based upon the specific facts and circumstances in this proceeding. I reserve the right to supplement this Declaration as necessary, to the extent any other relevant information becomes available between the date of this Declaration and the date that I may testify in this proceeding.

[2]      Access to pediatric trauma care in the United States. *Nance ML, Carr BG, Branas CC Arch Pediatr Adolesc Med. 2009 Jun; 163(6):512-8.*

[3]      Institute of Medicine (U.S.) Emergency Care for Children: Growing Pains. National Academies Press; Washington, D.C: 2006. Committee on the Future of Emergency Care in the United States Health System, National Academies Press (U.S.) p. 254.

[4]      American College of Surgeons. Resources for Optimal Care of the Injured Patient : 1999. The College; Chicago, Ill: 1999. Committee on Trauma; p. 135.

[5]      Acute care clinical indicators associated with discharge outcomes in children with severe traumatic brain injury. *Vavilala MS, Kernic MA, Wang J, Kannan N, Mink RB, Wainwright MS, Groner JI, Bell MJ, Giza CC, Zatzick DF, Ellenbogen RG, Mitchell PH, Rivara FP, Pediatric Guideline Adherence and Outcomes Study. Crit Care Med. 2014 Oct; 42(10):2258-66.*

Trauma victims are defined as patients who have incurred a multisystem injury due to blunt force, penetrating, or burns.[6] Pediatric trauma refers to the subset of trauma victims under the age of 15years old.[7] Examples of common traumatic injuries in children include falls, motor vehicle crashes, gunshot wounds, and burns. Severely injured children require unique resources and specialized care due to immature anatomical features and developing psychological functions. Hospitals that have pediatric specific equipment and staff who are experienced in providing care for injured children are the best qualified to meet the needs of pediatric trauma victims.[8] The ACS and many state regulatory agencies, including Florida Department of Health, have long recognized the specialized needs of pediatric trauma patients. In response, they have developed standards of care and trauma center verification programs to identify hospitals that have the resources, expertise, and are able to provide the care required for injured children. In Florida, there are 4 dedicated pediatric trauma centers: Johns Hopkins All Children's Hospital (Pinellas County), St. Joseph's Hospital (Hillsborough), Sacred Heart Hospital (Escambia County), and Nicklaus Children's Hospital (Dade County).[9] While Level I trauma centers also qualify as pediatric trauma centers, the closest to Lee County, Florida is also in Tampa. A map is helpful to visualize the locations of Florida's trauma centers, both adult and pediatric.[10]

In 1990, the Florida Legislature passed the Roy E. Campbell Trauma Act, which directed the Department of Health to establish standards of care and a verification process for state approved trauma centers. In response, the Department of Health developed criteria for the establishment of

---

[6] Hospital Licensing and Regulation, Trauma, section 395.4001(19), Florida Statutes (2018).
[7] American College of Surgeons, *Resources for Optimal Care of the Injured Patient*, (2014), pg. 67.
[8] American College of Surgeons, *Resources for Optimal Care of the Injured Patient*, (2014), pg. 65.
[9] *See* http://www.floridahealth.gov/licensing-and-regulation/trauma-system/_documents/traumacenterlisting2018.pdf. (Last accessed February 23, 2020).
[10] *See* http://www.floridahealth.gov/licensing-and-regulation/trauma-system/_documents/trauma-centers-acute-care-hospitals.pdf. (Last accessed February 23, 2020).

Level I, Level II, and pediatric trauma centers. Florida Trauma Center Standards (DH Pamphlet 150-9) require that both Level I and pediatric trauma centers have the resources to treat injured children. The pediatric specific standards for Level I trauma centers do vary slightly from the pediatric trauma center requirements; however, the requirements for both levels of designation ensure that hospitals have the capability to meet the specialized needs of injured children. The following explains the various trauma center levels:

**Level I**: Treats both adult and pediatric trauma victims. Clinical capabilities may exceed those of a Level II. Is required to have a formal research program. Serves as a resource facility to Level II trauma centers, pediatric trauma centers, and general hospitals.

**Pediatric**: Treats pediatric trauma victims. Is required to have a formal research program.

**Level II**: Treats adult trauma victims. (And would have to have other specific designation to do pediatric trauma)

Lee Health is a Level II adult trauma center. Lehigh Regional Medical Center is a non-trauma center (NTC) that has a fully staffed emergency department (ED). Neither has a pediatric emergency department, which fact is significant, as explained above. Consequently, wherever a NTC encounters a pediatric trauma patient in its ED, it must immediately ascertain the pediatric patient's condition to determine if the patient is sufficiently stable for a transfer to a higher level of care, such as a trauma center. If sufficiently stable, the pediatric trauma patient should be transferred to a pediatric trauma center, which would be the center that would provide the patient with the best possible chance of survival. If sufficiently stable, but where a pediatric trauma center is unavailable (such as due to excessive distance or poor weather for a medi-flight), the pediatric trauma patient should be transferred to the nearest trauma center for a higher level of care, where the patient can be further stabilized before another transfer to a pediatric trauma center. However, where travel times between a Level II adult trauma center and a pediatric trauma center are approximately equal, the proper and appropriate standard of care is for the pediatric trauma patient to be transferred to the

pediatric trauma center. Regardless, a transfer is only proper where the patient will not suffer a material deterioration during the transfer between facilities.

Where the patient is unstable, the hospital may not transfer the patient unless (i) the physician certifies the medical benefits expected from the transfer outweigh the risks, or (ii) a patient makes a transfer request in writing after being informed of the hospital's obligations under EMTALA and the risks of transfer. In addition, the transfer of unstable patients must be "appropriate" under the law, such that (1) the transferring hospital must provide ongoing care within it capability until transfer to minimize transfer risks, (2) provide copies of medical records, (3) must confirm that the receiving facility has space and qualified personnel to treat the condition and has agreed to accept the transfer, and (4) the transfer must be made with qualified personnel and appropriate medical equipment.

The crucial issue is the definition of "stabilized." "Stabilized" means that within reasonable medical certainty, "no material deterioration" should occur from or during the transfer.[11] Stabilization is a process and could require several days or even weeks of hospitalization. EMTALA mandates that "a participating [i.e., Medicare] hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, and neonatal intensive care units)… shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities… if the hospital has the capacity to treat the individual." In plain terms, this means that (i) if the transfer is appropriate (ii) the receiving hospital may refuse the transfer if it lacks the specialized capabilities necessary for treatment. This issue frequently arises in pediatric trauma.

Without question, a patient who is in pulseless electrical activity (PEA) is not sufficiently stable for a transfer. In simplest terms, PEA indicates electrical activity in the heart but the patient has no

---

[11]     Examination and treatment for emergency medical conditions and women in labor. 42 USC 1395dd (1986). Available at http://www.medlaw.com/ statute.htm (accessed July 2001).

other discernable pulse and is in need of immediate resuscitation. The first step in managing pulseless electrical activity is to begin chest compressions according to ACLS protocol followed by administrating epinephrine every 3 to 5 minutes, while simultaneously looking for any reversible causes. Once a diagnosis is made, the treating physician needs to begin immediate specific management i.e., decompression of pneumothorax, pericardial drain for tamponade, fluids infusion for hypovolemia, correction of body temperature for hypothermia, administration of thrombolytics for myocardial infarction or pulmonary embolism. An arterial blood gas and serum electrolytes should be obtained during the resuscitation process. Epinephrine should be administered in 1 mg doses intravenously/intraosseously every 3 to 5 minutes during pulseless electrical activity arrest. Each dose should be followed by 20 ml of flush and elevating the arm for 10 to 20 seconds for better perfusion. The chances of a successful outcome depend on a very coordinated resuscitation process.

As can be seen from the above resuscitation procedures, this can only be done in a hospital setting and under no circumstances should a patient in PEA ever be transferred to another facility as doing so would almost guarantee certain death. Stated simply, a patient in PEA has the best chance for survival by staying put and being treated where they are – not by transferring them.

### IV.   Dr. Fonte Did <u>Not</u> Violate the Prevailing Standards of Care By Refusing a Transfer of an Infant Who Had Pulseless Electrical Activity (PEA) to Lee Health's Non-Pediatric Trauma Unit.

In preparing this Report, I reviewed the transcript of the audio recording from the Transfer Center of a phone call on November 12, 2018 between Dr. Heisler of Lehigh Regional Medical Center and Dr. Fonte of Lee Health. This transcript provided me with the exact information that Dr. Fonte received from Dr. Heisler. During that call, Dr. Heisler made clear that the 5-year old pediatric patient she was treating was had only an intermittent pulse and was in and out of PEA. Dr. Heisler also reported the pediatric patient's abdomen was expanding. A patient in that condition – pediatric or adult – was not sufficiently stable to be transferred to <u>any</u> facility. And Dr. Heisler affirms that

the patient was not sufficiently stable to be transferred by air to the nearest pediatric trauma center in Tampa, which flight would have been approximately the same duration as an ambulance ride from Lehigh Regional to Lee Health. Had Dr. Heisler's treatment caused the pediatric patient to regain a steady pulse, a transfer *may* have been appropriate. But without that, the pediatric patient's best (and only) chance for survival was to continue receiving treatment from Dr. Heisler. Putting the pediatric patient into an ambulance or helicopter for transfer would have without question resulted in the pediatric patient's death, and thus the transfer would not have been "appropriate" under EMTALA or any appropriate standard of care. Nothing in the transcript led me to believe that this patient was stable for transfer. Dr. Fonte's refusal to accept the transfer under such conditions was absolutely proper and was in the pediatric patient's best interests.

Furthermore, Lee Health does <u>not</u> have specialized pediatric trauma services. Dr. Fonte was absolutely correct in stating that Lee Health is <u>not</u> a state designated pediatric trauma center. Indeed, Dr. Fonte indicated to Dr. Heisler that if she was able to resuscitate the pediatric patient, the best chance for survival was an air transfer to the pediatric trauma center in Tampa. In my experience, the travel time by air from Southwest Florida to Tampa would be about 35-minutes. The travel time by ambulance from Lehigh Regional Medical Center to Lee Health is about 30-minutes. This difference is minute and without question a pediatric trauma patient like this should have been transferred to Tampa by air <u>if</u> a pulse could have been regained, which it had not because the patient was in and out of PEA. A transfer to a Level II adult trauma center would have been improper and would have been a deviation from the appropriate standard of care owed to the patient. If Lee Health is of the position that Dr. Fonte violated EMTALA by not accepting this transfer, it is completely incorrect. As stated above, if a pulse could not have been regained, the pediatric patient should not have been transferred anywhere. And if it could, the pediatric patient should have been transferred to the state designated pediatric trauma center in Tampa.

An additional factor also supports this conclusion: Lee Health did not self-report any EMTALA violation, which it would have been required to do had Dr. Fonte improperly refused to accept the transfer of the pediatric trauma patient who was in PEA. As stated above, Dr. Fonte did not improperly refuse to accept this patient.

Dated: February 24, 2020        _____
                                Lawrence Lottenberg, MD FACS

# Curriculum Vitae

### Lawrence Lottenberg, MD FACS
### Trauma and Acute Care Surgeon
*159 Darby Island Pl*
*Jupiter, FL 33458*
*lawrence.lottenberg@gmail.com*

### PERSONAL INFORMATION

**Age:**                          69

**Date of Birth:**            February 2, 1950

**Place of Birth:**          New York, New York

**Marital Status:**          Married to Mary Rose Lottenberg

**Medical License Number:** 0027008 –    Florida
                                          01074401A - Indiana
**DEA Number:**  AL 9251074
**NPI Number:**  1346286184
**CAQH Number:** 10714436


### EDUCATION

**Postgraduate:**            Chief Resident, Surgery, Jackson Memorial Hospital 1979-1980
                             Surgical Residency, Jackson Memorial Hospital 1975-1980

**Graduate:**                University of Miami School of Medicine 1971-1975

**Undergraduate:**           University of Florida BS with Honors in Chemistry 1968-1971

**High School:**             North Miami Senior High School 1965-1968

**PROFESSIONAL EXPERIENCE**

**April 1, 2015 – Present**
**Acute Care Surgeon/Trauma Surgeon**
**Director of Trauma Research and Education**
**St. Mary's Medical Center**
**West Palm Beach, FL**
**Clinical Affiliate  Professor of Surgery**
**Director of Surgical Simulation and Technology**
**Charles E. Schmidt College of Medicine**
**Florida Atlantic University**
**Boca Raton, FL**

**January 2017 – Present**
**Physician Consultant to the Trauma Service**
**Parkview Regional Medical Center**
**Ft. Wayne, IN**

**December 2014 – December 2016**
**Acute Care Surgeon/Trauma Surgeon**
**Parkview Regional Medical Center**
**Ft. Wayne, IN**

**November 2014 – Present**
**Medical Director, Trauma and Critical Care**
**Paradigm Outcomes**
**Walnut Creek, CA**

**January 2004 – November 2014**
**Associate Professor of Surgery and Anesthesiology**
**Division of Acute Care Surgery**
**Department of Surgery**
**University of Florida, College of Medicine**
**Gainesville, FL**

Former Trauma Medical Director (2004 to 2010) of the Trauma and Emergency Surgery Services at a major academic medical center and Level I Trauma Center and Pediatric Trauma Referral Center in North Central Florida.  Responsible for oversight of coordinating all aspects of care for trauma patients across the continuum including clinical, educational, research, pre-hospital and for monitoring all patient outcomes.

Currently practicing trauma, surgical critical care and emergency surgery on a daily basis. Duties include daily walk rounds, bi-weekly multidisciplinary sit down rounds, and caring for an average daily census of 30 to 50 patients, including approximately 450 operative cases per year in the operating room and over 500 bedside surgical procedures in the intensive care unit. Complex surgical procedures including entero-cutaneous fistula repair and complex ventral hernia repair. Expert in abdominal wall reconstruction after open abdomen. Referral sources from throughout Florida and Georgia.

Responsible for initiation of Surgical Stabilization of Rib Fracture Programs in 3 different trauma centers. Performed over 450 cases of rib fracture fixation since 2007.

Responsible for co-authoring the State of Florida Application for a Level I Adult and Pediatric Trauma Center at Shands/UF, establishment of all policies and procedures related to trauma care at Shands/University of Florida and directs quality improvement initiatives in the care of trauma patients.

Daily teaching responsibilities include mentoring surgical residents, medical students, physician extender students, and formal didactic lectures and laboratory training sessions.

Responsible for the training and mentorship of twelve actively practicing Trauma Surgeons in the United States.

Innovator and Establishment:

Diaphragm Pacing System Program for ventilator-dependent quadriplegic patients at UF Health
Diaphragm Pacing System Program for patients with Pompei Disease at UF Health
Rib Fracture Operative Fixation Program at UF Health
Rib Fracture Operative Fixation Program at St. Mary's Medical Center
Rib Fracture Operative Fixation Program at Parkview Regional Medical Center

**1992- 2003**
**Director Trauma and Surgical Critical Care**
**Memorial Regional Trauma Center**
**Hollywood, FL**

Practicing Trauma Surgeon participating in daily trauma call, admitting and treating all trauma patients, rounding, and caring for all patients in the 16 bed combined trauma and neurotrauma intensive care unit. Administrates and directs the Trauma Service to include implementation and design of all procedures and policies related to the care of the trauma patient. Responsible for quality improvement both within the Trauma Center and at county and regional levels. Director of all surgical education at Memorial Regional Hospital including surgical resident rotations in trauma, general surgery, and vascular surgery as well as design and structure of clinical rotations for third and fourth year medical students from two medical schools and second year physician assistant students from three university physician assistant schools.

**1980-1992**
**Private Practice General and Vascular Surgery, Hollywood, FL**

**HOSPITAL AFFILIATIONS:**

Parkview Regional Medical Center – Ft. Wayne, IN
St. Mary's Medical Center – West Palm Beach, FL
UF Health Shands Hosptial – Courtesy Staff - Gainesville, FL
Memorial Regional Hospital – Emeritus Staff

## FACULTY APPOINTMENTS

Clinical Affiliate Associate Professor of Surgery Florida Atlantic University 2015 – present
Associate Professor of Surgery University of Vermont School of Medicine 2016 - present
Associate Professor of Surgery and Anesthesiology University of Florida – 2004 to 2014
Courtesy Staff UF Health Shands Hospital Gainesville, FL – 2016 - present
Clinical Associate Professor University of Miami School of Medicine  - past
Adjunct Clinical Professor Nova Southeastern School of Medicine - past
Adjunct Clinical Professor Nova Southeastern Physician Assistant Program - past
Adjunct Clinical Professor Barry University Physician Assistant Program - past
Clinical Associate Professor Saba University Medical School – past

## HOSPITAL APPOINTMENTS – Current

Physician Advisor Disaster Committee –St. Mary's Medical Center
Director of Trauma Research and Education – St. Mary's Medical Center
Member Trauma Quality Improvement Committee – St. Mary's Medical Center

## HOSPITAL APPOINTMENTS – Past

Member Medical Executive Committee – St. Mary's Medical Center
Physician Director Utilization Review Committee – St. Mary's Medical Center
Former Chief of Staff – Humana Hospital Pembroke
Former Member Executive Committee – Humana Hospital Pembroke
Former Director Trauma and Critical Care – Memorial Healthcare System
Former Director Surgical Residency Program – Memorial Healthcare System
Former Clinical Associate Professor – Department of Surgery – University of Miami
Former Clinical Associate Professor – Nova Southeastern College of Osteopath
Former Clinical Professor of Physician Assistant Sciences – Nova Southeastern University
Chairman of Trauma Quality Improvement Committee – Memorial Hospital
Chairman of Disaster Committee – Memorial Regional Hospital
Member of Informatics Task Force – Memorial Regional Hospital
Clinical Teaching Faculty – Mt. Sinai Hospital/Surgical Residency Program

## INTERNATIONAL DIRECTORSHIP
Medical Director – Superboat International Productions

## NATIONAL COMMITTEES

American College of Surgeons Committee on Trauma, Member 1998 -2010
Publication Sub-Committee American College of Surgeons Committee on Trauma: 2007
Disaster Management Sub-Committee American College of Surgeons Committee on Trauma 2009

American Association for the Surgery of Trauma: Ad-Hoc Sub-Committee, Developing a State Trauma System, Chair 2008
Site Surveyor: Pennsylvania Trauma System Foundation: 2006 – Current
Disruptive Physician Behavior, Panel Member at American College of Surgeons Leadership and Advocacy Meeting.
Senior Committee at Eastern Association for the Surgery of Trauma, Chair: 2008- Current
Eastern Association for the Surgery of Trauma, Board Member 2008- 2011
Board Member Eastern Association for the Surgery of Trauma Foundation – 2009- Current
Reviewer for the Journal of Trauma and Acute Care Surgery
Reviewer for the American Surgeon


**STATE AND LOCAL COMMITTEES**

President – Florida Chapter American College of Surgeons 2008- 2010
Medical Consultant, State of Florida Department of Health, Division of Trauma 2007- Current
Florida Council Member, Southeastern Surgical Congress
Board Member, Southeastern Surgical Congress
Mini-Internship Leadership Gainesville Program, Participant 2009
Vice Chairman - Florida Committee on Trauma – 1995 to 1997
Chairman - Florida Committee on Trauma – 1997 to 2003
Broward County Trauma Agency – 1996 to 1998, 2002 to 2003
Co-Chairman - State of Florida EMS Access to Trauma Care 1999 to present
Provider - Advanced Trauma Life Support
Provider - Advanced Cardiac Life Support
Regional Course Director and Instructor - Advanced Trauma Life Support
Regional Course Director and Instructor - Advanced Trauma Operative Management
Regional Course Director and Instructor – Advanced Surgical Skills for Exposure in Trauma
Regional Course Director and Instructor – Disaster Management and Emergency Prepardeness
Director - State of Florida Trauma Medical Director – 2005 to 2006
State Faculty - Advanced Trauma Life Support


**COMMITTEES AND DIRECTORSHIPS UNIVERSITY OF FLORIDA**

Iatrogenic Pneumothorax Prevention Committee, Member 2009
Preventive Urinary Tract Infection Committee, Chair, Shands UF 2009
Massive Transfusion Protocol Committee, Member 2007
Massive Pulmonary Embolism Committee, Member 2007
Central Venous Line Infection Committee, Chair,
Anti-Infective Sub-Committee, Member
Transfusion Committee – Member
Operating Room Committee – Member
Trauma Quality Improvement – Chairman
Brain & Spinal Cord Committee – Member
Course Director ATLS – Advanced Trauma Life Support
Course Director ATOM – Advanced Trauma Operative Management
Course Director ASSET – Advanced Surgical Skills for Exposure in Trauma
Course Director DMEP – Disaster Management and Emergency Preparedness

Central Line Instruction Video and Hands On Course for Surgical Residents
Focused Assessment Using Sonography for Trauma for Surgical Residents
Intraosseous Placement Instructional Course for Residents/Attendings
MS 4 Senior Medical Student Surgical Skills Course
Rib Plating Instructional Course for Surgical Residents/Attendings
Surgical Skills Course for Neurosurgical PGY1 Residents
Trauma Lecture to MS3 Clerkship Students each rotation
Director of the Trauma Chief Resident Conference – weekly review of "Top Knife"
Trauma Quality Management – Chaired meeting 3 times – 2011/12
Disaster Management Committee – Physician Representative – 2011/12
Sepsis Committee for Computerized Decision Making in 4 West ICU – 2011/12
Trauma Resuscitation Committee for Computerized Decision Support in 4 West ICU – 2011/12

## PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS

**Member:**

Alpha Omega Alpha Honor Society – 1975
Iron Arrow Honor Society University of Miami – 1975
South Florida Chapter American College of Surgeons – 1984
Eastern Association for the Surgery of Trauma – 1994 - present
American Association for the Surgery of Trauma – 2003 – present
American College of Surgeons COT ATLS Subcommittee
Florida Department of Health EMS Advisory Council –1998 to 2002
Florida Department of Health Brain and Spinal Cord Trauma Committee - 1998 to 2003
Society of Critical Care Medicine – 1998 to present
Pan American Trauma Association – 1998 to present
American Trauma Society – 1998 to present
American Association of Medical Informatics – 2001
Chest Wall Injury Society – 2017 to present – President 2017

**Certified:**

Master Educator, Medical Education Faculty Development Program: 2008
Instructor: Advanced Trauma Life Support
Instructor: Advanced Trauma Operative Management (ATOM)
Course Director  - Advanced Trauma Life Support Provider and Instructor Courses
Course Director – Advanced Trauma Operative Management
Course Director – Advanced Surgical Site Exposures for Trauma
Course Director – Disaster Management and Emergency Management

ATLS Regional Facutly – 2015 - 2018
American Board of Surgeons – Recertification in Critical Care Surgery 2007
American Board Of Surgery - # 27214  - 1981, 1991, 2001, 2012
ACLS – 1992, 1998, 2003, 2015
PALS - 2015
Added Qualifications in Surgical Critical Care ABS - #1449-1995, 2005

**Fellow:**

Southeastern Surgical Congress – 1982 to present
American College of Surgeons – 1985 to present
American Association for the Surgery of Trauma – 1997 to present
Southern Surgical Association – 2000 to present
Pan American Trauma Society – 2002 to present

## Visiting Professorships:

1. Visiting Professor, Grand Rounds, "Anticoagulation Reversal for Trauma and Surgical Patients: Big Trouble Is Here" University of Florida, FL, September 4, 2013.
2. Visiting Professor, Grand Rounds, Bay Medical Center, Panama City, FL August 2012.
3. Visiting Professor, Grand Rounds, "The Fracture Rib… Not Just Another Broken Bone." University of Florida, FL, July 2012.
4. Visiting Professor, "Resuscitation 2009" Stony Brook University Hospital, Islip, NY, 2009
5. Visiting Professor, Grand Rounds, University of Tennessee, Knoxville, TN, May 1999.
6. Visiting Professor, Grand Rounds, University of Mississippi, Jackson, MS, May 1999.

## Funding/Source/Studies

1. A Multicenter Randomized, Open-Label, Phase 3 Study to Compare the Safety and Efficacy of Intravenous Doripenem with that of Intravenous Piperacillin/Tazobactam in Hospital-Acquired Pneumonia, 07/08/04- Complete. Principal Investigator $83,812.50.

2. A Multicenter Randomized, Open-Label, Phase 3 Study to Compare the Safety and Efficacy of Intravenous Doripenem with that of Intravenous Imipenem in Ventilator-Associated Pneumonia, July 5th, 2004 – Complete. Sub-Investigator  $117,225.00

3. Development of a Shark Attack Severity Score using the International Shark Attack File, October 5, 2005 Complete. Sub-Investigator Funding- Physician Initiated

4. The Effects of Estrogen on CTGF and TGF-B in Pre/Post Menopausal Women and Men of Varying Ages Following Burn Injury, October 5, 2005 – Complete.  Sub-Investigator Funding- Physician Initiated

5. A Prospective Study to Evaluate the Erythropoietic Responsiveness Associated with Once Weekly (QW) Administration of Darbepoetin alfa (Aranesp) in Patients Admitted to the ICU, Jenica, November, 1st 2005 – Complete, $43,375.00 Sub-Investigator

6. F7Trauma-1648: A multi center, randomized, double-blind, parallel group, placebo controlled trial to evaluate the efficacy and safety of activated recombinant factor VII (rFVlla/NovoSeven®/NiaStase®) in the treatment of refractory bleeding in severely injured trauma patients.  BB-IND.9864. Novo Nordisk, February 10, 2006 – Complete. Principal Investigator  $68,900.00

7. A Randomized Double Blinded Pilot Study Evaluating the Efficacy of Lidoderm 5% Transdermal Patches in Treating Pain in Trauma Patients with Rib and Sternum Fractures, February 22, 2006 –N/A.

8. Evaluation of the GORE TAG Thoracic Endoprosthesis for the Treatment of Complex Pathology of the Descending Thoracic Aorta, GORE, March 5, 2006 – present.

9. Bard Recovery Filter Study, BARD, October 3, 2006 – present.

10. A Retrospective Review to Evaluate Outcomes of Two Feeding Tubes Used to Provide Nutritional Support for Surgical Patients, August 28, 2006 – present.

11. Dexmedetomidine versus Propofol for the Sedation of Trauma Patients at-risk for Alcohol Withdrawal in an Intensive Care Unit, September 28, 2006 –

12. A Comprehensive Assessment of the Florida Trauma System, University of South Florida, July 15, 2004 – February 8, 2005, $73,499.00.

13. A Multicenter, Retrospective, Observational Study to Evaluate Erythropoietic Stimulating Protein (ESP) Use and Clinica Outcomes in Hospitalized Patients (ASSESS), Amgen, March 22nd, 2005 – February 2, 2006, $14,000.00.

## **PUBLICATIONS**

### ***Book Chapters***

1.      Winfield, RD, <u>Lottenberg, L</u>. Secondary and Tertiary Triage of the Trauma Patient. <u>Civetta, Taylor, & Kirby's Critical Care</u>, Fourth Edition, Philadelphia, Lippincott Williams & Wilkins, a Wolters Kluwer Business, 2009, 1109-1128.

2.      Hoyt DB, Coimbra R, Potenza BM (Commentary: <u>Lottenberg L</u>). Trauma Systems, Triage, and Transport. <u>Trauma</u>. New York. McGraw Hill. 2008, 57-82.

3.      Gonzalez, Jr. P, <u>Lottenberg L</u>, Layon AJ. Abdominal Compartment Syndrome. <u>Complications in Anesthesiology.</u>2008, 581-589.

4.      <u>Lottenberg L</u>, Ang D. Geriatric Trauma, <u>Trauma Contemporary Principles and Therapy</u>.Philadelphia, Lippincott Williams & Wilkins, a Wolters Kluwer Business, 2008, 607-612.

5.      Taheri PA, Butz DA, <u>Lottenberg L</u>, et al.  The cost of trauma center readiness.  In Year Book of surgery 2005.  Philadelphia: Mosby Inc; 2005: 32-33. Copeland EM III, et al,


**Peer Reviewed Articles/Publications**
.

1.      **Indications for surgical stabilization of rib fractures in patients without flail chest: surveyed opinions of members of the Chest Wall Injury Society.** Pieracci FM, Agarwal S, Doben A, Shiroff A, Lottenberg L, Whitbeck SA, White TW. Int Orthop. 2018 Feb;42(2):401-408. doi: 10.1007/s00264-017-3612-1. Epub 2017 Aug 29.

2.      **Prehospital Spine Immobilization/Spinal Motion Restriction in Penetrating Trauma: a Practice Management Guideline from the Eastern Association for the Surgery of Trauma (EAST)**. Velopulos CG, Shihab HM, **Lottenberg L**, Feinman M, Raja A, Salomone J, Haut ER.J Trauma Acute Care Surg. 2017 Dec 28.

3.      **Evaluation of a Device Combining an Inferior Vena Cava Filter and a Central Venous Catheter for Preventing Pulmonary Embolism Among Critically Ill Trauma Patients.** Tapson VF, Hazelton JP, Myers J, Robertson C, Gilani R, Dunn JA, Bukur M, Croce MA, Peick A, West S, **Lottenberg L**, Doucet J, Miller PR, Crookes B, Gandhi RR, Croft CA, Manasia A, Hoey BA, Lieberman H, Guillamondegui OD, Novack V, Piazza G, Goldhaber SZ. J Vasc Interv Radiol. 2017 Sep;28(9):1248-1254. doi: 10.1016/j.jvir.2017.05.001. Epub 2017 Jun 20.

4.      **Diaphragm Pacing as a Rehabilitative Tool for Patients With Pompe Disease Who Are Ventilator-Dependent: Case Series.** Smith BK, Fuller DD, Martin AD, **Lottenberg L**, Islam S, Lawson LA, Onders RP, Byrne BJ. Phys Ther. 2016 May;96(5):696-703

5. **Clostridium difficile Infections after Blunt Trauma: A Different Patient Population?** Vanzant EL, Ozrazgat-Baslanti T, Liu H, Malik S, Davis R, Lanz J, Miggins MV, Gentile LF, Cuenca A, Cuenca AG, **Lottenberg L**, Moore FA, Ang DN, Bihorac A, Efron PA.Surg Infect (Larchmt). 2015 Aug;16(4):421-7. doi: 10.1089/sur.2013.141. Epub 2015 Jun 2.

6. **Antibiotic Regimen after a Total Abdominal Colectomy with Ileostomy for Fulminant Clostridium difficile Colitis: A Multi-Institutional Study**. van der Wilden GM, Subramanian MP, Chang Y, **Lottenberg L**, Sawyer R, Davies SW, Ferrada P, Han J, Beekley A, Velmahos GC, de Moya MA. Surg Infect (Larchmt). 2015 Aug;16(4):455-60. doi: 10.1089/sur.2013.153. Epub 2015 Jun 12.

7. **Successful implementation of a packed red blood cell and fresh frozen plasma transfusion protocol in the surgical intensive care unit.** Szpila BE, Ozrazgat-Baslanti T, Zhang J, Lanz J, Davis R, Rebel A, Vanzant E, Gentile LF, Cuenca AG, Ang DN, Liu H, **Lottenberg L**, Marker P, Zumberg M, Bihorac A, Moore FA, Brakenridge S, Efron PA. PLoS One. 2015 May 26;10(5):e0126895.

8. **Understanding Why Patients Return to the Emergency Department after Mild Traumatic Brain Injury within 72 Hours**. Ganti L, Conroy LM, Bodhit A, Daneshvar Y, Patel PS, Ayala S, Kuchibhotla S, Hatchitt K, Pulvino C, Peters KR, Lottenberg LL.West J Emerg Med. 2015 May;16(3):481-5. doi: 10.5811/westjem.2015.2.23546. Epub 2015 Apr 2.

9. **TBI ADAPTER: traumatic brain injury assessment diagnosis advocacy prevention and treatment from the emergency room--a prospective observational study.** Ganti L, Daneshvar Y, Bodhit A, Ayala S, Patel PS, Lottenberg LL, York D, Counsell C, Peters KR. Mil Med. 2015 Apr;180(4):380-6

10. **A protocol for the management of adhesive small bowel obstruction.** Loftus T, Moore F, VanZant E, Bala T, Brakenridge S, Croft C, **Lottenberg L**, Richards W, Mozingo D, Atteberry L, Mohr A, Jordan J.J Trauma Acute Care Surg. 2015 Jan;78(1):13-9; discussion 19-21.

11. **Inferior vena cava filters in trauma patients: a national practice patterns survey of U.S. Trauma centers.** Rajasekhar A, Elmariah H, **Lottenberg L**, Beyth R, Lottenberg R, Ang D. Am Surg. 2014 Dec;80(12):1237-44.

12. **Small bowel obstruction secondary to impacted phytobezoar within a Meckel's diverticulum.** Cantrell EF, Cohen-Shohet RN, Browning RL, Richards WT, **Lottenberg L**. Am Surg. 2014 Jul;80(7):e194-5. No abstract available.

13. **Blunt cerebrovascular injury in rugby and other contact sports: case report and review of the literature**. Cuellar TA, **Lottenberg L**, Moore FA.World J Emerg Surg. 2014 May 4;9:36. doi: 10.1186/1749-7922-9-36. eCollection 2014. Review.

14. **Computer versus paper system for recognition and management of sepsis in surgical intensive care.** Croft CA, Moore FA, Efron PA, Marker PS, Gabrielli A, Westhoff LS, **Lottenberg L**, Jordan J, Klink V, Sailors RM, McKinley BA. J Trauma Acute Care Surg. 2014 Feb; 76(2): 311-9.

15. **Multicenter review of diaphragm pacing in spinal cord injury: Successful not only in weaning from ventilators but also in bridging to independent respiration.** Posluszny JA Jr, Onders R, Kerwin AJ, Weinstein MS, Stein DM, Knight J, **Lottenberg L**, Cheatham ML, Khansarinia S, Dayal S, Byers PM, Diebel L. J Trauma Acute Care Surg. 2014 Feb; 76(2): 303-10.

16. **Impact of helmet use in traumatic brain injuries associated with recreational vehicles.** Ganti L, Bodhit AN, Daneshvar Y, Patel PS, Pulvino C, Hatchitt K, Hoelle RM, Peters KR, Kuchibhotla S, Lottenberg L, Gabrielli A, Mazzuoccolo A, Elie-Turenne MC, Falgiani T, Maerz PW, Kharod SM, Conroy LM, Khalid HM, Tyndall JA. Adv Prev Med. 2013; Epub 2013 Sep 25.

17. **Improbable Survival after Prolonged Traumatic Cardiopulmonary Arrest: Revisiting the 15-minute** Rule. Kim T, Kim SS, Lottenberg L, Efron PA, Ang DN. Am Surg. 2013 Jun; 79(6): 649-50.

18. **Vascularized plantar myocutaneous free flap transfer for amputee stump preparation: a proof of concept cadaver study.** Smith LN, Richards WT, Mozingo DW, Lottenberg L. Mil Med. 2013 Feb; 178(2):222-7.

19. **TBI surveillance using the common data elements for traumatic brain injury: a population study.** Stead LG, Bodhit AN, Patel PS, Daneshvar Y, Peters KR, Mazzuoccolo A, Kuchibhotla S, Pulvino C, Hatchitt K, Lottenberg L, Elie-Turenne MC, Hoelle RM, Vedula A, Gabrielli A, Miller BD, Slish JH, Falgiani M, Falgiani T, Tyndall JA; Emergency Medicine Traumatic Brain Injury Research Network Investigators. Int J Emerg Med. 2013 Feb 27;6(1):5. doi: 10.1186/1865-1380-6-5.

20. **A genomic analysis of Clostridium difficile infections in blunt trauma patients.** Efron PA, Liu H, Lottenberg L, Cuenca AG, Gentile LF, Miggins MV, Bihorac A, Baker HV, Moore FA, Moldawer LL, Ang DN. J Trauma Acute Care Surg. 2013 Jan;74(1):334-8. doi: 10.1097/TA.0b013e3182789426.

21. **Candida albicans Necrotizing Soft Tissue Infection: A Case Report and Literature Review of Fungal Necrotizing Soft Tissue Infections.** Buchanan PJ, Mast BA, Lottenberg L, Kim T, Efron PA, Ang DN.Ann Plast Surg. 2012 Nov 1. [Epub ahead of print]

22. **Management of pediatric occult pneumothorax in blunt trauma: a subgroup analysis of the American Association for the Surgery of Trauma multicenter prospective observational study.** Notrica DM, Garcia-Filion P, Moore FO, Goslar PW, Coimbra R, Velmahos G, Stevens LR, Petersen SR, Brown CV, Foulkrod KH, Coopwood TB Jr, Lottenberg L, Phelan HA, Bruns B, Sherck JP, Norwood SH, Barnes SL, Matthews MR, Hoff WS, Demoya MA, Bansal V, Hu CK, Karmy-Jones RC, Vinces F, Hill J, Pembaur K, Haan JM.J Pediatr Surg. 2012 Mar;47(3):467-72.

23. **Intraosseous vascular access for in-hospital emergency use: a systematic clinical review of the literature and analysis.** Voigt J, Waltzman M, Lottenberg L.Pediatr Emerg Care. 2012 Feb;28(2):185-99. Review.

24. **Obese patients show a depressed cytokine profile following severe blunt injury.** Winfield RD, Delano MJ, Cuenca AG, Cendan JC, Lottenberg L, Efron PA, Maier RV, Remick DG, Moldawer LL, Cuschieri J.Shock. 2012 Mar;37(3):253-6.

25. **A pilot study on the randomization of inferior vena cava filter placement for venous thromboembolism prophylaxis in high-risk trauma patients.** Rajasekhar A, Lottenberg L, Lottenberg R, Feezor RJ, Armen SB, Liu H, Efron PA, Crowther M, Ang D. J Trauma. 2011 Aug;71(2):323-8; discussion 328-9.

26. **A regionalised strategy for improving motor vehicle-related highway driver deaths using a weighted averages method.** Kim T, Rivara FP, Mozingo DW, Lottenberg L, Harris ZB, Casella G, Liu H, Moldawer LL, Efron PA, Ang DN.Inj Prev. 2012 Feb;18(1):16-21. Epub 2011 Jun 16.

27. **Blunt traumatic occult pneumothorax: is observation safe?--results of a prospective, AAST multicenter study.** Moore FO, Goslar PW, Coimbra R, Velmahos G, Brown CV, Coopwood TB Jr, Lottenberg L, Phelan HA, Bruns BR, Sherck JP, Norwood SH, Barnes SL, Matthews MR, Hoff WS, de Moya MA, Bansal V, Hu CK, Karmy-Jones RC, Vinces F, Pembaur K, Notrica DM, Haan JM.J Trauma. 2011 May;70(5):1019-23; discussion 1023-5.

28. **Mopeds and scooters: crash outcomes in a high traffic state.** Miggins M, Lottenberg L, Liu H, Moldawer L, Efron P, Ang D. J Trauma. 2011 Jul;71(1):217-22.

29. **Review of a large clinical series: once- versus twice-daily enoxaparin for venous thromboembolism prophylaxis in high-risk trauma patients.** Bush S, LeClaire A, Hampp C, Lottenberg L. J Intensive Care Med. 2011 Mar-Apr;26(2):111-5. Epub 2011 Jan 21.

30. **Pulmonary embolism prophylaxis with inferior vena cava filters in trauma patients: a systematic review using the meta-analysis of observational studies in epidemiology (MOOSE) guidelines.** Rajasekhar A, Lottenberg R, Lottenberg L, Liu H, Ang D. J Thromb Thrombolysis. 2011 Jul;32(1):40-6. Review.

31. **All-terrain vehicle safety in Florida: is legislation really the answer?** Winfield RD, Mozingo DW, Armstrong JH, Hollenbeck JI, Richards WT, Martin LC, Beierle EA, Lottenberg L. Am Surg. 2010 Feb;76(2):149-53.

32. **A massive pulmonary embolism treatment protocol: how trauma performance improvement affects outcome throughout the hospital system.** Velopulos CG, Zumberg M, McAuliffe P, Lottenberg L, Layon AJ. Am Surg. 2010 Feb;76(2):145-8. Review.

33. **Traditional resuscitative practices fail to resolve metabolic acidosis in morbidly obese patients after severe blunt trauma.** Winfield RD, Delano MJ, Lottenberg L, Cendan JC, Moldawer LL, Maier RV, Cuschieri J. J Trauma. 2010 Feb;68(2):317-30.

34. **Mortality and management of 96 shark attacks and development of a shark bite severity scoring system.** Lentz AK, Burgess GH, Perrin K, Brown JA, Mozingo DW, Lottenberg L. Am Surg. 2010 Jan;76(1):101-6.

35. **Differences in outcome between obese and nonobese patients following severe blunt trauma are not consistent with an early inflammatory genomic response.** Winfield RD, Delano MJ, Dixon DJ, Schierding WS, Cendan JC, Lottenberg L, Lopez MC, Baker HV, Cobb JP, Moldawer LL, Maier RV, Cuschieri J. Crit Care Med. 2010 Jan;38(1):51-8.

36. **Endovascular treatment of traumatic thoracic aortic injuries.** Feezor RJ, Hess PJ Jr, Martin TD, Klodell CT, Beaver TM, Lottenberg L, Martin LC, Lee WA. J Am Coll Surg. 2009 Apr;208(4):510-6.

37. **Sturgeons versus surgeons: leaping fish injuries at a level I trauma center.** Wilson JP, Burgess G, Winfield RD, Lottenberg L. Am Surg. 2009 Mar;75(3):220-2.

38. **A US multicenter, retrospective, observational study of erythropoiesis-stimulating agent utilization in anemic, critically ill patients admitted to the intensive care unit.** Brophy GM, Sheehan V, Shapiro MJ, Lottenberg L, Scarlata D, Audhya P; ASSESS Study Group and Amgen Inc. Clin Ther. 2008 Dec;30(12):2324-34.

39. **A case of dual thoracoabdominal impalement in vehicular trauma.** Winfield RD, Parr AG, Ang DN, Martin TD, Chen MK, Seagle MB, Hochwald SN, Reed AI, Lottenberg L. Am Surg. 2008 Aug;74(8):757-60.

40. **Traumatic aortic injuries in the pediatric population.** Anderson SA, Day M, Chen MK, Huber T, Lottenberg LL, Kays DW, Beierle EA. J Pediatr Surg. 2008 Jun;43(6):1077-81.

41. **Assessing effectiveness of a mature trauma system: Association of trauma center presence with lower injury mortality rate.** Papa L, Langland-Orban B, Kallenborn C, Tepas JJ 3rd, Lottenberg L, Celso B, Durham R, Flint L. J Trauma. 2006 Aug;61(2):261-6; discussion 266-7.

42. **The use of hydrogen peroxide for achieving dermal hemostasis after burn excision in a patient with platelet dysfunction.** Potyondy L, Lottenberg L, Anderson J, Mozingo DW. J Burn Care Res. 2006 Jan-Feb;27(1):99-101.

43. **A systematic review and meta-analysis comparing outcome of severely injured patients treated in trauma centers following the establishment of trauma systems.** Celso B, Tepas J, Langland-Orban B, Pracht E, Papa L, Lottenberg L, Flint L. J Trauma. 2006 Feb;60(2):371-8; discussion 378. Review.

44. **Blunt traumatic injury of the gallbladder.** Carrillo EH, Lottenberg L, Saridakis A. J Trauma. 2004 Aug;57(2):408-9. No abstract available.

45. **The cost of trauma center readiness.** Taheri PA, Butz DA, Lottenberg L, Clawson A, Flint LM. Am J Surg. 2004 Jan;187(1):7-13.

46. **Comparison of carbon dioxide and iodinated contrast for cavography prior to inferior vena cava filter placement.** Holtzman RB, Lottenberg L, Bass T, Saridakis A, Bennett VJ, Carrillo EH. Am J Surg. 2003 Apr;185(4):364-8.

47. **Use of a human patient simulator for the advanced trauma life support course.** Block EF, Lottenberg L, Flint L, Jakobsen J, Liebnitzky D. Am Surg. 2002 Jul;68(7):648-51.

48. **Traumatic head injury in the anticoagulated elderly patient: a lethal combination**. Karni A, Holtzman R, Bass T, Zorman G, Carter L, Rodriguez L, Bennett-Shipman VJ, Lottenberg L. Am Surg. 2001 Nov;67(11):1098-100.

49. **Blunt innominate artery injury.** Stover S, Holtzman RB, Lottenberg L, Bass TL. Am Surg. 2001 Aug;67(8):757-9.

50. **Elderly injury: a profile of trauma experience in the Sunshine (Retirement) State.** Tepas JJ 3rd, Veldenz HC, Lottenberg L, Romig LA, Pearman A, Hamilton B, Slevinski RS, Villani DJ. J Trauma. 2000 Apr;48(4):581-4; discussion 584-6.

51. **Bedside placement of inferior vena cava filters in the intensive care unit.** Tola JC, Holtzman R, Lottenberg L. Am Surg. 1999 Sep;65(9):833-7; discussion 837-8.

52. **THE EFFECTS OF DIRECT MYOCARDIAL REVASCULARIZATION ON INFARCT SIZE: A CLINICAL AND EXPERIMENTAL CORRELATION.**Bolooki H, Dresnick S, Lottenberg L, Cueto G, Golkar R.Cardiovasc Dis. 1977;4(2):184-198. No abstract available.

## *Instructional Videos*

1.         Lottenberg, L, Guidelines for Placement of Central Venous Access, Gainesville: ProMediaDigital; 2008.

2.         Lottenberg, L, et al.  Patient Management Problems in Trauma and Critical Care, Blunt Chest Trauma.  Ontario: BC Decker; 2003

## **DEVELOPER**

Developed trauma documentation templates currently used by physicians, with the "PocketChart-Trauma Edition" software by Care Tools, Inc. **www.caretools.com**

## **RESEARCH ACTIVITIES**

### *Ongoing*

1. Vidacare clinical trial – Insertion of IO for CT scanning

2. NeuRx- Diaphragm Pacing System for use in stable, high spinal cord injuries; HUD Exemption

3. NeuRx- Diaphragm Pacing System for use patient with Amyotrophic Lateral Sclerosis

4. Methicillin-Resistant Staphylococcus Aureus in a Trauma Population: Does Decolonization Prevent Infection (MRSA)

5. Advanced Trauma Operative Management Course (ATOM)

6. An Observational Study to Determine the Safety and Effectiveness of Intraosseous Contrast Dye Vascular Access for the Delivery of CT

7. Extra-Peritoneal Pelvic Packing: Description and Analysis Data Collection and Entry complete.

8. Utility of Point of Care Testing (POCT) in Predicting Outcomes in Trauma Patients

9. Acute Care Surgery Database

10. Management of Blunt Splenic Injury: A Single Institution Retrospective Study

### *Completed*

1. A Multicenter Randomized, Open-Label, Phase 3 Study to Compare the Safety and Efficacy of Intravenous Doripenem with that of Intravenous Piperacillin/Tazobactam in Hospital-Acquired Pneumonia, 07/08/04- Complete. Principal Investigator $83,812.50.

2. A Multicenter Randomized, Open-Label, Phase 3 Study to Compare the Safety and Efficacy of Intravenous Doripenem with that of Intravenous Imipenem in Ventilator-Associated Pneumonia, July 5th, 2004 – Complete. Sub-Investigator  $117,225.00

3. Development of a Shark Attack Severity Score using the International Shark Attack File, October 5, 2005 Complete. Sub-Investigator Funding- Physician Initiated

4. The Effects of Estrogen on CTGF and TGF-B in Pre/Post Menopausal Women and Men of Varying Ages Following Burn Injury, October 5, 2005 – Complete.  Sub-Investigator Funding- Physician Initiated

5. A Prospective Study to Evaluate the Erythropoietic Responsiveness Associated with Once Weekly (QW) Administration of Darbepoetin alfa (Aranesp) in Patients Admitted to the ICU, Jenica, November, 1st 2005 – Complete, $43,375.00 Sub-Investigator

6. F7Trauma-1648: A multi center, randomized, double-blind, parallel group, placebo controlled trial to evaluate the efficacy and safety of activated recombinant factor VII (rFVIIa/NovoSeven®/NiaStase®) in the treatment of refractory bleeding in severely injured trauma patients.  BB-IND.9864. Novo Nordisk, February 10, 2006 – Complete. Principal Investigator  $68,900.00

7. A Randomized Double Blinded Pilot Study Evaluating the Efficacy of Lidoderm 5% Transdermal Patches in Treating Pain in Trauma Patients with Rib and Sternum Fractures, February 22, 2006 –N/A.

8. Evaluation of the GORE TAG Thoracic Endoprosthesis for the Treatment of Complex Pathology of the Descending Thoracic Aorta, GORE, March 5, 2006

9. Bard Recovery Filter Study, BARD, October 3, 2006

10. A Retrospective Review to Evaluate Outcomes of Two Feeding Tubes Used to Provide Nutritional Support for Surgical Patients, August 28, 2006

11. Dexmedetomidine versus Propofol for the Sedation of Trauma Patients at-risk for Alcohol Withdrawal in an Intensive Care Unit, September 28, 2006

12. A Comprehensive Assessment of the Florida Trauma System, University of South Florida, July 15, 2004 – February 8, 2005, $73,499.00.

13. A Multicenter, Retrospective, Observational Study to Evaluate Erythropoietic Stimulating Protein (ESP) Use and Clinica Outcomes in Hospitalized Patients (ASSESS), Amgen, March 22nd, 2005 – February 2, 2006, $14,000.00.

14. Incidence of Venous Thromboembolism in High Risk Trauma Patients with Retrievable Inferior Vena Cava Filter Prophylaxis; A Pilot Feasibility Study, October 2008-February 2013.  Sub-Investigator  Funding-Physician Initiated

## **Invited Lecturer**

### *National:*

1. Invited presenter for Haemonetics Corporation, Experiences with TEG, Milwaukee, MN, November 12, 2013.

2. Invited speaker, Rib Plating, Indianapolis, IN; August 26, 2013.

3. Invited speaker, Rib Plating Consortium, Henderson, NV; June 1, 2013.

4. Invited Grand Rounds speaker, University of Texas San Antonio, San Antonio, TX; May 16, 2013.

5. Invited Grand Rounds speaker, University of South Alabama, Mobile, AL; February 22, 2013.

6. Invited Grand Rounds speaker, Rib Plating, Savannah, GA; January 10, 2013.

7. Speaker at Scientific Program, Eastern States Trauma, National Harbour, MD; June 10-12, 2012.

8. Speaker at 14th Annual Trauma Conference, "Controversies in Trauma: Where Have We Been, Where Are We Going?" *Rib Plating;* Ft. Worth, TX, April 5, 2012.

9. Speaker at Synthes National Meeting, "Rib Fracture Fixation'" Palm Springs, CA; March 10-13, 2012.

10. Invited Lecturer, *Pancreatitis,* Point/Counterpoint on Acute Care Surgery, National Harbor, MD; June 12-14, 2011.

11. "Advanced Complex Ventral Hernia Repair Symposium", Covidien, Las Vegas, NV; January 29, 2009.

12. Invited Lecturer, Visiting Professor, "Resuscitation 2009" Stony Brook University Hospital, Islip, NY, May 13, 2009.

13. Invited Lecturer, Covidien, "Trauma and Emergency Surgery, Simple Solutions for Complex Cases using Biologics", Boston, MA, May 8, 2009.

14. Invited Lecturer, Harris Methodist Annual Trauma Conference, "Advanced resuscitation Technique to Decrease Compartment Syndrome", Fort Worth, TX, April 22, 2009.

15. Invited Lecturer, Covidien, "Trauma and Emergency Surgery, Simple Solutions for Complex Cases using Biologics", Chicago, IL, April 1, 2009.

16. Invited Lecturer, Covidien, "Trauma and Emergency Surgery, Simple Solutions for Complex Cases using Biologics", Charlottesville, VA, March 4, 2009

17. Invited Lecturer, sanofi-aventis – "Prophylaxis of VTE in Patients Undergoing Abdominal Surgery" – Thomasville, GA October 17th 2006.

18. Invited Speaker - Point/Counterpoint – Williamsburg, VA June 4th – 6th, 2006.

19. Invited Senior Site Surveyor for the Pennsylvania Trauma Foundation – Pennsylvania University and Allen, Pennsylvania April 18th – 21st, 2006.

20. ATS, Trauma Information and Exchange Program, Washington, DC, November 13-14, 2005.

21. Physician Assistants in Trauma, Eastern Association for the Surgery of Trauma, Amelia Islands, FL January 2004.

22. Trauma & Critical Care Meeting, Las Vegas, NV, March 2001

23. "The Impact of a Transfusion Alternatives Program on Surgical Transfusion Practice and Costs", Southeastern Surgical Congress, New Orleans, LA. February 2001

24. Early Intervention By The Multidisciplinary Team Improves Outcome During Inpatient Rehabilitation, Southeastern Surgical Congress, New Orleans, LA, Feb. 2001

25. Annual Trauma Center Leadership Conference, Newport Beach, CA, February. 2001

26. Symposium By the Sea, Captiva, FL August 2000

27. Annual Multidisciplinary Trauma Conference, Sparrow Hospital, Lansing, MI, May 2000

28. Space Coast Trauma Symposium, Melbourne Beach, FL November 1999

29. Surgery Advisory Board Meeting, Knoxville, TN, May 1999

*Regional:*

1. Invited Lecturer for Haemonetics, "TEG in trauma" Southeastern Surgical Meeting, Savannah, GA; February 21, 2014.

2. Invited presenter for Haemonetics Corporation, Experiences with TEG, Ft. Lauderdale, FL; June 10-11, 2013.

3. Invited Lecturer, "Inspiring Quality", Rollins College, Orlando, FL; January 23, 2013.

4. Invited Lecturer, Grand Rounds, Panama City, FL; August 22, 2012.

5. Invited Lecturer, Symposium By The Sea - Controversies in Emergency Medicine Conference, "Coagulation Reversal in Head Trauma Patients" – Amelia Island, FL; August 5, 2012.

6. Invited Lecturer, "Rib Plating" – Orlando, FL; June 15, 2012.

7. Invited Lecturer, Shands Live Oak, "Rural Trauma Systems," – Live Oak, FL; May 13, 2011.

8. Invited Lecturer, "Resuscitation 2009", Sacred Heart Hospital, Pensacola, FL November 17,2008.

9. Disaster Management, Speaker –, Orlando, FL November 21, 2008.

10. Invited Lecturer, sanofi-aventis – "Prophylaxis of VTE in Patients Undergoing Abdominal Surgery" – Tallahassee, FL October 23rd 2006

11. Invited Lecturer, sanofi-aventis – "Prophylaxis of VTE in Patients Undergoing Abdominal Surgery" – Pensacola, FL September 25-26th 2006

12. Invited Lecturer, sanofi-aventis – "Prophylaxis of VTE in Patients Undergoing Abdominal Surgery" – Ocala, FL September 14th 2006

13. Invited Lecturer, Shands  Jacksonville – Disaster Management Seminar "Disaster Management in the Austere (Rural) Environment" – Jacksonville, FL October 23rd 2006

14. Disaster Management, Speaker – Topic: "Current Status and Future of HRSA/CDC Grants for Florida", October 11th, 2005

15. Florida Chapter American College of Surgeons Meeting, Speaker – Topic: "Update of Florida Trauma System" – Boca Grande, Florida, May 27th, 2005.

16. Robert Zeppa Memorial Lecture "Florida's Trauma System: 25 years of Progress", Jackson Memorial Hospital, June 12th, 2004.

17. Invited lecturer, Disaster Planning Conference, Hurricane Andrew: Ten Years After, New Jersey. April 2002.

18. Invited Lecturer, Florida Surgical Society/Florida Chapter ACS Annual Meeting, Key West, FL. June 2001

**Local:**

1. Invited Lecturer, "Management of complex pelvic fractures" University of Florida, Gainesville, FL; February 18, 2014.

2. Invited Lecturer, "Rib Plating" Jacksonville, FL; February 17, 2014.

3. Invited Lecturer, University of Florida Surgery 201 Course, "Management of enterocutaneous fistulas" – Gainesville, FL; March 27, 2012.

4. Invited Lecturer, "Management of Pelvic Fractures," Surgery Course PGY201, University of Florida, May 2011.

5. Invited Lecturer, New Housestaff Orientation Program, UF Graduate Medical Education, June 2009.

6. Lecturer, Disruptive Physicians, 3rd year Medical Students, January 22, 2009

7. Lecture to the Medical Students – Topic: "Trauma" Dragstedt Conference Room, April 4, 2006

8. DVT Prophylaxis in Trauma/Surgery – Gainesville, FL, March 2, 2006.

9. Lecture FCCS, Shands & University of Florida, School of Nursing, FL, November 19, 2005.

10. Lecture to the Medical Students – Topic: "Trauma" Comunicore Classroom  C1-4, November 8, 2005.

11. ATOM, Speaker – Topic: "Splenic Trauma", Hartford Hospital, October 27, 2005.

12. Lecture to the Medical Students – Topic: "Trauma" Dragstedt Conference Room, October 12, 2005.

13. Lecture to the Rotary – Topic: "Trauma Care at Shands & University of Florida", Paramount Resort Hotel, Gainesville, August 23, 2005.

14. Grand Rounds in OB/GYN, Lecture – Topic: "Management of Trauma in Pregnancy" – Barron Library, 3rd Floor, Medical Science Bldg, April 22, 2005.

15. Multidisciplinary Approaches to Multisystem Trauma: "Issues and Priorities" – Post Graduate Course, April 18, 2005.

16. Lecture to the Medical Students – Topic: "Trauma" Dragstedt Conference Room, March 31, 2005.

17. In-Service – Topic: "Trauma" with Jim Howard and ShandsCair Team in Chiefland, FL, March 30, 2005.

18. AACN Monthly Chapter Meeting Lecture – Topic: "End Points of Resuscitation", Shands/UF Room 6120, March 8, 2005.

19. In-Service – Topic: "Trauma" with Jim Howard and ShandsCair Team in Gilchrist County Sheriffs Office, February 23, 2005.

20. Lecture to the Medical Students – Topic: "Trauma", Dragstedt Conference Room, February 17, 2005.

21. Critical Care Medicine Journal Club Meeting Lecture – Topic: "Emergency Airway Management", Steve's Café American, February 8, 2005.

22. Lecture to the Medical Students – Topic: "Trauma", Commincore Classroom CG-56, February 4, 2005.

23. Journal Club Meeting Lecture – Topic: "Invasive Procedures", 706 Restaurant, January 25, 2005.

24. General ATLS Approach Lecture, Shands Hospital, January 4, 2005.

25. Anesthesiology Lecture – Topic: "Characteristics, Infrastructures & Lines of Command in the Level 1 Trauma Sytem at Shands", January 3, 2005.

26. Inservice – Topic: "Pain Control" to Nursing staff at Shands Hospital, December 16, 2004.

27. Lecture – Topic: "Bedside Surgery", Panamerican Trauma Society Conference Meeting, Miami FL, November 17, 2004.

28. Initial Management of Trauma, Union County EMS, Bradford, FL, March 30, 2004.

29. Sedation and Pain Management, Halifax Hospital, Daytona Beach, FL, March 26, 2004.

30. Blood Conservation in Trauma and Critical Care, Surgery Grand Rounds, Shands/Jacksonville Department of Surgery, March 17, 2004.

31. Sedation and Pain Management in Trauma and Critical Care, Surgery Grand Rounds, University of Florida Department of Surgery, February 25, 2004.

32. Trauma in North Central Florida 2004, Alachua County Medical Society, January 2004.

33. Invited lecturer, Nutritional Support in Trauma & Critical Care, Mission Hills, CA, September 2003.

34. Invited lecturer, Nutritional Support in Trauma & Critical Care, Los Angeles, CA, September 2003.

35. Invited lecturer, Sedation & Pain Management in Critical Illness, 5th Annual Total Trauma Care Conference, Greeley, CO, August 2003.

36. Invited lecturer, Sedation & Pain Management in Critical Illness, May Day Trauma Conference, Melbourne, FL, May 2003.

37. Invited lecturer, Sedation & Pain Management in Critical Illness, New Orleans, LA, April 2003.

38. Invited lecturer, Sedation & Pain Management in Critical Illness, Chattanooga, TN, April 2003.

39. Invited lecturer, Sedation & Pain Management in Critical Illness, Las Vegas, NV, March 2003.

40. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Minneapolis, MI. December 2002.

41. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Trauma Grand Rounds, Dearborn, MI. October 2002.

42. Invited lecturer, Broward County Physician Assistant Association, Fort Lauderdale, FL. October 2002.

43. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit. September 2002.

44. Invited lecturer, Sedation & Pain Management in the ICU, Fort Lauderdale, FL. August 2002.

45. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Atlanta, GA. July 2002.

46. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Birmingham, AL. July 2002.

47. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Fort Lauderdale, FL. May 2002.

48. Invited lecturer, Ant fungal Medication in the Intensive Care Unit, Fort Lauderdale, FL., May 2002.

49. Invited lecturer, Acute Abdominal Trauma, Nova Southeastern University, Florida, January 2002.

50. Invited lecturer, Fluid & Electrolyte Management in Adults, Nova Southeastern University, Florida. January 2002.

51. Invited lecturer, Parenteral & Enteral Nutrition Symposium. November 2001.

52. Invited lecturer, North Florida Region Trauma Agency, Status of Trauma Care in Florida, Ocala, FL. November 2001.

53. Invited lecturer, Sedation & Pain Management in the Intensive Care Unit, Wisconsin. October 2001.

54. Invited Lecturer, New Strategies in Gram Positive Infections, Melbourne, FL. August 2001.

55. Invited Lecturer, New Strategies in Gram Positive Infections, Fort Lauderdale, FL. August 2001.

56. Invited Lecturer, New Strategies in Gram Positive Infections, Davie FL. July 2001.

57. Invited Lecturer, Canidida Infections, Captiva, FL. May 2001.

58. Invited Lecturer, Clarion Methodist Hospital Grand Rounds, Indianapolis, IN. May 2001.

59. Invited Lecturer, Sacred Heart Hospital Grand Rounds, Pensacola, FL., April 2001.

60. Invited Lecturer, Carraway Injury Institute Grand Rounds, Birmingham, AL., April 2001.

61. Invited Lecturer, University of Miami Grand Rounds, Miami, FL., March 2001.

62. Invited Lecturer, New Strategies in Gram Positive Infections, N. Miami, FL., March 2001.

63. Invited Lecturer, Nova Southeastern University Medical School, Davie, FL, Jan. 2001.

64. Invited Lecturer, Grand Rounds, St. Mary's Hospital, West Palm Beach, FL, August 2000.

65. Invited Lecturer, Trauma Conference, Holmes Regional Trauma Center, Melbourne, FL, August 2000.

66. Invited Lecturer, Yeast Infections in the ICU, Charlotte, NC, July 2000.

67. Invited Lecturer, Trauma & Critical Care - Point/Counterpoint Annual Meeting, Atlantic City, NJ, May 2000.

68. Invited Lecturer, Yeast Infections in the ICU, Orlando FL, April 2000.

69. Invited Lecturer, Yeast Infections in the ICU, Miami FL, February 2000.

70. Invited Lecturer, "Tough Trauma Talk", Pinecrest High School, Fort Lauderdale FL, February 2000.

71. Invited Lecturer, Nova Southeastern University Medical School, Davie FL, January 2000.

72. Invited Lecturer, Grand Rounds, Mount Sinai Medical Center, Miami FL, November 1999.

73. Invited Lecturer, New Antibiotic Strategies, Savannah GA, September 1999.

74. Invited Lecturer, New Antibiotic Strategies, Orlando FL, May 1999.

75. Invited Lecturer, New Antibiotic Strategies, Knoxville TN, May 1999.

76. Invited Lecturer, New Antibiotic Strategies, Columbia SC, May 1999.

77. Invited Lecturer, New Antibiotic Strategies, Pensacola FL, May 1999.

78. Invited Lecturer, New Antibiotic Strategies, Jackson MS, May 1999.

79. Invited Lecturer, Trauma Conference, Pelvic Fractures, Greenville Memorial Hospital, Greenville, SC, May1999.

80. Invited Lecturer, Pensacola Surgical Society Meeting, Pensacola, FL. May 1999.

81. Invited Lecturer, New Antibiotic Strategies, Nashville TN, April 1999.

82. Invited Lecturer, New Antibiotic Strategies, Fort Lauderdale FL, April 1999.

83. Invited Lecturer, New Antibiotic Strategies, Miami Beach FL, April 1999.

84. Invited Lecturer, New Antibiotic Strategies, Washington DC, March 1999.

85. Invited Lecturer, New Antibiotic Strategies, Florence SC, February 1999.

86. Invited Lecturer, New Antibiotic Strategies, Miami FL, January 1999.

87. Invited Lecturer, New Antibiotic Strategies, Savannah GA, January 1999.

88. Invited Lecturer, University of Central Florida Pre-Professional Medical Society, Gainesville FL, January 1999.

89. Invited Lecturer, Nova Southeastern University, Davie FL, January 1999.

90. Invited Lecturer, Surgical Grand Rounds, Mt. Sinai Medical Center, Miami Beach FL, January 1999.

91. Invited Lecturer, Trauma Team 98 Conference, Orlando Regional Healthcare System, Orlando, FL, October 1998.

92. Invited Lecturer, Grand Rounds, Department of Surgery, University of Florida Health Science Center, Jacksonville, FL, October 1998.

93. Invited Lecturer, Grand Rounds, Department of Surgery, University of South Alabama, Mobile, AL, September 1998.

94. Invited Lecturer, Deep Vein Thrombosis Prophylaxis and Vena Cava Filter Insertion, Sparrow Hospital, Lansing, MI, June 1998.

95. Invited Lecturer, Ventilation Care - A Trauma Surgeons Prospective - Multidisciplinary Trauma Conference, North Broward Medical Center, Pompano Beach, FL, May 1998.

96. Invited Lecturer, Pelvic Care - A Trauma Surgeons Prospective, 2nd Annual First There First Care EMS Conference, sponsored by Broward County EMS, Margate, FL, May 1998.

97. Invited Lecturer, Trauma Center Implementation, Holmes Regional Medical Center, Melbourne, FL, March 1998.

## **Invited Presentations:**

1. Podium Presentation, History of Medicine- Robert Zeppa: A Southern Transplant that Survived. Southern Surgical Congress, December 2008.

2. Presentation, Project CARGO, Olson Middle School, Dania, FL, May 2000.

3. Video Presentation – WLRN Channel 17, "Protecting America's Children", Miami, FL, April 2000.

4. Presentation, "Tough Trauma Talk", Leadership Hollywood Organization, Holly, FL, March 2000.

5. Presentation, Project CARGO, Davie FL, November 1999.

6. Presentation, Project CARGO, Miramar FL, May 1999.

7. Presentation, Project CARGO, Pembroke Pines FL, February 1999.

## **Other**

8.    Participant – Antifungal Speaker Training Workshop for Surgeons – Chicago July 28th-29th, 2006

9.    Invited Senior Site Surveyor for the Pennsylvania Trauma Foundation – Temple University Trauma Center and Albert Einstein Trauma Center, Pennsylvania June 7th – 9th, 2006

10.   Moderator, ABS Oral Exams – Tampa, FL, December 11th, 2005

11.   Moderator, ACS Clinical Congress,: "Trauma Video", San Francisco, October 17-29th, 2005.

12.   Moderator "Colloquim for Decubiti", Boardroom, Shands Hospital, August 12th, 2005.

13.   Pocket Chart Demo – Topic: "How it increase revenues through electronic charge capture system" for Laura Wilson – the new Director of Business Development for the Vascular, TCV & Plastic Surgery Divisions – Dragstedt Conference Room, April 13th, 2005.

14.   CardioQ Inservice, March 15th, 2005.

15.   Course Instructor – Ultrasound, Sacred Heart Hospital, Pensacola, FL. July 2001.

16.   Course Instructor – Ultrasound, Clarion Methodist Hospital, Indianapolis,   IN. May 2001.

17.   Course Director for the Memorial Regional Hospital Annual Trauma Symposium, Ft. Lauderdale, FL, 1994-2003.

18.   Reviewer for North Carolina Office of Emergency Medical Services for Level I Trauma Center Renewals, March 2000.

19.   Director, MRH Trauma Symposium, Fort Lauderdale, FL, February 2000.

20.   Reviewer for American College of Surgeons Committee on Trauma.

21.   Verification/Consultation Program for Hospitals, March 1999, June 1999, July 1999, November 1999.

22.   Director, Trauma Symposium, Ft, Lauderdale FL, February 1999.

23.   Director of Ultrasound in Trauma Course, Memorial Regional Hospital Annual Trauma Symposium, Ft. Lauderdale, FL, 1996-1998.

24.   Guest Panelist, Implementation of the Trauma System, Michigan Committee on Trauma Meeting, Gaylord, MI, June 1998.

25.   Guest Panelist, Homicide Investigators Seminar, co-sponsored by the Broward County State Attorneys Office and the Medical Examiners Office, Ft. Lauderdale, FL, May1998.

26.    Instructor, Refresher Course on Advanced Surgical Airway Management, Broward County Fire Rescue Flight Medic Program, April 1998.

27.    Guest Examiner for the American Board of Surgery, Miami, FL  1990.

## COMMITTEE MEETINGS

### *National:*

1. ACS Annual Meeting, Washington DC, October 6-9, 2013.

2. Leadership / Joint Advocacy Meeting, Washington, DC, March 22, 2009

3. Committee on Trauma Meeting, Chicago, IL, March 18, 2009

4. ACS Annual Meeting, San Fransisco, CA October 12, 2008

5. AAST Annual Meeting, Maui, HI, September 23,2008

6. AAMC – SGEA Master Educator, Nashville, TN, April 3, 2008

7. ACS Annual Meeting – Chicago, - October 8-11th, 2006

8. AAST Annual Meeting – New Orleans, - September 27-29th, 2006

9. ACS COT Annual Meeting – Chicago, IL – March 16th, 2006

10. ACS Leadership Conference – Washington, DC – June 12th, 2005

11. American College of Surgeons Annual Meeting – Washington, DC – March 3rd, 2005

12. Pan American Trauma Society Conference Meeting – Miami, FL – November 17th, 2004

13. ACS Site Survey – Evansville, Indiana – October 14th, 2004

14. American College of Surgeons Clinical Congress National Trauma Meeting – New Orleans, LA – October 10th, 2004

### *Regional*

1. EAST Annual Conference, Naples, FL, January 13-18, 2014.

2. Southeastern Surgical Congress, Atlanta, GA. February 11, 2009

3. EAST Annual Conference – Orlando, FL, January 12, 2009

4. IHI Annual Form, Nashville, TN, December 18, 2008

5. Southern Surgical Association Annual Meeting, Palm Beach, FL November 30, 2008

6. Southeastern Surgical Congress, Birmingham, AL, February 9, 2008

7. Southeastern Surgical Congress, Savannah, GA, February 10, 2007.

8. Southern Surgical Association, Palm Beach, FL, December 3, 2006

9. Southern Surgical Association Conference – Hot Springs, VA – December 4th, 2005

10. Dori 9 & 10 Investigators Meeting – Atlanta, GA – February 2nd, 2005

11. Eastern Association for the Surgery of Trauma Meeting – Fort Lauderdale, FL – January 11th, 2005.

12. Southern Surgical Committee Meeting – Palm Beach, FL – December 4th, 2004.

13. EAST Site Evaluation – Fort Lauderdale, FL – November 4th, 2004.

*State*

1. FL Committee on Trauma Meeting, Tampa, FL, October 24-25, 2013.

2. FL Chapt American College of Surgeons, Palm Coast, FL May 20, 2009

3. Air Medical Safety Summit, Clermont, FL May 1, 2009

4. Life Quest Advisory Meeting, Jacksonville, FL February 5, 2009

5. FL Disaster Management Program, Miami, FL November 24, 2008

6. FL Disaster Management Program, Tallahassee, FL November 20, 2008

7. FL Chapt. American College of Surgeons, Palm Beach, FL May 22, 2008

8. FL Chapt. American College of Surgeons, Palm Beach, FL, May 24,2007

9. FL COT Annual Meeting, Jacksonville, FL, January 24,2007

10. FCOT - Fire Rescue East – Jacksonville, FL – January 26th, 2006

11. Rule Development Workshop - Tampa, FL - October 31st, 2005

12. DOH Leadership Team & North Carolina Trauma Team - Tallahassee, FL - August 15th, 2005.

13. Alcohol Impaired Drivers Conference - Raddison Hotel Ronald Regan Airport - July 18th, 2005.

14. State EMS Meetings/FCOT Meeting – Orlando, FL - July 5-7th, 2005

15. CDC/HRSA Statewide Advisory Board Meeting – Orlando, FL – April 21st, 2005.

16. Emergency Medicine & Trauma Surgery joint Journal Club Meeting – 706 Restaurant, Gainesville, FL – April 19th, 2005.

17. EMS Advisory Council Meeting – Tallahassee, FL – April 13th, 2005.

18. ED Meeting – Orlando, FL – March 29th, 2005.

19. Trauma Office Meeting – Tallahassee, FL – March 22nd, 2005.

20. Trauma Registry Meeting – Tampa Airport, Tampa FL – March 11th, 2005.

21. Current Trends in Trauma and Critical Care Meeting – St. Petersburg, FL – February 18th, 2005.

22. State AFTC Meeting – Tallahassee, FL – February 2nd, 2005.

23. Trauma Study Board Meeting – Shands Jacksonville, FL – January 7th, 2005.

24. Trauma Study Board Meeting – Tampa, FL – October 28th, 2004.

25. Orthopedic Trauma Association Meeting – Fort Lauderdale, FL – October, 8th, 2004

26. Florida Committee Meeting on Trauma Annual Meeting – Orlando, FL - July 7th, 2004

*Institutional*

1. Texas Trauma Conference, Ft Worth, TX, April 22, 2009

2. Navigating the Future of Trauma – St Petersburg, FL – February 23rd, 2006

# **Fee Schedule**

**Lawrence Lottenberg, MD FACS**
**General Surgery**
**Trauma, Acute Care Surgery, Surgical Critical Care**
**Board Certified American Board of Surgery**
**Added Qualifications Surgical Critical Care**
**lawrence.lottenberg@gmail.com**

Fee schedule is as follows:

| | |
|---|---|
| Phone/Office Conference | $750.00  per hour (one hour minimum) |
| Case/chart review and response prep | $750.00  per hour |
| Narrative | $750.00  per hour |
| Deposition time | $950.00  per hour |
| Courtroom testimony | $1200.00 per hour |
| Independent Medical Examination | $1500.00 per hour |

If required, travel and waiting time is billed at the lowest rate not exceeding eight hours/day. These fees do not include travel, lodging, clerical or other ordinary expenses. Cancellation must be made two weeks in advance or $1000.00 rescheduling fee will be assessed.

Checks should be made payable to **Lawrence Lottenberg, MD PA**

The tax ID number is **37-1775105**

Please send check(s) to the following address:

Lawrence Lottenberg, MD
159 Darby Island Pl
Jupiter FL 33458

Please call for questions: 352-4942440

# **Fee Schedule**

**Lawrence Lottenberg, MD FACS**
**General Surgery**
**Trauma, Acute Care Surgery, Surgical Critical Care**
**Board Certified American Board of Surgery**
**Added Qualifications Surgical Critical Care**
**lawrence.lottenberg@gmail.com**


Fee schedule is as follows:

| | |
|---|---|
| Phone/Office Conference | $750.00  per hour (one hour minimum) |
| Case/chart review and response prep | $750.00  per hour |
| Narrative | $750.00  per hour |
| Deposition time | $950.00  per hour |
| Courtroom testimony | $1200.00 per hour |
| Independent Medical Examination | $1500.00 per hour |

If required, travel and waiting time is billed at the lowest rate not exceeding eight hours/day. These fees do not include travel, lodging, clerical or other ordinary expenses. Cancellation must be made two weeks in advance or $1000.00 rescheduling fee will be assessed.

Checks should be made payable to **Lawrence Lottenberg, MD PA**

The tax ID number is **37-1775105**

Please send check(s) to the following address:

Lawrence Lottenberg, MD
159 Darby Island Pl
Jupiter FL 33458

Please call for questions: 352-4942440

## PRIOR EXPERT TESTIMONY IN PREVIOUS 4-YEARS

1. Wilbur, Anthony v. Orlando Health, Inc. (68103-5).

2. Rey, Lissette a/p/r of the Estate of Jose Rey vs. Kendall Regional Medical Center.

437075 FONTE

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | AUDIO TRANSCRIPTION |
| 6 | FILE:   437075 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 2

1    SPEAKER: Can you open up the (inaudible) —
2    TRISH: Transfer Center; this is Trish.
3    SPEAKER: Okay. Hold on.
4    DR. HEISLER: Hello?
5    TRISH: Hi, Dr. Heisler.
6    DR. HEISLER: Hey.
7    TRISH: All right. So let me get Dr. Fonte with
8    trauma —
9    DR. HEISLER: Thanks.
10    TRISH: — on the line. Okay?
11    DR. HEISLER: Thank you.
12    TANYA: SIC, (phonetic) this is Tanya; can I help
13    you?
14    TRISH: Hi. I was looking for Dr. Fonte, please.
15    TANYA: Okay. Hold on.
16    SPEAKER: Is it for me?
17    SPEAKER: (Inaudible).
18    DR. FONTE: Hello. Dr. Fonte?
19    TRISH: Dr. Fonte, it's Trish at the Transfer
20    Center; I've got Dr. Heisler on the phone —
21    DR. FONTE: Okay.
22    TRISH: — from Lee High. Hold on.
23    Dr. Heisler, I've got Dr. Fonte from trauma.
24    DR. HEISLER: Hey.
25    DR. FONTE: Hey; how are you?

Page 3

1    DR. HEISLER: Hey. So we're getting a — like an
2    intermittent pulse on this child. He goes in — in and out
3    of PEA and we did a chest x-ray; I don't see any pneumos.
4    We did get him intubated. We're repeating his chest x-ray.
5    It did look like he probably had some pulmonary contusion.
6         His abdomen's got bruising on that, as well as his
7    chest. And his abdomen does seem to be expanding.
8         I just — I don't think he is stable enough to —
9    to go up to Tampa. I think that, you know, he would
10    require to go to you and then be transferred up there.
11    DR. FONTE: The problem, Hope, is — is I don't
12    have pediatric services here, and he's five. So — you
13    know, when we get five-year-olds and stabilize them enough
14    to transfer anywhere, we send them to Tampa.
15         So it would be —
16    DR. HEISLER: Right.
17    DR. FONTE: — you know, it would be negligent of
18    me to accept a patient to a — you know, to — to us, as
19    opposed to trying to get him to the appropriate facility,
20    which would be the pediatric trauma center.
21    DR. HEISLER: Right. Even if he's not really
22    stabilized enough to — to go up there?
23         I mean, I feel like he needs another step of
24    stabilization prior to going there; and I know, you know,
25    we've done that in the past.

Page 4

1    DR. FONTE: Right. I guess my —
2    DR. HEISLER: Right.
3    DR. FONTE: — my concern is, is if I — if I
4    can't do anything for him, then — then we've delayed his
5    transfer to the appropriate facility instead of trying to
6    get him there.
7         You know, you've got — so you said you've got
8    no — no pneumothoraxes, right? So it's not like —
9    DR. HEISLER: Right.
10    DR. FONTE: — it's a —
11    DR. HEISLER: But it looks like pulmonary —
12    bilateral pulmonary contusions —
13    DR. FONTE: Right.
14    DR. HEISLER: — and he keeps going into PEA.
15    We've got, you know, a couple of lines going in with a — a
16    — you know, fluids going —
17    DR. FONTE: Right. Right.
18    DR. HEISLER: — you know, and everything that we
19    can do here; but his abdomen is, you know, starting to
20    distend and — you know, I just — the time it's going to
21    take to transfer him to Tampa, I just feel like, you know,
22    he needs to go to the closest trauma facility.
23    DR. FONTE: But he needs to go to the closest
24    appropriate trauma facility, I guess is my point.
25         I — you know, I — I just —

Page 5

1    (Talking simultaneously.)
2    DR. HEISLER: Yeah. I mean —
3    DR. FONTE: — I don't want to —
4    DR. HEISLER: — they would have diverted to you
5    though if he had a pulse; which he did —
6    DR. FONTE: Right. Right.
7    DR. HEISLER: — initially on scene —
8    DR. FONTE: Right. Right. Right.
9    DR. HEISLER: Now that he has a pulse, he would
10    have — you know, normally come to you anyway; and then he
11    would have gone up there (inaudible).—
12    DR. FONTE: No. No. So — so the — so the way
13    it goes, it's like — it's like a burn, right?
14    DR. HEISLER: Yeah.
15    DR. FONTE: You don't send us burns. Burns go up
16    to Tampa. And so — you know, when you've got a five— — I
17    mean, if you said: Look, he's 16-years-old, but he's adult
18    sized —
19    DR. HEISLER: Right.
20    DR. FONTE: — that's different. You know what I
21    mean?
22    DR. HEISLER: Right.
23    DR. FONTE: But when you're talking about a
24    five-year-old —
25    DR. HEISLER: Right.

Page 6

1    DR. FONTE: -- you know, we don't have a
2    pediatric facility at my campus. Right?
3    DR. HEISLER: Right.
4    DR. FONTE: So we deal -- if it comes in, and
5    it's an emergency, and I need to do what I need to do, we
6    do it.
7    DR. HEISLER: Yeah. Right.
8    DR. FONTE: But at this point, I'm taking a
9    transfer, and it just --
10    DR. HEISLER: Right.
11    DR. FONTE: -- you know, we're not the
12    appropriate facility for that --
13    DR. HEISLER: Right.
14    DR. FONTE: -- just like I wouldn't take a burn;
15    it doesn't make sense for us to --
16    DR. HEISLER: Right.
17    DR. FONTE: -- take him and -- and
18    (inaudible) --
19    (Talking simultaneously.)
20    DR. HEISLER: So -- I mean, you would --
21    DR. FONTE: Yeah. Yeah. I have a (inaudible) --
22    (Talking simultaneously.)
23    DR. HEISLER: -- (inaudible) bleeding into his
24    belly?
25    Huh? Okay. Yeah. It was diminished on the left;

Page 7

1    tell him to pull back.
2    Okay.
3    DR. FONTE: Yeah. I would say try to -- try to
4    get him up there as quickly as possible so that they can
5    do -- I mean, they've got the pediatric surgeons; they've
6    -- you know, they've got the pediatric interventionalist,
7    so like if --
8    DR. HEISLER: Uh-huh.
9    DR. FONTE: -- it's the liver, they can embolize
10    it. I don't have pediatric embolization catheters --
11    DR. HEISLER: (Inaudible) --
12    (Talking simultaneously.)
13    DR. FONTE: -- you know what I mean? So that
14    sort of thing.
15    DR. HEISLER: All right.
16    DR. FONTE: And I don't want to waste time if --
17    you know, you've got him back and you've got -- you know,
18    you've got vitals, then let's try to get him to the
19    appropriate facility --
20    DR. HEISLER: Yeah.
21    DR. FONTE: -- where they have all the --
22    (Talking simultaneously.)
23    DR. HEISLER: They're back, but they keep coming
24    and going; that's what I'm saying --
25    DR. FONTE: Yeah. Yeah. Yeah.

Page 8

1    DR. HEISLER: He's not really stable-stable.
2    He's in and out; so that's the reason why I wanted to go to
3    you guys.
4    But if you, you know, don't want to accept him,
5    I'll have to call Tampa.
6    DR. FONTE: I just think he needs to go to the
7    appropriate facility --
8    DR. HEISLER: All right. --
9    DR. FONTE: -- from the get-go. Okay?
10    DR. HEISLER: All right.
11    DR. FONTE: All right.
12    DR. HEISLER: Thanks.
13    DR. FONTE: Uh-huh.
14    (End of the recording.)
15
16
17
18
19
20
21
22
23
24
25

Page 9

1    C E R T I F I C A T E
2
3    I, JACKIE MENTECKY, do hereby certify that I was
4    authorized to transcribe the foregoing recorded proceeding, and
5    that the transcript is a true and accurate transcription of my
6    shorthand notes to the best of my ability taken while listening
7    to the provided recording.
8
9    Dated this 8th day of January, 2020.
10
11
12
13
14
15    JACKIE MENTECKY
16
17
18
19
20
21
22
23
24
25

3. Rule Development Workshop – Tampa, FL - August 10th, 2005.

4. National Steering Committee Meeting for Trauma Study, Participant: Tampa, FL - June 24th, 2005.

5. National Steering Committee Meeting for Trauma Study – Tampa, FL – June 24th, 2005.

6. Senate Chambers Meeting – Tallahassee, FL – February 2nd, 2005.

7. Gainesville Sun Editorial Board Meeting – Gainesville, FL – January 27th, 2005.

8. Pharmacy & Therapeutics Committee Meeting – Topic: "Possible addition of Dexmedetomidine (Precedex) in the Formulary" – Shands/UF – January 18th, 2005.

9. CCM Journal Club Meeting – Steve's Café American – December, 14th 2005.

10. ICU Improvement Committee CY – Shands/UF Room 2154 – September 23rd, 2004.

## CERTIFICATES/AWARDS

1. Raymond H. Alexander, MD Award Florida Chapter of the American College of Surgeons "In Recognition of outstanding dedication and service to the medical profession in the field of surgery" (2013)
2. Outstanding Faculty Award/General Surgery "In Recognition of Academic Excellence In Service to Housestaff & Students" (2008-2009).
3. Certificate of Appreciation for the "Contributions as a Clinical Preceptor to the College of Nursing (2004-2005).
4. Outstanding Faculty Award/General Surgery "In Recognition of Academic Excellence In Service to Housestaff & Students" (2004-2005).

## PERSONAL INTERESTS
- Second Degree Black Belt GoJu Karate.
- Handheld Computer Technology and Software Development.
- Deep Sea Fishing.
- Avid Miami Dolphins and Florida Gators Football Fan.
- Avid Florida Gators Fan

# **Fee Schedule**

**Lawrence Lottenberg, MD FACS**
**General Surgery**
**Trauma, Acute Care Surgery, Surgical Critical Care**
**Board Certified American Board of Surgery**
**Added Qualifications Surgical Critical Care**
**lawrence.lottenberg@gmail.com**

Fee schedule is as follows:

| | |
|---|---|
| Phone/Office Conference | $750.00  per hour (one hour minimum) |
| Case/chart review and response prep | $750.00  per hour |
| Narrative | $750.00  per hour |
| Deposition time | $950.00  per hour |
| Courtroom testimony | $1200.00 per hour |
| Independent Medical Examination | $1500.00 per hour |

If required, travel and waiting time is billed at the lowest rate not exceeding eight hours/day. These fees do not include travel, lodging, clerical or other ordinary expenses. Cancellation must be made two weeks in advance or $1000.00 rescheduling fee will be assessed.

Checks should be made payable to **Lawrence Lottenberg, MD PA**

The tax ID number is **37-1775105**

Please send check(s) to the following address:

Lawrence Lottenberg, MD
159 Darby Island Pl
Jupiter FL 33458

Please call for questions: 352-4942440

# **Fee Schedule**

**Lawrence Lottenberg, MD FACS**
**General Surgery**
**Trauma, Acute Care Surgery, Surgical Critical Care**
**Board Certified American Board of Surgery**
**Added Qualifications Surgical Critical Care**
**lawrence.lottenberg@gmail.com**

Fee schedule is as follows:

| | |
|---|---|
| Phone/Office Conference | $750.00  per hour (one hour minimum) |
| Case/chart review and response prep | $750.00  per hour |
| Narrative | $750.00  per hour |
| Deposition time | $950.00  per hour |
| Courtroom testimony | $1200.00 per hour |
| Independent Medical Examination | $1500.00 per hour |

If required, travel and waiting time is billed at the lowest rate not exceeding eight hours/day. These fees do not include travel, lodging, clerical or other ordinary expenses. Cancellation must be made two weeks in advance or $1000.00 rescheduling fee will be assessed.

Checks should be made payable to **Lawrence Lottenberg, MD PA**

The tax ID number is **37-1775105**

Please send check(s) to the following address:

Lawrence Lottenberg, MD
159 Darby Island Pl
Jupiter FL 33458

Please call for questions: 352-4942440

# Invoice

# Dr. Nelayda Fonte v. Lee Memorial Health System

**Benjamin H. Yormak, Esq.**
**Yormak Employment & Disability Law**
**9990 Coconut Road**
**Bonita Springs, FL 34135**

**Lawrence Lottenberg, MD FACS**
**General Surgery**
**Trauma, Acute Care Surgery, Surgical Critical Care**
**Board Certified American Board of Surgery**
**Added Qualifications Surgical Critical Care**
**lawrence.lottenberg@gmail.com**

Phone/Office Conference  (3 hours) @               $750.00  per hour ...$2250

Case/chart review and response prep (3 hours)@  $750.00  per hour ...$3000

Narrative (1 hours) @                             $750.00  per hour...$ 750

# TOTAL ...........................................................$6000

**Additional Estimates for further reviews or deposition or court testimony per written fee schedule per hour**

Check should be made payable to **Lawrence Lottenberg, MD PA**

The tax ID number is **37-1775105**

Please send check(s) to the following address:

Lawrence Lottenberg, MD
159 Darby Island Pl
Jupiter FL 33458